Nos. 24-2230 & 24-2236

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RISHI SHAH AND SHRADHA AGARWAL,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Judge Thomas M. Durkin
(No. 1:19-cr-00864)

## OPENING BRIEF AND REQUIRED SHORT APPENDIX FOR DEFENDANT-APPELLANT SHRADHA AGARWAL

Eugene A. Sokoloff
　*Counsel of Record*
Megan Cunniff Church
Kenneth E. Notter III
Peter C. Douglas
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone: (312) 450-6718
esokoloff@mololamken.com

*Counsel for Defendant-Appellant Shradha Agarwal*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2236_____

Short Caption: USA v. Shradha Agarwal_____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Shradha Agarwal

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    MoloLamken LLP; Larson LLP; McGuire Woods LLP; Blegen & Garvey; Law Office of John D. Cline;

    Kasting, Kauffman & Mersen, PC; Wilkie Farr & Gallagher LLP; Blegen & Associates

(3)    If the party, amicus or intervenor is a corporation:

        i)    Identify all its parent corporations, if any; and

            n/a

        ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Eugene A. Sokoloff_____    Date: 4/4/2025

Attorney's Printed Name: Eugene A. Sokoloff_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]    No [ ]

Address: 300 North LaSalle St., Suite 5350

    Chicago, IL 60654

Phone Number: 312.450.6718_____    Fax Number: 312.450.6701

E-Mail Address: esokoloff@mololamken.com

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-2236_____

Short Caption: USA v. Shradha Agarwal_____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Shradha Agarwal

_____

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

MoloLamken LLP; Larson LLP; McGuire Woods LLP; Blegen & Garvey; Law Office of John D. Cline;

Kasting, Kauffman & Mersen, PC; Wilkie Farr & Gallagher LLP; Blegen & Associates

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

n/a

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

_____

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

_____

Attorney's Signature: /s/ Megan Cunniff Church_____ Date: 4/4/2025_____

Attorney's Printed Name: Megan Cunniff Church_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 300 North LaSalle St., Suite 5350_____

Chicago, IL 60654_____

Phone Number: 312.450.6716_____ Fax Number: 312.450.6701_____

E-Mail Address: mchurch@mololamken.com_____

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-2236_____

Short Caption: USA v. Shradha Agarwal_____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Shradha Agarwal_____

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

MoloLamken LLP; Larson LLP; McGuire Woods LLP; Blegen & Garvey; Law Office of John D. Cline;

Kasting, Kauffman & Mersen, PC; Wilkie Farr & Gallagher LLP; Blegen & Associates

(3)    If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and

        N/A_____

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A_____

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A_____

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A_____

---

Attorney's Signature: /s/ Kenneth E. Notter III_____ Date: 4/4/2025_____

Attorney's Printed Name: Kenneth E. Notter III_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 300 North LaSalle St., Suite 5350_____

Chicago, IL 60654_____

Phone Number: 312.450.6715_____ Fax Number: 312.450.6701_____

E-Mail Address: knotter@mololamken.com_____

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2236_____

Short Caption: USA v. Shradha Agarwal_____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Shradha Agarwal_____

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

MoloLamken LLP; Larson LLP; McGuire Woods LLP; Blegen & Garvey; Law Office of John D. Cline;

Kasting, Kauffman & Mersen, PC; Wilkie Farr & Gallagher LLP; Blegen & Associates

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A_____

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A_____

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A_____

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A_____

---

Attorney's Signature: /s/ Peter Douglas_____    Date: 4/4/2025_____

Attorney's Printed Name: Peter Douglas_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]    No [✓]

Address: 300 North LaSalle St., Suite 5350_____

Chicago, IL 60654_____

Phone Number: 312.450.6719_____    Fax Number: 312.450.6701_____

E-Mail Address: pdouglas@mololamken.com_____

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT..........................................................3

STATEMENT OF ISSUES .......................................................................4

STATEMENT OF THE CASE ..................................................................4

    A.    Ms. Agarwal's Brief Role in Advertising Sales at Outcome...................5

    B.    Ms. Agarwal Transitions Away from Advertising Sales ........................9

    C.    The Indictment ...................................................................11

    D.    The Government's Concededly Unlawful Restraint of Assets ............11

    E.    The Government's Case Against Ms. Agarwal.....................................12

        1.    The Government Jettisons Its Key Witness Against Ms. Agarwal ..............................................................14

        2.    The Government Tries to Backstop Its "Groundwork" Theory.................................................15

        3.    The Government Cabins Its Case Against Ms. Agarwal .........17

        4.    The Government Urges a Sweeping View of Fraud .................21

    F.    Verdict and Post-Trial Proceedings.........................................22

    G.    Sentencing............................................................................23

SUMMARY OF ARGUMENT ...............................................................24

ARGUMENT...........................................................................................27

I.    Vacatur Is Required Because the Instructions Allowed the Jury to Convict on Multiple Legally Insufficient Theories .........................................27

    A.    The Government Urged the Jury to Convict on the Invalid Theory That "Under-delivering" on a Contract Is Fraud....................29

B.    The Government Urged the Jury to Convict on the Invalid Theory That "Overselling" to Obtain a Contract Is Fraud ................. 33

    1.    The Government Had to Prove Intent to Deprive Outcome's Advertisers of the Benefit of the Contractual Bargain ....................................................... 34

    2.    The Government Conceded That Ms. Agarwal Never Intended to Deprive Outcome's Advertisers of the Benefit of Their Contracts ........................................... 37

    3.    The Allegedly Fraudulent List Matches Cannot Support the Convictions Either .................................................. 39

C.    The Instructions Did Nothing to Prevent Conviction on the Government's Invalid Theories ............................................... 40

D.    Because Every Count Could Have Rested on One of the Government's Invalid Theories, Vacatur Is Required ........................ 43

II.    Alternatively, Ms. Agarwal's Convictions Rest on Improperly Admitted Grand-Jury Testimony .................................................. 44

A.    The Untainted Evidence Against Ms. Agarwal Could Not Support Conviction ................................................... 45

B.    The Government Cannot Meet Its Burden to Show That the Improperly Admitted Evidence Did Not Influence the Verdict ........ 48

III.    The Government's Illegal Restraint of Untainted Funds Violated Ms. Agarwal's Right to Counsel of Her Choice ............................... 52

CONCLUSION ............................................................... 54

# TABLE OF AUTHORITIES

Page(s)

CASES

*Chapman v. California,*
   386 U.S. 18 (1967) ................................................................. 52

*Ciminelli v. United States,*
   598 U.S. 306 (2023) ......................................................... 35, 40

*Corley v. Rosewood Care Ctr., Inc. of Peoria,*
   388 F.3d 990 (7th Cir. 2004) ............................... 2, 27, 30, 31

*Durland v. United States,*
   161 U.S. 306 (1896) ............................................... 2, 30, 33

*Evans v. United States,*
   153 U.S. 584 (1894) ............................................................. 33

*Greyer v. Illinois Dep't of Corr.,*
   933 F.3d 871 (7th Cir. 2019) ............................................. 30

*Kelly v. United States,*
   590 U.S. 391 (2020) ............................................................ 35

*Kotteakos v. United States,*
   328 U.S. 750 (1946) ............................................................ 52

*Neder v. United States,*
   527 U.S. 1 (1999) ......................................................... 35, 38

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.,*
   822 F.3d 650 (2d Cir. 2016) ...................................... 30, 31, 32

*Perlman v. Zell,*
   185 F.3d 850 (7th Cir. 1999) ....................................... 2, 30

*Turner v. United States,*
   693 F.3d 756 (7th Cir. 2012) ............................................. 29

*United States v. Batio,*
   No. 21-3195, 2023 WL 8446388 (7th Cir. Dec. 6, 2023) ......................................... 43

*United States v. Blagojevich,*
    794 F.3d 729 (7th Cir. 2015) ....................................................... 3, 28, 33, 42

*United States v. Borrero,*
    771 F.3d 973 (7th Cir. 2014) ............................................................ *passim*

*United States v. Bradley,*
    628 F.3d 394 (7th Cir. 2010) ..................................................................... 54

*United States v. Chaparro,*
    956 F.3d 462 (7th Cir. 2020) .................................................. 44, 45, 48, 49

*United States v. Cotnam,*
    88 F.3d 487 (7th Cir. 1996) ....................................................................... 51

*United States v. Griffin,*
    76 F.4th 724 (7th Cir. 2023) .............................................................. 35, 40

*United States v. Johnson,*
    43 F.4th 771 (7th Cir. 2022) ..................................................................... 52

*United States v. Kelerchian,*
    937 F.3d 895 (7th Cir. 2019) ........................................................... *passim*

*United States v. Leahy,*
    464 F.3d 773 (7th Cir. 2006) .................................................. 36, 37, 38, 39

*United States v. Lee,*
    558 F.3d 638 (7th Cir. 2009) .............................................................. 41, 42

*United States v. Milheiser,*
    98 F.4th 935 (9th Cir. 2024) .............................................................. 28, 35

*United States v. Miller,*
    673 F.3d 688 (7th Cir. 2012) .............................................................. 48, 51

*United States v. Newton,*
    76 F.4th 662 (7th Cir. 2023) .............................................................. 52, 53

*United States v. Pigee,*
    197 F.3d 879 (7th Cir. 1999) ..................................................................... 53

*United States v. Sadler,*
  750 F.3d 585 (6th Cir. 2014) ................................................................. 35

*United States v. Segal,*
  644 F.3d 364 (7th Cir. 2011) ................................................................. 29

*United States v. Shelton,*
  997 F.3d 749 (7th Cir. 2021) ................................................................. 49

*United States v. Takhalov,*
  827 F.3d 1307 (11th Cir. 2016) ............................................................. 35

*United States v. Wahi,*
  850 F.3d 296 (7th Cir. 2017) ................................................................. 40

*United States v. Yermian,*
  468 U.S. 63 (1984) ................................................................................. 48

*Yates v. United States,*
  354 U.S. 298 (1957) ........................................................................ 28, 41

## Statutes

8 U.S.C. § 1101(a)(43)(M)(i) ....................................................................... 23

8 U.S.C. § 1182(a)(2) .................................................................................... 23

8 U.S.C. § 1226(c) ........................................................................................ 23

18 U.S.C. § 1341 ..................................................................................... 11, 35

18 U.S.C. § 1343 ..................................................................................... 11, 35

18 U.S.C. § 1344 ..................................................................................... 11, 35

18 U.S.C. § 3143(b) ...................................................................................... 24

18 U.S.C. § 3231 ............................................................................................. 3

18 U.S.C. § 3742 ............................................................................................. 3

28 U.S.C. § 1291 ............................................................................................. 3

## INTRODUCTION

When reports emerged of fraud at Outcome Health, a company that delivered health-related educational content and advertising to doctors' waiting rooms, the government looked for someone in management to blame. That search swept up Shradha Agarwal, a person who, the government later admitted, strived to build Outcome into a company dedicated to "serving patients and doing good for society."

The government initially urged that Ms. Agarwal "planted the seeds" of the fraud, directing staff to entice advertisers by misrepresenting the number of doctors in Outcome's network. But the evidence did not support that theory. The government was forced to disavow its star witness against Ms. Agarwal, and there was little else incriminating her personally. By closing arguments, prosecutors had demoted her from one of the fraud's architects to its "enthusiastic supporter." By sentencing, the government struggled to go even that far, admitting that Ms. Agarwal's role in key aspects of the alleged scheme was "very minimal" or "nonexistent."

Its case narrowed by the evidence, the government pressed a sweeping theory of fraud. "Anytime" Outcome failed to deliver the contracted-for number of ads, the government asserted, "they're making a false promise about what they're going to deliver." Just one such "false" promise, the government told the jury, was enough to establish a scheme and intent to defraud under the federal mail, wire, and bank fraud statutes. That is not the law and never has been. It has been crystal clear for 130 years that the fraud statutes do not criminalize contractual "promises" without proof that the

promisor intended never to perform. *See Durland v. United States*, 161 U.S. 306, 312-14 (1896); *accord Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999). Yet the government urged (and the instructions permitted) the jury to convict without such proof.

Worse, the government argued that Ms. Agarwal's efforts to *deliver* what Outcome promised were evidence of fraud. That is backwards. Not even *breaches* of contract are evidence of fraud. *See Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1007 (7th Cir. 2004). Efforts to perform contradict any inference of fraudulent intent. Yet the government persuaded the trial court to instruct the jury that Ms. Agarwal's intent to perform was no defense. The jury, following those instructions, could have convicted Ms. Agarwal on 15 counts of fraud even if it found (as it likely did) that she had done no more than make ambitious promises.

The government's false-promise theory was not the only legally invalid theory it presented. The government also urged the jury to convict Ms. Agarwal for misrepresenting the size of Outcome's network to secure advertising contracts. That is not a crime, either. The federal fraud statutes protect "'*property*'"—they are not there to save people from "'transactions they would otherwise avoid.'" *United States v. Kelerchian*, 937 F.3d 895, 910, 912 (7th Cir. 2019) (emphasis added). Without proof that Ms. Agarwal intended *not* to deliver what Outcome's advertisers bargained for, there could be no proof of an intent to deprive Outcome's advertisers of a protected property interest and no violation of the federal fraud statutes. Yet the government invited, and the instructions allowed, jurors to convict without such proof.

2

No amount of evidence could cure the error the government's arguments invited. Where, as here, a jury's instructions permit conviction on a "*legally insufficient*" theory, the court "must remand for a new trial, because a jury that followed its instructions might have convicted on the invalid ground." *United States v. Borrero*, 771 F.3d 973, 976-77 (7th Cir. 2014). Even where the evidence supporting a *valid* ground is "overwhelming," a conviction "cannot stand" where the instructions do not permit the court to "be sure" that the jury did not choose the invalid ground. *United States v. Blagojevich*, 794 F.3d 729, 734-35 (7th Cir. 2015).

That rule disposes of this case. The government argued that the jury could "return guilty verdicts for *every count of conviction*" based "solely" on a finding that Ms. Agarwal oversold Outcome's inventory. R. 502 at 34 (emphasis added). Because there is no way for this Court to "be sure" that no juror voted to convict based on a legally defective theory, vacatur is the only option. *Blagojevich*, 794 F.3d at 734-35.[1]

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. The court entered judgment on July 1, 2024, SA23, and Ms. Agarwal timely noticed this appeal on July 12, 2024, SA47.[2] This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

---

[1] In accordance with this Court's order, Doc. 2, Ms. Agarwal fully adopts the arguments for reversal and vacatur set forth in the brief of her co-defendant, Rishi Shah. She addresses those arguments only insofar as necessary to account for her individual circumstances.

[2] This brief uses the following abbreviations: "R.__" refers to the docket number in the district court, "SA__" refers to Ms. Agarwal's required short appendix, "JA__" refers to

**STATEMENT OF ISSUES**

1.      Whether the judgment must be vacated because the jury could have convicted Ms. Agarwal on one or more legally invalid theories.

2.      Whether, in the alternative, the judgment must be vacated because the government cannot prove that the trial court's erroneous admission of hearsay evidence was harmless to Ms. Agarwal.

3.      Whether the judgment must be reversed (or at a minimum, vacated) because the government's admittedly unlawful pre-trial restraint of assets denied Ms. Agarwal her constitutionally guaranteed rights to due process and to counsel of her choosing.

**STATEMENT OF THE CASE**

Ms. Agarwal moved to Chicago in 2004 to study journalism at Northwestern University.  R. 753 at 7, 12.  The government described her as a deeply "charitable person" who "wanted to do the right thing."  R. 850 at 37:14-18, 38:5-11.  Even as a busy student far from home, Ms. Agarwal devoted her spare time to others, volunteering at a Southside nonprofit dedicated to young girls of color and an Evanston-based organization helping underprivileged children prepare for post-secondary education.  R. 753 at 12-13.

---

Appellants' joint supplemental appendix, and "SSA__" refers to Shah's required short appendix.

In 2008, Ms. Agarwal saw an opportunity to combine her commitment to service and her passion for education in a recently formed business, Outcome Health. R.850 at 95:13-15; R.587 at 1631:24. Outcome leveraged technology to bring health-related educational content to the people most likely to benefit from it—patients waiting to see their doctors. *See* R.582 at 237:9-19; R.588 at 1935:8-14.[3]

The company's business model was simple. At no cost to doctors, Outcome stocked waiting and exam rooms with screens (TVs and tablets) that occupied patients with educational videos relevant to their needs. R.582 at 237:9-238:5; R.584 at 570:10-23. To pay for that, Outcome sold advertising space on those screens to pharmaceutical companies. R.582 at 238:4-5.

## A.     Ms. Agarwal's Brief Role in Advertising Sales at Outcome

Ms. Agarwal's principal role at Outcome was overseeing the development of the educational content Outcome delivered and growing the company's workforce. *See* R.850 at 43:1-10. She strived—in the government's words—"to build a company" known worldwide "for serving patients and doing good for society[.]" R.850 at 38:7-10. "[A]ll" of Ms. Agarwal's interest in working at Outcome, the trial court agreed, "related to patient welfare, patient education, working in a startup business, [and] helping people who worked there." R.850 at 95:12-15.

---

[3] The company was founded as ContextMedia but rebranded as Outcome Health. For consistency, we use "Outcome" throughout.

Although the record in this case is too large to summarize here, the government's case against Ms. Agarwal focused on the period from July 2012 to July 2013, when Ms. Agarwal was asked to help the "sponsorship sales" team responsible for selling advertising on Outcome's growing network of offices to pharmaceutical companies. R. 615 at 9170:16-17, 9177:8-20; R. 587 at 1638:10-18; R. 599 at 4840:20-25; R. 947-2 at 1-2 (GX0028).

1.     Part of Outcome's value proposition was its ability to target specific doctors or medical specialties. R. 606 at 6806:15-6807:8. Before contracting for an ad campaign, advertisers would ask Outcome's sponsorship team to provide lists of physicians in its network matching their criteria. R. 584 at 576:4-8, 576:25-577:2, 580:1-5; R. 598 at 4521:1-7, 4522:1-17; R. 608 at 7547:6-7548:6; R. 947-27 at 1 (DX6210); R. 947-30 (DX7566). Some wanted to target physicians who treated certain conditions, R. 584 at 606:20-607:8; others wanted to reach specific providers, R. 584 at 640:1-17.

As a startup building its network from scratch, Outcome did not always have relationships with every physician an advertiser hoped to reach. *See*, *e.g.*, R. 586 at 1323:2-1324:15. So Outcome openly pursued a "sell, then build" strategy. R. 587 at 1652:13-25. When an advertiser wanted to reach physicians who were not yet in Outcome's network, the "membership" team responsible for recruiting would work to fill the gap. R. 585 at 1058:13-1059:10, 1060:16-19.

Because advertisers typically requested "list matches" well before their campaigns were set to run, there was often time for Outcome to grow into a target

area.  R. 598 at 4521:1-7, 4522:1-17; R. 608 at 7547:6-7548:6.  Outcome was constantly

increasing the number of physicians in its network and the number of employees on

the "membership" team responsible for expanding that network.  *E.g.*, R. 587 at

1566:22-1567:2.  With physicians joining nearly every day, a list match that returned

a few hits on Monday might be outdated by Friday, let alone six months later when

a campaign would start.  *See* R. 585 at 970:17-23; R. 587 at 1527:15-18; R. 594 at

3502:3-5; R. 947-21 (GX1067); R. 947-32 (DX8514).

Outcome would build this growth into its dealings with advertisers in two

ways.  Sometimes, Outcome sold campaigns on a "weighted average" basis, meaning

that Outcome would initially reach fewer physicians or screens than the contracted-

for target but would grow into the average by exceeding the target later.  R. 584 at

609:20-610:9; *see* R. 585 at 895:8-897:16 (discussing examples); R. 947-13 (GX0247);

R. 947-34 (DX10099); R. 947-35 (DX10175); R. 947-36 (DX10484).  Other times, Out-

come would include projections in responses to list-match requests, matching adver-

tisers' criteria against a combination of existing "inventory" and physicians expected

to join Outcome's network.  R. 584 at 681:16-24, 682:14-20, 714:17-22.

During Ms. Agarwal's brief involvement from 2012 to 2013, the sponsorship

team worked hard to provide advertisers with real projections, based on real data

and real analysis.  *See* R. 587 at 1525:21-1537:21.  Those projections were based on

several factors.  *See* R. 587 at 1525:21-1537:21.  First, the team assessed the rate at

which new physicians were joining the network.  R. 584 at 633:5-18, 718:4-719:23

(describing methodology); R.947-3 (GX0039). Second, the team looked at where physicians on an advertiser's target list stood in Outcome's membership pipeline—from physicians Outcome had identified for outreach, to physicians who had already joined the network and were waiting for their screens to be installed. R.584 at 593:4-594:6, 681:16-24, 682:14-20, 715:2-7; R.588 at 1768:4-25. Those further in the pipeline were more certain to be online by the time a campaign started. R.584 at 738:16-739:17; R.585 at 924:17-20. Where growth in an area had been slow, the team might include only current inventory and offices already committed but awaiting installation and those very "close" to joining. R.587 at 1534:24-1535:19; R.947-32 (DX8514). Where growth was picking up, the team might reach deeper in the pipeline to include physicians that had not yet committed. *See* R.587 at 1528:2-24, 1530:2-23, 1531:19-1532:9-10.

2. With or without projections, there was always a risk that an advertiser might not reach all the physicians it contracted for. Physicians might drop out of Outcome's network or change practices, or technical issues might prevent the ads from playing. R.592 at 2932:7-2933:10. Outcome's contracts included provisions intended to ensure that advertisers got their money's worth regardless.

For example, Outcome offered a variety of "make-goods" to compensate advertisers if their ads did not play in as many offices as promised. R.583 at 312:5-8, 384:15-17. Outcome might run ads for free for months after the campaign's original

end-date. R.586 at 1345:21-1346:1. Or it might offer a partial refund or credit. R.583 at 386:17-387:2; R.586 at 1344:23-1345:7, 1346:17-1347:12.

The contracts also promised advertisers a return on their investment. These "ROI" provisions promised that the advertiser would earn a set amount—typically $2-3—in prescription or other revenue for every dollar spent on ads. R.583 at 278:1-8; R.947-15 at 1 (GX0349) (3:1 for 2014 Xeljanz campaign); R.947-14 at 1 (GX0343) (2014 Humira campaign); R.947-18 at 2 (GX0536) (2016 Jardiance campaign); R.947-19 at 2 (GX0666) (2017 Xeljanz campaign). If those targets were not met, Outcome would continue to run the ads "at no additional cost," until the guaranteed ROI was reached. *See, e.g.*, R.947-15 at 1 (GX0349).

### B.    Ms. Agarwal Transitions Away from Advertising Sales

The government never disputed that Ms. Agarwal intended and expected that Outcome would meet its projections. Indeed, the government affirmatively argued that Ms. Agarwal and others worked hard to fulfill their promises. *See, e.g.*, R.615 at 9175:12-14. It elicited testimony from Jason Ketchum, the Outcome employee responsible for projections during Ms. Agarwal's brief tenure in sponsorship, that the projections she directed reflected "a good-faith effort" to estimate inventory given the company's rapid expansion. R.584 at 720:3-12; R.586 at 1304:25-1305:9. It introduced emails between Ms. Agarwal, Ketchum, and others expressing confidence that the company would meet or exceed projections. R.584 at 711:15-713:8, 734:4-735:2; R.586 at 1334:3-18; R.603 at 5943:3-21; R.947-3 (GX0039); R.947-

5 (GX0044); R.947-16 (GX0446). And its own demonstratives showed real growth—the number of physicians in Outcome's network matching one advertiser's criteria nearly doubled over a six-month period in 2012; another's grew by 44% in a four-month period in 2013. R.947-23 (GX1132b); R.947-24 (GX1133*l*).

All that changed after August 2013, when Outcome CEO Rishi Shah replaced Ms. Agarwal as the point person on sponsorship sales and a new hire, Ashik Desai, replaced Ketchum. R.587 at 1637:16-1638:18; R.593 at 3383:16-19, 3449:4-14; R.595 at 3829:16-23; R.947-26 (DX3063). When Desai took over the task of "providing direction of how much to project," he abandoned the evidence-based approach Ms. Agarwal and Ketchum had used. R.594 at 3455:13-19; R.591 at 2771:7-2773:5; R.597 at 4272:18-24. Where Ms. Agarwal and Ketchum used real data to generate good-faith projections, Desai relied on wholesale fabrications. *See* R.587 at 1525:21-1537:21; R.597 at 4232:15-21, 4236:9-18. For years, Desai made up "bogus offices" to make it seem as if Outcome was playing more ads than it really was, falsely certified that Outcome was delivering what it promised, and lied to the company's executives to cover up his fraud. R.591 at 2771:7-2773:5; R.597 at 4205:2-4206:3, 4232:3-21, 4262:10-12; R.599 at 4968:6-17. Although Desai discussed his fraud with others, he did not tell Ms. Agarwal. R.596 at 4010:16-4011:23.

In 2017, one of Desai's subordinates, David Ma, reached out to the *Wall Street Journal* to report what he had seen, providing screenshots of text messages with Desai. R.590 at 2455:21-2456:17, 2459:2-6. The resulting article described

"instances of potential fraud" and "bad business practices" by Desai and his team. R. 596 at 4132:19-25; R. 605 at 6706:24-6707:2.

### C.     The Indictment

The *Journal* article triggered a government investigation and ultimately an indictment charging Ms. Agarwal (alongside Shah, Desai, and Outcome's CFO, Brad Purdy) with 17 counts of mail, wire, and bank fraud. R. 14 (citing 18 U.S.C. §§ 1341, 1343, 1344).[4] According to the government, Outcome over-promised to advertisers by inflating the results of its list matches, under-delivered on its contracts when it failed to meet those projections, and then concealed those under-deliveries from advertisers, auditors, lenders, and investors. R. 277 at 1-8. Desai pleaded guilty. R. 48. The government tried Ms. Agarwal together with Shah and Purdy.

### D.     The Government's Concededly Unlawful Restraint of Assets

As Shah's brief explains, the government obtained a pre-trial restraint of the defendants' property allegedly subject to forfeiture, SSA168-169, including $10.3 million in funds that Ms. Agarwal and Shah had already transferred to their counsel, R. 93 at 2. The district court declined to release those funds, relying on the government's representations that there was "probable cause" that the funds derived from

---

[4] Those 17 counts fall into three buckets: (1) mail fraud relating to checks sent by pharmaceutical companies or their advertising agencies to Outcome—counts 1, 2, 4, 11, 23, and 25; (2) bank and wire fraud relating to loans and lines of credit obtained by Outcome from banks and investors—counts 9, 13, 22, 24, and 26; and (3) wire fraud relating to communications sent among Defendants—counts 14, 15, 16, 17, 18, and 20. R. 14. For simplicity, we refer to these as the "pharmaceutical" counts, "lender-and-investor" counts, and "communications" counts.

the alleged fraud.   SSA7; R.75; R.75-1; R.93.   After working closely with Ms. Agarwal throughout the government's investigation, her attorneys were forced to withdraw, and she proceeded to trial with new counsel.   R.114; R.75-2 at 12-13. The government later admitted it had restrained millions of dollars not traceable to the alleged fraud.   SSA173 (citing R.480); JA128.

### E.     The Government's Case Against Ms. Agarwal

The government built its case around Desai's admitted fraud, telling the jury that "the defendants" had "work[ed] alongside" him.   R.615 at 9170:8-19.   But the evidence specific to Ms. Agarwal showed she and Desai overlapped "for just a matter of weeks" on sponsorship sales.   Desai did not even join Outcome until August 2013. R.593 at 3383:16-19; R.599 at 4840:17-19.   Shah had replaced Ms. Agarwal as the "first point of contact on everything [sponsorship sales] related" by then.   R.587 at 1637:16-1638:17; R.947-26 (DX3063).   And by late 2013, the government admitted, Ms. Agarwal's role in sales was "essentially nonexistent," R.850 at 43:1-18, while Desai was "still on training wheels . . . learning the ropes from Shah and Purdy," R.620 at 10290:16-19.

The government attempted to connect Ms. Agarwal to the alleged fraud in two ways.   First, prosecutors often lumped the "defendants" or "Shah and Agarwal" together, over defense objection and regardless of whether they were discussing evidence directly relevant to Ms. Agarwal or not.   *E.g.*, R.615 at 9251:2-4, 9333:1-6; *see* R.331 at 65:19-66:18 (denying pretrial motion to preclude government from

lumping defendants together). Second, the government urged that Ms. Agarwal "planted the seeds" of Desai's fraud by using projections (albeit ones based on real, not made-up, data) during her brief time in sponsorship from 2012 to 2013. R.615 at 9212:12-16, 9213:11-18, 9241:3-7.

But the government's "groundwork" theory ran into trouble with the facts. Though the government initially claimed Ms. Agarwal affirmatively concealed the use of projections from advertisers throughout her time in sales, the government's own exhibits and witnesses forced the government to give up on 2012. *See* R.587 at 1492:11-1494:3, 1576:21-1577:17. By closing arguments, the government was reduced to arguing that Outcome was merely "not disclosing" the use of projections "[f]rom 2013 forward." R.620 at 10355:24-25.

Desai's testimony regarding his brief overlap with Ms. Agarwal did little to corroborate the government's narrative. He testified that others—not Ms. Agarwal—taught him to perform list matches and ROI analyses. R.594 at 3441:1-14, 3446:2-8; R.599 at 5039:6-8. In fact, Desai admitted that Ms. Agarwal told him *not* "to overpromise" or "to make up data," that she was focused on "accuracy," and that she used "caution in projections." R.599 at 4880:2-3; R.602 at 5891:19-5892:3, 5896:14-5897:24; R.947-33 (DX8931). Although Desai answered "yes" to a string of government questions about whether Ms. Agarwal "deceive[d]" or "conceal[ed]" information from Outcome's clients," his testimony was notable for what it did *not* say. R.602 at 5646:5-14. Desai said that others had directed him to lie—but not Ms.

13

Agarwal.  R. 602 at 5645:20-5646:4.  Desai said he had told others he was fabricating data and falsifying documents—but not Ms. Agarwal.  R. 596 at 4010:16-4011:23.  Perhaps for that reason, the discussion of Desai's testimony in the government's opposition to the defendants' motions for acquittal made no reference to Ms. Agarwal by name.  R. 502 at 38-41.

1.     *The Government Jettisons Its Key Witness Against Ms. Agarwal*

The government's "groundwork" theory rested chiefly on the testimony of Jason Ketchum, who received immunity in exchange for his cooperation.  R. 583 at 423:11-425:20.  Ketchum performed list matches and projections until Desai replaced him in August 2013.  R. 584 at 573:18-21, 575:5-578:15.  Ketchum, the government promised the jury, would show that "the fraud" was "in full swing" before Desai came on the scene.  R. 583 at 552:12-18.

Things went as planned—initially.  Ketchum testified that Ms. Agarwal "directed" the strategy "behind list matches," including "what projections should [look] like and what should be communicated to the client."  R. 584 at 581:5-9.  To keep projections secret, Ketchum claimed, Ms. Agarwal limited communications with the salespeople who interacted with advertisers directly.  R. 584 at 630:15-632:6.  But Ketchum later walked that back after seeing emails showing that Outcome disclosed the use of projections to all of its major clients in 2012.  R. 587 at 1492:11-1494:3, 1576:21-1577:17.  The salespeople interfacing with those advertisers were routinely included on emails discussing projections.  R. 587 at 1648:18-24.  And the

14

projections themselves reflected "real analysis based on real numbers." R.587 at 1529:11-24, 1530:5-1537:23.

The government tried to get Ketchum back on message on redirect by having him read—over defense objections—the grand-jury testimony prosecutors had written for him. R.588 at 1821:13-1831:21. But Ketchum acknowledged on re-cross that the evidence the defense showed him at trial—evidence the government never showed him in their many meetings—led him to reconsider what he had said about Ms. Agarwal. R.588 at 1900:2-1905:6. The government changed tack.

No sooner had Ketchum left the stand than the government told the jury, "you don't need to rely on Ketchum's testimony." R.588 at 1924:10. By summation, the government was attacking Ketchum, arguing that "[h]e would have answered yes to nearly any question posed to him. That's why the defense was able to lead him around like a circus pony." R.615 at 9212:23-9213:1; *see* R.615 at 9241:8-11 ("We've been going for over two hours, and I've . . . not relied on anything Jason Ketchum said."). "Fortunately," the government assured the jury, "you can put his testimony aside." R.615 at 9213:8.

### 2. *The Government Tries to Backstop Its "Groundwork" Theory*

Instead of Ketchum's testimony, the government asked the jury to focus on emails purportedly connecting Ms. Agarwal to the fraud. R.588 at 1924:6-12. The government directed the jury to "three campaigns" sold while Ms. Agarwal was involved in sponsorship: Crestor, Humira, and Pradaxa. R.615 at 9181:6-8, 9211:20-

23, 9212:12; *see* R. 582 at 41:5-12. But none of those campaigns related to the charged transactions, and none was the smoking gun the government promised.

For example, the evidence showed that the Crestor campaign was pitched to the client as a "growth" campaign, with an express distinction between Outcome's existing inventory and its projected inventory. *See* R. 947-25 (GX1190) (telling client that proposed campaign included not-yet-installed inventory); R. 947-36 at 13 (DX10484) (pitch deck expressly referencing "weighted average reach"); R. 586 at 1283:4-1284:6, 1294:13-1296:18; R. 593 at 3234:6-3235:14; R. 947-4 (GX0042) (internal emails expressing "full confidence" in "great projection" to reach full installation by contract start); R. 947-6 (GX0045) (related); R. 947-28 (DX6221) (directing salesperson to pitch projected inventory); R. 947-29 (DX7115) (similar).

So too with the Humira campaign. The government contended that Outcome inflated its list match for Humira by including projections and by counting the number of screens it could reach, rather than the number of offices. *See* R. 615 at 9181:8-9183:25. The evidence showed the opposite: The campaign was for screens, not offices, and it expressly encompassed projected inventory. *See* R. 587 at 1485:7-1487:1, R. 588 at 1891:11-1894:3; R. 947-8 at 2 (GX0107); R. 947-9 (GX0110); R. 947-10 (GX0122); R. 947-11 (GX0129); R. 947-22 at 2 (GX1076); R. 947-34 (DX10099) (quoting Humira on additional "screens" via "[w]eighted average" model); R. 947-35 (DX10175) (similar).

The government placed special emphasis on the Pradaxa campaign, arguing that it "was the playbook" for the alleged fraud. R. 615 at 9265:12-13. Ms. Agarwal,

the government claimed, hid the use of projections from salespeople, supposedly knowing that the client was expecting a list match with existing inventory only. R.582 at 53:3-15; R.594 at 3411:12-3412:18, 3414:7-3416:24. Again, the evidence showed the opposite. Ms. Agarwal told one member of Outcome's three-man sales team that the Pradaxa list match included projections. R.947-31 (DX7624); *see* R.603 at 5903:5-13 (court noting that defense exhibit 7624 "contradicts" Desai's testimony that Pradaxa projections were concealed from salespeople). And emails showed that Ms. Agarwal subjectively believed Pradaxa had "purchased a weighted average" campaign to begin with. R.947-13 (GX0247); *see* R.947-7 (GX0088) (Ms. Agarwal reminds team they "have to race" to get to projected inventory necessary under Pradaxa contract). Outcome's then-CFO, responsible for contracting, had the same understanding. R.947-12 (GX0195); R.586 at 1360:16-1365:7.

Time and again, witnesses and evidence that the government promised would implicate Ms. Agarwal showed the opposite—when Ms. Agarwal was involved in sponsorship sales, clients were pitched on growth, salespeople were kept informed, and projections were fact-based and conservative.

### 3.     *The Government Cabins Its Case Against Ms. Agarwal*

As Ketchum and the documents took down the government's groundwork theory piece by piece, the government began to change how it described Ms. Agarwal's role. At the trial's outset, she and Shah had been the fraud's architects. R.582 at 50:19-51:2. By closing, "Shah was the fraud's leader"—Ms. Agarwal had

17

been demoted to "enthusiastic supporter." R.615 at 9170:16-17. By sentencing, the government struggled to go even that far, admitting that Ms. Agarwal's "role in sales to pharma clients" charged in counts 1, 2, 4, 11, 23, and 25 was "essentially nonexistent." R.850 at 43:16-18. Her role in the "capital raise" and the effort to "borrow money from banks"—charged in counts 9, 13, 22, 24, and 26—was likewise "very minimal." R.850 at 43:23-44:1. The "most egregious conduct" that Ms. Agarwal supposedly "engaged in in the 2014 through 2017 time period" was helping "Shah to circle the wagons" when concerns about Desai surfaced—the conduct charged in the remaining counts against Ms. Agarwal, counts 14, 15, 16, 17, 18, and 20. R.850 at 45:18-22. This "circling" supposedly comprised three episodes, in 2015, 2016, and 2017.

*First*, the government highlighted a meeting Ms. Agarwal had in 2015 with David Ma, the employee who later conveyed his concerns to the *Wall Street Journal*. Ms. Agarwal, the government urged, had dismissed Ma's concerns about Desai's practices, purportedly telling Ma that Outcome used "smoke bombs" to conceal fraud. R.620 at 10274:4-10276:11. But Ma admitted he never directly raised the question of "fraud" with Ms. Agarwal. R.590 at 2422:16-19, 2424:7-2425:6. Instead, Ma phrased his concerns "as a question" and "ask[ed] for her opinion." R.590 at 2424:23-2425:6; *see* R.591 at 2768:25-2769:6 ("I used euphemisms, which is sort of speaking around it"), 2773:3-25 (similar).

Faced with Ma's equivocations, the government again reached for the grand-jury testimony it had drafted. Over defense objections, Ma went from admitting

that he only "indirectly impl[ied]" that he was "uncomfortable" with what Desai was doing, R.590 at 2422:16-19, 2424:7-2425:6, to reading aloud the prosecutors' script, asserting "I told Agarwal that I was not comfortable with the business practice of selling inventory that we did not have," R.592 at 3058:18-19.

*Second*, the government claimed Ms. Agarwal misled the company's auditors. But the evidence showed Ms. Agarwal was sidelined from Outcome's fundraising to the point that the lead investor from Goldman Sachs didn't even meet her during Goldman's diligence process, and other key investors like Google spoke with her about Outcome's "content innovation ... for patients," but not its "financials," "operations," or "business model." R.606 at 6859:10-18; R.612 at 8612:23-8614:20; *see* R.609 at 7781:3:18, 7844:13-7845:9 (witness confirmed Ms. Agarwal had "no role in providing financial information" to JPMorgan or in the presentation to ratings agencies). True, Ms. Agarwal signed a March 2016 letter attesting she was unaware of any fraud affecting Outcome's financials. R.616 at 9392:16-24. But concerns over the accuracy of Outcome's data did not reach Ms. Agarwal until November 2016. *See* R.595 at 3916:6-3917:17. When they did, Desai falsely assured Ms. Agarwal that any problems were attributable to "operational issues" or "[h]uman error." R.603 at 5954:8-5968:22. Ms. Agarwal was excluded from communications in which Desai, Shah, and Purdy discussed "grave concerns" about Outcome's "ability to fulfill" contracts and the risk that Desai's fraudulent affidavits of performance might come

to light.  R.948-1 (GX701a); R.948-2 (GX701b); R.948-3 (GX704a); R.948-4 (GX704b); R.948-5 (GX707a); R.948-6 (GX707b).

*Third*, the government pointed to Ms. Agarwal's reaction several months later in early 2017 upon learning that two members of the sponsorship team, Liane Pierce and Adam Prowker, had told a newly hired executive, Sameer Kazi, that Desai had been "changing the numbers" and misrepresenting the company's inventory. R.947-20 at 1 (GX0747b); R.615 at 9360:9-9361:25.  Ms. Agarwal suggested that Pierce and Prowker had shown bad "leadership."  R.947-20 at 2 (GX0747b).  Yet Ms. Agarwal suggested in the same message that Outcome "really need[ed] to take a strong stance on" the alleged misconduct and give Kazi a "mandate" to address it—"maybe even saying in 2 weeks you have got to clean this up and show us fully transparent inventory, which is why you are here."  R.947-20 at 1 (GX0747b).

Ms. Agarwal pressed on.  She wrote to the executive team, urging that the company immediately "ope[n] a chief compliance officer job posting," publish "materials for transparency," and ensure a "heavier exec[utive] presence" in the company's New York office where the sponsorship team was based.  R.599 at 4954:6-4955:20; R.947-38 (DX11035).  And she continued to push Desai to implement procedures for "publishing roi studies and results + case studies" to ensure full "transparency."  R.950-1 (DX11032).

4.    *The Government Urges a Sweeping View of Fraud*

As the evidence came in, the government increasingly urged that a failure to deliver on a contract was sufficient to convict.  It told jurors after Ketchum's testimony that, "If the clients had ended up getting what Outcome had sold, . . . we wouldn't be here today."  R.588 at 1927:11-14.  "Anytime a projection is used and they say, we are going to deliver X and then the campaign starts and they're not delivering X," the government told the jury in summation, "they're making a false promise about what they're going to deliver."  R.616 at 9416:21-24.

The government made a similar argument at the charge conference.  The defense objected to an optional portion of this Court's pattern good-faith instruction telling the jury that a "defendant's honest and genuine belief that he will be able to perform what he promised is not a defense to fraud if the defendant also knowingly made false and fraudulent representations."  JA109; Seventh Circuit Pattern Jury Instructions Section 6.10; R.335 at 1, 9.  The government opposed.

"This case is about delivery," the government contended.  R.614 at 9108:7-14. "It's about the list-match process and deltas" between what was promised and what was delivered.  R.614 at 9108:7-14.  The contention that the defendants "believe[d] these projections were going to all work out in the end," the government urged, was no defense.  R.614 at 9108:7-14.  The court agreed:  "[S]o much of the case" was the "idea that the defendants believed they would be able to perform, and that's not a defense if they made false and fraudulent representations."  R.614 at 9110:7-11.

21

The court accordingly instructed the jury—over defense objections—that it could convict Ms. Agarwal if the government proved "one or more of the false or fraudulent pretenses, representations, or promises charged in the portion of the indictment describing the scheme" and that Ms. Agarwal had "knowingly devised or participated" in that scheme "with the intent to deceive or cheat the victim in order to cause a gain of money or property to [herself] or another, or the potential loss of money or property to another."  R.615 at 9156:10-9160:3; *see* JA119.  It cautioned that "[a] defendant's honest and genuine belief that he or she will be able to perform what he or she promised is not a defense to fraud if the defendant also knowingly made false and fraudulent representations."  R.615 at 9166:9-12; *see* JA121.

### F.    Verdict and Post-Trial Proceedings

The jury found Ms. Agarwal guilty on 15 counts.  JA123-124.  Ms. Agarwal moved for a judgment of acquittal or a new trial, challenging the sufficiency of the evidence on the "lender-and-investor" and "communications" counts.  R.487; *see* p.11 n.4, *supra*.  She adopted Shah's and Purdy's arguments regarding the remaining counts.  R.487 at 1; R.486; R.489.  Ms. Agarwal also joined Shah's motion to dismiss the indictment or for a new trial, arguing that the government's unlawful pre-trial restraint of assets not traceable to the alleged fraud and its use of false grand-jury testimony (violations that had only just come to light) denied her constitutionally guaranteed rights to due process and a fair opportunity to choose her counsel.  R.488.  The court denied those motions.  SSA127-211.

22

### G.     Sentencing

The court sentenced Ms. Agarwal to one day of imprisonment, "time served," and three years of supervised release in community confinement. R.850 at 100:1-12; R.807. If affirmed, the conviction would also strip Ms. Agarwal of her status as a lawful permanent resident and subject her to forcible deportation. R.807 at 4; *see* 8 U.S.C. §§ 1226(c), 1182(a)(2), 1101(a)(43)(M)(i). After 20 years in the United States, Ms. Agarwal would be uprooted from the life and community she has built here with her husband.

The government acknowledged that it was "clear from the evidence at trial" and post-trial submissions that Ms. Agarwal's "motives" were "very different" than those of her co-defendants. R.850 at 37:14-20. Ms. Agarwal "wanted to do the right thing, she wanted to do good." R.850 at 38:10-13. "She lived quite modestly" and showed a "very significant, notable, admirable dedication to charitable efforts." R.850 at 50:22-24, 55:3-5. The court agreed, hailing the "incredible array of good deeds" Ms. Agarwal had done throughout her "entire adult life," "never to draw attention to [her]self," but "out of the goodness of [her] heart." R.850 at 91:23-92:9.

The court declined to impose a term of imprisonment, reasoning that doing so would arbitrarily subject Ms. Agarwal to far harsher conditions of confinement than her co-defendants. R.850 at 97:7-23. Bureau of Prisons policy forbids assigning non-citizens—even lawful permanent residents like Ms. Agarwal—to the kind of minimum-security camp where her citizen co-defendants could expect to be housed.

R. 850 at 97:7-23. She would therefore be housed in a prison alongside offenders convicted of "violent crimes," where she would be "subject to potential abuse" and otherwise harsher conditions than her co-defendants. R. 850 at 65:20-66:8.

Shah moved for bail pending appeal under 18 U.S.C. §3143(b), arguing that the over-restraint of funds and the court's decision to admit grand-jury testimony were likely to result in reversal or a new trial. R. 829. The court granted the motion, agreeing that defendants had raised a "substantial question" on the choice-of-counsel issue. JA159-163. The court subsequently granted Ms. Agarwal's unopposed motion to stay her term of supervised release for the same reasons. R. 884; R. 886.

This appeal followed.

## SUMMARY OF ARGUMENT

**I.A.** The government told the jury that failing to deliver on a contract was proof of a "false promise"—an element of mail, wire, and bank fraud. Any time Outcome failed to play as many ads as an advertiser had contracted for, the government claimed, that "under-delivery" was fraud. That is not the law. Failing to fulfill contractual promises is not fraud without proof that the promisor intended never to perform. Yet the instructions allowed the jury to convict without finding that Ms. Agarwal intended never to fulfill Outcome's promises to advertisers. Worse—the instructions suggested that the jury was forbidden to consider Ms. Agarwal's intention to perform.

24

**B.** The government's alternative theory—that Ms. Agarwal joined a scheme to obtain contracts by concealing the use of projections to misrepresent Outcome's inventory—is similarly flawed. Not every contract induced by deceit is a federal crime. Under this Court's precedent, the government must prove that the promisor intended to deprive the promisee of a core aspect of the contractual bargain. Here, the government affirmatively argued that Ms. Agarwal intended to *deliver* what Outcome promised. That Outcome did not always meet its targets is irrelevant. The fraud statutes punish the "scheme to defraud," not the completed fraud. What matters is the object of the scheme and the defendant's intent. A scheme to deliver what is promised is, by definition, not a scheme to defraud—no matter what happens next.

**C.** The jury's instructions and general verdict make it impossible to tell whether the verdict rests, in whole or in part, on one of the invalid theories urged by the government. The instructions did not explain what makes a contractual promise "false." Nor did they tell the jury that a scheme to obtain contracts by deceit is not, standing alone, a "scheme to defraud" under the federal fraud statutes. While that might not pose a problem in another case, it raises the risk here that the jury convicted Ms. Agarwal for conduct the federal fraud statutes do not reach.

**D.** That the jury may have convicted Ms. Agarwal under a legally deficient theory requires across-the-board vacatur. From start to finish, the government insisted that every count rested on the supposed scheme to over-promise and under-

25

deliver to Outcome's advertisers.  The government charged every count that way, it tried the case that way, and it defended the convictions after trial that way.  Given the government's choices, this Court cannot be sure that any count was unaffected by the government's invalid theories.

**II.A.**  The trial court's improper admission of government-scripted grand-jury testimony independently requires a new trial.  The government's only hope of tying Ms. Agarwal to the fraud here was its "groundwork" theory.  The only witness who could support that theory, Jason Ketchum, imploded on the stand.  Confronted with the evidence, he testified that Ms. Agarwal never directed him to fabricate list matches, that she was transparent about projections, that she kept salespeople in the loop, and that she in fact disclosed under-delivery to clients.  The government's remaining witnesses against Ms. Agarwal—Desai and Ma—could not dig the government's case out of the hole Ketchum made.

**B.**  With such a thin case against Ms. Agarwal, the government cannot possibly carry its burden to show that the untainted evidence against her was so "overwhelming" that the grand-jury statements could not have swayed the jury to convict.  The scripts put the government's words in the witnesses' mouths, giving the government arguments it could not otherwise have made.  At a minimum, the improperly admitted statements bolstered the government's star witnesses—classic prejudice that alone precludes any finding of harmlessness.  A new trial is required.

**III.** As Shah's brief explains, the government's unlawful restraint of funds and knowing use of false evidence before the grand jury require dismissal with prejudice or at least vacatur. But even taking the district court's deeply flawed analysis at face value, the conclusion that Ms. Agarwal suffered no constitutional deprivation rests on a chain of speculative inferences that cannot withstand even deferential review. That alone requires vacatur and remand.

## ARGUMENT

I. **VACATUR IS REQUIRED BECAUSE THE INSTRUCTIONS ALLOWED THE JURY TO CONVICT ON MULTIPLE LEGALLY INSUFFICIENT THEORIES**

The government urged the jury to convict Ms. Agarwal for joining a "scheme to oversell and under-deliver." R. 615 at 9270:16. "You have to deliver what you sold on day one," the government insisted, because "[s]elling something that you don't have" is "fraud." R. 611 at 8492:17-18; *see* R. 620 at 10297:2-3. That is wrong. "Fraud requires much more than simply not following through on contractual or other promises." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1007 (7th Cir. 2004). Even outright lies made to induce a contract are not enough. The federal fraud statutes protect "'*property*'"—they are not there to protect people from entering "'transactions they would otherwise avoid.'" *United States v. Kelerchian*, 937 F.3d 895, 910, 912 (7th Cir. 2019) (emphasis added). Without proof that the promisor intended *not* to give the promisee what they bargained for, there is no proof of intent to deprive the promisee of their property and no violation of the federal fraud statutes.

Yet the government urged (and the instructions allowed) the jury to convict Ms. Agarwal for over-promising and under-delivering—*even if* she fully intended that Outcome would deliver. That requires vacatur. Where the jury instructions permit conviction on a "*legally* insufficient" theory, the court "must remand for a new trial, because a jury that followed its instructions might have convicted on the invalid ground." *United States v. Borrero*, 771 F.3d 973, 976-77 (7th Cir. 2014); *see Yates v. United States*, 354 U.S. 298, 326-27 (1957). Even where the evidence supporting a *valid* ground is "overwhelming," a conviction "cannot stand" where the instructions do not permit the court to "be sure" that the jury did not choose the invalid ground. *United States v. Blagojevich*, 794 F.3d 729, 734-35 (7th Cir. 2015).

The government's invalid theories take out every count. The government argued that, "since pharma [advertiser] fraud was the central, unifying feature of the scheme alleged in the indictment," the jury could "return guilty verdicts for *every count of conviction*" based "solely" on a finding that Ms. Agarwal oversold Outcome's inventory with the intent to induce advertisers to contract—whether she intended to give them full value or not. R. 502 at 34 (Rule 29 Opp.) (emphasis added). That is not the law. This Court should vacate the convictions.

**Standard of Review.** This Court considers whether a conviction is "legally defective" *de novo*. *Borrero*, 771 F.3d at 975-76; *see United States v. Milheiser*, 98 F.4th 935, 941 (9th Cir. 2024) ("We review *de novo* whether the Government's theory of fraud at trial was legally valid."). Vacatur is required unless the government

proves "beyond a reasonable doubt" that it was impossible for a rational jury to convict on the invalid theory without also convicting on a valid theory. *Turner v. United States*, 693 F.3d 756, 759 (7th Cir. 2012); *accord United States v. Segal*, 644 F.3d 364, 366 (7th Cir. 2011). That is so even if "no one—not the prosecutor, not the judge, and not defense counsel—recognized" that the government's theory was "legally defective" until "the case reached this court." *Borrero*, 771 F.3d at 976. So long as the defendant moved for acquittal, "they are entitled to that relief" if "they have been convicted of acts that the law does not make criminal." *Id.*

### A.    The Government Urged the Jury to Convict on the Invalid Theory That "Under-delivering" on a Contract Is Fraud

The jury was instructed that conviction on any of the fraud counts required proof that (1) the defendant "knowingly devised or participated in a scheme to defraud," with (2) "the intent to defraud," and that (3) the scheme "involved a materially false or fraudulent pretense, representation, or promise." R. 615 at 9156:10-9158:9; *see* JA112-119. At the outset of its count-by-count summation, the government argued that proof of Outcome's failure to deliver on a contract satisfied all three elements. "Anytime a projection is used and [the defendants] say, we are going to deliver X and then the campaign starts and they're not delivering X," the government asserted, "they're making a false promise about what they're going to deliver." R. 616 at 9416:21-24. Ms. Agarwal's "general[ ] aware[ness]" of that "false promise,"

the government argued, both proved she "joined a broad scheme to defraud" and supplied evidence of her intent to defraud.  R.616 at 9416:13-24.  That is wrong.

Failing to make good on a contractual promise "is not fraud" within the meaning of the federal fraud statutes.  *Perlman v. Zell*, 185 F.3d 850, 852-54 (7th Cir. 1999).  "[O]nly making a promise with the intent not to keep it deserves that epithet."  *Id.* at 852.  "[A] party might intentionally breach a contract, even in a 'widespread' or 'systematic' way," but "[a] finding of fraud requires 'that the defendant engaged in deceptive acts or practices *distinct from any underlying breach of contract*.'"  *Greyer v. Illinois Dep't of Corr.*, 933 F.3d 871, 881 (7th Cir. 2019) (emphasis added).  Indeed, a breach, standing alone, is not even *evidence* of fraudulent intent.  *See Corley*, 388 F.3d at 1007.

That principle is nothing new.  The idea that "'proof that a promise was made and that it was not fulfilled is sufficient to prove fraud'" is not, "'and has never been, a correct statement of the law.'"  *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 659 (2d Cir. 2016).  As far back as *Durland v. United States*, 161 U.S. 306 (1896), the Supreme Court explained that "no conviction [may] be sustained" based on a promise, "no matter how visionary" or outlandish, unless the defendant never intended to "make good [those] promises."  *Id.* at 312-14.  What makes a scheme fraudulent is the "intent and purpose" of the promise.  *Id.* at 313.

Take the Second Circuit's decision in *O'Donnell*, which this Court has cited with approval.  *See Greyer*, 933 F.3d at 881.  In that case, a mortgage lender sold loans

to two government-sponsored entities under contracts "warrant[ing] and repre-sent[ing]" that the loans would be "investment quality." *O'Donnell*, 822 F.3d at 664. The government sued the lender's executives, arguing that the lender had violated the mail and wire fraud statutes by later selling loans it knew "were not investment quality." *Id.* at 654. A jury agreed. The Second Circuit reversed. The government's proof, the court explained, "show[ed] only post-contractual intentional breach of the representations." *Id.* at 666. But "[i]t is emphatically the case—and has been for more than a century—that a representation is fraudulent only if made with the contemporaneous intent to defraud." *Id.* at 658. Because there was no evidence that the executives intended to sell nonconforming loans when the contracts were made, "the jury had no legally sufficient basis" for its verdict. *Id.* at 666.

The verdict here suffers from the same legal defect. Again and again, the government asked the jury to infer Ms. Agarwal's fraudulent intent from Outcome's breaches of its contracts with advertisers. "If the clients had ended up getting what Outcome had sold," the government told the jury, "we wouldn't be here today." R. 588 at 1927:11-14. "Anytime" the defendants said "we are going to deliver X" and then "they're not delivering X," the government urged, that was "a false promise about what they're going to deliver." R. 616 at 9416:21-24. That misstates the law. A "subsequent breach, although consistent with deceptive intent[,] is not in and of itself evidence of such an intent." *Corley*, 388 F.3d at 1007. There must be some

evidence that, "at the time" the promise was made, the defendant "had no intention of honoring it." *Id.* There was no such evidence here.

Just as in *O'Donnell*, the government presented no evidence that Ms. Agarwal acted "with contemporaneous intent never to perform" on Outcome's contracts with advertisers. 822 F.3d at 666. And even if it had, the jury instructions did not require the jury to find such intent. To the contrary, the instructions suggested Ms. Agarwal's intent to perform *couldn't* matter. Over defense objections, the trial court gave an optional portion of this Court's pattern instructions, telling the jury that "[a] defendant's honest and genuine belief that he or she will be able to perform what he or she promised is not a defense to fraud if the defendant also knowingly made false and fraudulent representations." R.615 at 9166:9-12; *see* R.614 at 9107:19-21; JA109-110.

Given the government's argument that under-delivery itself was proof of a "false promise," the jury could have thought the instruction required it to disregard Ms. Agarwal's intent to perform and to convict so long as Outcome under-delivered. Indeed, that is just what the government wanted the jury to think. In arguing for the disputed instruction, the government asserted that "*[t]his case is about delivery*." R.614 at 9108:8-9 (emphasis added). "It's about the list-match process and [under-delivery]." R.614 at 9108:8-9. The instruction was needed, the government told the court, because a good-faith "belie[f] these projections were going to all work out in the end" is no defense. R.614 at 9108:10-11. But it *is* a defense when

32

it comes to contracts and has been for 130 years. A person who makes a promise, "knowing that he is unable" to perform "at the time, but believing" that he will when the time comes, "is guilty of no offense, even if he be disappointed" in making good on that promise. *Durland*, 161 U.S. at 313 (quoting *Evans v. United States*, 153 U.S. 584, 592 (1894)).

To be sure, the government pressed other theories. It asserted other misrepresentations. But the instructions did not require the jury to accept those arguments before voting to convict Ms. Agarwal. As the government stressed in the final moments before the jury retired to deliberate, "remember the jury instruction. We only need to prove one lie or misrepresentation. We've proved so many and we've proved many material omissions, but we only need to prove one." R. 620 at 10411:12-15. Because the general verdict offers no way to "be sure" that the jury did not rely on the government's legally insufficient false-promise theory, the convictions fail. *Blagojevich*, 794 F.3d at 734-35.

## B.    The Government Urged the Jury to Convict on the Invalid Theory That "Overselling" to Obtain a Contract Is Fraud[5]

The idea that a breach of contract constitutes a "false promise" was not the only legally invalid theory the government presented. The government also argued

---

[5] Because nothing required the jury to find that Ms. Agarwal knew of or participated in any material misrepresentations of Outcome's inventory, this Court can vacate without opining on the government's "overselling" theory. The convictions could rest, and fall, on the government's false-promise theory alone.

that the defendants lied about "the inventory that Outcome had available" to "get bigger contracts." R.582 at 53:12-15. The Supreme Court is set to decide whether deception to induce a commercial exchange can *ever* constitute mail or wire fraud where inflicting economic harm is not the object of the scheme. *See Kousisis v. United States*, No. 23-909 (U.S.). But this Court's precedent already precludes the theory the government advanced here.

The fraud statutes reach only those schemes "intended to deprive" someone "of a recognized property interest." *Kelerchian*, 937 F.3d at 910. "'[S]chemes that do no more than cause their victims to enter into transactions they would otherwise avoid'" do not qualify. *Id.* at 912. Where the object of the alleged scheme is to obtain a contract, this Court's cases recognize that the government must show an intent to deprive the other party of *the benefit of the contractual bargain*. Yet the instructions allowed the jury to convict Ms. Agarwal based on a finding that she joined a scheme to obtain contracts by misrepresenting Outcome's inventory *even if* the jury also believed—as the evidence showed and the government conceded—that she intended to deliver on Outcome's promises and give advertisers what they bargained for. That independently requires a new trial.

1.  *The Government Had to Prove Intent to Deprive Outcome's Advertisers of the Benefit of the Contractual Bargain*

The fraud statutes criminalize schemes "to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."

18 U.S.C. § 1343 (wire fraud); *see id.* §§ 1341 (mail fraud), 1344 (bank fraud).  The "'common understanding' of the words 'to defraud' when the statute was enacted referred to '*wronging* one in his property rights.'"  *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (emphasis added).  The government accordingly must prove a scheme "'to *deprive* the victim of money or property.'"  *Kelly v. United States*, 590 U.S. 391, 398 (2020) (emphasis added; brackets omitted); *see United States v. Griffin*, 76 F.4th 724, 738 (7th Cir. 2023).[6]

Inducing someone to enter a transaction by deceit is not, standing alone, suggestive of an intent "'to *deprive* the victim of money or property.'"  *Kelly*, 590 U.S. at 398 (emphasis added; brackets omitted).  After all, a party that gets what it contracted for is not "deprived" of anything.  *See, e.g.*, *Milheiser*, 98 F.4th at 945; *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016); *United States v. Sadler*, 750 F.3d 585, 590-92 (6th Cir. 2014) (Sutton, J.).  To establish a defendant's participation in a scheme "to defraud," the government must show that the defendant acted with the intent to deny the victim what they bargained for.

This Court's decision in *Kelerchian* is instructive.  The defendants in that case induced a gunmaker to sell them machineguns by pretending to act on behalf of a law-enforcement agency permitted to buy them.  937 F.3d at 907-08.  The defendants challenged their convictions, arguing that, having paid for the machineguns, there

---

[6]  Because the relevant elements of mail, wire, and bank fraud are the same, courts interpret them as one.  *See Neder v. United States*, 527 U.S. 1, 20-22 (1999).

was no evidence that they "intended to deprive" anyone "of a recognized property interest." *Id.* at 910. If inducing a contract by means of a material misrepresentation were wire fraud, that argument would have been a footnote. Instead, this Court recognized that the defendants' payment put the case "close to the edge of the reach of the wire and mail fraud statutes." *Id.* at 913.

The court upheld the convictions only because it found that there was more to the bargain than the price of the guns or even "the seller's preferences about the terms of the deals." *Kelerchian*, 937 F.3d at 913. Selling machineguns to buyers "legally prohibited from buying" them, the court explained, entails serious legal and business risks. *Id.* "[I]n such a deal, the fact that the seller was paid full price does not mean it received all it bargained for and is not decisive." *Id.* Under those unusual circumstances, the court concluded that the government had established a violation of the fraud statutes by showing that the scheme deprived the gunmaker of a "cognizable property interest in avoiding illegal sales of its products." *Id.* at 914.

*Kelerchian* built on this Court's decision in *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006). The defendants in *Leahy* pretended to run minority- and women-owned businesses to win contracts from the City of Chicago reserved for such businesses. *Id.* at 778-81. The defendants argued they had not deprived the City of any property because they provided the services the City paid for. *Id.* at 787. Since the City would have "paid the same for the provided services regardless," they reasoned, "Chicago lost no money." *Id.* Again, if lying to obtain a contract were sufficient to

establish wire and mail fraud, the court could have stopped there.  Instead, the court took pains to explain that the City had *not* gotten what it bargained for.

The court acknowledged that the City "received *one* type of services it contracted for"—the cleaning and janitorial services the defendants' companies performed.  *Leahy*, 464 F.3d at 788 (emphasis added).  But it "completely lost the *other* type of services for which it was paying"—namely, "services performed by" minority- and women-owned businesses.  *Id.* (emphasis added).  That was not a loss in a financial sense; the City was prepared to pay *more* for services by minority- and women-owned businesses "to foster their growth."  *Id.* at 789 n.3.  Yet the City nonetheless "suffered a loss of money *in that it paid for a service . . . that it did not receive.*"  *Id.* at 788 (emphasis added).  The scheme, in other words, deprived the City of a property interest in services performed by a certain *kind* of business.

> 2.    *The Government Conceded That Ms. Agarwal Never Intended to Deprive Outcome's Advertisers of the Benefit of Their Contracts*

If the schemes in *Kelerchian* and *Leahy* were "close to the edge" of the fraud statutes, the alleged scheme here is leagues past it.  The government argued that Outcome misrepresented "the inventory that [it] had available" to get advertisers to "sign contracts for inventory that did not *yet* exist."  R.582 at 53:12-15; R.615 at 9175:3-4 (emphasis added).  Compare that to the frauds in *Kelerchian* and *Leahy*, where the defendants *never* intended to fulfill a core part of the bargain.  The defendants in *Kelerchian* never intended to purchase machineguns for authorized

buyers—the whole point was to funnel the guns to *un*authorized buyers. *See* 937 F.3d at 902. The defendants in *Leahy* likewise never intended to provide services performed by minority- and women-owned businesses—the whole point was to get contracts for businesses run by a white man. *See* 464 F.3d at 779-81.

The opposite is true here. The *government itself* argued repeatedly that Ms. Agarwal fully intended to deliver what Outcome promised. Prosecutors told the jury how the defendants "went out" after concluding contracts "*to try to acquire* the very screens that they had sold." R.615 at 9175:12-14 (emphasis added). The defendants used "smoke bomb[s]," the government urged, *in the "hope[s] that* by the time the smoke cleared, by the time the campaign started, or at least by the midway point, they *would* have had the inventory that they had sold." R.615 at 9175:22-9176:2 (emphasis added). Ms. Agarwal's efforts to *obtain* the promised inventory are inconsistent with an intent to deprive anyone of the benefit of a contractual bargain. And even without the government's concessions, there was nothing in the jury's instructions to suggest the government was required to prove Ms. Agarwal acted with *that* intent.

That Outcome did not always meet projections is irrelevant. Proving a scheme that inflicts actual harm is neither necessary nor sufficient. *Leahy*, 464 F.3d at 786; *see Neder v. United States*, 527 U.S. 1, 25 (1999) (statutes punish "'scheme to defraud,' rather than the completed fraud"). If Ms. Agarwal had intended to defraud Outcome's advertisers, it would not have mattered if advertisers got everything they

bargained for.  But the flipside is also true:  That some advertisers got less than they bargained for did not excuse the government from its obligation to prove that Ms. Agarwal acted with fraudulent intent.  While proof of harm might support an inference of fraudulent intent in some cases, the only "harm" from failing to meet projections was under-delivery—a breach of the parties' contract.  And a breach, even a willful one, is not evidence of fraud.  *See* pp. 29-30, *supra*.  Without proof that Ms. Agarwal acted with specific intent to deprive Outcome's advertisers of the benefit of their contractual bargain, Ms. Agarwal committed no crime.

      3.    *The Allegedly Fraudulent List Matches Cannot Support the Convictions Either*

The government insisted that a "lie on the front end about the list-match," even without more, "is still fraud."  R. 620 at 10414:4-6.  No.  Fraud requires a scheme and intent to deprive someone of property.  Furnishing (supposedly) unwitting advertisers with list matches that included undisclosed projections may have been misleading.  But that would at most have deprived Outcome's advertisers of information about the likelihood that Outcome would make good on its contracts.  And the Supreme Court has squarely rejected the notion that a "'cognizable harm occurs where the defendant's scheme denies the victim of the right to control its assets by depriving it of information necessary to make discretionary economic

decisions.'" *Ciminelli*, 598 U.S. at 313.[7]  Without proof that Ms. Agarwal intended

never to deliver the ads promised, the list matches did no more than get advertisers

"'to enter into transactions they would otherwise avoid.'" *Kelerchian*, 937 F.3d at

912.  That is not a federal crime.

## C.    The Instructions Did Nothing to Prevent Conviction on the Government's Invalid Theories

The jury instructions required the jury to find a "materially false or fraudu-

lent pretense, representation, or promise."  R.615 at 9157:1-2.  But no instruction

told the jury what makes a promise "false."  Nothing prevented the jury from

believing, as the government urged, that "not delivering" on a contract was a "false

promise."  R.616 at 9416:21-24.  And nothing prevented the jury from believing that

breaching a contract is fraud—*i.e.*, that "[i]f the clients had ended up getting what

Outcome had sold, . . . we wouldn't be here today."  R.588 at 1927:11-14.

The instructions likewise did nothing to prevent the government from

pressing its legally insufficient overselling theory.  The jury was told it could find a

"scheme to defraud" based on nothing more than an intent "to obtain money" by

deceit.  R.615 at 9159:16-20; *see* JA118-119.  To find an "intent to defraud," it was

enough to intend "a gain" or "the potential loss of money" to another.  R.615 at

---

[7] As this Court has observed, *Ciminelli* raises questions about the theory upheld in *Kelerchian*. *See Griffin*, 76 F.4th at 740.  The property interest recognized in *Leahy* is even further afield.  If the court concludes that those decisions permit the convictions here, it should consider whether they remain good law. *See United States v. Wahi*, 850 F.3d 296, 302 (7th Cir. 2017).

9160:1-3.  Neither instruction told the jury that merely inducing another party to enter a contract involving the payment of money is insufficient.  *Cf. Kelerchian*, 937 F.3d at 912-13.  And nothing in the instructions explained that the government had to prove that Ms. Agarwal intended not to make good on Outcome's promises at the time they were made.  To the contrary, the good-faith instruction suggested that the jury was forbidden to consider Ms. Agarwal's intent to fulfill Outcome's obligations.  *See* R.615 at 9166:9-12; JA121.

The government's invalid theories make this case just like *Borrero*.  The defendants there lied to the State of Indiana to obtain vehicle titles and license plates.  771 F.3d at 975.  Though the scheme deprived the State of tax revenue, the government at trial "did not emphasize" that loss, arguing instead that the "titles and license plates" themselves were "'property.'"  *Id.*  On appeal, the government conceded that titles and plates are not "property" under the fraud statutes.  *Id.* at 976.  "Unfortunately," the instructions gave no way to tell which theory the jury had accepted or even whether jurors had voted to convict based "on some mixture of frauds and understandings of 'property.'"  *Id.*  That meant there was no way for this Court to assess the sufficiency of the evidence.  The only option was to vacate the resulting convictions and remand for a retrial on the valid theory.  *Id.* at 976-77; *see United States v. Lee*, 558 F.3d 638, 644-45 (7th Cir. 2009) (similar); *Yates*, 354 U.S. at 338.  Just so here.  The general verdict and the court's instructions make it impossible to tell whether every juror agreed to convict Ms. Agarwal on legally

sufficient grounds or whether the verdict rests—in whole or in part—on one of the invalid theories urged by the government.

That is not to say that the instructions would have been improper in another case. But instructions that may be "unexceptionable" in the ordinary case may nonetheless become "a problem" where they fail to prevent conviction on a legally invalid theory. *Blagojevich*, 794 F.3d at 734, 738. The instructions in *Lee*, for example, "correctly defined 'proceeds'" for purposes of money laundering but failed to "tell the jur[y] that ordinary rent and utilities do not count as net proceeds" as the government had argued. 558 F.3d at 644-45. Similarly, the instructions in *Borrero* correctly required the jury to "find that false statements injured a victim by depriving it of 'money or property'" but failed to specify that license plates and titles are not "property." 771 F.3d at 976. The government's legally erroneous theories thus "contaminated the jury instructions," raising the risk that the defendants had "been convicted of acts that the law does not make criminal." *Id.*

The same is true here. Instructions that do not explain what makes a contractual promise "false," for example, may not be a problem in cases not involving contractual promises. Similarly, telling the jury to disregard a defendant's belief that they will be able to perform what they promised would not be a problem in a case where an intent to keep a promise does not negate fraudulent intent. For example, someone who misrepresents their creditworthiness to obtain a lower interest rate on a loan intends to defraud the lender of a higher interest rate, even if

they intend to repay the loan in full.  *See United States v. Batio*, No. 21-3195, 2023 WL 8446388, at *2 (7th Cir. Dec. 6, 2023).  In *this* case, however, those instructions failed to enforce the requirements of the federal fraud statutes.

**D.     Because Every Count Could Have Rested on One of the Government's Invalid Theories, Vacatur Is Required**

The government's legally insufficient theories infected every count of conviction.  From indictment through sentencing, the government insisted that every count rested on a scheme to over-promise and under-deliver to Outcome's advertisers.  *See* R. 14 ¶¶ 2-31; *see* R. 14 at 21, 23, 28, 31, 33-40, 42, 44-48.

The government argued in its pre-trial motion to admit co-schemer evidence that Ms. Agarwal "engaged in" the charged scheme by "institut[ing] the practice of sending clients aggressive (and unrealistic) 'projections' of Outcome's inventory during the list-match process, which set in motion Outcome's inevitable and pervasive under-deliveries on clients' advertising campaigns."  R. 277 at 62-63.

The government sounded the same theme in summation, urging that it was enough that each defendant was "generally aware" of "false promises" such as "say[ing], we are going to deliver X" and then "not delivering X."  R. 616 at 9416:18-9417:11.  The only "aspect in which each one of the fraud counts o[f] the indictment differs" was the jurisdictional element.  R. 616 at 9413:6-15.

The government doubled down on that argument post-trial.  Opposing Ms. Agarwal's motion for acquittal, the government argued that "since pharma

[advertiser] fraud was the central, unifying feature of the scheme alleged in the indictment," a finding that Ms. Agarwal participated in defrauding "Outcome's pharma clients" furnished "a sufficient evidentiary basis to return guilty verdicts *for every count of conviction.*"  R. 502 at 34 (emphasis added).

By the government's own logic, every count of conviction must be vacated. Since every count could rest on a finding that Ms. Agarwal participated in the "pharma fraud," there is no way for this Court to be sure that any count was unaffected by the government's invalid theories.

## II. ALTERNATIVELY, MS. AGARWAL'S CONVICTIONS REST ON IMPROPERLY ADMITTED GRAND-JURY TESTIMONY

At the start of trial, the government urged the jury to focus its attention on three key witnesses—Ketchum, Desai, and Ma. *E.g.*, R. 582 at 52:17-60:17.  "Listen to these witnesses," the government told jurors, "[l]isten to what they have to say." R. 582 at 59:17-19.  But the government did not like what it heard.  To get its stars back on script, the government had them read aloud from the grand-jury "statements" written for them by the prosecution team.  R. 588 at 1819:10-1832:19 (Ketchum); R. 592 at 3054:13-3059:21 (Ma); R. 602 at 5647:13-5673:12 (Desai).  As Shah's brief explains, admitting those statements was error.  SSA114-115 (Ketchum); SSA116-119 (Ma); SSA120-126 (Desai).  For Ms. Agarwal, that error requires a new trial.

**Standard of Review.** An evidentiary error requires a new trial unless the government proves the error had "no substantial influence on the verdict." *United States v. Chaparro*, 956 F.3d 462, 482 (7th Cir. 2020). To do so, the government must show that the "untainted incriminating evidence" was "overwhelming." *Id.*

## A.     The Untainted Evidence Against Ms. Agarwal Could Not Support Conviction

The government's case against Ms. Agarwal was always different. As the government later conceded, Ms. Agarwal's role in advertising sales—the heart of the alleged scheme—was "essentially nonexistent" after Desai took over in August 2013. R.850 at 43:16-18. The trial court agreed: "[T]he evidence I heard at trial" was that after 2013 "she was off on a different aspect of [the] company" unrelated to the alleged fraud. R.850 at 22:6-8. Ms. Agarwal's role in Outcome's efforts to borrow money from banks and raise capital from investors, the government admitted, was likewise "very minimal." R.850 at 43:23-44:1.

That made it critical for the government to show Ms. Agarwal somehow "planted the seeds" of the fraud *before* she left the sponsorship team in mid-2013. R.615 at 9172:10-12. The government staked its case against Ms. Agarwal on Ketchum. Ketchum's testimony, the government promised, would show how "Shah and Agarwal created Outcome's fraudulent business practices." R.583 at 552:12-24. Ketchum alone, it said, could tell how Ms. Agarwal "directed [him] to lie to clients

about the amount of ad inventory that Outcome could give them to give clients fraudulent list match results." R.582 at 52:17-53:2.

That's not what happened. Ketchum testified that he never had an intent to defraud. R.587 at 1516:9-15. He admitted on cross-examination that Ms. Agarwal never told him to "make up" list matches. R.587 at 1526:12-14. He testified that the list matches he and Ms. Agarwal gave advertisers reflected "actual analysis" and extensive work. R.587 at 1525:25-1529:24. He testified that Ms. Agarwal was transparent about projections and kept salespeople in the loop. R.587 at 1553:8-15, 1574:11-22, 1576:21-1577:16. And he testified that Ms. Agarwal disclosed under-delivery to advertisers and that everyone, advertisers included, understood Outcome's business model was to sell then build. R.587 at 1644:16-1645:10, 1652:13-25.

That testimony devastated the government's case against Ms. Agarwal. It demonstrated that Ms. Agarwal had not acted with the intent to defraud anyone. At a minimum, it destroyed the link between Ms. Agarwal and Desai's fraud. The government immediately realized its mistake. By the end of trial, it was imploring the jury *not* to listen to what Ketchum said—"[f]ortunately, you can put his testimony aside." R.615 at 9213:8.

The evidence that followed at best lifted the government to ground level from the hole Ketchum dug. Take Desai's testimony. By the time Desai started at Outcome, Ms. Agarwal was no longer the "first point of contact" for sales. R.587 at 1637:16-1638:17; R.947-26 (DX3063). Desai's "direct supervisor" and "mentor" was

46

Shah.  R.595 at 3829:2-8.  Indeed, as the district court recalled, "Desai confirmed" that Ms. Agarwal had moved on.  R.850 at 22:13-14.

What little Desai did say about Ms. Agarwal—even on direct or redirect—was vague or nonspecific.  Desai referred generally to emails with Ms. Agarwal "around concealing things from clients," but he contrasted her approach with Shah's "aggressive kind of sales tactics."  R.595 at 3838:6-14.

Desai's most pro-government testimony regarding Ms. Agarwal amounted to a series of "yes" answers to questions about whether she hid information from advertisers.  R.602 at 5646:5-14.  But Desai never said Ms. Agarwal directed him to lie—though he said others had.  R.602 at 5645:16-5647:8.  Nor did he say that he told Ms. Agarwal what he was doing—though he told others.  R.596 at 4010:16-4011:23.  Rather, Desai agreed that Ms. Agarwal told him *not* "to overpromise."  R.602 at 5896:14-5897:24, 5891:19-22.  Desai's testimony was ultimately of so little value that the discussion of that testimony in the government's opposition to Ms. Agarwal's acquittal motion does not even mention her by name.  R.502 at 38-41.

Ma's testimony was similar.  Ma recalled exactly one conversation in which he "delicately" "dance[d] around" the topic of Desai's conduct, taking care *not* to "directly imply" he thought it was unethical.  R.590 at 2424:1-24.  Rather than tell Ms. Agarwal he was concerned, Ma "phras[ed] it as a question."  R.590 at 2423:5-2425:6.  That was on *direct* examination.  On cross, Ma conceded he did "not recall" *ever* "telling [Ms. Agarwal] that [he] inflated" metrics or "made up data."  R.591 at

47

2772:9-2773:2.  And he agreed it was "fair" to say Ms. Agarwal never directed him to lie or fabricate information.  R.591 at 2777:19-2778:5.

The government emphasized that Ms. Agarwal supposedly told Ma that Outcome "throw[s] smoke bombs" while it "clean[ed] up [its] operations"—apparently a reference to how Shah publicly described Outcome's efforts to meet projections by the time advertisers' ads ran.  R.592 at 3030:15-3031:2.  The government would refer to "smoke bombs" dozens of times.  But that comment told jurors (at most) that Ms. Agarwal was aware the company scrambled at times to meet its commitments.  That is a far cry from proof that Ms. Agarwal personally acted with the intent to defraud those advertisers.  Even if the jury thought her conduct was deceptive, deception and fraud "are not synonymous." *United States v. Yermian*, 468 U.S. 63, 73 n.12 (1984).

### B.    The Government Cannot Meet Its Burden to Show That the Improperly Admitted Evidence Did Not Influence the Verdict

Given the threadbare case against Ms. Agarwal personally, the government cannot meet its burden to establish that the "untainted incriminating evidence" against her was so "overwhelming" that the government-scripted grand-jury testimony could not have swayed the jury.  *Chaparro*, 956 F.3d at 482-83; *see United States v. Miller*, 673 F.3d 688, 701 (7th Cir. 2012) ("Doubts" equal no harmless error).

Start with Ma.  The government urged that the "smoke bomb" comment Ma recalled was "devastating" evidence of Ms. Agarwal's intent.  R.620 at 10274:9-25;

48

*see* R.383 at 4 (court noting Ma's grand-jury "testimony" went "directly to the central issues of this case"). But that inference depends on what Ms. Agarwal thought Ma was saying. If Ms. Agarwal thought Ma was expressing concern about Outcome's ability to meet projections, then hearkening back to Shah's reference to "smoke bombs" was just a way of reassuring him that things would work out in the end. To draw the government's preferred inference, the jury had to think Ms. Agarwal understood Ma to be reporting *fraud*.

Ma's trial testimony failed to lay that predicate. Again, Ma described using "euphemisms," being "indirect," and "danc[ing] around" his concerns, framing them "as a question." R.590 at 2423:7-2425:6; R.591 at 2768:7-2769:18, 2772:4-2775:25. Ma's grand-jury testimony painted a different picture: "I told Agarwal that I was not comfortable with the business practice of selling inventory that we did not have." R.592 at 3058:18-19. Recasting the conversation that way—from maybe-sorta-kinda-hinting to *telling*—allowed the government to cast Ma as a whistleblower. The prosecution's case against Ms. Agarwal would have been "significantly less persuasive" without it. *Chaparro*, 956 F.3d at 482.

Vacatur would be required even if Ma's grand-jury testimony had done no more than corroborate his trial testimony, as the government insisted. R.620 at 10274:25-10275:2, 10276:9-11. Evidence that "provide[s] corroboration for the testimony of the government's star witness" has the potential to "shape[ ] the entire trial." *United States v. Shelton*, 997 F.3d 749, 773 (7th Cir. 2021). That was certainly

true here, where the government insisted throughout trial and afterwards that "Ma's consistent testimony about Agarwal, at trial and to the grand jury years before," offered "a rational factfinder" an independent basis to convict her. R.502 at 33; *see* R.591 at 2770:2-24 (noting lack of other corroboration).

The introduction of Ketchum's grand-jury statement was just as prejudicial to Ms. Agarwal—if for a different reason. The defense cross of Ketchum would have left any juror with reasonable doubt about Ms. Agarwal's guilt. *See* p. 46, *supra*. The government no doubt hoped that the grand-jury script would get Ketchum back on message. While Ketchum admitted on the stand that Ms. Agarwal had never told him to "make up" numbers, R.587 at 1526:12-13, the words prosecutors had put in his mouth said the opposite—that Ms. Agarwal "instructed" him to "misrepresent[ ]" Outcome's inventory, R.588 at 1826:12-18. But it didn't work out that way.

When the defense got Ketchum to agree that new information had made him reassess what he had told the grand jury about Ms. Agarwal's approach to list matches and projections, R.588 at 1895:1-1910:15, the government changed tactics. Rather than ask the jury to believe the story Ketchum told to the grand jury, it argued that the *inconsistency* between Ketchum's trial and grand jury testimony showed he was duplicitous or unreliable. The government went from telling the jury Ketchum would establish some connection between Ms. Agarwal and Desai's fraud to calling him "a circus pony" who would "have answered yes to nearly any question posed to him." R.615 at 9212:22-9213:8. That made it far more likely that the jury

50

would listen to the government's entreaty to "put his testimony aside" entirely, instead of focusing on the fact that Ketchum had destroyed the "groundwork" theory essential to the government's case against Ms. Agarwal.  R. 615 at 9212:22-9213:8.

Although Desai had little to say about Ms. Agarwal, his testimony needed every bit of bolstering it could get.  The government repeatedly leaned into the grand-jury statement, telling the jury that Desai "told you the truth.  Just like he told the grand jury the truth back in 2019."  R. 615 at 9241:23-25; *see* R. 620 at 10347:21-25, 10348:9-11, 10352:23-10353:2, 10353:13-16, 10362:15-16, 10365:7-8.  It allowed the government to portray an admitted liar as someone who "has been straight with the government from the start," including during "[h]is grand jury statement."  R. 620 at 10347:21-25.

Desai's grand-jury statement also let the government implicitly contrast him, a fraudster who "owned up to what he did" by testifying "before the grand jury, and for two and a half weeks on that witness stand at trial," with the defendants who did not testify.  R. 614 at 9080:2-11; *cf. United States v. Cotnam*, 88 F.3d 487, 498 (7th Cir. 1996) (indirect comment on defendant's failure to testify improper).

Given the weakness of the government's case against Ms. Agarwal and the obvious importance the government placed on the grand-jury statements in making its case to the jury, it is impossible to say "'with fair assurance' that the verdict was not substantially swayed by" the district court's error.  *Miller*, 673 F.3d at 701

(quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).  For that reason, too, a new trial is warranted.

## III.  THE GOVERNMENT'S ILLEGAL RESTRAINT OF UNTAINTED FUNDS VIOLATED MS. AGARWAL'S RIGHT TO COUNSEL OF HER CHOICE

The government admits it illegally restrained Ms. Agarwal's untainted funds. For the reasons set forth in Shah's brief, that restraint and the government's misconduct denied Ms. Agarwal her constitutional rights to due process and representation by counsel of her choice, a structural error that is not subject to review for harmlessness, was timely raised, and requires reversal or vacatur. Ms. Agarwal writes separately to explain why the rulings specific to her fail on their own terms.

**Standard of Review.**  This Court "'review[s] de novo the denial of a motion to dismiss an indictment and the [district] court's factual findings for clear error.'" *United States v. Johnson*, 43 F.4th 771, 779 (7th Cir. 2022).  A constitutional error requires "automatic reversal" unless the government proves harmlessness beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18, 21-24 (1967).  At a minimum, vacatur is warranted when a decision rests on clearly erroneous findings. *See, e.g.*, *United States v. Newton*, 76 F.4th 662, 674-75 (7th Cir. 2023).

The district court held that Ms. Agarwal had not established a violation of her Sixth Amendment rights because, according to the court, Ms. Agarwal could not have paid her chosen lawyers even without the unlawful restraint.  *See* SSA187.

Even if the legal premise of the court's analysis were right—and it is not—the court's findings regarding Ms. Agarwal rest on a chain of speculative inferences that cannot withstand review.

*First*, the trial court found that Ms. Agarwal would have needed $3.5 million from the restrained funds to pay her existing counsel at McGuireWoods. R.747 at 22. But that finding rests on the firm's request for $5.8 million. R.747 at 22. It is impossible to say whether McGuireWoods would have accepted less. Fees are always negotiable, law firms undertake representations at discounted rates or under flexible fee structures for a host of reasons, and "legal expenses" often end up being "less than anticipated." R.75-2 at 21. Where, as here, "only speculation can support the district court's" finding, reversal is warranted. *Newton*, 76 F.4th at 674; *see United States v. Pigee*, 197 F.3d 879, 889 (7th Cir. 1999) (similar).

*Second*, it is likewise pure speculation that McGuireWoods would not have accepted some combination of liquid and illiquid assets. Although *Shah's* counsel indicated it would not accept "the promise of future payments from the proceeds of potential sales or distributions from illiquid assets," the district court acknowledged "there was no parallel testimony from" Ms. Agarwal's counsel. SSA189-190. The court observed that there was "no suggestion in the record that McGuireWoods would have been open to the promise of future proceeds from these illiquid assets." SSA190. But a gap in the evidence is not an excuse for speculation. *See, e.g.*, *Newton*, 76 F.4th at 672-74 (clear error where "testimony d[id] not support such a sweeping

53

finding"). There was simply no basis from which to find that Ms. Agarwal's counsel could not have been paid over time.

*Third*, in concluding that the illegal restraint made unavailable—at most—$1.739 million, the district court assumed that Ms. Agarwal would need to take distributions or sell illiquid assets by June 30, 2020, the deadline to find new counsel. SSA188-191. That piles speculation on speculation. The only reason to think Ms. Agarwal would have needed to sell off illiquid assets by the deadline is that her counsel would not have accepted the promise of future payments. With no evidence on that score, there was likewise no basis to assume that the unlawfully restrained assets would have had to be sold off in a rush.

*Fourth*, the district court clearly erred in finding that Ms. Agarwal would receive only 15-20% of the illegally restrained assets. That finding ignored Shah's past practice of splitting funds 50-50 with Ms. Agarwal to pay legal fees. SSA191-192. The court brushed that evidence aside, observing that Shah's past decisions were "discretionary." SSA191-192. But that did not make it any less speculative to assume that Shah would *not* do so again. *See*, *e.g.*, *United States v. Bradley*, 628 F.3d 394, 399-401 (7th Cir. 2010) (broad assumptions must give way to particularized evidence).

## CONCLUSION

The federal fraud statutes were not intended to displace state-law tort, contract, or consumer-protection claims; they were enacted to punish schemes to fraudulently deprive victims of traditionally recognized property rights. The

government pushed the envelope. In urging the jury to convict Ms. Agarwal for "over-promising" and "under-delivering," the government created the risk that Ms. Agarwal would be found guilty of conduct that the law does not make criminal. The government must live with the consequences of that decision.

Under this Court's precedent, no amount of evidence can save the judgment. With no way to be sure the jury's verdict rests on valid grounds, vacatur is the only option. But a new trial would be required regardless. Given the acknowledged weakness of the case against Ms. Agarwal, the erroneous introduction of grand-jury testimony necessarily influenced the jury's verdict. And the government's concededly unlawful restraint of assets denied Ms. Agarwal her right to choose her counsel—a structural error that cannot be salvaged and that requires outright reversal or vacatur and remand given the court's clearly erroneous findings. The judgment must be reversed or, at a minimum, vacated.

Dated: April 4, 2025
      Chicago, IL

Respectfully submitted,

/s/ Eugene A. Sokoloff

Eugene A. Sokoloff
  *Counsel of Record*
Megan Cunniff Church
Kenneth E. Notter III
Peter C. Douglas
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone: (312) 450-6718
esokoloff@mololamken.com

*Counsel for Defendant-Appellant Shradha Agarwal*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Cir. R. 32(c) because this brief contains 13,574 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Expd BT 13-point font.

Dated:  April 4, 2025
        Chicago, IL

/s/ Eugene A. Sokoloff

Eugene A. Sokoloff
  *Counsel of Record*
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone: (312) 450-6718
esokoloff@mololamken.com

*Counsel for Defendant-Appellant Shradha Agarwal*

☑

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on ___April 4, 2025___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ___Eugene A. Sokoloff___

☐

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                          address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/_____

Nos. 24-2230 & 24-2236

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

RISHI SHAH AND SHRADHA AGARWAL,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Illinois, Judge Thomas M. Durkin
(No. 1:19-cr-00864)

## REQUIRED SHORT APPENDIX FOR
## DEFENDANT-APPELLANT SHRADHA AGARWAL

Eugene A. Sokoloff
  *Counsel of Record*
Megan Cunniff Church
Kenneth E. Notter III
Peter C. Douglas
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone: (312) 450-6718
esokoloff@mololamken.com

*Counsel for Defendant-Appellant Shradha Agarwal*

**STATEMENT OF COMPLIANCE**

Pursuant to Cir. R. 30(d), I hereby certify that all materials required by Cir. R. 30(a) and 30(b) are included in this Required Short Appendix, the Required Short Appendix filed by Defendant-Appellant Rishi Shah, and the Separate Joint Appendix filed in conjunction with the Opening Briefs of Defendants-Appellants Shradha Agarwal and Rishi Shah.

Dated: April 4, 2025
     Chicago, IL

/s/ Eugene A. Sokoloff

Eugene A. Sokoloff
  *Counsel of Record*
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone: (312) 450-6718
esokoloff@mololamken.com

*Counsel for Defendant-Appellant Shradha Agarwal*

# TABLE OF CONTENTS[1]

Page

Transcript of Ms. Agarwal's Sentencing Hearing
    (June 27, 2024) (R. 850) (excerpts)....................................................SA1

Judgment as to Ms. Agarwal
    (July 1, 2024) (R. 807) .........................................................................SA23

Notice of Appeal
    (July 12, 2024) (R. 811) .......................................................................SA47

---

[1] To avoid unnecessary duplication, Ms. Agarwal's required short appendix omits the following district court orders and rulings, which are already contained in Shah's required short appendix ("SSA"):

- Order denying motion to amend the protective order (SSA1-11);
- Oral rulings on admission of Ketchum grand-jury statement (SSA12-45);
- Oral rulings on admission of Ma grand-jury statement (SSA46-94);
- Oral rulings on admission of Desai grand-jury statement (SSA95-113);
- Order admitting Ketchum grand-jury statement (SSA114-115);
- Order admitting Ma grand-jury statement (SSA116-119);
- Order admitting Desai grand-jury statement (SSA120-126);
- Order denying motions for judgment of acquittal or a new trial based on the sufficiency of the evidence (SSA127-167); and
- Order denying motions to dismiss the indictments or for a new trial based on unconstitutional pre-trial restraint of assets (SSA168-211).

Case: 24-2230   Document: 30   Filed: 04/04/2025   Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 1 of 109 PageID #:32442

1

```
  1                   IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
  2                            EASTERN DIVISION

  3    UNITED STATES OF AMERICA,         )    Case No. 19 CR 864-2
                                         )
  4            v.                        )
                                         )
  5    SHRADHA AGARWAL,                  )    Chicago, Illinois
                                         )    June 27, 2024
  6                    Defendant.        )    9:30 a.m.

  7                 TRANSCRIPT OF PROCEEDINGS - Sentencing
                   BEFORE THE HONORABLE THOMAS M. DURKIN
  8

  9    APPEARANCES:

 10    For the Government:      United States Attorney's Office
                                BY:  MR. KYLE C. HANKEY
 11                             Criminal Division, Fraud Section
                                1400 New York Avenue NW
 12                             Washington, D.C. 20530

 13
                                United States Attorney's Office
 14                             BY:  MR. JASON YONAN
                                219 South Dearborn Street, 5th Floor
 15                             Chicago, Illinois 60604

 16

 17

 18
       Court Reporter:          ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
 19                             Official Court Reporter
                                United States District Court
 20                             219 South Dearborn Street, Room 1432
                                Chicago, Illinois 60604
 21                             312.408.7782
                                Elia_Carrion@ilnd.uscourts.gov
 22

 23                            *   *   *   *   *

 24              PROCEEDINGS REPORTED BY STENOTYPE
          TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
 25
```

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 22 of 109 PageID #:32463

22

1  participation in the scheme, that's sufficient for guidelines

2  purposes.

3       So I'll pause there, Your Honor, if you have any

4  questions; but I'm happy to --

5       THE COURT:  Is it reasonably foreseeable when she

6  pushes back?  Maybe she started it and got in on the

7  beginning, but she -- the evidence I heard at trial was she

8  was off on a different aspect of this company.

9       She did certainly circle the wagons at the end, and

10 there's a number of Voxers and emails relating to Prowker and

11 Sameer Kazi and Pierce and other people.  But her role was --

12 certainly after the start of this process was minimal relating

13 to the sales -- the analytic group.  I think Desai confirmed

14 that -- not nonexistent, but minimal.

15      And I -- we're -- given where the guidelines are at,

16 it's -- whatever my finding is, again, the guidelines in these

17 cases are -- for reasons I stated yesterday, are significantly

18 higher than any realistic sentence I'd ever impose.

19      MR. HANKEY:  Uh-huh.

20      THE COURT:  So I don't want to prolong this too much

21 when the dispute is not going to be dispositive toward any

22 sentence, but I -- I'll let you make your record.

23      You have -- just as defense has a right to appeal,

24 the government does too.  So go ahead and make your record.

25      MR. HANKEY:  Well, thank you, Your Honor.  And we

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 31 of 109 PageID #:32472

31

1   pushing the aggressive -- wildly aggressive revenue goals that

2   were driving the fraud here.  He was the impetus behind the

3   fundraising.

4        Ms. Agarwal was -- had very, very limited involvement

5   in that; didn't even know about it as it was going on;

6   literally wrote an email saying, I'm being kept in the dark

7   about these things.  She is not a leader/organizer and should

8   not get that 4-point enhancement.

9        THE COURT:  All right.  View of the government?

10        MR. HANKEY:  We rest on our papers, Your Honor.

11        THE COURT:  All right.  I'm not going to apply any

12   points for leader and organizer.

13        The primary goal of Section 3B1.1 is to make a

14   commonsense judgment about the defendant's relative

15   culpability, given her status in the criminal hierarchy.  And

16   I think for reasons just given by Mr. Blegen and my own

17   observation of Ms. Agarwal's role in this case, to call her a

18   leader and organizer for a 4-point enhancement or a manager or

19   supervisor or an organizer/leader and manager involving more

20   than five participants has to focus on what her role was in

21   the criminal activity.

22        I am not comfortable and don't believe the evidence

23   supports such an enhancement -- role enhancement, aggravating

24   role enhancement for Ms. Agarwal in this case.  That's not a

25   comment on statements I will consider in aggravation for,

**SA3**

Case: 19-cr-00884 Document #: 859 Filed: 08/19/24 Page 25 of 109 PageID #:32473
Case: 24-2230 Document: 59 Filed: 04/04/2025 Pages: 118

32

 1    nonetheless, being a partial owner of this company and a

 2    spokesperson for the company and other aspects of her role;

 3    but for guideline purposes, the 4 points will not be applied.

 4         Okay.  That, then, gives us a base offense level --

 5    or an offense level for the fraud 2B1.1 calculation of 25;

 6    2 points added for 10 or more victims, and 2 points added for

 7    the million dollars or more in gross receipts from a financial

 8    institution, which is Level 29.

 9         Do the parties agree with my math?

10         MR. BLEGEN:  Judge, there's the 0 point offender

11    reduction.

12         THE COURT:  You're right.  With that -- and she's

13    eligible for that by not putting in the leader or organizer

14    language.  So we're down to minus 2 on that, so we're 27.

15         Does the government agree with my math?

16         MR. HANKEY:  Yes.

17         THE COURT:  Does defense agree with it?

18         MR. BLEGEN:  Yes.

19         THE COURT:  All right.  Then that means the

20    guidelines for a Criminal History Category I is 70 to 87

21    months.

22         Do the parties agree on that?

23         MR. HANKEY:  Yes.

24         MR. BLEGEN:  Yes.

25         THE COURT:  Okay.  That'll be the guideline

1    that.

2           THE COURT:  Mr. Saba would come up with a discount

3    factor for it.

4           MR. HANKEY:  Yes, Your Honor.

5           THE COURT:  Which I would similarly find speculative.

6           Go ahead.

7           MR. HANKEY:  Thank you.

8           Your Honor, this is -- this is a -- one of the cases

9    where we think -- and we know this doesn't work this way, but

10   having the -- a defendant's sentencing memo before we submit

11   our recommendation actually would have been very helpful.  And

12   that's because this sentencing memo is probably the most

13   compelling one that I've seen in my career.

14          Ms. -- Ms. Agarwal is obviously a very charitable

15   person.  She -- it's clear from the evidence at trial and also

16   submitted by the defense that her motives in committing these

17   crimes are very different than the motives of Rishi Shah and

18   also of Mr. Purdy, although Mr. Purdy's motives -- we'll speak

19   to this, of course, later -- but were different from

20   Mr. Shah's as well.

21          It doesn't change the fact that she committed serious

22   crimes, and we'll get to that in a minute.  But it introduces

23   interesting issues in terms of evaluating how to apply the

24   3553(a) factors.

25          Her -- her charitable nature and the charitable

Case: 1:19-cr-00864 Document #: 859 Filed: 08/19/24 Page 39 of 109 PageID #:32479
Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118

38

1    nature of her work at Outcome and -- and, also, you know, the

2    motives that she had, not being necessarily driven by greed

3    but being driven by other things, offers, we posit, both

4    aggravating and mitigating circumstances.

5         Mitigating, of course, because it -- it does seem

6    clear that more than greed, and maybe to the exclusion of

7    greed, Ms. Agarwal's motivation for committing these crimes

8    was to build a company to -- that -- that would be known for

9    serving patients and doing good for society, both here in the

10   United States and globally.  And she wanted that because she

11   wanted to do the right thing, she wanted to do good; but

12   unfortunately, she also wanted recognition and fame for doing

13   that, for building it.

14        That's what she got.  She -- she was recognized and

15   she, to a degree, received at least locally fame for her role

16   as one of the founders of Outcome Health.

17        Now, how is that aggravating, and perhaps aggravating

18   in a different way than if she were motivated by greed?  What

19   it suggests is that in her mind at the time, the ends justify

20   the means.  And that is a different motivation than greed.

21   Greed, Mr. Shah's motivation, is more transactional.

22        The defendant can make a judgment, am I willing to

23   make a risk of maybe being prosecuted civilly or criminally

24   for my actions in order to earn a billion dollars or more?

25   That's different than someone who has a vision for what they

Case: 24-2230   Document: 30   Filed: 04/04/2025   Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 39 of 109 PageID #:32480

39

1  believe is the right thing to do and is willing to take

2  unethical, illegal, and improper steps to get there.  And

3  it -- and it raises concerns about her character, at least at

4  the time.

5       So we think it -- her -- her motives in committing

6  the crime are both mitigating in a significant way, but also

7  aggravating in that respect.

8       Now, I think the Court should also consider how --

9  the fact that she was very young when she joined

10 Outcome Health.  She had just graduated from college.  She was

11 a brand-new professional in her career.  And, you know,

12 it's -- I think it's a natural temptation for -- for people

13 who are inclined towards service to others to be tempted to

14 want recognition for that service, not -- not to serve solely

15 for the basis of service, but to serve also for recognition

16 and something else in return.

17      It's a temptation.  Probably everyone feels it.

18 Anyone who's so inclined feels that from time to time.  And

19 she was overcome by that.  She wanted recognition for her

20 charitable works and for what she wanted to do, but it -- that

21 succumbing to that temptation probably in large part had to do

22 with her age and her lack of experience and her

23 impressionability as -- as a young adult.

24      And I think that also was probably impacted

25 significantly by the -- the charismatic qualities and

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 43 of 109 PageID #:32484

43

1          Now, it is true and it's very important for the Court

2    to consider that Ms. Agarwal's involvement in the fraud

3    dropped off significantly after Mr. Desai joined the company.

4    And she did go back to -- or she took over the role of

5    ensuring that the company's content was, you know, excellent

6    and -- and that they had the right way to deliver their

7    product to the consumers of it, the patients that she did care

8    so much about.  And so her role at the company did again kind

9    of focus on -- on the good part of the company, the part that

10   she cared the most about.

11         And I think that's important for the Court to

12   consider.  That's what she wanted to do, and that's what she

13   did.  And that's the role that she carved out for herself and

14   she played from 2014 through 2017, probably even starting in

15   late 2013.

16         And her -- similarly, so her role in sales to pharma

17   clients, you know, was essentially nonexistent during that

18   time period.  She -- she, of course, knew the scheme was

19   ongoing.  And I'll speak to that in a minute.  She wanted it

20   to continue.  She helped it continue.  But at the same time,

21   she wasn't there directing Mr. Desai or anyone on how to do

22   it.

23         Now, similar things can be said about the capital

24   raise in 2017 and -- and the effort to borrow money from banks

25   prior to that in 2016.  She -- her role in -- in both of those

1    was very minimal.  The most significant role that she had was

2    in deceiving Deloitte.  She had to do that in order to get a

3    clean audit from Deloitte.  And a clean audit from Deloitte

4    was necessary for them to get the money from the banks and the

5    investors.

6           Not only did she sign false management representation

7    letters, which she shouldn't have done, but she participated

8    in management inquiry meetings with Deloitte.  Government's

9    Exhibit 533 is one -- one of the Deloitte work papers from one

10    of those management inquiry meetings.  And I'm paraphrasing,

11    but it described how Mr. Shah, Ms. Agarwal, and Mr. Purdy --

12    and it doesn't differentiate between the three of them, to be

13    clear -- emphasized that if an individual acts unethically,

14    they would be terminated immediately.

15           And of course, they -- they knew that there was

16    unethical conduct occurring at the company.  They knew that

17    there were allegations of Mr. Desai acting unethically.  And

18    yeah, someone probably took the lead in making those

19    representations.  I posit that it probably wasn't Ms. Agarwal,

20    but the auditors got the impression that she stood behind

21    those statements.

22           THE COURT:  No, and it's not unusual for an auditing

23    company to want to see the -- the owners of a company when

24    they want to find out if a company is being run honestly.

25    They don't want a third-level manager there to make that

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 50 of 109 PageID #:32491

50

1          THE COURT:  Right.  Ms. Agarwal and Mr. Shah had

2    percentage ownerships of Gravitas.  I think it was, what,

3    80/20 or something along those lines?  I thought.

4          MR. HANKEY:  I -- I -- I don't know exactly,

5    Your Honor; but certainly Mr. Shah controlled it and they were

6    coconspirators -- or coschemers.

7          THE COURT:  I agree.

8          MR. HANKEY:  So -- but -- but I think it's also --

9    I mean, it's important when we're talking about the money

10   that -- that she obtained to point out, like -- as you just

11   have, that she didn't -- she didn't try to hide the money.

12   She, in fact, appears to have spent very little of it.

13         And I think that's a -- a significant -- a very

14   significant mitigating factor; and it goes again to, you know,

15   her motives for doing what she did.

16         THE COURT:  No, there's no private jets, there's no

17   expensive residences, there's no huge artwork purchases,

18   there's no going to casinos.  There's none of the trappings of

19   extravagance and excess that Mr. Shah exhibited, with

20   Ms. Agarwal.  I will save Mr. Blegen that argument because I

21   acknowledge that.

22         MR. HANKEY:  And it -- and I would even go further,

23   Your Honor.  She lived quite modestly, and I think that speaks

24   volumes about her motives, again.

25         Now, with respect to the effort she undertook to

 1  very top of it.  She had the opportunity and the ability to

 2  stop it, being the president of the company.  She didn't.

 3        She -- we've weighed her, you know, her -- her very

 4  significant, notable, admirable dedication to charitable

 5  efforts against those things.  We've weighed the fact that she

 6  was young at the time and impressionable against those things.

 7  And even then, we think that a significant term of

 8  imprisonment is appropriate.  We think anything less would

 9  undermine the rule -- the respect for the rule of law.

10        And so for -- for those reasons, Your Honor, we think

11  70 months or some lesser but significant amount of time of

12  imprisonment would be appropriate in this case.

13        THE COURT:  You'd agree if I sentenced her to a --

14  what you asked for, a significant sentence of incarceration,

15  she's not going to be treated the same as her codefendants --

16        MR. HANKEY:  Yes.

17        THE COURT:  -- and go to a camp?

18        MR. HANKEY:  Yeah.  And --

19        THE COURT:  You cannot as a representative of the

20  Department of Justice tell me that she would be going to a

21  camp?

22        MR. HANKEY:  I cannot, Your Honor.

23        THE COURT:  Okay.

24        MR. HANKEY:  And we -- we agree that that's in all

25  likelihood going to happen.  And so for that reason, we think

1    that, who were former Bureau of Prisons officials themselves.

2         MR. BLEGEN:  There's a lot of exhibits.  It'll take

3    me a second to pull them out.

4         So we had submitted three exhibits:  One from

5    Joel Sickler, a BOP consultant; another one from Janet Perdue,

6    who you discussed earlier; and another from Maureen Baird.

7    Ms. Perdue and Ms. Baird were both BOP officials.  Ms. Baird

8    was a --

9         THE COURT:  She was a warden at Danbury and --

10        MR. BLEGEN:  Yes, former warden.

11        THE COURT:  And Ms. Perdue was an associate warden at

12   the MCC.

13        MR. BLEGEN:  Yes.  I think I actually summarized --

14        THE COURT:  And associate warden.

15        MR. BLEGEN:  -- the -- some of the conditions in our

16   memo.  So if I can turn to that, I will.

17        THE COURT:  Well, my -- my big concern is not

18   visiting hours or some of the other things that are an

19   inconvenience but part of being in a prison.

20        I'm more concerned -- and it was pointed out -- that

21   the potential violence relating to fellow inmates and the

22   crimes they've been convicted of, which are not white-collar

23   crimes, but in fact are in many cases gun, drug, and violent

24   crimes, being housed with someone who is a white-collar

25   criminal who may be perceived by those fellow inmates as

1    someone with wealth who would make her subject to potential

2    abuse, or worse, extortion and things that are not part of

3    the -- supposed to be part of the aspect of incarceration

4    beyond separation from society and the punishment aspect.

5         You're punished by going to jail and being put in a

6    jail to be separated from your loved ones, separated from

7    society; but you're not being put in a jail to be abused, to

8    be subject to -- abuse, I guess is the best way to put it.

9         MR. BLEGEN:  So I can put these on the record.  I

10   found the --

11        THE COURT:  Briefly.

12        MR. BLEGEN:  Yes, I will.  So -- and what we're

13   talking about here is the difference between a camp and an

14   FCI.  I'll skip over the parts that...

15        I do think the lack of visitation from her family is

16   a significant issue, but not as significant as the other ones.

17   But to get directly to the point, the third difference

18   between -- and this is from Ms. Baird's -- hang on, let me

19   make sure of that.  This is from Mr. Sickler's declaration,

20   which was adopted in part by Ms. Baird and Ms. Perdue.

21        The third difference between an FPC and an FCI is the

22   type of inmate.  Camps house offenders convicted who are

23   serving short sentences and have often cooperated with the

24   government.  These inmates generally are --

25        THE COURT:  Slow down for my court reporter.

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 91 of 109 PageID #:32532

91

1    to give over so much money?  And the reason why, it was a good

2    business.  You had a good business.  You had a good idea.  You

3    didn't have to cheat.  Nobody did.  I said this yesterday to

4    Mr. Shah, nobody had to do this to survive and make a good

5    living and provide services to patients and have happy

6    employees, have people that would be proud of the work they

7    did and not having a tarnish on their résumé.  It didn't have

8    to be this way.  So that's all in aggravation.

9         In mitigation, there's an awful lot.  You had a

10   modest upbringing in India.  Your parents separated.  You have

11   complicated family relationships.  Your mother has had health

12   problems and says you're the only one who really have nurtured

13   her and helped her after her medical incident down in

14   Florida -- down in Texas.

15        There is a great potential you're going to be

16   deported upon the completion of any sentence I give, even

17   though you've been in this country for 20 years.  You'll have

18   to give up your hope for citizenship, as it likely will be

19   something you'll never be able to obtain.  And you'll go back

20   to a country, as your husband just said, a country that you've

21   never -- you haven't lived in for 20 years and is unfamiliar

22   to you at this adult age.

23        You have done charity work since you left Outcome and

24   became unemployed.  You were involved in charity work your

25   entire adult life.  It's an incredible array of good deeds,

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 92 of 109 PageID #:32533

92

1   seemingly never to draw attention to yourself.  It wasn't

2   checkbook charity where you're rich, so you have the luxury of

3   writing checks to people and getting patted on the back or be

4   listed in an ad book as being a benefactor for some charity.

5        My impression was you didn't do it for fame or

6   self-aggrandizement.  You did it out of the goodness of your

7   heart, including, you know, the -- working at a refugee camp

8   in Greece for Syrian refugees; not writing a check, but

9   actually being in the camp.  It's really incredible.

10       Greed did appear.  And fame didn't appear to be a

11  primary motivator for your conduct, even at the interview

12  played to the jury about the smoke bomb while the -- the smoke

13  bomb comment, Mr. Shah did all the talking.  You, in my -- my

14  at least view of that, you looked uncomfortable there.

15  Mr. Shah did not, and he enjoyed speaking to the adoring fans.

16       But I have an enormous number of letters from people

17  at all stages of your life describing someone who is not a

18  criminal actor, but exactly the opposite.  Letters from former

19  employees of Outcome who I would have thought would be

20  resentful because jobs were lost, reputations tarnished; but

21  they were in praise of you.  Similarly, there were letters

22  from investors who said they lost money -- and make no

23  mistake, investors lost money and banks lost money.

24       I made guideline calculations under the strict

25  language of the guidelines and also to -- well, that's why I

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 93 of 109 PageID #:32534

93

1  made those guideline calculations, but it should not be a

2  ratification that nobody lost money.  Because people in their

3  own letters here said, Judge, I invested in Outcome; I lost

4  money, but Ms. Agarwal is still a wonderful person and I don't

5  hold her accountable for it.

6        But by all counts, you're a very compassionate and

7  kind person who has had a positive impact on many, many

8  people.  Many people express in their letters a respect for

9  the court system and the jury system, but can't believe a jury

10  would find that you -- they know you were guilty.  The

11  difference, of course, for the people who wrote those letters

12  is that the jury sat through every minute of the trial and

13  thought otherwise.  And they promised to be fair.  They

14  promised to keep an open mind.

15        And that doesn't mean I don't respect the view of

16  people who wrote letters.  They have a view of you that knew

17  you otherwise, more than the jury did.  But the jury knew the

18  facts of the case.  And so I don't disagree with that.

19        Some people in their letters have -- and I don't --

20  I'm not criticizing the letter writer or letter writers, but

21  one person said:  The current legal situation leaves me with

22  profound dismay.  Shradha's potential imprisonment not only

23  affects her but sends a disconcerting message to an entire

24  community inspired by her vision and values.

25        The message ought to be, just like Mr. Shah, if

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 94 of 109 PageID #:32535

94

1   you're going to get a billion dollars in money, you better be

2   accurate about what you tell them.  That's the message.  The

3   message shouldn't be that Ms. Agarwal is a victim in this

4   case.  The victims in this case, even as Ms. Agarwal

5   recognized in her statement, the victims are the investors,

6   the banks, and the pharmaceutical companies and the people at

7   the company who worked there and either lost their jobs

8   or/and, at the very least, have this on their résumé.  They

9   came there to do good or get a good job, but they're forever

10  tarnished with this.  And that's -- those are the victims.

11          In mitigation, there's the statement of her husband,

12  which mirrors what he wrote in a letter, it's heartfelt.  And

13  the defendant's statement where she apologized to the right

14  people.  And I take that as a mitigating factor.

15          A number of people wrote that wealth and power didn't

16  change you.  And that -- those are the people that know you

17  best.

18          The age of the defendants, Mr. Hankey wrote -- or

19  spoke and said that is perhaps a mitigating factor; and I also

20  agree, but you're an adult.  You're an intelligent adult, just

21  like Mr. Shah, and you're adult enough to have gathered a

22  billion dollars in funding.  So age only goes so far.

23          But each of the letters said something about you

24  that -- where you had a positive influence on the author or

25  their family.  These letters came from people in all walks of

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 95 of 109 PageID #:32536

95

1    life.  They were not the letters I sometimes get saying, I

2    know the defendant because I know his parents from the country

3    club, which are meaningless and worthless letters.  These are

4    letters that spoke with detail in their recollection of a

5    personal act of kindness, generosity, being a mentor, being an

6    outstanding person.  Just as a few examples -- and they were

7    littered with anecdotes of those acts.  So I find that highly

8    mitigating.

9          Are there any primary arguments in mitigation I

10   failed to address?

11         MR. BLEGEN:  No.

12         THE COURT:  Okay.  One of the great tragedies in this

13   case is that all of your interests in this company related to

14   patient welfare, patient education, working in a startup

15   business, helping people who worked there.  And the tragedy is

16   it didn't have to end this way.  Somewhere along the line

17   people lost their moral compass, thought that there was a

18   means to an end -- the -- the -- the end were justified by the

19   means.  And the means happen to be criminal.

20         This is an especially tough sentencing for me because

21   your life -- your entire life is so at odds with the conduct

22   you were convicted of.

23         I think Judge Rakoff in the *U.S. v. Adelson* case said

24   it best, though -- and I'll substitute woman for man, because

25   he was sentencing a man:  But surely if ever a woman is to

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 96 of 109 PageID #:32537

96

1   receive credit for the good work she has done and her

2   immediate misconduct assessed in the context of her overall

3   life hitherto, it should be at the moment of her sentencing

4   when her very future hangs in the balance.  This elementary

5   principle of weighing the good with the bad, which is basic to

6   all the great religions, moral philosophies, and systems of

7   justice, was plainly part of what Congress had in mind when it

8   directed courts to consider as a necessary sentencing factor

9   the history and characteristics of the defendant.

10          Judge Rakoff said it.  It's been repeated in other

11  sentencings, and it was quoted by defense in their memo.  And

12  I think it's a particularly apropos comment in this case.

13          Just as I count your -- prior convictions of people

14  that have prior criminal conduct and, of course, you have

15  none, and this is a nonviolent offense, I also have to count

16  the goodness of a person when I decide whether to sentence

17  them.

18          Specific deterrence is not an issue.  You'll never be

19  back before me again for anything related to a criminal

20  activity.  I am as sure of that as I am sure of anything.

21          General deterrence is meant to be a warning to young

22  entrepreneurs in this case -- or old entrepreneurs.  You can't

23  fake it, you can't monkey around with numbers, you can't

24  provide false information to people that want to loan you

25  money.  And I think yesterday's sentencing reflected my view

Case: 24-2230     Document: 30     Filed: 04/04/2025     Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 97 of 109 PageID #:32538

97

1   that general deterrence plays an important role in a

2   white-collar crime.  It's too hard to detect; it's too easy to

3   commit; and unless there is a significant consequence to that

4   misconduct, other people are going to do it because the risk

5   will not be greater than the reward.  And that's what general

6   deterrence is all about.

7          But the conviction here in this case carries with it

8   collateral consequences that no other defendant has faced.  In

9   this case, or any other case I've ever had, I've never had

10  this situation before.  And I've had, oh, probably over 100 to

11  200 sentencings since I've been a judge and countless

12  sentencings as a prosecutor and a defense attorney.

13         Never confronted the situation if someone was not a

14  citizen, they were in the country illegally, which is an

15  entirely different issue than Ms. Agarwal's situation.  She's

16  here legally.  She's a permanent resident.  The law recognizes

17  the legality of her being here, but the Bureau of Prisons

18  doesn't.  They don't recognize that she's here legally, or

19  they would put her in with people who she would normally not

20  be designated with.  She doesn't belong there.

21         Even the Bureau of Prisons knows she doesn't belong

22  there because but for her citizenship, they wouldn't put her

23  there.  I said earlier, and I repeat that, you know,

24  Elizabeth Holmes with her own case with a higher sentence than

25  I gave Mr. Shah is in a camp.  And I'm not going to put

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 850 Filed: 08/19/24 Page 100 of 109 PageID #:32541

100

1          But -- pursuant to the Sentencing Reform Act of 1984,

2     it's the judgment of the Court, the defendant, Shradha

3     Agarwal, is hereby committed to the custody of the Bureau of

4     Prisons to be imprisoned for a term of one day to be

5     considered time served.

6          Upon release from one-day imprisonment, the defendant

7     shall be placed on supervised release for a term of 3 years on

8     each of Counts 1, 2, 4, 9, 11, 13 through 18, 22, 24, 25,

9     26 to run concurrently.

10          A condition of her supervised release will be that

11     she reside in a halfway house or a community confinement

12     facility.  There will be no release for work during that

13     period of time.  That'll be a condition of my order.

14          Like any period of supervised release, it's subject

15     to review and modification at some point if appropriate, if a

16     motion is made and I hear argument on it.  But for the

17     first -- for that three-year period of supervised release,

18     she'll remain at a community confinement center and with no

19     release for work.  She will remain in that center other than

20     for approved activities, such as medical visits, medical

21     appointments, attorney visits, or anything else that the

22     people at that facility view as necessary.  If they view

23     something as necessary that's outside those restrictions, they

24     can -- just like I routinely get through the probation officer

25     or through a defense motion, you can make a motion to modify

1                    *   *   *   *   *

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4     */s/ Elia E. Carrión*          *29th day of July, 2024*

5     Elia E. Carrión                         Date
      Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
### Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| SHRADHA AGARWAL | ) | Case Number:     1:19-CR-00864(2) |
| | ) | |
| | ) | USM Number:     54787-424 |
| | ) | |
| | ) | |
| | ) | Patrick W. Blegen |
| | ) | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)     which was accepted by the court.

☒ was found guilty on count(s) 1, 2, 4, 9, 11, 13-18, 22, and 24-26 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18:1341 Mail Fraud | 02/02/2015 | 1 |
| 18:1341 Mail Fraud | 02/04/2015 | 2 |
| 18:1341 Mail Fraud | 05/14/2015 | 4 |
| 18:1344 Bank Fraud | 04/08/2016 | 9 |
| 18:1341 Mail Fraud | 07/22/2016 | 11 |
| 18:1344 Bank Fraud | 12/23/2016 | 13 |
| 18:1343 Wire Fraud | 01/23/2017 | 14 |
| 18:1343 Wire Fraud | 01/24/2017 | 15-17 |
| 18:1343 Wire Fraud | 01/25/2017 | 18 |
| 18:1343 Wire Fraud | 03/01/2017 | 22 |
| 18:1343 Wire Fraud | 03/20/2017 | 24 |
| 18:1341 Mail Fraud | 04/24/2017 | 25 |
| 18:1343 Wire Fraud | 04/28/2017 | 26 |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count(s) Any remaining dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

June 27, 2024
Date of Imposition of Judgment

*Thomas M. Durkin*
Signature of Judge
Thomas M. Durkin, United States District Judge

Name and Title of Judge

July 1, 2024
Date

Case: 1:19-cr-00864 Document #: 807 Filed: 07/01/24 Page 2 of 24 PageID #:30053

DEFENDANT:  SHRADHA AGARWAL
CASE NUMBER:  1:19-CR-00864(2)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: 1 day, time served as to count(s) 1, 2, 4, 9, 11, 13-18, 22, and 24-26, terms to run concurrently.

☐      The court makes the following recommendations to the Bureau of Prisons:

☐      The defendant is remanded to the custody of the United States Marshal.

☐      The defendant shall surrender to the United States Marshal for this district:

     ☐      at      on

     ☐      as notified by the United States Marshal.

     ☐      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

         ☐      before 2:00 pm on

         ☐      as notified by the United States Marshal.

         ☐      as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By    _____
DEPUTY UNITED STATES MARSHAL

**SA24**

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case

Sheet 6 – Schedule of Payments                                                                Judgment – Page 3 of 8

DEFENDANT:  SHRADHA AGARWAL
CASE NUMBER:  1:19-CR-00864(2)

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of: three (3) years as to count(s) 1, 2, 4, 9, 11, 13-18, 22, and 24-26, terms to run concurrently. The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall not commit another Federal, State, or local crime.

☒ (2) you shall not unlawfully possess a controlled substance.

☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence.  [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]

☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act **(42 U.S.C. § 16913)**.

☒ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

☒ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release.  [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**. The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☐ (1) you shall provide financial support to any dependents if you are financially able to do so.

☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).

☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows:

☒ (4) you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s))           .

☒ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
      ☐ visit the following type of places:           .
      ☐ knowingly meet or communicate with the following persons:           .

☒ (7) you shall refrain from ☐ any or ☒ excessive use of alcohol (defined as ☐ having a blood alcohol concentration greater than 0.08; or ☐           ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.

☒ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.

☐ (9) ☐ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
      ☐ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
      ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify:           .)

☐ (10) (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling           [no more than the lesser of one year or the term of imprisonment authorized for the

**SA25**

Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118
Case: 1:19-cr-00864 Document #: 807 Filed: 07/01/24 Page 4 of 24 PageID #:30055
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                                          Judgment – Page 4 of 8

DEFENDANT: SHRADHA AGARWAL
CASE NUMBER: 1:19-CR-00864(2)

offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period ⬚.

☒ (11) (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of up to 36 months to commence no sooner than 01/06/2025 and terminate on the date on which supervised release will terminate. You are restricted to the community confinement facility at all times except for religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; or court-ordered obligations. You shall not be released from community confinement for employment. Community Confinement Placement to be served at the Salvation Army in Chicago, Illinois or the Rock Valley Community Programs in Janesville, Wisconsin.

☐ (12) you shall work in community service for ⬚ hours as directed by a probation officer.

☐ (13) you shall reside in the following place or area: ⬚, or refrain from residing in a specified place or area: ⬚.

☒ (14) you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15) you shall report to a probation officer as directed by the court or a probation officer.

☒ (16) ☒ you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified: ,
       ☒ at home     ☒ at work     ☒ at school          ☒ at a community service location
       ☒ other reasonable location specified by a probation officer
   ☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17) you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18) you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)
       ☐ (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
       ☐ (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
       ☐ (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
       ☐ from the times directed by the probation officer; or ☐ from __ to __.
       ☐ (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
       ☐ (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20) you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☒ (21) (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations.  If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22) you shall satisfy such other special conditions as ordered below.

☐ (23) You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release.  You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

☐ (24) Other:

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                                                 Judgment – Page 5 of 8

DEFENDANT:  SHRADHA AGARWAL
CASE NUMBER:  1:19-CR-00864(2)

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)
The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

☐ (1)  if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐ (2)  you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☐ (3)  you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed 300 hours.

☐ (4)  you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☒ (5)  you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☒ (6)  you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☒ (7)  within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☒ (8)  you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐ (9)  you shall participate in a sex offender treatment program.  The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

    ☐  You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent.  The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations.  A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

    ☐  The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

    ☐  You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

    ☐  You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

    ☐  You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2)**, regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

    ☐  You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

    ☐  This condition does not apply to your family members:              [Names]

    ☐  Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer.  Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity.  You shall not participate in any volunteer

DEFENDANT:  SHRADHA AGARWAL
CASE NUMBER:  1:19-CR-00864(2)

activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

☐    You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

☐    You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☒  (10)    you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒  (11)    you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐  (12)    you shall pay to the Clerk of the Court $ _____ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to _____ (list both Agency and Address.)

☒  (13)    if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐  (14)    You shall observe one Reentry Court session, as instructed by your probation officer.

☒  (15)    Other: Upon commencement of supervision, you shall be permitted to travel between the Northern District of Illinois and Western District of Texas.

Case: 1:19-cr-00864 Document #: 807 Filed: 07/01/24 Page 7 of 24 PageID #:30058
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments
Case: 24-2230    Document: 30    Filed: 04/04/2025    Pages: 118    Judgment – Page 7 of 8

DEFENDANT: SHRADHA AGARWAL
CASE NUMBER: 1:19-CR-00864(2)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $1,500.00 | TBD | $.00 | $.00 | $.00 |

☒ The determination of restitution is deferred until a restitution hearing takes place. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to **18 U.S.C. § 3612(f)**. All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the       .

   ☐ the interest requirement for the      is modified as follows:

☐ The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                            Judgment – Page 8 of 8

DEFENDANT:  SHRADHA AGARWAL
CASE NUMBER:  1:19-CR-00864(2)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☒   Lump sum payment of $1,500.00 due immediately.

☐   balance due not later than            , or

☒   balance due in accordance with ☐ C, ☐ D, ☐ E, or ☒ F below; or

B   ☐   Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C   ☐   Payment in equal            *(e.g. weekly, monthly, quarterly)* installments of $        over a period of        *(e.g., months or years)*, to commence        *(e.g., 30 or 60 days)* after the date of this judgment; or

D   ☐   Payment in equal            *(e.g. weekly, monthly, quarterly)* installments of $        over a period of        *(e.g., months or years)*, to commence        *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence within        *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☒   Special instructions regarding the payment of criminal monetary penalties: you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☒   Joint and Several with co-defendants Rishi Shah and Brad Purdy, amount TBD.

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☒   The defendant shall forfeit the defendant's interest in the following property to the United States: See attached Amended Preliminary Order of Forfeiture.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

SA30

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 864-2 |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| SHRADHA AGARWAL | ) | |

## **AMENDED PRELIMINARY ORDER OF FORFEITURE**

On motion of the United States, this Court previously entered a Preliminary
Order of Forfeiture (Doc. #468) with respect to Defendant Shradha Agarwal. The
United States now asks this Court to issue an amended preliminary order of
forfeiture pursuant to of Title 18, United States Code, Sections 981(a)(1)(C),
982(a)(2)(A), Title 28, United States Code, Section 2461(c), and Fed. R. Crim. P. 32.2
to correct certain errors in the Preliminary Order of Forfeiture.

(a)     On November 21, 2019, a superseding indictment was returned
charging SHRADHA AGARWAL with mail fraud, in violation of Title 18, United
States Code, Section 1341 (Counts 1, 2, 4, 11, 23, and 25); wire fraud, in violation of
Title 18, United States Code, Section 1343 (Counts  14, 15, 16, 17, 18, 19, 20, 22, 24,
and 26), and bank fraud, in violation of Title 18, United States Code, Section 1344
(Counts 9 and 13).

(b)     The superseding indictment sought forfeiture to the United States of
any and all right, title and interest defendant SHRADHA AGARWAL may have in
any property which constitutes and is derived from proceeds traceable to the charged
mail and wire fraud offenses, as provided in Title 18, United States Code, Section

**SA31**

981(a)(1)(C) and Title 28, United States Code, Section 2461(c); and any property which constitutes and is derived from proceeds obtained, directly or indirectly as to the bank fraud offenses, as provided in Title 18, United States Code, Section 982(a)(2)(A).

(c)    Beginning on January 24, 2023, a jury trial was held before this Court.

(d)    On April 11, 2023, the jury returned a verdict of guilty against defendant SHRADHA AGARWAL on Counts 1, 2, 4, 9, 10, 11, 13, 14, 15, 16, 17, 18, 22, 24, 25, and 26 of the superseding indictment, thereby making certain property subject to forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

(e)    Defendant SHRADHA AGARWAL waived her right to have the forfeiture allegations in the superseding indictment considered by the jury. It was agreed instead that this Court would consider the issues relating to the forfeiture.

(f)    The government is entitled to entry of a personal money judgment in the amount of $13,700,000 against SHRADHA AGARWAL, which represents proceeds traceable to the offenses.

(g)    The government is further entitled to the forfeiture of specific property listed in Exhibit A to the United States, as property which represents proceeds defendant obtained as a result of the fraud offenses of conviction. The property is to be applied in partial satisfaction of the personal money judgment.

(h)    The government is further entitled to the forfeiture of substitute property listed in Exhibit B to the United States, to be applied in partial satisfaction of the personal money judgment.

(i)    Because of the defendant's conviction of the above violations, funds in the amount of $13,700,000 are subject to forfeiture as property which constitutes and is derived from proceeds traceable to the violations of conviction, and the property is therefore subject to forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, Section 2461(c). Furthermore, because of the defendant's conviction of the mail, wire, and bank fraud violations, the foregoing property is subject to forfeiture as property which constitutes and is derived from proceeds obtained as result of the violations of conviction, and are therefore subject to forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

(j)    The United States requests that this Court enter a personal money judgment in the amount of $13,700,000, and further enter a preliminary order of forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, Section 2461(c), forfeiting all right, title, and interest defendant SHRADHA AGARWAL has in the foregoing property, as property constituting and derived from proceeds of the violations of conviction as charged in the indictment.

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED:

1.      A judgment is entered against SHRADHA AGARWAL in the amount of $13,700,000 (the "$13.7 million money judgment").

2.      Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), Title 28, United States Code, Section 2461(c), and Fed. R. Crim. P. 32.2, all right, title, and interest SHRADHA AGARWAL may have in the property listed in Exhibit A, is hereby forfeit to the United States of America for disposition according to law as which constitutes and is derived from proceeds obtained as result of the violations of conviction.

3.      Further, the property listed in Exhibit A and Exhibit B is hereby restrained, and forfeit to the United States of America, up to the value of the $13.7 million money judgment, though at this time the Court will not order the seizure and liquidation of the property in Exhibit B. If the government obtains authority to seize and liquidate any property in Exhibit B and in fact liquidates such property, it will be applied in partial satisfaction of the $13.7 million money judgment.

4.      Pursuant to the provisions of Title 21, United States Code, Section 853(g), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), upon entry of this preliminary order of forfeiture, United States Marshals Service, Federal Bureau of Investigation, or any other authorized law enforcement agency, shall seize and take custody of the property listed in Exhibit A for disposition according to law.

4. Specifically, at the direction of representatives of the United States Department of Justice, including the United States Attorney's Office for the Northern District of Illinois, the Fraud Section, and the United States Marshals Service, the property and accounts listed in Exhibit A shall be liquidated and distributed to the United States.

5. Further, pursuant to the provisions of Title 21, United States Code, Section 853(n)(1), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), upon entry of this preliminary order of forfeiture, the United States shall publish notice of this order and of its intent to dispose of the subject property according to law. The United States may also, to the extent practicable, provide written notice to any person known to have alleged an interest in the property that is the subject of the preliminary order of forfeiture.

6. Further, pursuant to the provisions of Title 21, United States Code, Section 853(n)(2), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), if, following notice as directed by this Court and Title 21, United States Code, Section 853(n)(1), any person, other than the defendant, asserts a legal interest in the subject property has been ordered forfeited to the United States, within thirty days of the final publication of notice or this receipt of notice under paragraph 5, whichever is earlier, and petitions the Court for a hearing to adjudicate the validity of this alleged interest in the property, the government shall request a hearing. The hearing shall be held before the court alone, without a jury.

7.    Following the Court's disposition of all third party interests, the Court shall, upon the government's motion, if appropriate, enter a final order of forfeiture as to the subject property which shall vest clear title in the United States of America.

8.    By any act or omission on the part of defendant SHRADHA AGARWAL, funds in the amount of $13,700,000 cannot be located to satisfy the forfeiture judgment, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), the United States has the authority to forfeit substitute assets up to the amount of the outstanding balance to satisfy the money judgment entered by this Court.

9.    Should assets become available to satisfy the forfeiture judgment in the future, the United States shall at that time file a motion for substitution of assets before this Court requesting permission to seize such assets and publish notice of the United States' intent to forfeit the property in satisfaction of the forfeiture money judgment according to law.

10.    Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), Title 28, United States Code, Section 2461(c), and Fed. R. Crim. P. 32.2, the terms and conditions of this preliminary order of forfeiture entered by this Court be made part of the sentence imposed against defendant SHRADHA AGARWAL and included in any judgment and commitment order entered in this case against her.

11.    The government shall provide notice of this order to the entities referenced in Exhibits A and B.

12.    This Court shall retain jurisdiction in this matter to take additional action and enter further orders as necessary to implement and enforce this forfeiture order.

_Thomas M Durkin_
_____
THOMAS M. DURKIN
United States District Court Judge

Dated:  6/18/2024

**Exhibit A**

(a)     All right, title and interest in 7Wire Ventures Fund LP, regardless of whether such interest is held in cash, stock or otherwise, held in the name of Jumpstart Ventures II, LLC that was acquired by, or exchanged for $280,000 in capital contributions submitted on or around January 5, 2017, and $60,000 in capital contributions submitted on or around May 31, 2018, plus any appreciation on that right, title and interest;

(b)     All right, title and interest in AP 100 W Huron Investors, LLC, or any successor entity, held in the name of Gravitas Holdings, LLC, that was 17.747958% of 100 W Huron Investors, LLC on or about October 10, 2017, acquired by $2,537,695 from Gravitas Holdings, LLC and RISHI SHAH, on or about that same date, plus any appreciation on that right, title and interest;

(c)     All right, title and interest in Eight Partners VC Fund I, LP held in the name of Jumpstart Ventures II, LLC, that was acquired by or exchanged for $175,000 in capital contributions submitted between approximately July 15, 2016 and June 14, 2017, and $15,000 in capital contributions submitted on or about April 24, 2018, plus any appreciation on such right, title and interest

(d)     All right, title and interest in Guild Capital and investments made by Guild Capital, held in the name of or for the benefit of Gravitas Holdings, LLC and Jumpstart Ventures II, LLC, that were acquired by or exchanged for $75,000 in capital contributions submitted on or about August 12, 2016, and $475,000 in capital contributions submitted between approximately August 1, 2017, and November 27, 2018, plus any appreciation on such right, title and interest;

(e)     All right, title and interest in Healthx Ventures Fund, held in the name of Jumpstart Ventures II LLC, Gravitas Holdings, LLC, RISHI SHAH, SHRADHA AGARWAL, and BRAD PURDY that was acquired by or exchanged for $22,000 in capital contributions submitted on or about October 27, 2016,  and $12,000 in capital contributions submitted on or about May 2, 2018, plus any appreciation on that right, title and interest;

(f)     All right, title and interest in Institutional Venture Partners XVI, LP, and in Institutional Venture Partners XV, LP, held in the name of Gravitas Holdings, LLC and Jumpstart Ventures II LLC, that was acquired by or exchanged for $80,000 in capital contributions submitted on or around January 5, 2017, and $1,800,000 in capital contributions submitted between approximately March 2, 2018, and July 9, 2019, plus any appreciation on that right, title and interest;

**Exhibit A**

(g)    All right, title and interest in L Squared Capital Management, LP, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $35,000 in capital contributions submitted on or around January 5, 2017, and $303,045 in capital contributions submitted between approximately September 27, 2017, and July 17, 2019, plus any appreciation on such right, title and interest;

(h)    All right, title and interest in L Squared Capital Partners II, LLC, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $2,235,621 in capital contributions submitted between approximately June 2, 2017, and July 18, 2017, plus any appreciation on that right, title and interest;

(i)    All right, title and interest in Leerink Transformation Fund I, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $2,980,631 in capital contributions submitted between July 28, 2017, and July 1, 2019, plus any appreciation on that right, title and interest, including $3,642,189 seized by the government on or about September 30, 2021, currently held in a United States Marshals Service escrow account, plus any appreciation on those funds;

(j)    All right, title and interest in Leerink Transformation Partners, LTP BHE LP, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $319,489 in capital contributions submitted on or about June 28, 2019, plus any appreciation on that right, title and interest;

(k)    All right, title and interest in Monarch Capital Partners IV, LP, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $1,526,821.96 in capital contributions submitted between approximately May 9, 2019, and July 25, 2019, plus any appreciation on that right, title and interest, including $991,050.69 currently held in a United States Marshals Service escrow account, plus any appreciation on those funds;

(l)    All right, title and interest in approximately 60,053 shares of Series A2 Preferred Stock of Swipesense, which were converted into interests in SC Johnson, held in the name of Jumpstart Ventures II, LLC; 90,425 shares of Series B3 Preferred Stock of Swipesense, converted into interest in SC Johnson, held in the name of Gravitas Holdings, LLC; 252,045 shares of Series B4 Preferred Stock of Swipesense, converted into interest in SC Johnson, held in the name of Gravitas Holdings, LLC; and 361,702 shares of Series B Preferred Stock of Swipesense, converted into interest in SC Johnson, held in the name of Gravitas Holdings, LLC and Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest;

**Exhibit A**

(m)   All right, title and interest in Valor Equity Partners IV, LP, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $2,222,238 in capital contributions submitted on or about August 14, 2017, plus any appreciation on that right, title and interest;

(n)   $7,461,413.17 in Account XAZ006290 and all linked accounts at Pershing, LLC, held in the name of Gravitas Holdings, LLC, including, but not limited to, Accounts XEJ006076, XEJ006159, XEJ003123, XA6063129, XEJ007090, and XEJ007108, plus any appreciation on those funds;

(o)   All right, title and interest in approximately 3,291 shares of common stock of Instructure, Inc., held in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest;

(p)   All right, title and interest in Boom Train, currently known as Zeta Global Holdings Corp, held in the name of Gravitas Holdings, LLC, Jumpstart Ventures II LLC, and RISHI SHAH that was acquired by or exchanged for $18,161 in capital contributions on or about January 5, 2017, plus any appreciation on that right, title and interest;

(q)   All right, title and interest in I2A Ventures SPV held in the name of Jumpstart Ventures II, LLC that was acquired by, or exchanged for $1,000,000 in capital contributions submitted on or about May 9, 2016, plus any appreciation on that right, title and interest;

(r)   All right, title and ownership in Chicago Ventures Founders Fund LP held in the name of Jumpstart Ventures II, LLC that was acquired by, or exchanged for $100,000 in capital contributions submitted on or about June 28, 2016, plus any appreciation on that right, title and interest, including $ 329,933.80[1] currently held in a United States Marshals Service escrow account, plus any appreciation on those funds;

(s)   All right, title, and interest in Diversified 321 N Clark, LLC, held by or in the name of Jumpstart Ventures II, LLC, that was acquired by, or exchanged for $200,000 in capital contributions submitted on or about August 8, 2016, plus any appreciation on that right, title and interest;

(t)   All right, title and interest in Greatpoint Ventures Innovation Fund, LP, held in the name of Jumpstart Ventures II LLC, that was acquired by or exchanged for $158,879 in capital contributions submitted between approximately August 8, 2016, and April 28, 2017, including 209 shares (38%

---

[1] Updated to include $14,152.26 that was previously listed in paragraph (q)

**Exhibit A**

of 549 shares) of Beyond Meat held in the name of Jumpstart Ventures II LLC, which were held in a Merrill Lynch account, plus any appreciation on that right, title and interest;

(u)     All right, title and interest in MATH Venture Partners, LP held in the name of Jumpstart Ventures LLC, that was acquired by or exchanged for $45,000 in capital contributions submitted on or about October 11, 2016, plus any appreciation on that right, title and interest;

(v)     All right, title and interest in approximately 250,454 shares of Series Preferred AA stock of Silvervue, Inc., and 751,362 shares of common stock of Silvervue, Inc., held in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest;

(w)     All right, title and interest in approximately 705,417 shares of Wisercare that was acquired by or exchanged for $250,000 on or about August 5, 2016, held in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest;

(x)     All funds and asset on deposit in Account xxxxx6647 and all linked accounts at Pershing, LLC, held in the names of Shradha AGARWAL and AGARWAL Relative A, including but not limited to $2,050,383.62;

(y)     All funds and assets on deposit in Account xxxxxx7618 at Kotak Mahindra Bank, including, but not limited to $2,000,000.00, held in the name of Shradha AGARWAL;

(z)     All right, title, and interest in various items of jewelry purchased from Jewelry Company A on or about December 1, 2017, using funds from Account XXX3805 at Gold Coast Bank, including, but not limited to, jewelry and precious gems valued at approximately $200,000.00;

(aa)   All funds and assets on deposit in Account xxxxxxxx3548 at RBL Bank Ltd., including, but not limited to $1,580,917.97, held in the name of Shradha AGARWAL;

(bb)   All funds and assets on deposit in Account xxxxxxxx7836 at RBL Bank Ltd., including, but not limited to $333,977.77, held in the name of AGARWAL Relative A;

(cc)   All funds and assets on deposit in Account xxxxxxxx2006 at HSBC, including, but not limited to $110,166.42, held in the name of AGARWAL Relative A;

**Exhibit A**

(dd)   All right, title and interest in Corazon Capital II, LP, held in the name of Jumpstart Ventures II, LLC that was acquired by, or exchanged for $50,000 in capital contributions submitted on or about January 5, 2017, plus any appreciation on that right, title and interest, including $38,923.25 currently held in a United States Marshals Service escrow account, plus any appreciation on those funds;

(ee)   All right, title and interest in Institutional Venture Partners XV, LP held in the name of Jumpstart Ventures, LLC and/or Gravitas Holdings, LLC, that was acquired by, or exchanged for $40,000 in capital contributions submitted on or about July 15, 2016, plus any appreciation on those funds;

(ff)   All right, title and interest in Impact Engine IV, LLC, held in the name of Rishi Shah, Shradha Agarwal, Brad Purdy, Gravitas Holdings, LLC, and Jumpstart Ventures LLC, that was acquired or exchanged for $35,000 in capital contributions, plus any appreciation on that right title and interest; and

(gg)   Funds in the amount of $3,816,824.52 turned over to the government by McGuireWoods LLP on or about July 13, 2020, currently held in a United States Marshals Service escrow account, plus any appreciation on those funds.

Exhibit B

i.   All right, title, and interest in 7Wire Ventures Fund, held by or in the name of Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $60,000 and $280,000 in capital contributions (plus any appreciation) directly forfeitable;

ii.   All right, title, and interest in Eight Partners VC Fund I, LP, held by or in the name of Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $15,000 and $175,000 in capital contributions (plus any appreciation) directly forfeitable;

iii.   All right, title, and interest in Guild Capital and investments made by Guild Capital, held by or in the name of Gravitas Holdings, LLC or Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $475,000 and $75,000 in capital contributions (plus any appreciation) directly forfeitable;

iv.   All right, title, and interest in Healthx Ventures Fund held by or in the name of Rishi SHAH, Gravitas Holdings, LLC, or Jumpstart Ventures II LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $12,000, and $22,000 in capital contributions (plus any appreciation) directly forfeitable;

v.   All right, title, and interest in Institutional Venture Partners XVI, LP, and in Institutional Venture Partners XV, LP, held by or in the name of Rishi SHAH, Gravitas Holdings, LLC, or Jumpstart Ventures II LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $1,800,00000, $80,000 and $200,000 in capital contributions (plus any appreciation) directly forfeitable;

vi.   All right, title, and interest in L Squared Capital Management, LP, held by or in the name of Gravitas Holdings, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $303,045.00 in capital contributions (plus any appreciation) directly forfeitable;

vii.   All right, title, and interest in L Squared Capital Partners II, LLC and L Squared Capital Partners II, LLC – Series Oracle, held by or in the name of Gravitas Holdings, LLC, plus any appreciation on such right,

1

**SA43**

Exhibit B

title and interest, less the right, title, and interest acquired by or equivalent to $2,235,621.00 in capital contributions (plus any appreciation) directly forfeitable;

viii.  All right, title, and interest in Leerink Transformation Partners – LTD BHE LP, held by or in the name of Gravitas Holdings, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $319,489.00 in capital contributions (plus any appreciation) directly forfeitable;

ix.  All right, title, and interest in Monarch Capital Partners IV, LP, held by or in the name of Gravitas Holdings, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $1,526,821.96 in capital contributions (plus any appreciation) directly forfeitable;

x.  All right, title, and interest in Swipesense, Inc., converted into interests in SC Johnson, held by or in the name of Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest, less the 60,053 shares of Series A2 Preferred Stock directly forfeitable, less the 90,425 shares of Series B3 Preferred Stock directly forfeitable, less the 252,045 shares of Series B4 Preferred Stock directly forfeitable, and less the 361,702 shares of Series B Preferred stock, converted into interest in SC Johnson, (plus any appreciation) directly forfeitable;

xi.  All right, title, and interest in Account xxxxx6290 and all linked accounts at Pershing, LLC, held in the name of Gravitas Holdings, LLC, including, but not limited to, Accounts xxxxx6076, xxxxx6159, xxxxx3123, xxxxx3129, xxxxx7090, and xxxxx7108, plus any appreciation on such right, title and interest, less the $7,461,413.17 (plus any appreciation) directly forfeitable;

xii.  All right, title, and interest in Boom Train, currently known as Zeta Global Holdings Corp, held by or on behalf of Rishi SHAH, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $18,161 in capital contributions (plus any appreciation) directly forfeitable;

xiii.  All right, title, and interest in I2A Fund II LLC, held by or in the name of Jumpstart Ventures II LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $1,000,000 in capital contributions (plus any appreciation) directly forfeitable;

Exhibit B

xiv.    All right, title, and interest in Chicago Ventures Founders Fund LP, held by or in the name of Jumpstart Ventures II LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $100,000 in capital contributions (plus any appreciation) directly forfeitable;

xv.    All right, title, and interest in Diversified 321 N Clark, LLC, held by or in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $200,000 in capital contributions (plus any appreciation) directly forfeitable;

xvi.    All right, title, and interest in Greatpoint Ventures Innovation Fund, LP, held by or in the name of Jumpstart Ventures II, LLC, including 340 shares of Beyond Meat, which were held in a Merrill Lynch account, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $158,879.00 in capital contributions and 209 shares of Beyond Meat (plus any appreciation) directly forfeitable;

xvii.    All right, title, and interest in MATH Venture Partners, LP, held in the name of Jumpstart Ventures LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $45,000 in capital contributions (plus appreciation) directly forfeitable;

xviii.    All right, title, and interest in Corazon Capital II, LP, held in the name of Jumpstart Ventures LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $50,000 in capital contributions (plus any appreciation) directly forfeitable;

xix.    All right, title and interest in Institutional Venture Partners XV, LP held in the name of Jumpstart Ventures, LLC and/or Gravitas Holdings, LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $40,000 in capital contributions (plus any appreciation) directly forfeitable; and

3

**SA45**

Exhibit B

    xx.      All right, title, and interest in Impact Engine, IV, LLC, held by or in the name of Rishi Shah, Shradha Agarwal, Brad Purdy, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $35,000 in capital contributions (plus any appreciation) directly forfeitable.

**SA46**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 19 CR 864 |
| vs. | |
| | Hon. Thomas M. Durkin |
| RISHI SHAH, SHRADHA | United States District Judge |
| AGARWAL, and BRAD PURDY | |

## DEFENDANT SHRADHA AGARWAL'S NOTICE OF APPEAL

Defendant Shradha Agarwal hereby appeals to the United States Court of Appeals for the Seventh Circuit from the judgment entered against her in this case (Doc. 807).

Respectfully submitted,

Dated: July 12, 2024

LAW OFFICE OF JOHN D. CLINE

By: /s/ *John D. Cline*_____
        John D. Cline

Attorney for Defendant
Shradha Agarwal

1