Nos. 24-2230, 24-2236

In The

# United States Court of Appeals
# for the Seventh Circuit

———————————

United States of America,

*Plaintiff-Appellee*,

v.

Rishi Shah and Shradha Agarwal,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:19-cr-00864,
District Judge Thomas M. Durkin

———————————

## OPENING BRIEF AND REQUIRED SHORT APPENDIX FOR DEFENDANT-APPELLANT RISHI SHAH

———————————

Richard Finneran
Bryan Cave Leighton Paisner
LLP
211 N. Broadway
Suite 3600
St. Louis, MO 63102
(314) 308-2297
richard.finneran@bclplaw.com

Neal Kumar Katyal
  *Counsel of Record*
William E. Havemann
Kristina Alekseyeva
Milbank LLP
1850 K Street, N.W.
Washington, D.C. 20006
(202) 835-7500
nkatyal@milbank.com

Reedy C. Swanson
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
reedy.swanson@hoganlovells.com

April 4, 2025

*Counsel for Defendant-Appellant Rishi Shah*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2230</u>

Short Caption: <u>United States v. Shah</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Rishi Shah</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Milbank LLP; Hogan Lovells US LLP; Bryan Cave Leighton Paisner LLP; Quinn Emanuel Urquhart & Sullivan LLP</u>

<u>Benesch Friedlander Coplan & Aronoff LLP; Hueston Henningan LLP; Law Offices of Vadim A. Glozman</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>n/a</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>n/a</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>n/a</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>n/a</u>

Attorney's Signature: <u>/s/ Neal Kumar Katyal</u>    Date: <u>4/7/2025</u>

Attorney's Printed Name:  <u>Neal Kumar Katyal</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☑  **No** ☐

Address: <u>Milbank LLP, 1850 K Street NW, Washington, D.C. 20006</u>

Phone Number: <u>(202) 835-7500</u>    Fax Number: <u>(202) 263-7586</u>

E-Mail Address: <u>nkatyal@milbank.com</u>

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-2230

Short Caption: United States v. Shah

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[✔] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Rishi Shah

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Milbank LLP  (*new*); Hogan Lovells US LLP; Bryan Cave Leighton Paisner LLP; Quinn Emanuel Urquhart & Sullivan

LLP Benesch Friedlander Coplan & Aronoff LLP; Hueston Henningan LLP; Law Offices of Vadim A. Glozman

(3)   If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ William E. Havemann        Date: 4/7/2025

Attorney's Printed Name: William E. Havemann

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✔]

Address: Milbank LLP, 1850 K Street NW, Washington, D.C. 20006  (*new*)

Phone Number: (202) 835-7500  (*new*)        Fax Number: (202) 263-7586  (*new*)

E-Mail Address: whavemann@milbank.com  (*new*)

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2230</u>

Short Caption: <u>United States v. Shah</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Rishi Shah</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Milbank LLP; Hogan Lovells US LLP; Bryan Cave Leighton Paisner LLP; Quinn Emanuel Urquhart & Sullivan LLP</u>

<u>Benesch Friedlander Coplan & Aronoff LLP; Hueston Henningan LLP; Law Offices of Vadim A. Glozman</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>n/a</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>n/a</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>n/a</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>n/a</u>

Attorney's Signature: <u>/s/ Kristina Alekseyeva</u>    Date: <u>4/7/2025</u>

Attorney's Printed Name: <u>Kristina Alekseyeva</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>Milbank LLP, 1850 K Street NW, Washington, D.C. 20006</u>

Phone Number: <u>(202) 835-7500</u>    Fax Number: <u>(202) 263-7586</u>

E-Mail Address: <u>kalekseyeva@milbank.com</u>

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2230

Short Caption: United States v. Shah

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Rishi Shah

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Milbank LLP; Hogan Lovells US LLP; Bryan Cave Leighton Paisner LLP; Quinn Emanuel Urquhart & Sullivan LLP

Benesch Friedlander Coplan & Aronoff LLP; Hueston Henningan LLP; Law Offices of Vadim A. Glozman

(3)     If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

            n/a

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            n/a

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Richard Finneran          Date: 4/7/2025

Attorney's Printed Name: Richard Finneran

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: Bryan Cave Leighton Paisner LLP, 211 N. Broadway, Suite 3600, St. Louis, MO 63102

Phone Number: (314) 308-2297          Fax Number: (314) 308-2020

E-Mail Address: richard.finneran@bclplaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2230

Short Caption: United States v. Shah

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Rishi Shah

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Milbank LLP; Hogan Lovells US LLP; Bryan Cave Leighton Paisner LLP; Quinn Emanuel Urquhart & Sullivan LLP

Benesch Friedlander Coplan & Aronoff LLP; Hueston Henningan LLP; Law Offices of Vadim A. Glozman

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Reedy C. Swanson    Date: 4/7/2025

Attorney's Printed Name: Reedy C. Swanson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: Hogan Lovells US LLP, 555 13th St. NW, Washington, D.C. 20004

Phone Number: (202) 637-5600    Fax Number: (202) 637-5910

E-Mail Address: reedy.swanson@hoganlovells.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ................................... x

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 4

STATEMENT OF THE ISSUES .................................................. 5

STATEMENT OF THE CASE ..................................................... 5

    A.    Years After Shah Founds Outcome Health, His
           Trusted Lieutenant Commits Fraud And Conceals
           It From Shah............................................................ 5

    B.    The Government Unlawfully Restrains Millions Of
           Dollars From Shah And Agarwal .......................... 10

    C.    Shah Goes To Trial Without His Counsel Of
           Choice ................................................................. 11

    D.    The District Court Commits Serious Evidentiary
           Errors At Trial .................................................... 13

    E.    Desai's Testimony Confirmed That He
           Orchestrated The Fraud And Concealed It From
           Shah .................................................................. 16

    F.    The Jury Convicts, And The Court Denies Shah's
           Post-Trial Motions .............................................. 20

SUMMARY OF THE ARGUMENT ........................................... 24

STANDARD OF REVIEW ....................................................... 27

i

## TABLE OF CONTENTS—Continued

Page

ARGUMENT ................................................................................. 28

I.  THE GOVERNMENT'S IMPROPER RESTRAINT OF MILLIONS
    IN UNTAINTED ASSETS VIOLATED THE SIXTH AND FIFTH
    AMENDMENTS .................................................................... 28

    A.  The Government's Concededly Illegal Over-
        Restraint Impaired Shah's Choice Of Counsel And
        Violated Due Process ............................................ 30

    B.  The District Court Erred In Rejecting Shah's
        Tracing Challenge ................................................. 32

        1.  The District Court Misconstrued The Sixth
            Amendment As A Matter Of Law ...................... 33

        2.  The District Court Erred In Concluding That
            Shah Could Not Have Afforded Burck Absent The
            Restraint ................................................... 35

        3.  The District Court Misconstrued The Fifth
            Amendment As A Matter Of Law ...................... 38

        4.  Shah Preserved His Tracing Arguments ............. 40

    C.  The Government's Restraint Of Shah's Settlement
        Proceeds Separately Violated The Sixth
        Amendment .......................................................... 44

    D.  The Remedy Is Dismissal With Prejudice, Or At Least
        A New Trial .......................................................... 46

II. THE IMPROPER BULK ADMISSION OF GRAND-JURY
    HEARSAY STATEMENTS REQUIRES A NEW TRIAL ........... 49

    A.  The Bulk Admission Of The Grand-Jury
        Statements Violated Rule 801(d)(1)(B) ................. 49

    B.  The District Court Legally Erred In Admitting The
        Grand-Jury Statements ......................................... 52

# TABLE OF CONTENTS—Continued

Page

C.    The Government Cannot Meet Its Burden of
Proving That The Statements' Improper Admission
Was Harmless .......................................................................... 58

III.    THE GOVERNMENT RELIED ON A LEGALLY DEFECTIVE
THEORY OF FRAUD ........................................................................ 62

CONCLUSION ............................................................................................ 65

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

CERTIFICATE OF SERVICE

APPENDIX

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Anderson v. Milwaukee County*,
  433 F.3d 975 (7th Cir. 2006) ...................................................................... 27

*Barker v. Wingo*,
  407 U.S. 514 (1972) .................................................................................. 47

*Chapman v. California*,
  386 U.S. 18 (1967) .................................................................................... 35

*Corley v. Rosewood Care Ctr., Inc. of Peoria*,
  388 F.3d 990 (7th Cir. 2004) ..................................................................... 62

*Doggett v. United States*,
  505 U.S. 647 (1992) .................................................................................. 47

*Giglio v. United States*,
  405 U.S. 150 (1972) .................................................................................. 39

*Glossip v. Oklahoma*,
  145 S. Ct. 612 (2025) ................................................................................ 43

*Greer v. United States*,
  593 U.S. 503 (2021) .............................................................................27, 44

*Greyer v. Ill. Dep't of Corrs.*,
  933 F.3d 871 (7th Cir. 2019) ..................................................................... 62

*Kaley v. United States*,
  571 U.S. 320 (2014) ...........................................................................*passim*

*Kelley v. United States*,
  590 U.S. 391 (2020) .................................................................................. 62

*Kyles v. Whitley*,
  514 U.S. 419 (1995) .................................................................................. 39

## TABLE OF AUTHORITIES—Continued

Page(s)

*Luis v. United States*,
  578 U.S. 5 (2016) ...................................................................*passim*

*Marks v. United States*,
  430 U.S. 188 (1977) ........................................................... 31

*Medina v. California*,
  505 U.S. 437 (1992) ........................................................... 35

*Miller v. Greenleaf Orthopedic Assocs., S.C.*,
  827 F.3d 569 (7th Cir. 2016) ............................................. 57

*Nix v. Williams*,
  467 U.S. 431 (1984) ........................................................... 36

*Powell v. Alabama*,
  287 U.S. 45 (1932) ..........................................................24, 33

*Puckett v. United States*,
  556 U.S. 129 (2009) ..........................................................40, 44

*Rodriguez v. Chandler*,
  492 F.3d 863 (7th Cir. 2007) ............................................. 48

*Shinseki v. Sanders*,
  556 U.S. 396 (2009) ........................................................... 58

*State v. Lenarz*,
  301 Conn. 417 (2011) ........................................................ 48

*Tome v. United States*,
  513 U.S. 150 (1995) ...................................................*passim*

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
  822 F.3d 650 (2d Cir. 2016) ..............................................62, 63

*United States v. Best*,
  939 F.2d 425 (7th Cir. 1991) (en banc) ............................. 61

## TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Borrasi*,
  639 F.3d 774 (7th Cir. 2011)....................................................... 28

*United States v. Borrero*,
  771 F.3d 973 (7th Cir. 2014)....................................................... 28

*United States v. Burke*,
  425 F.3d 400 (7th Cir. 2005)....................................................... 32

*United States v. Collicott*,
  92 F.3d 973 (9th Cir. 1996) ........................................................ 58

*United States v. Echols*,
  104 F.4th 1023 (7th Cir. 2024).......................................... 51, 52, 57

*United States v. Gonzalez-Lopez*,
  548 U.S. 140 (2006) ...................................................... 1, 3, 28, 48

*United States v. Harris*,
  761 F.2d 394 (7th Cir. 1985)....................................................... 50

*United States v. Hills*,
  618 F.3d 619 (7th Cir. 2010)....................................................... 47

*United States v. Kelerchian*,
  937 F.3d 895 (7th Cir. 2019)....................................................... 62

*United States v. Levy*,
  577 F.2d 200 (3d Cir. 1978)........................................................ 48

*United States v. Lewis*,
  954 F.2d 1386 (7th Cir. 1992)..................................................... 51

*United States v. Loughry*,
  660 F.3d 965 (7th Cir. 2011)....................................................... 59

*United States v. Lozada-Rivera*,
  177 F.3d 98 (1st Cir. 1999)..................................................... 58, 61

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Maez,*
960 F.3d 949 (7th Cir. 2020)..........................................................44

*United States v. Mann,*
140 F. Supp. 3d 513 (E.D.N.C. 2015)..........................................39

*United States v. Mills,*
122 F.3d 346 (7th Cir. 1997)..........................................................27

*United States v. Monsanto,*
491 U.S. 600 (1989) .......................................................................46

*United States v. Moreno,*
94 F.3d 1453 (10th Cir. 1996).......................................................51

*United States v. Morrison,*
449 U.S. 361 (1981) ................................................................25, 46

*United States v. Navarrete,*
88 F.4th 672 (7th Cir. 2023) ...................................................27, 44

*United States v. Nelson,*
39 F.3d 705 (7th Cir. 1994) .....................................................50, 51

*United States v. Portillo,*
969 F.3d 144 (5th Cir. 2020)....................................................55, 56

*United States v. Quinto,*
582 F.2d 224 (2d Cir. 1978)...........................................................61

*United States v. Ramos-Caraballo,*
375 F.3d 797 (8th Cir. 2004)..........................................................58

*United States v. Rodriguez-Santos,*
56 F.4th 206 (1st Cir. 2022)...........................................................44

*United States v. Simonelli,*
237 F.3d 19 (1st Cir. 2001) ............................................................58

**TABLE OF AUTHORITIES—Continued**

Page(s)

*United States v. Sorich*,
  523 F.3d 702 (7th Cir. 2008)........................................................ 28

*United States v. Stein*,
  541 F.3d 130 (2d Cir. 2008)............................................. 46, 47, 48

*United States v. Trujillo*,
  376 F.3d 593 (6th Cir. 2004)........................................................ 51

*United States v. Ware*,
  247 F.2d 698 (7th Cir. 1957)................................................. 60, 61

CONSTITUTIONAL PROVISION:

U.S. Const. amend. VI ..................................................................... 28

STATUTES:

18 U.S.C. § 3231 ............................................................................... 4

21 U.S.C. § 853(a) ........................................................................... 10

28 U.S.C. § 1291 ............................................................................... 4

28 U.S.C. § 3664(o) .......................................................................... 4

RULES:

Fed. R. App. P. 4(b)(1)(A) ................................................................ 4

Fed. R. App. P. 28(i) ....................................................................... 62

Fed. R. Crim. P. 52(a) ..................................................................... 28

Fed. R. Evid. 801(d)(1)(B) ................................................................ 3

Fed. R. Evid. 801(d)(1)(B)(i) ..................................................... 26, 49

Fed. R. Evid. 801(d)(1)(B)(ii) .................................................... 26, 54

Fed. R. Evid. 801 advisory committee's note to 2014 amendment ............... 54

**TABLE OF AUTHORITIES—Continued**

Page(s)

**OTHER AUTHORITY:**

Wright & Miller, 30B Federal Practice & Procedure: Evidence
  § 6753 (2024 ed.) ........................................................................... 51

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Rishi Shah respectfully requests oral argument on this important criminal case. This case presents the question whether the Government violated Appellants' Sixth and Fifth Amendment rights by unlawfully restraining millions' worth of untainted assets before trial and making false statements to the grand jury. There is no controlling precedent on either question, and the District Court recognized that the Sixth Amendment question was "undoubtedly a close one" when granting bail pending appeal. JA160. This case likewise involves novel questions regarding the prohibition on hearsay evidence and the scope of the federal fraud statutes. Oral argument will also assist the Court because of the complexity of this case and the voluminous record.

## INTRODUCTION

This appeal arises from the unconstitutional prosecution of Rishi Shah in connection with his role as CEO of a company called Outcome Health.  Shah's conviction resulted from three independent errors, each of which warrants reversal.

*First*, before trial, the prosecution unlawfully restrained millions in assets belonging to Shah—including funds Shah had already transferred to his counsel—that the Government falsely claimed were traceable to fraud.  This unlawful restraint meant that the counsel Shah had originally chosen to represent him was forced to withdraw for lack of funds, and Shah was forced to go to trial without his counsel of choice.  After trial, the Government *conceded* that its restraint was unlawful because it covered millions in assets not traceable to fraud.  The district court ultimately ordered the Government to return more than $9 million in unlawfully restrained assets, but the release came far too late for Shah to use it for his trial defense.

This was a straightforward—and egregious—violation of the Sixth Amendment.  A defendant's right to use his own money to hire his counsel of choice is the "root meaning" of the Sixth Amendment's guarantee.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-148 (2006).  For that reason, "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice

violates the Sixth Amendment." *Luis v. United States*, 578 U.S. 5, 10 (2016) (plurality op.).

This case exemplifies the concerns the Sixth Amendment was designed to avoid. As the Chief Justice has explained, the "possibility that a prosecutor could elect to hamstring his target by preventing him from [hiring] his counsel of choice raises substantial concerns about the fairness of the entire proceeding." *Kaley v. United States*, 571 U.S. 320, 345 (2014) (Roberts, C.J., dissenting). And because the over-restraint resulted from representations to the grand jury that were "not accurate," SA199,[1] the Government's over-restraint violated the Fifth Amendment as well. The Government has identified no case decided by any court, at any level, holding that anything like what happened here is constitutionally permissible.

In granting bail pending appeal, the district court recognized that the Sixth Amendment question in this case was "undoubtedly a close one" raising "substantial" issues. JA159-160. But the district court nonetheless erroneously excused the Government's misconduct. Among other things, the district court misconstrued the Sixth Amendment by placing an unprecedented evidentiary burden on Shah, even though the Government was responsible for the over-

---

[1] "R.__" refers to the district court's docket; "SA__" refers to Appellant Shah's short appendix; "JA__" refers to Appellants' Joint Supplemental Appendix.

restraint. The district court also improperly faulted Shah for failing to challenge the grand jury's findings years before the Government disclosed the documents that revealed its unlawful conduct. Because a Sixth Amendment violation is a structural error "with consequences that are necessarily unquantifiable and indeterminate," *Gonzalez-Lopez*, 548 U.S. at 150 (citation omitted), this Court should reverse.

*Second*, over Shah's objection, the district court permitted the prosecution to introduce lengthy Government-scripted statements that its three star witnesses had read to the grand jury years earlier. The district court admitted these hearsay statements under Federal Rule of Evidence 801(d)(1)(B), which allows admission of a prior consistent statement "to rebut an express or implied charge that the declarant recently fabricated" his testimony "or acted from a recent improper influence or motive in so testifying." But such statements are admissible only if made *before* "the alleged improper influence or motive [to lie] arose." *Tome v. United States*, 513 U.S. 150, 152, 167 (1995).

Here, all three witnesses quite plainly had the same motive to lie to the grand jury that they had at trial. All three were Outcome employees who ultimately cut deals with the Government for a favorable plea or immunity. This Court and every other court to address a comparable case have concluded with no difficulty that witnesses have a motive to lie in these circumstances. To make

3

matters worse, the Government failed to tailor the grand-jury statements, instead introducing dozens of pages to bolster the witnesses' direct-examination testimony—exactly what Rule 801 prohibits.  The Government cannot come close to satisfying its burden of proving harmlessness, particularly given that the testimony was *scripted by the prosecution* to be as damaging as possible.

*Third*, the prosecution's theory of fraud was legally erroneous.  The Government's principal theory of fraud was that Outcome was "built on a lie" because it underdelivered on its contractual promises.  But what separates fraud from mere breach of contract is the intent not to perform at the time of contracting.  The instructions permitted the jury to convict without such a finding, fatally undermining Shah's conviction.

The Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 18 U.S.C. § 3231.  The district court entered judgment on July 1, 2024, SA212, and Shah timely appealed on July 15, 2024, R.816.  *See* Fed. R. App. P. 4(b)(1)(A).  This Court has jurisdiction under 28 U.S.C. § 1291.[2]

---

[2] The District Court has not yet resolved restitution.  Those ongoing proceedings do not affect this Court's jurisdiction.  *See* 28 U.S.C. § 3664(o).

## STATEMENT OF THE ISSUES

1. Whether the Government's pretrial restraint of millions' worth of untainted assets impaired Shah's right to his counsel of choice, violating the Sixth and Fifth Amendments.

2. Whether the district court erred in admitting lengthy grand-jury statements of three Government witnesses as prior consistent statements, where the witnesses made those statements after developing a motive to lie and the statements were admitted without tailoring to issues raised on cross-examination.

3. Whether Shah's conviction fails as a matter of law because the jury was not required to find that Shah intended not to perform any contractual promises at the time they were made, a necessary element of fraud.

## STATEMENT OF THE CASE

Shah appeals from a judgment of conviction for wire fraud, mail fraud, bank fraud, and money laundering following an eleven-week trial before Judge Durkin.

### A. Years After Shah Founds Outcome Health, His Trusted Lieutenant Commits Fraud And Conceals It From Shah.

Shah founded Outcome Health in 2006 as a 20-year-old college sophomore, later joined by Shradha Agarwal, a classmate. His father was a doctor, and he hoped to continue his father's legacy by educating patients about

their treatment options.  *See* Trial.Tr.1631:11-13, 4813:23-4814:15, 8697:2-7. Outcome installed televisions and tablets in doctors' offices, which played educational videos while patients waited.  Outcome provided these services for free to doctors and patients; to finance its operations, Outcome contracted with pharmaceutical companies to display advertisements.  Trial.Tr.237:11-238:5.

Because Outcome was a startup, it did not always initially have screens in every office an advertiser might want to reach.  Outcome therefore built growth into its early contracts.  One way it did so was by basing its contracts on projections; Outcome analyzed seasonal trends and other data to predict where screens could be placed.  *See* Trial.Tr.681:16-24, 682:14-20, 718:4-719:23.  Many of Outcome's contracts expressly disclosed this strategy, pledging "best efforts to install" the devices by the end of the contract period.  Trial.Tr.4351:19-4357:6; *see also, e.g.*, Trial.Tr.4351:25-4352:2 (customer email explaining "there's not a lot installed right now, but we're going to build it for you").  Other contracts were based on "weighted average" campaigns, allowing Outcome to operate below the monthly target at the beginning of a campaign and then exceed the target in later months.  Trial.Tr.4357:2-6.  If Outcome did not reach its projected goals, contracts provided for "make-goods," which are common mechanisms in the media industry for providing a refund or credit past the contract period.  *E.g.*, Trial.Tr.384:15-386:16, 4355:22-4356:5.

Outcome grew quickly, and by 2017, it employed over 500 people. SA1; R.764 at 7-9; Trial.Tr.355:3-356:11. During this growth period, Shah trusted his employees to do their jobs honestly and transparently. Trial.Tr.4083:8-11, 4584:12-17. Unfortunately, some employees did not live up to that expectation.

In 2013, Shah hired Ashik Desai as the vice president of research and analytics. Trial.Tr.3408:6-8. Within a month, Desai began lying to Outcome's pharmaceutical customers to boost his own profile and hide his performance shortcomings. *See* Trial.Tr.4198:6-4199:14. Among many other things, Desai lied to customers about which doctors were in Outcome's network; charged customers for advertising that was not delivered; lied to customers about how many screens their advertisements were running on; inflated patient engagement metrics; and inflated return-on-investment (ROI) numbers. Trial.Tr.4132:3-16, 4198:1-4199:14, 4201:4-11, 4205:19-4206:3, 4232:3-21.

Desai actively concealed his fraud from Shah. He lied about contract performance; discredited subordinates when they raised concerns; and blamed discrepancies on technological issues. *See* Trial.Tr.3889:5-3892:13, 4124:1-4125:22, 4203:25-4205:5, 4293:22-4294:8, 4551:9-16, 5713:22-5718:23. Notwithstanding Desai's lies, however, the vast majority of Outcome's revenue was legitimate. Outcome had approximately 100,000 devices by the end of

2016, and the company delivered the vast majority of promised services. GX1973; Trial.Tr.4997:5-5000:11; *see also* Trial.Tr.5837:3-7.

Shah knew that Outcome experienced growing pains and occasionally under-delivered. But Outcome was quickly expanding its services, so Shah had reason to be optimistic about meeting projected goals by the end of each contract period. Because many contracts were based on averages and projections, under-deliveries in particular months did not necessarily constitute a breach of contract, let alone fraud. *See* Trial.Tr.4172:21-23 (Desai conceding "there's nothing wrong with selling or forecasting future inventory" "[i]f the client knows it's a growth campaign"). Indeed, Outcome *over*-delivered in other months. *See, e.g.*, Trial.Tr.478:7-14. And Desai assured Shah that Outcome provided make-goods to correct any shortfalls. *E.g.*, Trial.Tr.5700:2-5.

In 2016, Outcome sought additional financing and hired Deloitte to audit Outcome's financials. *See* Trial.Tr.3978:2-14, 4641:22-24. Rather than come clean to Shah, Desai doubled down on his lies, falsifying internal documents and lying on Deloitte's questionnaires. Trial.Tr.3997:18-4001:7, 4734:20-4735:12, 4735:16-4744:5, 4970:25-4971:13. Desai's cover-up was effective; even Deloitte did not spot any issues. Trial.Tr.4005:21-23, 4863:14-4864:3. As a result, Outcome received two loans totaling $485 million in 2016, and investments worth $487.5 million in 2017. SA1-2. A portion of that money was

8

provided as a dividend to Shah and Agarwal, which they set aside but did not distribute to themselves. *Id.*

Several months later, the *Wall Street Journal* reported that Outcome had charged pharmaceutical companies for ad placements on video screens that did not exist and provided inflated performance data. SA2. Shah promptly placed Desai on leave as he investigated the report.

After confirming Desai's misdeeds, Shah and Agarwal reached a settlement with investors in which Shah and Agarwal transferred $31 million back to the investors and agreed not to collect the dividend they had previously set aside. SA2. As part of the settlement, Shah and Agarwal agreed to relinquish control of Outcome, the company they had founded and built, which was worth $730 million even "after adjusting for the effects of the fraud." R.764-1 at 45; SA2-3; Trial.Tr.4145:21-4146:7. As consideration for these substantial concessions, the settlement gave Shah and Agarwal $31 million.

At Shah's direction and with Agarwal's support, Outcome conducted an audit of its ad campaigns and provided tens of millions of dollars to its pharmaceutical-company customers in reimbursements and make-goods, before learning of the Government's investigation. R.764-1 at 67.

9

### B. The Government Unlawfully Restrains Millions Of Dollars From Shah And Agarwal.

In November 2019, a grand jury returned an indictment charging Shah with fraud and money laundering. Similar charges were brought against Agarwal, Desai, and Brad Purdy, the company's CFO. R.14 at 20-48. The indictment described three categories of fraud—first, against pharmaceutical-company customers who paid for services Outcome did not perform; second, against banks who loaned money to Outcome in 2016; and third, against investors who invested in Outcome in 2017. *Id.*

The indictment included forfeiture allegations stating that "[a]ll right, title, and interest" in certain of Shah's investments and accounts were traceable to the alleged fraud. R.14 at 49-57; *see* 21 U.S.C. § 853(a) (authorizing forfeiture of property "derived from" proceeds obtained "as the result of" a violation). To obtain the indictment, the prosecution repeatedly told the grand jury that the forfeiture allegations "truly and accurately … list[ed] items for which there is probable cause that they came from proceeds of the fraud." SA199 (citation omitted). Based on the grand jury's finding that all the listed assets were traceable, the district court entered a protective order restraining the assets. R.27.

As the district court would later find, however, the Government's forfeiture allegations, as well as its grand-jury testimony, were—to put it mildly—"not accurate." SA199. In fact, the Government never attempted to trace all the assets it restrained. It traced only a subset of the listed assets, while falsely claiming that "all" the listed assets were traceable to fraud. The Government later acknowledged that "some of the [restrained] assets contained non-traceable funds," which the Government estimated were worth $5 million in 2019. JA128.[3]

### C. Shah Goes To Trial Without His Counsel Of Choice.

The Government's overbroad restraint prevented Shah from retaining his counsel of choice, William Burck of Quinn Emanuel. SA169, SA189. Burck agreed to represent Shah, and estimated that he would charge $9-10 million for such a complex trial. SA188-189. Because of the improper restraint, however, Shah had only $4 million in liquid funds. SA189. Burck therefore entered a limited appearance to challenge the restraint, hoping to free up sufficient assets to make up the difference. R.490-1 at 1-3 ¶¶ 5, 11.

---

[3] The value of these assets was disputed, and ascertaining their value at the time of the restraint and thereafter is a complex undertaking. Shah's expert calculated that Shah and Agarwal together would have had access to over $12 million but for the restraint after selling the unlawfully restrained investments. SA190, SA193. The District Court ultimately did not resolve this dispute. SA190-191, SA193-196.

Burck lacked any basis to know that the indictment's forfeiture allegations were false.  R.726 at 825:3-826:6, 892:7-22.  After all, during the grand-jury proceedings, the Government made clear "that the allegation was that the entire business was a fraud."  R.726 at 814:24-815:25.  And Supreme Court precedent prohibited Burck from challenging that broad theory of fraud pre-trial.  *See Kaley*, 571 U.S. at 322.

Given those limitations, Burck instead argued that Shah's settlement with the investors cleansed the proceeds of the 2016 loans and the 2017 capital raise of any taint associated with the alleged fraud, and that the Sixth Amendment barred the Government from restraining such untainted assets.  SA5, SA7-8.  Burck asked for a hearing on that motion.   The district court suggested that if there had been an "evidentiary" dispute about the restraint, it would have ordered a hearing, requiring the Government "to demonstrate that funds are traceable to the alleged fraud."  SA4-5, SA7.  But the Government did not disclose information needed to identify the over-restraint until years later, so the district court denied Burck's motion without a hearing.  SA8-11.  Burck was forced to withdraw "in light of Mr. Shah's inability to raise the required funds."  R.490-1 at 4 ¶ 19; *see* R.116.

Shah interviewed several attorneys who charged lower rates but they, too, declined to take Shah's case for lack of sufficient funds.  *See* R.726 at 951:4-16;

*see also* R.490-1 at 3-4 ¶¶ 15, 17.  As Shah explained in a request for more time to retain counsel, he faced difficulties finding representation despite speaking to "many attorneys" "because he ha[d] a limited amount of money available to him" and his case was "very complex."  R.111 at 1-2.

Shah ultimately hired John Hueston, who had never previously represented a defendant even once in a criminal trial, because "his firm was … willing [to] accept the promise of future payments [based on] illiquid assets" when other firms were not.  SA189-190.

### D. The District Court Commits Serious Evidentiary Errors At Trial.

More than three years later, the Government began a joint trial against Shah, Agarwal, and Purdy.  The critical question was whether the defendants knowingly participated in fraud or were unaware of the fraud being perpetrated by Desai and his team.

The Government built its case primarily on the testimony of Desai, Jason Ketchum, and David Ma—three former Outcome employees who were investigated and agreed to cooperate with the prosecution.  Before the Government submitted the indictment to the grand jury, Ketchum and Ma received immunity in exchange for agreeing to testify for the Government.  GX1025 (Ma); GX1026 (Ketchum).  Desai was indicted alongside Shah, Agarwal, and Purdy but was actively courting a plea deal during the grand-jury

proceedings.  The Government ultimately agreed to charge Desai with just one count of conspiracy, reducing his maximum Guidelines sentence by 17 years, if he testified against Shah.  Trial.Tr.4311:2-4313:10.  He was sentenced to just seven months.  R.887 at 2.

On direct examination at trial, Ketchum, Ma, and Desai testified that Shah and his codefendants were aware of the fraud and directed it.  *See, e.g.*, Trial.Tr.2348:13-2350:8, 3397:7-19.    Ketchum's testimony was especially important, because he held Desai's position before Desai joined Outcome in 2013.  *See* Trial.Tr.579:5-13.  The Government thus elicited testimony from Ketchum that Outcome had concealed under-deliveries and otherwise lied to customers as far back as 2012, before Desai's arrival.  *E.g.*, Trial.Tr.672:8-25, 692:2-17.

But Ketchum took that back on cross-examination.  After seeing evidence the prosecution had not shared, he was forced to concede that all "big clients during 2012" knew that Outcome's contracts were based on "growth." Trial.Tr.1492:11-1494:3.  Outcome's "sell, then build" model "was not a secret to the clients."  Trial.Tr.1652:19-25.  And no one, it turned out, lied to the sales team about using projections.    Trial.Tr.1590:25-1591:17, 1648:4-24; *see also* Trial.Tr.1900:2-1905:6 (acknowledging on re-cross that trial evidence caused him to reconsider his initial testimony).  Ketchum's about-face on cross-

14

examination was so damaging that the Government was later forced to concede that the defense had led Ketchum around like a "circus pony." Trial.Tr.1924:10, 9212:23-9213:1.

Shah challenged Ketchum's, Ma's, and Desai's credibility on the ground that all three witnesses had a powerful motive to lie about Shah's role in the fraud to secure immunity or a favorable plea deal. And Shah noted that their testimony differed from statements given before they had a reason to cooperate. *E.g.*, Trial.Tr.1507:17-1512:19 (Ketchum admitting he had characterized rumors of fraud as "ridiculous" before the Government's investigation commenced).

On re-direct, the Government sought to introduce the witnesses' grand-jury statements under Federal Rule of Evidence 801(d)(1)(B). Shah objected because such statements are admissible only if made before "the alleged improper influence or motive [to lie] arose," *Tome,* 513 U.S. at 152, 167, and all three witnesses gave the statements after developing their motive to lie. *See* R.368 at 2-3; *accord* R.398 at 7; SA53:1-6. Shah also argued that introducing these statements in bulk without tailoring to issues raised on cross-examination would be especially improper. R.398 at 2-3; *see also* R.368 at 4; SA53:8-25.

The district court overruled Shah's objections. As a result, on redirect, Ketchum, Ma, and Desai were permitted to read in dozens of transcript pages' worth of the grand-jury statements. Those statements *had been scripted by the*

15

*prosecution*, and they spoke to the most important issue at trial—Shah's knowledge—with a precision the witnesses had been unable to convey in their own words on direct examination.   JA2:14-15:19, JA18:14-23:21, JA26:13-52:12.

### E. Desai's Testimony Confirmed That He Orchestrated The Fraud And Concealed It From Shah.

Although the Government sought to rely on Desai's testimony on direct examination to prove that Shah spearheaded Outcome's fraud, his cross-examination testimony showed the opposite was true: Desai defrauded Outcome's customers, lenders, and investors on his own initiative and for his own ends.  Not even the Government disputed that Desai hid misconduct from Shah.

A campaign for Biogen's Tecfidera is illustrative.  In 2015, Biogen sought to renew its contract with Outcome, requesting 650 waiting-room and 900 exam-room tablets.  Trial.Tr.4524:24-4526:20.  Desai knew that Outcome did not have nearly enough exam-room tablets to deliver on such a contract.  Trial.Tr.4526:21-24, 4534:1-7.  Yet Desai did not tell Shah or Agarwal; he simply directed his team to write up the contract.  Trial.Tr.4526:21-4527:12.  Unsurprisingly, the campaign had disastrously low patient-engagement metrics, so Desai told his team to inflate the numbers.  Trial.Tr.4540:6-4544:13.  Desai

16

then covered up his fraud by falsifying the ROI report prepared by an outside company.  Trial.Tr.4548:17-4549:1, 4550:20-4551:8.

Desai testified that he used similar tactics in many other campaigns.  He routinely falsified ROI data and inflated metrics sent to customers.  Trial.Tr.3872:6-3878:6, 3878:13-3883:19, 3886:8-3889:14, 3925:20-3926:20.  He signed false affidavits certifying that Outcome delivered on all its contractual promises when Outcome had in fact underperformed.  Trial.Tr.4591:20-4593:5.  And he invented a screenshot scam to convince the customers the affidavits were true.  Trial.Tr.4197:15-25.  As Desai repeatedly confirmed, no one directed him to do any of this.  Trial.Tr.3873:13-14, 4198:6-4199:14, 4201:7-11, 4519:2-4.  In fact, Desai acknowledged that *he* pressured his subordinates at the company to commit fraud.  *E.g.*, Trial.Tr.4201:23-4203:14.

Desai worked hard to conceal his fraud from Shah.  He lied to Shah about how ad campaigns were performing.  *See, e.g.*, Trial.Tr.4914:15-4916:3.  He "did not tell Rishi Shah or others that [he] was changing the numbers in" ROI reports.  *E.g.*, JA46:5-7.  And he "[f]lat-out lied to" his supervisors and salespeople about the screenshots.  Trial.Tr.4203:25-4205:5.  When Purdy finally raised "grave concerns" upon discovering that incorrect information was being sent to customers, Trial.Tr.4592:17-4594:21, Desai told Shah it was a technological problem.  Trial.Tr.4598:4-19.

17

Desai also admitted that he defrauded lenders and investors:  He lied on Deloitte's questionnaires, falsified internal documents "to conceal the under-deliveries," and caused fake ROI reports to be sent to potential investors.  Trial.Tr.3997:18-4001:4,  4734:20-4735:12,  4735:16-4744:5;  5420:24-5422:3.  Once again, these were not lies that Shah ordered but Desai's own "ideas" to paper over his own fraud.  Trial.Tr.3997:21-3998:6, 3998:25-3999:5.

Desai testified to his motive to commit fraud and conceal it from Shah:  He sought the money, recognition, and respect that came with successfully growing Outcome's sales.  Desai explained that when Outcome's revenue skyrocketed, he became known as the "kid genius," Trial.Tr.4412:8-10, 4423:12-17, lauded in the press for "doubl[ing] year over year revenue." Trial.Tr.4413:16-4427:12.  Desai also received more than a fivefold increase in salary in three years based on his sales numbers.  Trial.Tr.4429:23-4432:23.  And as his fraud deepened, Desai doubled down on his lies to hide his fraud from Shah and others.

Desai's fraud was difficult to unmask.  Desai had significant control over inventory and customer interaction, which allowed him to hide his fraud effectively, especially as Outcome grew to a 500-person company.  *See* Trial.Tr.4731:5-4732:20.  And Desai discredited any employee who raised concerns about his conduct.  *See* Trial.Tr.5338:21-5339:6 (Desai lying to counsel

who launched investigation at Shah's request); *see also, e.g.*, Trial.Tr.4279:12-4280:2, 5694:7-5727:4, 5727:11-16 (similar).

The evidence showed that Shah knew Outcome under-delivered on some contracts. But the evidence did not show he knew Outcome *defrauded* customers, especially given that so much of Outcome's business was legitimate and so many of Outcome's contracts were based on projections and weighted averages. *E.g.*, Trial.Tr.4097:12-13, 4170:5-8 (Bristol Myers Squibb); Trial.Tr.4354:21-4355:6 (Novo Nordisk); Trial.Tr.3717:21-25, 4355:7-4356:5 (Johnson & Johnson); Trial.Tr.4553:23-4554:7 (AbbVie). Those contracts expressly disclosed that Outcome might not meet inventory goals in certain months. *See* Trial.Tr.4172:18-12, 4358:18-4360:2. Other contracts did not expressly mention weighted averages, but both Outcome and the customers understood them to be "weighted-average contract[s]" based on prior dealing. *E.g.*, Trial.Tr.4452:14-4453:12. Moreover, Desai assured Shah that Outcome always provided make-goods to correct delivery shortfalls. Trial.Tr.4637:10-4638:8.

The evidence also showed that Shah took steps to discourage improper practices. For example, when Purdy told Shah that customers were receiving false affidavits, Shah unequivocally told his employees that they "need a plan to deal with" the issue, asked for "recommendations," and suggested "a full audit"—even though Desai blamed the problem on a software issue.

19

Trial.Tr.4592:17-4594:6, 4594:22-4598:23. Shah then assigned a team to track deliveries. Trial.Tr.4621:11-4623:2, 4626:19-4627:9. And Shah hired "experienced" employees to "build out the inventory system" and conduct accurate ROI studies. Trial.Tr.330:6-331:1, 332:19-335:17, 5834:8-20 (hiring former Chief Information Officer of the United States).

Because Shah valued and trusted Desai, Shah was initially skeptical of claims about Desai's deceit. *See* Trial.Tr.4584:12-17. But once Shah's suspicions grew, he put Desai on leave. Trial.Tr.4145:21-4146:2. Shah also provided make-goods to customers. R.764-1 at 65-66. And he settled with Outcome's investors, relinquishing $190 million and signing over control of the company worth hundreds of millions. SA2-3; R.764-1 at 45.

### F. The Jury Convicts, And The Court Denies Shah's Post-Trial Motions.

The jury convicted Shah on 19 out of 22 counts. JA122-123. Defendants moved for acquittal or a new trial, arguing that the evidence presented at trial was insufficient for a conviction. SA127. The court denied the motions and sentenced Shah to 7.5 years' imprisonment. *Id.*; SA212-234. It subsequently sentenced Purdy to 27 months, Agarwal to one day, and Desai to seven months. R.807; R.809; R.887.

Post-trial proceedings focused heavily on the Government's improper pretrial restraint. Seven weeks into trial, the Government disclosed a tracing analysis and several internal emails related to the pretrial restraint of Shah's assets as part of its *Jencks* production. SA180. The tracing analysis revealed for the first time that the Government had not in fact traced *all* the restrained assets to the alleged fraud as it had told the grand jury. JA151, JA154-158. Indeed, the newly disclosed emails established that the Government knew certain restrained assets were *not* traceable to unlawful activity. For example, in one email from February 2020, the Government's tracing expert Megan Poelking reminded AUSA Matthew Madden that she could "only" trace a portion of a certain investment "to the fraud," and that "*the remainder is not protected*." R.722-1 (emphasis added). In another email dated August 2020, Poelking explained that while Shah used "traceable funds" to invest in two private equity companies, "there were also investments in these entities" that predated her tracing. JA147. These internal communications directly refuted Poelking's assurance to the grand jury that all those investments were traceable to fraud. The same prosecutors who had been told that certain assets were not traceable nonetheless drafted an indictment claiming that "all" of these assets were traceable.

After trial, the district court held an evidentiary hearing to address the questions raised by the *Jencks* production.   At the hearing, the Government admitted that certain restrained assets "were not traceable" to fraud.  R.480 at 16:13-14.  After additional briefing, the court ordered $9.6 million in wrongfully restrained assets to be released to Shah, which was the value of the *liquid* assets the Government conceded were not traceable.  JA131-133; R.551 at 2; R.555 at 2.

Days after the Government first acknowledged the wrongful restraint, Shah moved to dismiss the indictment or alternatively for a new trial, arguing that the unlawful pretrial restraint of untainted assets violated his Sixth Amendment right to counsel of choice.  *See Luis*, 578 U.S. at 10 (plurality op.). Shah further argued that the Government's knowing use of false testimony before the grand jury to procure the restraint violated the Fifth Amendment.  *See* JA135-144.

After evidentiary proceedings, the district court found that the pretrial "protective order should not have restrained 'all right, title, and interest' in" the assets identified in the indictment.  SA172.  The court further recognized that Poelking's grand-jury testimony asserting probable cause to believe that the restrained assets were traceable to fraud "was not accurate" and the

22

Government's claimed understanding of the indictment's language "defie[d] the meaning of the words themselves."  SA199, SA201-208.

Nevertheless, the court denied Shah relief.  The court principally held that, although Shah demonstrated that the Government had restrained many millions of dollars in untainted assets, Shah did not prove that he would have had enough cash on hand to hire his *first* choice of counsel, Burck, absent the illegal restraint. SA187-197.  The court ignored Shah's argument that, even if he would have had insufficient liquid assets to hire Burck, the improper restraint of millions of dollars plainly impaired his choice of counsel.  *See* R.737 at 1367:16-1368:9.

The court also maintained that Shah should have objected to the improper restraint before trial.  The court rejected Shah's argument that he was unable to discover the violation because the Government withheld the tracing analysis and internal emails that revealed the over-restraint until the middle of trial.  SA177-186.  But, even as it faulted Shah for failing to identify the over-restraint earlier, the district court excused the government attorneys and agents *who wrote the indictment and performed the tracing analysis*, finding that they did not violate the Fifth Amendment because they could not "put the pieces" together given that "the forfeiture was incredibly complex."  SA201, SA206.

Shah moved for bail pending appeal, which the district court granted after hearing oral argument.  The court held that "the question of whether the pretrial

restraint in this case violated Shah's Sixth Amendment right to counsel of choice" was "undoubtedly a close one."  JA159-161.

## SUMMARY OF THE ARGUMENT

**I.**  The Government's unlawful restraint of millions in untainted assets violated Shah's Sixth and Fifth Amendment rights.

**A.**  After trial, the Government *admitted* that it had improperly restrained millions of dollars of innocent assets for more than three years.  That was a straightforward violation of Shah's Sixth Amendment rights because it severely limited Shah's options.  *See Luis*, 578 U.S. at 10 (plurality op.).  The over-restraint also violated the Fifth Amendment because it resulted from knowingly false statements to the grand jury.  No comparable case has ever upheld such a dramatic over-restraint.

**B.**  The district court denied Shah relief because, in its view, Shah would not have been able to afford his *first* choice of counsel even absent the illegal restraint.  But nothing required Shah to prove that he could have afforded his *first* choice of counsel absent the restraint—the Sixth Amendment is violated whenever the Government impairs a defendant's "fair opportunity" to secure his choice of counsel.  *Id.* at 11 (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)).  In any event, the district court erred legally and factually in concluding that Shah could not have afforded Burck. It improperly placed the burden on

24

Shah, and it clearly miscalculated the time Shah had to liquidate his assets to secure counsel before trial. Finally, the district court invented an unprecedented requirement that Shah raise his Fifth and Sixth Amendment arguments pretrial, before the Government turned over information revealing its violation.

**C.** The Government's pre-trial restraint of Shah's settlement proceeds separately violated Shah's Sixth Amendment rights. As part of his settlement with investors, Shah agreed not to collect his dividend, resign as Outcome's CEO, relinquish his equity interest in the company, and give up the right to indemnification that would have otherwise funded his defense. Critically, the investors *knew* about the alleged fraud when they reached this agreement. Shah's settlement funds therefore derived from his valuable concessions to the investors, not the alleged fraud.

**D.** The remedy for the denial of counsel of choice is to restore a defendant to the circumstances that would have existed had there been no constitutional error. *See United States v. Morrison*, 449 U.S. 361, 364 (1981). Because there is no way to restore Shah to the status quo ante, the appropriate remedy is to dismiss the indictment with prejudice. At minimum, a new trial is required because the violation of the right to counsel of choice is a structural error.

**II.**  Shah is separately entitled to a new trial because the district court improperly admitted extensive narrative hearsay statements scripted by the prosecution for its three star witnesses.

**A.**  Federal Rule of Evidence 801(d)(1)(B)(i) allows courts to admit prior consistent statements to rebut a charge that a declarant "recently fabricated" his testimony.  Shah attacked Ketchum's, Ma's, and Desai's credibility on the ground that they had an improper motive to testify for the Government to receive immunity or a plea deal.  The grand-jury statements could not have rebutted that attack because, at time they were made, all three witnesses had either already received immunity or were actively negotiating a plea deal.  The Government, moreover, failed to tailor the statements to any inconsistencies that arose on cross-examination, instead introducing the statements in bulk to bolster the witnesses' testimony.

**B.**  The district court erred in admitting the grand-jury statements.  First, the court disregarded the powerful motives to lie that all three witnesses had before they testified to the grand jury.  Second, the court improperly relied on Rule 801(d)(1)(B)(ii), which allows a party to use a prior consistent statement "to rehabilitate the declarant's credibility as a witness when attacked on another ground."  Shah challenged the witnesses' credibility based on their motive to lie—a motive that squarely fits within Rule 801(d)(1)(B)(i).  As the Fifth Circuit

has held, the Government should not be permitted to sidestep subsection (i)'s clear limitation by claiming that a witness's credibility was challenged on other grounds.

**C.**  The Government cannot meet its burden of proving that introduction of the grand-jury statements was harmless.  The statements were laser-focused on the central issue at trial—Shah's state of mind—and, highly unusually, were drafted by the prosecution itself.

**III.**  The Government's theory of fraud was legally defective.  The jury was invited to convict the defendants, in the Government's own words, for overpromising and underdelivering—even if they fully intended to deliver at the time they contracted.  As Agarwal's brief explains in detail, that is not criminal fraud.

**STANDARD OF REVIEW**

The Court reviews constitutional questions *de novo*.  *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006).  A violation of the right to counsel of choice is a structural error requiring "automatic reversal on appeal." *Greer v. United States*, 593 U.S. 503, 512-513 (2021) (quotation marks omitted); *see also United States v. Navarrete*, 88 F.4th 672, 674 (7th Cir. 2023).  The Court reviews any underlying factual findings for clear error.  *United States v. Mills*, 122 F.3d 346, 350 (7th Cir. 1997).

The Court reviews a district court's interpretation of the evidentiary rules *de novo*.  *United States v. Borrasi*, 639 F.3d 774, 778 (7th Cir. 2011).  If an evidentiary error occurred, this Court cannot disregard the error as harmless unless the Government proves that the error did not contribute to the verdict obtained.  Fed. R. Crim. P. 52(a).

The Court also considers *de novo* the scope of the federal fraud statutes.  *See United States v. Sorich*, 523 F.3d 702, 711-712 (7th Cir. 2008).  If the Government was permitted to convict on a "legally defective" theory, vacatur is required.  *United States v. Borrero*, 771 F.3d 973, 976 (7th Cir. 2014).

## ARGUMENT

### I.  THE GOVERNMENT'S IMPROPER RESTRAINT OF MILLIONS IN UNTAINTED ASSETS VIOLATED THE SIXTH AND FIFTH AMENDMENTS.

The Sixth Amendment guarantees the accused "the assistance of counsel for his defence."  U.S. Const. amend. VI.  The "root meaning" of that right is "the right to be assisted by counsel of one's choice."  *Gonzalez-Lopez*, 548 U.S. at 147-148.  This right stands "separate and apart from the guarantee to effective representation" and a "fair trial."  *Kaley*, 571 U.S. at 336.  The right to counsel of choice is the "most precious right a defendant has," as the accused "might readily give all he owns to defend himself."  *Id.* at 341, 344 (Roberts, C.J., dissenting).  The possibility that a prosecutor "could elect to hamstring his target

28

by preventing him from [hiring] his counsel of choice raises substantial concerns about the fairness of the entire proceeding." *Id.* at 345.

In *Luis*, Justice Breyer concluded for a four-Justice plurality that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." 578 U.S. at 10 (plurality op.). The plurality explained that "untainted" property "belongs to the defendant, pure and simple," and the Government violates the Sixth Amendment if it seizes untainted property the defendant needs to pay for counsel of choice. *Id.* at 12-13. Justice Thomas, providing the dispositive fifth vote, concurred in the judgment, concluding that the Sixth Amendment categorically "prohibit[s] pretrial freezes of criminal defendants' untainted assets," without regard for the defendant's need for the funds. *Id.* at 28-29 (Thomas, J., concurring in judgment).

In this case, the prosecution improperly—and concededly—restrained millions of dollars' worth of assets from Shah, forcing the withdrawal of the counsel he had hired to represent him. This was a straightforward violation of the Sixth Amendment. And because it resulted from false testimony to the grand jury, it also violated due process.

### A. The Government's Concededly Illegal Over-Restraint Impaired Shah's Choice Of Counsel And Violated Due Process.

The Government conceded that it illegally restrained millions of dollars from Shah. *See* JA128 (acknowledging that "some of the [restrained] assets" it estimated to be worth at least $5 million "contained non-traceable funds"). Shah "needed" those assets to retain his first-choice counsel, William Burck. Shah hired Burck to represent him at trial, and Burck was forced to withdraw due to "Mr. Shah's inability to raise the required funds" after the Government's illegal restraint. R.490-1 at 4 ¶ 19; *see also* R.75-8 ¶¶ 4-9; R.116.

The illegal restraint did not just preclude Shah from hiring Burck: It also put other attorneys outside Shah's reach. Shah interviewed many attorneys but faced difficulties finding counsel given the "limited amount of money available to him." R.111 at 2; *see also* R.726 at 951:4-16 (Burck testifying that another attorney to whom he referred Shah "expressed concern" that Shah's funds "wouldn't be sufficient"). Shah eventually settled on Hueston, who was undisputedly the only attorney Shah identified willing to accept a promise of future payment based on assets that were not immediately liquidated. The district court recognized that Shah paid Hueston the entire "amount he had available to pay counsel at that time." SA189 n.14.

The Government's over-restraint violated the Sixth Amendment under either the *Luis* plurality's approach or Justice Thomas's. Under Justice Breyer's

plurality opinion, the Government's restraint of millions of dollars Shah would have used for counsel deprived Shah of assets he "needed" to hire counsel he would have "preferred" to Hueston.  *Luis*, 578 U.S. at 10, 12 (plurality op.). And the Sixth Amendment violation is even more straightforward under Justice Thomas's concurrence, as the Government recognized below.  *See* R.512 at 20. In Justice Thomas's view, "a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice"—full stop. 578 U.S. at 24.  Because a violation occurred under either approach, this Court need not resolve which opinion controls.[4]

The over-restraint resulted from statements to the grand jury that the Government knew to be false.   Poelking, the Government's tracing expert, falsely told the grand jury that the indictment "truly and accurately" "list[ed]

---

[4] Should the Court address the question, Justice Thomas's opinion controls because it resolves the case "on the narrowest grounds." *See Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted).  All five Justices "agree[d]" in *Luis* that "a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice" because the "common law prohibited" the practice.   *Luis*, 578 U.S. at 24-25, 29-30 (Thomas, J., concurring); *see id.* at 19-20 (plurality op.).  The Justices parted ways only on Justice Breyer's balancing of the government's "contingent" interest in defendants' untainted assets as weighed against a defendant's "fundamental" interest in securing counsel of choice.  *Id.* at 18-19.  Justice Breyer's balancing approach "casts doubt on the constitutionality of incidental burdens on the right to counsel," and thereby constitutes a more expansive view of the Sixth Amendment than Justice Thomas's bright-line rule.  *See id.* at 33 (Thomas, J., concurring).

items for which there is probable cause that they came from the proceeds of the fraud." SA198. As the district court recognized, this statement was "not accurate." SA199. Internal emails revealed that Poelking and other government officials *knew* this and other statements were false at the time they were made. *See, e.g.*, R.722-1 (Poelking telling AUSA Madden in February 2020 that she "only" traced a portion of an investment "to the fraud" and "the remainder is not protected"); R.736 at 1017:12-1022:8 (AUSA Daniel Olinghouse admitting he knew "at the time that [he] prepared the … protective order" that not "all right, title, and interest" in the restrained investments "was purchased with traceable proceeds"). The "government's knowing use of false testimony, or failure to correct testimony, violates due process." *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005). For that reason, the Government's knowingly false statements to the grand jury and years-long failure to correct those statements violated due process.

### B. The District Court Erred In Rejecting Shah's Tracing Challenge.

The district court agreed that the pretrial restraint was unlawful but refused to grant relief even as it noted that the question was "undoubtedly a close one." JA159-160. None of its reasons withstands scrutiny.

1. _The District Court Misconstrued The Sixth Amendment As A Matter Of Law._

The district court concluded that Shah "would not have been able to afford" his first-choice counsel even absent the illegal restraint. SA187. That conclusion followed from the court's erroneous legal premise that Shah was required to prove that he could have _afforded Burck in particular_ absent the restraint.

That premise is wrong as a matter of law. The Sixth Amendment protects a defendant's "fair opportunity" to secure counsel of choice and prevents the Government from impairing that choice. _Luis_, 578 U.S. at 11 (plurality op.) (quoting _Powell_, 287 U.S. at 150). The Sixth Amendment does not require the defendant to identify which particular lawyer he would have hired but for an over-restraint. Thus, even assuming Shah could not have afforded Burck absent the improper restraint, it simply does not follow that the over-restraint of millions of dollars that Shah would have used to hire the best possible lawyer did not impair his choice. A simple analogy illustrates why: If a homebuyer initially sets his sights on a $5 million house, only to have the Government improperly restrain $4 million, then purchases a $500,000 condominium, it would be absurd to suggest that the restraint did not impair the homebuyer's choices because the first-choice house may have been out of reach anyway.

The district court fixated on Burck because Shah had already hired him when the improper restraint occurred. But that is happenstance. If, as in *Luis*, Shah had not yet hired a lawyer when the restraint occurred, the court would have asked simply whether the over-restraint of millions of dollars unduly impaired Shah's range of choices (which it obviously did). *Id.* at 11 (plurality op.). The result should be no different merely because Shah happened to hire an attorney before the unlawful restraint occurred.

The Government has argued that Shah has not identified which counsel other than Burck he would have preferred to the attorney he selected. But the record establishes Shah interviewed numerous attorneys and settled on Hueston only because he accepted the promise of payment from assets to be liquidated in the future. Asking more in this posture would be untenable. The Government revealed the illegal restraint only in the middle of trial, and Shah could not retroactively build a more specific record about a choice made years earlier. Nor did he have any reason to maintain such a record when he made the choice. To return to the homebuyer analogy: It would make no sense for a homebuyer left with $500,000 to spend time touring and making offers on homes far out of his diminished price range just in case the restraint is later revealed as overbroad.

2. _The District Court Erred In Concluding That Shah Could Not Have Afforded Burck Absent The Restraint._

In any event, the district court was wrong several times over in holding that Shah could not have afforded Burck absent the restraint.

The court began with a critical legal error: improperly placing the burden on Shah to prove that his untainted assets would have sufficed to hire Burck. SA197. The court required Shah to prove—four years after the fact—which of his investments could have been liquidated in 2020 and what discount rate would have applied to their liquidation based on 2020 market conditions. Despite Shah's efforts to meet the court's demands, the court found that analysis so "complicated," SA190, that even after months of evidentiary hearings it declined to determine how much cash Shah would have had absent the illegal restraint. *See* SA196-197.

The burden should have been on the Government, not Shah. The over-restraint was the Government's fault, and error "casts on someone other than the person prejudiced by it a burden to show that it was harmless." *Chapman v. California*, 386 U.S. 18, 23-24 (1967). Allocating the burden to the Government is especially warranted to discourage misconduct from recurring. *See Medina v. California*, 505 U.S. 437, 452 (1992) (burden of proof should rest with the government where necessary to "deter[] lawless conduct by police and prosecution" (citation omitted)). And allocating the burden to the Government

35

comports with analogous precedent requiring the Government to prove the defendant will suffer no adverse consequences from the Government's constitutional error. *See Nix v. Williams*, 467 U.S. 431, 444 (1984) (Government must prove that evidence obtained unconstitutionally "ultimately or inevitably would have been discovered by lawful means").

Had the district court correctly allocated the burden, it would have been compelled to rule in Shah's favor. The question whether Shah could have hired Burck absent the restraint turned largely on the liquidation value of Shah's investments in 2020. Using a "conservative" estimate, Shah submitted expert evidence calculating that value to be well above what he needed to hire Burck. *See* SA195. The Government, however, offered *no* contrary figure of its own, and the district court ruled against Shah largely because the expert's "analysis was *necessarily* speculative." SA193, SA195-196 (emphasis added). If true, that should cut against the Government as the party that created the constitutional problem, not Shah, who suffered the consequences.

Even if Shah bore the burden of proof, however, he satisfied it. As the district court itself acknowledged, its conclusion rested "critically" on the assumption that Shah would have had only 11 weeks to liquidate his assets: from April 8, 2020—when the court ruled Shah could not use his settlement proceeds to pay counsel—until June 30, 2020—the court's deadline for Shah to

secure counsel.  SA188, SA194-196.  The court found that this short deadline would have driven down the price Shah could sell for.  SA196.

But the court's timeline was obviously wrong.  The Government restrained Shah's assets on November 22, 2019, not April 8, 2020.  R.27.  If Shah could have accessed the assets in November, he would have begun liquidating them to hire counsel immediately and would have had *31 weeks* to complete the sale.  As even the district court acknowledged, Shah was able to liquidate numerous similar assets in far less time.  SA194-195 (finding that Shah needed six months to liquidate $2 million); *see also* R.725 at 708:4-23 (Shah's expert confirming the same).

The district court clearly erred on the back end, too.  The court acknowledged that it likely would have granted an extension from the June 30 deadline had Shah "asked for more time," but faulted Shah for failing to ask.  SA188.  Yet Shah had no reason to seek additional time to liquidate *assets that had been restrained*.  Shah unquestionably would have sought an extension had the only obstacle to hiring Burck been the need for more time to liquidate assets.  *See* R.726 at 853:18-854:4 (Burck would have sought "additional time from the Court" had he "known that some of the assets restrained by the protective order were not traceable").

The district court rejected Shah's conclusion that he could have liquidated his assets at a 10% discount, finding that rate "speculative." SA193-196. The Government did not propose a competing discount rate, but the court suggested 35% might be appropriate. SA195. That discount rate was wildly unrealistic in the Government's favor—*but even if it were correct, the court's conclusion was clearly wrong*. Even a *40%* discount would have given Shah sufficient money to hire Burck.[5] The district court's failure to spot that basic inconsistency requires reversal, especially coupled with its clear timeline errors.

*3. The District Court Misconstrued The Fifth Amendment As A Matter Of Law.*

The district court recognized that Poelking's representation to the grand jury that "all right, title and interest" in the restrained accounts was traceable to fraud was "not accurate." SA199. The district court nonetheless concluded that the Government's use of this false testimony, and years-long failure to correct it, did not violate due process. The court excused Poelking's misstatement on the ground that she "was not a lawyer." SA202. The court then forgave

---

[5] "Shah needed an additional $5-6M to hire" Burck. SA189. Because Shah would have received at least $900,000 in distributions from his investments absent the illegal restraint, SA190-191, he needed $4.1 million to make up the difference. Applying a 10% discount, Shah's expert concluded that Shah could have received as much as $6.29 million if he liquidated certain restrained assets. SA193. The district court thought 10% was too low, but a 40% discount still would have netted Shah $4.2 million—more than enough to hire Burck.

38

Olinghouse, who drafted the forfeiture allegations, because he "did not have any experience with the forfeiture of private equity." *Id.* As for the lead AUSA Madden, the court concluded that he "did not recall focusing on or even thinking about" the overbroad forfeiture language in the indictment. SA203-204. The upshot was that the court believed that no *individual* within the Government understood that the forfeiture allegation was overbroad—even as the court held that the officials' interpretation of the forfeiture language "defies the meaning of the words themselves." SA201.

This divide-and-conquer approach to the Government's knowledge misconstrues the Fifth Amendment. In all other contexts imposing affirmative disclosure requirements on the Government, the Fifth Amendment considers the Government's knowledge *collectively* rather than each official's understanding in isolation. *See Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995) (a "prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case"); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (similar); *United States v. Mann*, 140 F. Supp. 3d 513, 538 (E.D.N.C. 2015) ("Collectively, the government was aware ... that Mann's three bank accounts did not contain traceable property."). Here, there can be no question that the Government collectively knew the statements made to the grand jury were false, because Poelking told the prosecution in writing that she could

"only" trace a portion of a certain restrained investment "to the fraud." R.722-1. The prosecution's false grand-jury testimony—and its three-year-long failure to correct it—violated due process.

### 4. *Shah Preserved His Tracing Arguments*.

The district court legally erred in concluding that Shah should have raised his tracing arguments earlier. Shah was required to bring his motion "in a timely manner." *Puckett v. United States*, 556 U.S. 129, 134 (2009); *see* SA177. That is exactly what Shah did; he challenged the Government's tracing analysis shortly after he was on notice of the restraint's illegality.

At the time the restraint occurred, Shah had no basis to challenge the Government's tracing claim. The indictment unequivocally represented that the prosecution had "probable cause to believe" that "[a]ll right, title, and interest" in the investments listed were "traceable" to fraud. R.14 at 49-57. The district court accordingly agreed that the language of the forfeiture request "inevitably suggested ... that all of the property covered by the forfeiture allegations was derived from criminal proceeds." SA199. The Government's theory "was that the entire business was a fraud." R.726 at 814:24-815:25.

It was not until the middle of trial, when the Government disclosed its tracing spreadsheets and internal emails, that the Government revealed its forfeiture allegations were false. As those materials revealed, the Government's

tracing analysis established that only a *subset* of the restrained assets were traceable to fraud. *See, e.g.*, JA147 (Poelking explaining that assets listed in the indictment included investments "that dated back to 2015 and 2013" that she never "trace[d] to the fraud"). Shah had no basis to challenge the over-restraint before he saw the internal documents given the Government's repeated assurances that it had probable cause to restrain "[a]ll" the investments and its theory that the entire business was fraudulent.

The district court believed that the grand-jury testimony and exhibits themselves showed that the Government only traced assets back to 2016, and that Burck could have discovered that fact by reviewing grand-jury transcripts before trial. SA182-183. But the grand-jury transcripts did not reveal the over-restraint. Poelking testified that she "'identified a few transactions that resulted in large payments' to Defendants, specifically the 2016 loans and the 2017 capital raise," SA182 (quoting GX2114 at 5:18-6:20), but Shah had no reason to treat those statements as exclusive rather than illustrative. Later in her testimony, Poelking confirmed she had probable cause to believe that "*all* right, title, and interest" in each asset, "including, *but not limited to*" the amounts specified in the forfeiture allegation, was traceable to fraud. SA198 (emphases added). And here's the kicker: The Government *in fact restrained all the assets listed in the indictment*. Burck reasonably took the Government at its word.

41

The district court suggested that Shah's counsel could have "perform[ed] their own tracing analysis." SA180. Conducting such a tracing analysis, however, would have done no good. A tracing analysis requires an understanding of the Government's theory of fraud—it is that *theory of fraud* that distinguishes assets that are traceable to the fraud from assets that are not. But Shah was barred from challenging the Government's broad theory of fraud before trial. *See Kaley*, 571 U.S. at 333 ("A defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime."). The same goes for the district court's observation that it was Shah's "*own property*" that was "being restrained." SA180. Substantially *all* of Shah's money came from Outcome. Given the Government's broad theory of fraud, Shah had no basis to suspect that a challenge to the Government's tracing claims had any potential to succeed.

The district court finally stated that "nothing prevent[ed] [Shah] from asking for more information" about the Government's tracing or seeking a hearing. *Id.* But Burck *did seek a pretrial hearing*, which the Government opposed and the district court denied. SA5, SA11. Had Burck understood that the Government's forfeiture theory was narrower than the indictment represented, then he would have "[a]bsolutely" sought a hearing on that basis. R.726 at 837:1-11. More importantly, the district court's logic would, if affirmed, require

42

every defendant to challenge pretrial restraints as overbroad in every case—even absent a good-faith basis to believe the Government's tracing claims are incorrect—for fear of being accused of abandoning the issue later on.

The district court's timeliness ruling is irreconcilable with its own Fifth Amendment findings.  The court agreed that the Government's testimony was "not accurate" but found the Government did not knowingly make false statements to the grand jury because the forfeiture analysis "was incredibly complex" and the officials who performed the analysis "did not put the pieces together."  SA199, SA201, SA206.  These officials, unlike Shah, had access to internal tracing analyses and had explicitly acknowledged in internal emails that some assets listed in the indictment were not traceable to criminal proceeds.  If Shah should have acted sooner, then so too should have the Government.  Its failure to do so violated the Fifth Amendment.  And its three-year-long failure to correct the false statement was an ongoing violation that further refutes the district court's conclusion that Shah was required to object before trial.  *See Glossip v. Oklahoma*, 145 S. Ct. 612, 630 (2025) ("the Due Process Clause imposes 'the responsibility and duty to correct' false testimony on 'representatives of the State'" (citations omitted)).

Regardless, even if Shah could have raised such an argument pretrial, "structural" errors like "denial of counsel of choice" are "subject to automatic

reversal on appeal" because they "*necessarily* render a criminal trial fundamentally unfair." *Greer*, 593 U.S. at 512-513 (quotation marks and citations omitted); *Navarrete*, 88 F.4th at 674 (similar). Under *Greer*, even "unpreserved" structural errors warrant automatic reversal. *United States v. Rodriguez-Santos*, 56 F.4th 206, 219 (1st Cir. 2022). Reversal is therefore required even accepting the erroneous conclusion that Shah could have raised the argument sooner.[6]

## C. The Government's Restraint Of Shah's Settlement Proceeds Separately Violated The Sixth Amendment.

Before trial, Shah and Agarwal asked the district court to release $10.3 million of restrained funds, explaining that they needed the money to hire counsel and that the money was untainted because it derived from the 2018 settlement they had reached with Outcome's investors. R.75-2 at 2. The district

---

[6] If plain-error review applies, that standard is met. *See United States v. Maez*, 960 F.3d 949, 956 (7th Cir. 2020) (articulating the standard). The district court's errors were plain: It disregarded *Luis*'s straightforward holding, erroneously required Shah to prove he could have afforded *Burck in particular* absent the pretrial restraint, misallocated the burden of proof, clearly miscalculated the amount of time Shah would have had to hire counsel, and failed to recognize that even a 40% liquidation discount would have yielded enough cash to hire Burck. Because a Sixth Amendment violation is a structural error, it "automatically" impinged Shah's substantial rights. *Puckett*, 556 U.S. at 140. And it affected the trial's integrity given the profound unfairness of permitting the prosecution to handicap Shah by preventing him from using his own funds to hire his counsel of choice.

court denied their request, concluding that the assets were tainted because the settlement money was linked to a $225 million dividend which, in turn, was linked to the allegedly fraudulent 2017 capital raise. SA5, SA7-8. That conclusion was error.

Shah never collected the dividend: Although $225 million was set aside, it was held within the company's ownership chain and never distributed. Shah then settled with the investors, agreeing to resign as Outcome's CEO, relinquish his equity interest in Outcome, and give up his right to indemnification. R.75-3 ¶¶ 1-4, 9, 16. In return for that valuable consideration, the investors dropped their civil claims, and Shah and Agarwal received $31 million. *Id.* ¶¶ 8-9.

The Government has never suggested that the settlement itself was fraudulent, nor could it: The investors knew about the alleged fraud when they signed. *See Glob. Private Opportunities Partners II LP v. Shah*, No. 656800/2017 (N.Y. Sup. Ct.) (filed Nov. 16, 2017) (civil suit against Shah alleging fraud months before the settlement). And critically, the rights Shah gave up had nothing to do with the 2017 capital raise. They had value because *Outcome* had value on the day Shah signed the settlement. *See* R.764-1 at 45 (finding that Outcome was worth $730 million "after adjusting for the effects of the fraud"). The settlement money therefore was "traceable" to Shah's consideration, not "the crime charged in the indictment." *Kaley*, 571 U.S. at 324.

45

The district court rejected Shah's argument without a hearing because it "rests on the premise that the victim of a crime can undermine the government's right to seek forfeiture of criminal proceeds by agreeing to permit the defendant to keep them." SA8. But this simply assumes the conclusion. The point is the Government may not restrain proceeds of a valid settlement that the defendant received in return for giving up untainted, valuable assets.[7]

### D. The Remedy Is Dismissal With Prejudice, Or At Least A New Trial.

"Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation ...." *Morrison*, 449 U.S. at 364. The Supreme Court has accordingly directed courts to tailor relief that will "neutralize the taint" of Sixth Amendment violations. *Id.* at 365; *see also United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) (courts in Sixth Amendment cases must restore defendants "to the circumstances that would have existed had there been no constitutional error" (citation omitted)).

---

[7] If this Court were to affirm, Shah intends to ask the Supreme Court to overrule or revise *United States v. Monsanto*, 491 U.S. 600, 615 (1989), which allows the Government, before trial, to "freeze assets that a defendant needs to hire an attorney, based on nothing more than probable cause." *Luis*, 578 U.S. at 52 (Kagan, J., dissenting) (quotation marks omitted).

Dismissal with prejudice is the only remedy that will return Shah "to the status quo ante." *Stein*, 541 F.3d at 136. Shah has spent considerable sums challenging the improper restraint in post-trial proceedings and on appeal, and if he were retried now, he would have far less to pay trial counsel than he would have had absent the illegal restraint. And even if the district court released additional funds to Shah, the passage of time would incurably prejudice his defense. A delay in prosecution prejudices a defendant's ability "adequately to prepare his case" and "skews the fairness of the entire system." *Doggett v. United States*, 505 U.S. 647, 654 (1992) (citation omitted). Courts therefore readily presume prejudice where, as here, several years have passed. *Id.*; *see also Barker v. Wingo*, 407 U.S. 514, 533 (1972) (a delay "over five years" was "extraordinary"); *United States v. Hills*, 618 F.3d 619, 630 (7th Cir. 2010) ("two years creates a presumption of prejudice"). No remedy short of dismissal can cure the violation.

Courts dismiss with prejudice under similar circumstances. In *Stein*, for example, the Second Circuit found that the prosecution pressured defendants' employer to stop paying defendants' legal fees, unconstitutionally "interfer[ing] with defendants' relationship with counsel." 541 F.3d at 136. Although the prosecution eventually reversed course, the court held that the government altered the "dynamic in a way that [was] irreparable" and that the employer was

"unlikely to pay defendants' legal fees as if the government had never exerted any pressure." *Id.* at 145. The court therefore concluded that "dismissal of the indictment [was] required." *Id.* at 146. The Third Circuit similarly ordered dismissal with prejudice where a retrial could not "cure the violation." *United States v. Levy*, 577 F.2d 200, 210 (3d Cir. 1978); *see also State v. Lenarz*, 301 Conn. 417, 448 (2011) (same).

Dismissal with prejudice is particularly appropriate here. As the Chief Justice has explained, "few things could do more to undermine the criminal justice system's integrity than to allow the Government to initiate a prosecution and then, at its option, disarm its presumptively innocent opponent by depriving him of his counsel of choice." *Kaley*, 571 U.S. at 350 (Roberts, C.J., dissenting) (cleaned up). The Government in this case presented testimony to the grand jury that was "not accurate," used that testimony to secure an unlawful restraint of millions of dollars that Shah would have used for his defense, and then failed to disclose the documents revealing its illegal conduct for three years. Dismissal with prejudice will send an appropriately strong message to deter recurrences.

At minimum, however, Shah is entitled to a new trial. The "erroneous deprivation of the right to counsel of choice" causes a "structural error" because the "consequences" of the deprivation "are necessarily unquantifiable and indeterminate." *Gonzalez-Lopez*, 548 U.S. at 150 (quotation marks and citation

omitted).   Structural errors "always" require at least retrial.   *Rodriguez v. Chandler*, 492 F.3d 863, 864 (7th Cir. 2007).

## II.   THE IMPROPER BULK ADMISSION OF GRAND-JURY HEARSAY STATEMENTS REQUIRES A NEW TRIAL.

The district court allowed the jury to hear three lengthy hearsay statements scripted by the Government, even though all three witnesses made those statements after they developed the same motive to lie that they had at trial. Admission of this testimony was legal error and requires a new trial.

### A. The Bulk Admission Of The Grand-Jury Statements Violated Rule 801(d)(1)(B).

Federal Rule of Evidence 801(d)(1)(B)(i) exempts from the ban on hearsay a declarant's prior statement that is "consistent with the declarant's testimony" at trial and is introduced "to rebut an express or implied charge that the declarant recently fabricated" his testimony "or acted from a recent improper influence or motive in so testifying."  Not every consistent statement will do, however.  As the Supreme Court held in *Tome*, Rule 801(d)(1)(B) permits the introduction of prior consistent statements only if the statements were "made *before* the ... motive [to lie] came into being."  513 U.S. at 156 (emphasis added).  This "pre-motive" requirement derives from common law and ensures that a prior consistent statement actually rebuts the charge of recent fabrication rather than merely "bolstering the veracity of the story told."  *Id.* at 157-158.  Evidence "which

merely shows that the declarant said the same thing at trial as he did on a prior occasion" cannot "rebut an allegation of recent fabrication when the declarant's motive in making both statements was the same." *United States v. Harris*, 761 F.2d 394, 399 (7th Cir. 1985).

Under *Tome*, the admission of Ketchum's, Ma's, and Desai's grand-jury statements was error. Shah and his codefendants extensively cross-examined all three witnesses on the ground that they had a motive to give testimony favorable to the prosecution to receive a plea deal or avoid prosecution. *E.g.,* Trial.Tr.4311:7-9 (Desai admitting that his plea deal would result in "shortened prison time"); Trial.Tr.1181:8-12 (Ketchum agreeing that the "broad grant of immunity" was important because he admitted to "participating in crimes" that could otherwise subject him to jailtime); Trial.Tr.3016:7-13 (Ma testifying that thanks to his cooperation with the prosecution he was "testifying as a witness with immunity and not as a defendant").

All three witnesses had the exact same motive to lie when they testified before the grand jury. Ketchum and Ma received immunity deals before they testified to the grand jury. *See* GX1025 (Ma); GX1026 (Ketchum). And Desai was actively courting a plea deal. DX5551 at 11:1-21; *see also* Tr. 4310:8-4311:4.

This Court has held that witnesses like Ketchum and Ma have a clear motive to lie after obtaining immunity. *See United States v. Nelson*, 39 F.3d 705,

709 (7th Cir. 1994) ("Both immunity grants and plea bargains potentially give witnesses motives to testify falsely.").  This Court and others further agree that witnesses like Desai seeking a plea deal plainly have a similar—if not stronger—motive to lie.  *See United States v. Lewis*, 954 F.2d 1386, 1391 (7th Cir. 1992) (motivation to lie arises after being arrested even without a plea deal); *United States v. Moreno*, 94 F.3d 1453, 1455 (10th Cir. 1996) (rejecting argument that witness "had no incentive to fabricate a story prior to his plea-bargain agreement"); *United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004) ("It is simply not believable to suggest" that witnesses "did not have a motive to lie" after being arrested.).  Even the Government recently agreed in a different case that a witness developed a motive to lie before any plea deal was reached.  *See* Response to Defendant Robert Mitziga's Motion to Admit Prior Consistent Statements at 6-7, *United States v. Mitziga*, No. 1:23-cr-00242 (N.D. Ill. Aug. 3, 2024), Dkt. 167.  A "common scenario" where Rule 801(d)(1)(B) prohibits admission "involves an allegation that a government witness' testimony is improperly influenced by a motive to obtain favorable treatment under a plea deal or immunity agreement."  Wright & Miller, 30B Federal Practice & Procedure: Evidence § 6753 (2024 ed.).

This Court's recent precedent makes this an easy case.  In *United States v. Echols*, the district court admitted a witness's prior statement to a federal agent

suggesting that the defendant, rather than the witness's boyfriend, mailed drugs to the witness's house. 104 F.4th 1023, 1026 (7th Cir. 2024). The defendant contended that the statement should have been excluded under *Tome* because the witness had a motive to lie to protect her boyfriend, and the witness had this same motive to lie when she spoke to the federal agent. *Id.* at 1027. This Court agreed that because the defendant's "theory of a motive to fabricate seem[ed] at least plausible," the statement constituted "just the sort of prior consistent statement that the Supreme Court held inadmissible in *Tome*." *Id.* Because the defendant failed to make a *Tome* objection at trial, this Court reviewed for plain error, and nonetheless concluded that the error was "*obvious and undebatable*" because "[b]inding precedent establishes that [the] prior consistent statement was made too late." *Id.* at 1031 (emphasis added).[8]

## B. The District Court Legally Erred In Admitting The Grand-Jury Statements.

The district court committed the same error this Court called "obvious and undebatable" in *Echols*.

---

[8] The Court declined to reverse only because the defendant could not meet the final plain-error requirement—a showing of a "miscarriage of justice." *Echols*, 104 F.4th at 1031 (citation omitted). Here, plain error does not apply because Shah timely objected to the grand jury statements. *Supra* p. 15.

*First*, the district court erred in admitting the grand-jury statements under Rule 801(d)(1)(B)(i)—known as subsection (i).  As to Desai, the district court concluded that his grand-jury statement predated his motive to lie because he "made the statement to the grand jury before he received a plea deal" and "did not know what type of deal the government might offer."  SA123 (quotation marks omitted).  But Desai knew by at least May 2018 that he was a target of the Government's investigation and had been "caught red handed in fraud," Trial.Tr.4306:4-4307:1, and he cooperated with the investigation extensively before testifying before the grand jury in September 2019.  *See* Trial.Tr.4306:4-4311:4.  Desai was rewarded with a plea deal immediately following that testimony.  Trial.Tr.4311:2-4.  That Desai did not yet know what particular deal the Government would offer did not diminish his motive to lie—if anything, it *increased* it.

The court likewise erred to the extent it admitted Ketchum's and Ma's statements under subsection (i).  Both received immunity deals before they testified to the grand jury, and those deals required them to testify for the Government or face prosecution.  GX1025 (Ma); GX1026 (Ketchum).  This gave them the same powerful motive to lie to the grand jury that they had at trial—a motive the district court inexplicably failed to address.

*Second*, the district court improperly relied on Rule 801(d)(1)(B)(ii)—known as subsection (ii)—which was added in 2014 and allows admission of prior consistent statements "to rehabilitate the declarant's credibility as a witness when attacked on another ground." The district court concluded that subsection (ii) permitted it to admit Ketchum's and Ma's grand-jury statements, even if those statements predated the witnesses' motive to lie, because Shah *additionally* challenged the witnesses' credibility "on a variety of fronts, including improper motive, faulty memory, inconsistency, and general bias." SA118; *see also* SA114-115. It appears the district court did the same for Desai; although the court initially purported not to reach subsection (ii)—in a footnote it said Desai's statement was admissible "[a]lternatively" because Desai's credibility "was attacked on numerous other grounds." SA121, SA124 n.1.

The district court misunderstood the relationship between subsection (ii) and subsection (i). As the advisory committee explains, subsection (ii) "does not make any consistent statement admissible that was not admissible previously." Fed. R. Evid. 801 advisory committee's note to 2014 amendment. Subsection (ii) instead "only" means that prior consistent statements admissible for "rehabilitation" at common law may now be admitted "substantively as well." *Id.* That distinction makes no difference here given that not even the

Government claims that the grand-jury statements would have been admissible at common law.

"The *Tome* limitation predates Rule 801 and was a well-established common law principle that was accepted by the drafters of the rule." *United States v. Portillo*, 969 F.3d 144, 175 (5th Cir. 2020). As the Fifth Circuit held in *Portillo*, when "the *Tome* limitation is mapped on to Rule 801(d)(1)(B)(ii), a litigant may not introduce a prior consistent statement if that statement was made at a time when the litigant allegedly had a motive to fabricate—even if the litigant supplements his attack on the witness's credibility by pointing to *other* flaws in the declarant's testimony," such as inconsistency or memory problems. 969 F.3d at 175 (emphasis added).

The Fifth Circuit's reasoning fits this case exactly. Shah challenged the three witnesses' testimony on the ground that they developed an "improper influence or motive" to lie to protect immunity deals or secure a plea, SA114-115; SA118—"a motive that fits squarely within 801(d)(1)(B)(i), and not the alternative 801(d)(1)(B)(ii)." *Portillo*, 969 F.3d at 174. It therefore makes no difference that, in addition to repeatedly challenging the witnesses' testimony based on their motivation to lie, Shah and his codefendants asked the witnesses a handful of questions about their recollection of certain conversations and their bias against the defendants. *See, e.g.*, SA118 (observing that Agarwal

55

"challenged Ma's recollection of his purported conversation with Agarwal"). As in *Portillo*, "it is impossible to separate the defendants' attack on the [witnesses'] motivations from their charges of inconsistency" in other respects. 969 F.3d at 175.

A contrary approach would swallow the limitation set out in subsection (i) because the suggestion of a motive to lie can almost always be recharacterized as a different type of credibility attack. For example, the district court observed that Shah suggested "Ketchum changed his story over the course of 15 meetings with the government leading up to *and following* his grand jury testimony," which the court understood to suggest faulty memory. SA115 (emphasis in original). But the clear import of Shah's observation about Ketchum changing his story was not that he simply had a bad memory, but that he changed his story to please the prosecution and had trouble keeping it straight. The Government cannot "end-run around" the limitation in subsection (i) by claiming that prior statements are being introduced to rebut other generalized challenges to witness credibility where the core of the defendant's challenge goes to the witness's motivation to lie. *Portillo*, 969 F.3d at 174-176.

*Third*, even if certain limited portions of the grand-jury statements were admissible, the district court erred in admitting them nearly wholesale. Desai and Ketchum read their grand jury statements to the jury almost in their entirety

56

with only minor redactions.  *See* JA2:14-15:19, JA26:13-52:12.  Ma's lengthy grand jury statement contained more significant redactions, but those redactions removed information that was inconsistent with Ma's direct examination and did not purport to tailor the grand-jury statement to Ma's impeachment on cross-examination.  *See* JA18:14-23:21; SA117.  The prosecution made no effort to tailor the statements to issues that arose on cross-examination, despite Shah and his co-defendants' objections.  *See, e.g.*, R.398 at 2 (Desai); SA14:8-13, SA31:7-14 (Ketchum); Trial.Tr.2914:8-25 (Ma).

"The Rules do not accord this weighty, nonhearsay status to *all* prior consistent statements.  To the contrary, admissibility under the Rules is confined to those statements offered to rebut a charge of 'recent fabrication or improper influence or motive.'"  *Tome*, 513 U.S. at 157 (emphasis added; citation omitted); *see Echols*, 104 F.4th at 1027 (a prior consistent statement must be "aimed specifically at rebutting the charge of recent fabrication rather than merely bolstering more generally the credibility of a witness subject to impeachment"); *Miller v. Greenleaf Orthopedic Assocs., S.C.*, 827 F.3d 569, 573-575 (7th Cir. 2016) (a prior statement must "rebut the alleged link between the in-court testimony and the witness's recent improper motive").  No such tailoring occurred here.

Courts of appeals have easily rejected comparable efforts to impermissibly bolster witness testimony by introducing prior hearsay statements wholesale. The Eighth Circuit, for example, held that the government could not introduce an "officer's entire prior grand jury testimony" where it "made no attempt to specify which portions of these documents were relevant to the issues raised on cross-examination." *United States v. Ramos-Caraballo*, 375 F.3d 797, 803 (8th Cir. 2004). And the First Circuit determined that "[t]here is no rule admitting all prior consistent statements simply to bolster the credibility of a witness who has been impeached by particulars." *United States v. Simonelli*, 237 F.3d 19, 28 (1st Cir. 2001); *see also United States v. Lozada-Rivera*, 177 F.3d 98, 105 (1st Cir. 1999) (admission of DEA report improper where it "essentially provided the jury with an authoritative 'condensation of the government's whole case against the defendant'" (citation omitted)); *United States v. Collicott*, 92 F.3d 973, 979, 984 (9th Cir. 1996) (remanding for a new trial because the court improperly admitted "the whole conversation" without tailoring).

### C.    The Government Cannot Meet Its Burden of Proving That The Statements' Improper Admission Was Harmless.

The Government bears the burden of establishing that introduction of the grand-jury statements was harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 410-411 (2009). The Government cannot meet that burden where, as here, "the prosecution's case would have been significantly less persuasive had the

improper evidence been excluded." *United States v. Loughry*, 660 F.3d 965, 975 (7th Cir. 2011) (citations omitted).

It was undisputed at trial that fraud occurred at Outcome; the Government's case turned on Shah's knowledge of and participation in the fraud. In conflict with documentary evidence, the three grand-jury statements repeatedly asserted Shah's alleged contemporaneous knowledge of wrongdoing, and thus shored up the principal weakness in the prosecution's case. As the district court observed, these statements covered "the wheelhouse of the case." Trial.Tr.2991:11-12. The statements were particularly damaging given the three witnesses' central importance to the prosecution; their testimony composed well more than half of the total trial testimony. And the statements were still more damaging given their length. *See* JA10:16-20 (Ketchum's statement was so long the court had to give the jury a "stretch break[]"). The statements were akin to mini-closing arguments within the trial—but delivered by key Outcome insiders, meaning they were presented as evidence rather than argument.

Worse, the statements were *scripted by the prosecution*. *See* JA15:8-19 (Ketchum acknowledging the Government provided him with "a first draft" of his statement); JA19:5-21 (same with Ma); JA27:7-19 (Desai). This is a highly unusual practice—we have not identified any U.S. Attorney's Office other than

the Northern District of Illinois that drafts witnesses' grand-jury statements. No surprise that these prosecution-scripted statements were maximally prejudicial.

The introduction of Ketchum's statement illustrates the harm. The Government initially told the jury that Ketchum would prove that Shah "created Outcome's fraudulent business practices" before Desai started working there. Trial.Tr.552:12-24. But on cross-examination, Ketchum crumbled, admitting that customers knew that Outcome's contracts were based on "growth" and projections. Trial.Tr.1492:11-1494:3, 1590:25-1591:17, 1648:4-24, 1652:19-25. Those admissions were exceptionally damaging to the prosecution. But the prosecution was then permitted on redirect to clean up Ketchum's about-face by having him read his Government-scripted statement claiming, among many other things, that Shah sought to hide "the projections in the list-match results" from being "given to clients," R.469 at 3-4—precisely the opposite of what he admitted on cross.

This Court and others have found reversible error in far closer cases. In *United States v. Ware*, 247 F.2d 698, 700-701 (7th Cir. 1957), this Court concluded that the erroneous admission of notes by narcotics agents summarizing undercover purchases was not harmless because the notes served as "a neat condensation of the government's whole case against the defendant." The error was reversible even though—unlike in this case—the notes "were merely

60

cumulative of other evidence properly in the record and that there was overwhelming evidence properly received of the defendant's guilt." *Id.* at 700; *see also United States v. Best*, 939 F.2d 425, 430 (7th Cir. 1991) (en banc) (reaffirming *Ware*); *Lozada-Rivera*, 177 F.3d at 105 (erroneous admission of prior consistent statement not harmless); *United States v. Quinto*, 582 F.2d 224, 235-236 (2d Cir. 1978) (erroneous admission of prior consistent statement not harmless where the central issue was whether defendant acted willfully, and the statement included damaging quotation from defendant illustrating his intent).

If affirmed, this case would be an invitation for abuse. The prosecution could script grand-jury statements for its star witnesses to be as damaging to the defendant as possible. The prosecution could then call those witnesses to the stand at trial as a condition of favorable treatment, knowing the defense will attack their motive to lie. Even if it is absolutely clear that the cross-examination challenges the witnesses' credibility based on their motive to lie, as long as there is some plausible basis to characterize the cross-examination as challenging their credibility on other grounds—like "faulty memory" or "general bias"—the Government will be permitted to introduce the entire grand-jury testimony *that the prosecution itself scripted*. The Court should foreclose that roadmap for skirting the bedrock rule against hearsay.

## III. THE GOVERNMENT RELIED ON A LEGALLY DEFECTIVE THEORY OF FRAUD.

Shah fully adopts the argument articulated in Agarwal's brief that the Government's theory of fraud was legally defective. *See* Fed. R. App. P. 28(i) (authorizing "any party [to] adopt by reference a part of another's brief"). Agarwal's argument applies equally to Shah.

As Agarwal explains, an intentional breach of an existing contract, "even in a 'widespread' or 'systematic' way," is not fraud on its own. *Greyer v. Ill. Dep't of Corrs.*, 933 F.3d 871, 881 (7th Cir. 2019). The government must show "contemporaneous intent to defraud" at the time of contracting. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658-659 (2d Cir. 2016). That requires proof that, "at the time" of contracting, the defendant "had no intention of honoring" the promises he made. *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1007 (7th Cir. 2004). Additionally, it is not fraud to overstate current inventory unless the defendant intended "to deprive the victim of money or property" by denying them the benefit of the bargain. *Kelley v. United States*, 590 U.S. 391, 398 (2020) (brackets and citation omitted). Merely inducing someone "to enter into [a] transaction[] they would otherwise avoid ... do[es] not violate the mail or wire fraud statutes." *United States v. Kelerchian*, 937 F.3d 895, 912 (7th Cir. 2019) (citations omitted).

Here, the Government repeatedly urged the jury to convict on all counts based on evidence that the defendants stated "we are going to deliver X" when "they're not delivering X."  Trial.Tr.9416:21-24.  Consistent with that theory, the court instructed the jury that a "defendant's honest and genuine belief that he or she will be able to perform what he or she promised is not a defense to fraud if the defendant also knowingly made false and fraudulent representations."  Trial.Tr.9166:9-12; *see also* Trial.Tr.9157:1-2 (requiring the jury to find a "materially false or fraudulent pretense, representation, or promise").  The Government stressed this point in its rebuttal, stating "remember the jury instruction.  We only need to prove one lie or misrepresentation."  Trial.Tr.10411:12-15.  The instruction on which the Government relied, however, was a clear misstatement of the law because it allowed the jury to convict without evidence of "contemporaneous intent never to perform."  *O'Donnell*, 822 F.3d at 666.

As Agarwal rightly explains, this theory infects every count of conviction—just as the Government urged at trial that representations of "we are going to deliver X" followed by "not delivering X" were sufficient to *convict* on each count.  Trial.Tr.9416:18-9417:11.  The dominant theme of Shah's defense was that he *did* intend for Outcome to perform the contracts it entered at the time it entered into them: that "[t]hey were telling the world about sell,

63

then build." Trial.Tr.9449:21-22; *accord* Trial.Tr.9450:9-10 ("That's the message they had, sell, then build, but try to meet it, try to be … realistic, try to hit the goal."); Trial.Tr.9619:4-5 ("And the spirit of this, of course, was to be very transparent and candid with the client.").

There was strong evidence to support Shah's defense that he lacked the requisite intent. Shah repeatedly pushed to disclose to customers Outcome's growth-based model. *See, e.g.*, Trial.Tr.1848:19-25 (Ketchum agreeing that there were "repeated instances of Mr. Shah instructing Outcome employees to disclose projections in list matches," and not "a single instance where Mr. Shah told anyone not to disclose projections"). And Desai regularly assured Shah that Outcome offered make-goods whenever it fell short. *See, e.g.*, Trial.Tr.5699:20-5700:5. Moreover, Desai confirmed repeatedly that he lied to Shah about the fraud he was committing, *see supra* pp. 7-8—an admission that *makes no sense* if Shah was in on the scheme all along. The jury should not have been permitted to convict on the understanding that it did not matter whether Shah intended to perform, when in fact that is the defining feature of criminal fraud.

## CONCLUSION

For the foregoing reasons, Shah respectfully requests that the Court reverse the district court's judgment and dismiss the indictment with prejudice or, at minimum, vacate and remand for a new trial.

Respectfully submitted,

/s/Neal Kumar Katyal

Richard Finneran
BRYAN CAVE LEIGHTON PAISNER LLP
211 N. Broadway
Suite 3600
St. Louis, MO 63102
(314) 308-2297
richard.finneran@bclplaw.com

Neal Kumar Katyal
   *Counsel of Record*
William E. Havemann
Kristina Alekseyeva
MILBANK LLP
1850 K Street, N.W.
Washington, D.C. 20006
(202) 835-7500
nkatyal@milbank.com

Reedy C. Swanson
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
reedy.swanson@hoganlovells.com

*Counsel for Defendant-Appellant Rishi Shah*

April 4, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,940 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in Calisto MT 14-point font.

April 4, 2025                           /s/ Neal Kumar Katyal
                                        Neal Kumar Katyal

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

Pursuant to Circuit Rule 30(d), I certify that all of the materials required by Circuit Rule 30(a) are included in the required short appendix to this brief, and all of the materials required by Circuit Rule 30(b) are included in the separate joint supplemental appendix filed contemporaneously herewith.

April 4, 2025                               /s/ Neal Kumar Katyal
                                           Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system on April 7, 2025.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


 April 7, 2025                              /s/ Neal Kumar Katyal
                                           Neal Kumar Katyal

**APPENDIX**

# TABLE OF CONTENTS

Page

Memorandum Opinion and Order re: Motion to Amend
Protective Order (4/8/2020) (ECF 108)................................................. SA1

Trial Transcript Volume 7A (2/8/2023) (ECF 588) (excerpts
– pp. 1699, 1701-32, 1999) ................................................................SA12

Trial Transcript Volume 11A & 11B (2/15/2023) (ECF 592)
(excerpts – pp. 2830, 2908-19, 2965-99, 3118) ....................................SA46

Trial Transcript Volume 20A (3/6/2023) (ECF 601)
(excerpts – pp. 5296, 5298-310, 5376-77, 5380-81, 5602) ....................SA95

Order re: Motion to Admit Prior Consistent Statement
(Jason Ketchum) (2/9/2023) (ECF 373)............................................SA114

Order re: Motion to Admit Prior Consistent Statement
(David Ma)  (2/16/2023) (ECF 383) .................................................SA116

Order re: Motion to Admit Prior Consistent Statement
(Ashik Desai) (3/7/2023) (ECF 406)..................................................SA120

Memorandum Opinion and Order re: Motions for
Judgments of Acquittal and Motions for New Trial
(3/21/2024) (ECF 678)....................................................................SA127

Memorandum Opinion and Order re: Motions to Dismiss
the Indictment, or Alternatively For a New Trial
(6/12/2024) (ECF 747)....................................................................SA168

Rishi Shah Judgment (7/1/2024) (ECF 805)..........................................SA212

Trial Transcripts – Volumes/Pages Chart ..............................................SA235

i

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | No. 19 CR 864 |
| v. | Judge Thomas M. Durkin |
| RISHI SHAH; SHRADHA AGARWAL; BRAD PURDY; and ASHIK DESAI. | |

**MEMORANDUM OPINION AND ORDER**

Defendants have been indicted on charges of fraud in connection with their former business. The indictment identified certain property belonging to Defendants as being subject to forfeiture because it is alleged to be "derived" from the alleged fraud. *See* 21 U.S.C. § 853(a)(1). The Court then granted the government's motion for a protective order freezing the property. R. 27 (Nov. 22, 2019); R. 71; R. 72 (Dec. 16, 2019). Two of the four defendants, Rishi Shah and Shradha Agarwal, have moved to amend the protective order to exclude money they transferred to their defense attorneys' accounts. *See* R. 75; R. 76. They seek to use that money for their defense in this case. That motion is denied.

## Background

In 2006, Shah and Agarwal founded a company called Outcome Health to sell electronic advertising on screens in doctor's office waiting rooms. The company grew rapidly. To fund expansion, the company obtained a $110 million loan in early 2016, followed by a $375 million loan in late 2016. By 2017, the company employed over 500 people. That year, the company raised about $487.5 million from equity investors.

**SA1**

As a result, the company paid a $225 million dividend to Gravitas Holdings, LLC, an entity controlled by Shah and Agarwal.

Later in 2017, the press reported that the company had "misled pharmaceutical companies by charging them for ad placements on more video screens than [had been] installed" and "provided inflated data to measure how well ads performed." R. 75-2 at 3. Subsequently, the company became the subject of government investigations, and its investors and lenders filed complaints against the company, Shah, and Agarwal, in New York and Delaware courts. Shah and Agarwal also asserted claims against the investors and lenders, although they never filed causes of action in any court.

Those disputes were settled on January 26, 2018. The parties mutually released their claims in exchange for the following consideration:

- Shah and Agarwal resigned from the company and gave up their controlling interest in the company, by surrendering nearly 50% in equity;

- Shah and Agarwal paid $159 million to the company;

- Shah and Agarwal paid $31 million to the investors;

- Shah and Agarwal waived their company-provided legal indemnification coverage;

- Shah and Agarwal were paid severances of $400,000 and $500,000, respectively;

- The company, investors, and lenders permitted Shah and Agarwal to keep remaining legal retainers that had already been paid to law firms; and

2

**SA2**

- The company, investors, and lenders permitted Shah and Agarwal to keep about $31 million in equity in Gravitas.

*See* R. 75-2 at 4.

In anticipation of the indictment in this case, Shah and Agarwal transferred about $10.3 million of the $31 million they received in the settlement to their attorneys' firms' accounts. Shah and Agarwal do not dispute that this $10.3 million is traceable to the $31 million they received in the settlement. They also do not dispute that the $31 million is traceable to the $225 million dividend they received after the $487.5 million equity investment the company received in 2017.

The government seeks to freeze the $10.3 million as forfeitable. Shah and Agarwal argue that they require these funds to retain their current counsel. The Court has received some evidence regarding Shah and Agarwal's other assets potentially available to pay their attorneys. Besides the $10.3 million at issue on this motion, Shah has about $4 million on account with his attorneys leftover from prior indemnification payments made by the company on his behalf. Agarwal has about $1 million in cash. They both own properties valued in excess of $1 million that are currently used as primary residences. Shah and Agarwal presented evidence of extensive current and anticipated debts. By contrast, the government presented evidence indicating that Shah and Agarwal continue to maintain positive net cash flows. *See* R. 94 (and documents cited therein). Current counsel estimate that Shah and Agarwal's defense will cost about $14-15 million.

**SA3**

## Analysis

Under 28 U.S.C. § 853(a)(1), any person convicted of certain federal crimes "punishable by imprisonment for more than one year shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." Additionally, "[u]pon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) for forfeiture under this section." 28 U.S.C. § 853(e)(1).

"Under long-settled circuit law, the pretrial restraint of a defendant's assets 'without affording the defendant an immediate, postrestraint, adversary hearing at which the government is required to prove the likelihood that the restrained assets are subject to forfeiture violates the due process clause to the extent that it actually impinges on the defendant's qualified sixth amendment right to counsel of choice.'" *United States v. Jones*, 844 F.3d 636, 640-41 (7th Cir. 2016) (quoting *United States v. Moya-Gomez*, 860 F.2d 706, 731 (7th Cir. 1988)). "If the district court finds that the defendant has insufficient alternative assets with which to pay counsel, but the government fails to justify its retention of all the frozen assets, 'then the court must order the release of funds in an amount necessary to pay reasonable attorneys' fees for counsel[.]'" *Jones*, 844 F.3d at 640-41 (quoting *Moya-Gomez*, 860 F.2d at 730). In other words, the Seventh Circuit has held that if a defendant can demonstrate a bona fide need for restrained funds to retain counsel, the government has the burden to

4

**SA4**

demonstrate that funds are traceable to the alleged fraud. If the government satisfies that burden, the funds are unavailable to pay defense counsel.

To be sure, Shah and Agarwal argue that they have a bona fide need for the $10.3 million in order to pay the anticipated $14-15 million bill for their current attorneys' defense of this case. It is undisputed, however, that Shah has $4 million that the government is not seeking to freeze, that is dedicated to financing his defense. Shah and Agarwal also do not dispute that they have significant other assets. They argue that these assets are not available to pay for their defense because they: are needed for their daily expenses; are illiquid; or are less than their current or anticipated debts. Without making a finding on this dispute, the Court assumes that Shah and Agarwal do not have sufficient assets to meet a $14-15 million attorney bill. At the same time, Shah and Agarwal are currently represented by some of the more expensive attorneys in the country. The evidence of Shah and Agarwal's finances causes the Court to suspect that they might be able to retain equally sophisticated, but less expensive, defense with the assets that are available to them.

Presumably aware of the possibility that their substantial assets (even if illiquid or off-set by debt and other obligations) would undermine at least the appearance of bona fide need, Shah and Agarwal insist that they can demand a hearing to determine whether there is probable cause to believe that the funds at issue are traceable to the alleged fraud *without* demonstrating that they have a bona fide need for the funds to retain counsel. Never having directly addressed the issue, the Seventh Circuit has acknowledged in dicta that due process might require such a

**SA5**

hearing. *See United States v. Kirschenbaum*, 156 F.3d 784, 793 (7th Cir. 1998) ("[T]he Second Circuit's due process analysis could also be seen to support the broader notion that without regard to the need to obtain counsel, a defendant is entitled to a hearing on the restraint of his property. . . . Because [the defendant] has not adequately presented the issue on appeal, we will not decide this close question."). And the Ninth Circuit appears to have held that it does. *See United States v. Roth*, 912 F.2d 1131, 1133 (9th Cir. 1990) ("The law of our circuit therefore remains that in order for a restraining order under § 853 to be constitutional, the district court must hold a hearing under Rule 65 to determine whether probable cause exists to issue an injunction."). More recently, a district court found that due process required it to provide "pretrial judicial review of the challenged seizure warrants," even though the defendant raised "no Sixth Amendment claim that the seizure of the Disputed Funds implicates his right to counsel." *United States v. Bikundi*, 125 F. Supp. 3d 178, 183, 191 (D.D.C. 2015). However, most circuit courts have held that a threshold showing of bona fide need is necessary for a defendant to challenge an asset restraint imposed under 21 U.S.C. § 853(e). *See United States v. Jamieson*, 427 F.3d 394, 406 n.3 (6th Cir. 2005) (citing cases); *United States v. Cosme*, 796 F.3d 226, 233 & n.2 (2d Cir. 2015) ("Having explicitly confirmed his sufficient access to funds for his defense and having expressly waived his right to a *Monsanto* hearing and the related Sixth Amendment challenges in the two stipulations, Cosme has no independent constitutional entitlement to an adversarial hearing on his Fourth and Fifth Amendment challenges. . . . We note also that several sister circuits have indicated

6

**SA6**

that a pretrial, post-deprivation adversarial hearing is not required absent Sixth Amendment concerns." (citing cases)); *see also Kaley v. United States*, 571 U.S. 320, 353 (2014) (Roberts, J. dissenting) ("To even be entitled to the hearing, defendants must first show a genuine need to use the assets to retain counsel of choice."). No binding authority requires such a hearing in this Court.

But regardless of whether Shah and Agarwal have demonstrated, or are required to demonstrate, bona fide need, there is sufficient evidence for the Court to find probable cause that the funds at issue are derived from the alleged fraud, meaning that the funds are not available to pay counsel even on a showing of bona fide need. The government has the burden to demonstrate probable cause if Shah and Agarwal can demonstrate bona fide need. It is not clear who has the burden of proof if due process requires a hearing even without a showing of bona fide need, because, as already noted, most courts do not permit a hearing in such circumstances. In any event, the dispute here is not truly of an evidentiary nature. Shah and Agarwal *do not* dispute that the funds at issue are traceable to the dividend that is indisputably a product of the alleged fraud.

Instead, the question here is a legal one: whether the settlement agreement Shah and Agarwal reached with the company, the lenders, and the investors, cleans the funds of the taint associated with their undisputed allegedly illegal source. Shah and Agarwal argue that because the $31 million they received in the settlement agreement was their "compensation for giving up their company-provided indemnity coverage and releasing their claims against the Investors and Lenders, the

7

**SA7**

Government cannot meet its burden to show that the assets are subject to forfeiture." R. 75-2 at 15. The government contends that title to the $31 million, which is indisputably part of the $225 million dividend traceable to the alleged fraud, vested upon the commission of the allegedly fraudulent act, well before the settlement agreement was executed. *See* R. 80 at 9. Shah and Agarwal argue further, however, that regardless of who technically has title to the funds, because the $31 million is what they received in consideration for waiving their indemnification rights, they should be allowed to use part of the $31 million to finance their defense. They contend that prohibiting this use is the equivalent of allowing the government to freeze funds paid under the indemnification agreement, and an indemnification agreement cannot be subject to forfeiture because it cannot be said to be "something of value, directly or indirectly, that they would not have received but for the alleged fraud," as is required by the relevant statute, 18 U.S.C. § 853. *See* R. 75-2 at 18. In essence, they argue that since the indemnification rights were not tainted, any independent consideration they received in exchange for those right similarly must be untainted.

Shah and Agarwal's argument rests on the premise that the victim of a crime can undermine the government's right to seek forfeiture of criminal proceeds by agreeing to permit the defendant to keep them. *They cite no authority for this contention.* Rather, they appeal to the Court's sense of fairness and argue that freezing the funds at issue is akin to freezing their indemnification rights because they exchanged the rights for the funds. They contend that permitting the

**SA8**

government to freeze the funds sets a bad precedent considering the prevalence of the use of indemnification agreements for these purposes.

The problem with this argument is that, normally, funds paid under an indemnification agreement never reach a defendant's hands. Here, Shah and Agarwal, through their alleged fraud, acquired actual possession of the funds at issue. They were then able to leverage their possession of those funds to escape civil lawsuits. Of course, Shah and Agarwal gave up some valuable consideration in the settlement agreement. But that does not change the fact that Shah and Agarwal benefited from their possession of the dividend funds in a way they would never have been able to benefit from their right to indemnification.

Moreover, the Court notes that Shah and Agarwal did not surrender their indemnification rights for nothing. Rather, they escaped serious pending civil litigation, that risked a judgment in the hundreds of millions of dollars. The Court presumes that Shah and Agarwal would argue that without some way to pay their attorneys in this case—whether under the indemnification agreement or with the $31 million—the settlement agreement is an unfair deal they would not have made. But they have not expressly made this argument to the Court, and considering the relatively small value of indemnification in this case (Shah and Agarwal argue that it will cost about $14-15 million) in comparison to the hundreds of millions of dollars of liability Shah and Agarwal faced in civil liability, it is unlikely that the indemnification rights and the $31 million at issue here played a significant role in Shah and Agarwal's decision to enter the settlement agreement. And regardless of

**SA9**

their actual motivations for making the deal, removing the $31 million from the equation does not make the deal patently unfair.

In any event, the forfeiture statute's breadth—encompassing proceeds derived "directly or indirectly" from the alleged fraud, 21 U.S.C. § 853(a)(1)—means that the Court should not engage in speculation about the value of the settlement agreement's consideration, as Shah and Agarwal's argument requires. To the extent there is any merit to Shah and Agarwal's argument—which the Court finds there is not because the funds at issue are indisputably traceable to the fraud—it asks the Court to examine the relative value of the consideration paid by the various parties to the settlement agreement. Considering the many competing motivations for the settlement and the uncertain value of much of the consideration (most notably the value of Shah and Agarwal's equity in the company and the money damages caused by their fraud), this is a nearly impossible task. And certainly not one that is called for in determining traceability under a statute as broad as 21 U.S.C. § 853.

Lastly, the Court notes that Shah and Agarwal could be understood to be arguing that they "substituted" the dividend funds for their indemnification rights in the form of permission to retain $31 million. *See* 21 U.S.C. § 853(p) ("substitute property" is defined in part as property that "has been transferred or sold to, or deposited with, a third party"). Unlike funds that are proceeds derived from alleged criminal activity, "substituted" property, i.e., property that is purchased with illegally acquired funds, cannot be frozen prior to conviction, only after. *See Jones*, 844 F.3d at 641 (pretrial restraint permitted for "tainted assets prior to trial, but not the

10

**SA10**

restraint of substitute assets"). But Shah and Agarwal have not argued that the $31 million is substitute property. Nor could they, as the funds are indisputably derived from the dividend which is indisputably derived from Shah and Agarwal's alleged fraud.

The settlement agreement does not cleanse that taint. In hindsight, Shah and Agarwal likely wish the company was still obligated to indemnify them. But that decision was a privately bargained for exchange that ultimately is irrelevant to the fact that the $31 million is tainted, including the portion they wish to use to pay their attorneys' fees. The tainted funds were properly frozen.

## Conclusion

Therefore, Shah and Agarwal's motion is denied.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: April 8, 2020

**SA11**

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 1 of 301 PageID #:14257
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

1699

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )   Docket No. 19 CR 864
 4                   Plaintiff,       )
                                      )   Chicago, Illinois
 5        v.                          )   February 8, 2023
                                      )   8:38 a.m.
 6   RISHI SHAH, SHRADHA AGARWAL,     )
     BRAD PURDY,                      )
 7                                    )
                     Defendants.      )
 8

 9           TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 7A
            BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:     MR. MATTHEW F. MADDEN
13                           MR. SAURISH APPLEBY-BHATTACHARJEE
                             Assistant U.S. Attorneys
14                           219 South Dearborn Street, 5th Floor
                             Chicago, Illinois  60604
15

16                           MR. WILLIAM E. JOHNSTON
                             MR. KYLE C. HANKEY
17                           U.S. Department of Justice
                             Criminal Division, Fraud Section
18                           Washington, D.C.  20530

19

20

21

22                    ELIA E. CARRIÓN
                    Official Court Reporter
23              United States District Court
             219 South Dearborn Street, Room 1432,
24                  Chicago, Illinois 60604
                       (312) 408-7782
25             Elia_Carrion@ilnd.uscourts.gov
</pre>

**SA12**

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 3 of 301 PageID #:14259
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

1701

1    (Proceedings heard in open court; no jury.)

2          THE COURT:  Let's go on the record.

3          Okay.  We have the government's motion filed

4    yesterday afternoon to admit prior inconsistent -- a prior

5    inconsistent -- prior consistent statement, namely the

6    grand jury testimony of Mr. Ketchum.

7          Had defendants' opposition come in last night.  And

8    then not to be outdone, the government came up with a reply

9    this morning.

10          Have you seen the reply?

11          MS. CHOU:  Yes, Your Honor.

12          THE COURT:  Okay.  All right.  Any additional

13    argument on the issue?

14          First, from the government.

15          MR. MADDEN:  Unless you have questions, we'll stand

16    on our brief, Your Honor.

17          THE COURT:  All right.  Defense.

18          MS. CHOU:  Just to step back a little bit.  Even

19    though --

20          THE COURT:  And could someone shut the door in the

21    back.  The jurors do walk by there when they're coming in.

22          Thank you very much.  Thanks.

23          Go ahead, Ms. Chou.

24          MS. CHOU:  Even though the papers talk about the

25    timing of his motive to lie, this is not a situation that I

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 4 of 301 PageID #:14260
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1702

1    think is classically contemplated by the rule where the
2    witness has arguably lied on the stand.

3            Instead, his testimony was is that he saw a certain
4    set of emails when he met with the government, and he saw a
5    different set of emails when he testified.  And that accounts
6    for -- to the extent that there is any change in testimony,
7    that's what accounts for it.

8            And then my -- the second thing is just there is a
9    lot in this grand jury testimony that was not covered in his
10   cross-examination.  And so at a minimum, the government should
11   be asked to identify which portions they are trying to
12   introduce to bolster his trial testimony, and the rest should
13   be redacted.

14           THE COURT:  Response?

15           MR. MADDEN:  Your Honor, the entire statement should
16   come in.  I mean, this is -- this is really not a close case.

17           There was a lot of -- I mean, he was impeached about
18   ten different ways, suggested long-standing motive to lie,
19   recent motive to lie.  His -- they raised the fact that just
20   last week, the government filed a petition for immunity for
21   you, correct?

22           I mean, this is classic, recent motive to fabricate.
23   Raising the date of the immunity motion being so close to
24   trial, going over specific dates of meetings with the
25   government, including, you know, January of 2023.  You met

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 5 of 301 PageID #:14261
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1703

1  with this prosecutor, that prosecutor, that prosecutor.  That

2  is just classic, recent motive to lie.

3          THE COURT:  Well, and not to further your argument,

4  but there were PowerPoint slides put up to illustrate the

5  changing nature of the testimony post-grand jury --

6          MR. MADDEN:  Correct.

7          THE COURT:  -- all the way up to New Year's Eve or

8  two days before New Year's Eve.  And then I believe there

9  might have been a slide afterwards.  But at least up to

10  New Year's Eve, which was emphasized a couple of times.

11         MR. MADDEN:  Right.

12         THE COURT:  But there was a -- at least as to

13  portions of the statement, a -- I thought, a fairly effective

14  cross-examination about the changing nature of his testimony.

15         MR. MADDEN:  Correct, Your Honor.  And so that's --

16  I mean, this is -- I don't think it's -- we don't think it's a

17  close call.  This is just a classic case where the jury should

18  know that four years ago, this is what this witness said.

19         And, you know, what they do with it is up to them.

20  And most -- the defendants' arguments really go to weight.

21  They're going to be able to cross him on it; that's part of

22  the rule.  They can -- he -- it'll be read in.  We have other

23  examples.

24         Mr. Appleby-Bhattacharjee, this came up in a

25  healthcare fraud case with -- in front of Judge Kennelly,

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 6 of 301 PageID #:14262
Case: 24-2230    Document: 34         Filed: 04/04/2025    Pages: 322

1704

 1  *U.S. v. Garcia*, 18 CR 833 --

 2          THE COURT:  Slow down.

 3          COURT REPORTER:  Slow down, please.

 4          MR. MADDEN:  -- 18 CR 833, *U.S. v. Garcia,* healthcare

 5  fraud case tried by my trial partner.

 6          The witness was impeached on an immunity agreement,

 7  among other reasons.  The entire -- we moved into evidence the

 8  entire grand jury statement.  The statement was read to the

 9  jury, and then the witness was subject to cross.  That's --

10          THE COURT:  Who read it in?

11          MR. APPLEBY-BHATTACHARJEE:  Your Honor, in that

12  case --

13          THE COURT:  By -- to the mic.  You're good.

14          MR. APPLEBY-BHATTACHARJEE:  In that case, on -- on

15  redirect examination, we read the grand jury statement and had

16  the witnesses confirm that that's what he had previously --

17          THE COURT:  Right.  He basically said, "I'm going to

18  read a statement.  Did you give this to the grand jury?"

19          And then that opened up the recross on that statement

20  and the consistency or inconsistency of that with other

21  statements.

22          MR. APPLEBY-BHATTACHARJEE:  That's right, Your Honor.

23  And we went, you know, paragraph by paragraph in some

24  instances or section by section.  But that's -- that's what

25  happened --

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 7 of 301 PageID #:14263
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

1705

1          THE COURT:  All right.

2          MR. APPLEBY-BHATTACHARJEE:  -- in that case.

3          THE COURT:  Well, even -- Ms. Chou, what about the

4   amendment to the rule that talks about to rehabilitate the

5   declarant -- declarant's credibility as a witness when

6   attacked on another ground?

7          They attacked him not just on charges of recent

8   fabrication, but they attacked him on -- they -- you attacked

9   him on a variety of other reasons trying to please the

10  government.  But also, you know, just bad memory or incomplete

11  preparation where he saw some emails and not others.

12         His credibility was attacked, I thought, on a variety

13  of reasons, not just the -- a motive to fabricate something

14  more recently from the -- that occurred more recent than the

15  prior consistent statement.

16         MS. CHOU:  We do view this as different from a

17  situation where a witness says he can't remember or is just

18  sheerly inconsistent, because he didn't say that he couldn't

19  remember.  He said that the difference was that he was shown

20  different emails.

21         And so that does not seem like the situation that is

22  contemplated by the rule, given the advisory comments.  And it

23  is clear from the case law that the -- that the Supreme Court

24  case *Tome* is still supposed to apply to this rule generally.

25         The -- the comments address -- reference the entire

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 8 of 301 PageID #:14264
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1706

 1  rule, not a particular subsection.  And what Your Honor's

 2  speaking about is subsection --

 3         MR. POULOS:  Your Honor, may I be heard as well?

 4         MS. CHOU:  -- little (ii).

 5         THE COURT:  Yeah, let me just respond.  The *Tome*

 6  case, one, predates the amendment to the rule.  But the

 7  advisory notes to the 2014 amendment do mention the *Tome* case,

 8  but they don't -- I'm sorry -- the 2000 --

 9         MR. MADDEN:  '14.

10         THE COURT:  -- '14 notes, 2014 amendment notes

11  mention the *Tome* case.  But there's -- it doesn't address, at

12  least, the -- it doesn't address explicitly the amendment

13  itself.

14         It just says it retains the requirements set forth in

15  *Tome,* "A prior -- an in -- a consistent statement offered to

16  rebut a charge of recent fabrication or improper influence or

17  motive must have made -- been made before the alleged

18  fabrication or improper influence or motive arose."

19         And, one, I think the government has set forth a

20  number of reasons, and I accept those as reasons why there's

21  been an argument of recent fabrication.

22         It's -- you couldn't listen to that cross-examination

23  and not take from it -- the -- the idea that the government

24  was either squeezing him to change his testimony in a way that

25  they liked or was intentionally keeping documents away from

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 9 of 301 PageID #:14265
Case: 24-2230   Document #: 34        Filed: 04/04/2025   Pages: 322

1707

1  him in order to prevent him giving a fuller explanation of

2  something he believed, at least at the time of the grand jury,

3  was illegal.

4          And so I think there has been an express or implied,

5  certainly an implied charge that the declarant recently

6  fabricated his testimony.  "Recently," meaning in -- since the

7  time he gave his grand jury testimony.  And -- or acted from a

8  recent, improper influence or motive.  And that is satisfied,

9  because the recent improper motive or influence is the request

10 and the giving of the government -- by the government of

11 statutory immunity.

12         Now, I also think this rehabilitates his credibility

13 as a witness when he's attacked on another ground.  They

14 attacked it on -- you attacked him on a variety of grounds

15 that I believe this rule allows the government then to

16 rehabilitate him, because his credibility has been attacked on

17 a ground, in this case, in many -- the chief one is that he

18 was only shown or remembered selective emails.

19         So, anyway, I'm -- I -- but I -- I will hear argument

20 from the other counsel before I make a final ruling, but

21 that's my preliminary ruling.

22         MR. BLEGEN:  Understood, Judge.  And I would like to

23 make a couple of comments.  The first being --

24         COURT REPORTER:  Slow down.

25         MR. BLEGEN:  I would like to make a couple of

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 10 of 301 PageID #:14266
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

1708

1   comments.  The first being, I didn't attack the witness at

2   all.  My entire point of the cross-examination was that his

3   testimony and understanding of things was based on the fact

4   that he had not seen certain documents.

5          That was the point of it.  I never said, "You

6   fabricated anything."  I never said, "You were squeezed."  I

7   said, "You told us you would tell the truth, and if you see

8   something that changes your view on things, that can change

9   your -- your testimony, right?"

10          And he said, "Yes."  And then multiple times said,

11  "Yes, having now seen something that I had not seen before."

12  And you told me I couldn't say the government didn't show you

13  this on direct, so I didn't do that.  Now they want to put in

14  a grand jury testimony where he also had not seen those same

15  documents.

16          So not only is it not inconsistent, I didn't do any

17  of the things that the rule would allow that to come in.  So

18  you should either say that this stuff is not admissible

19  against Ms. Agarwal at all or, I guess, we should ask for a

20  severance, because we --

21          THE COURT:  Are you asking for a severance?

22          MR. BLEGEN:  I'm going to discuss it with cocounsel,

23  and I'll let you know in a moment if that's okay.

24          THE COURT:  Certainly.  You can discuss it.

25          MR. BLEGEN:  Can I finish what I was going to say

SA20

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 11 of 301 PageID #:14267
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

1709

1    first --

2              THE COURT:  You may.  Yeah.

3              MR. BLEGEN:  -- because it might resolve the issue?

4        So I don't think I opened the door for any of those

5    things.

6              And I would say in response to Mr. Madden's claim

7    that this is a -- like a typical or a classic example of this.

8    It's not.  What happened with the witness yesterday is not a

9    classic example of what happens when prior grand jury

10   testimony comes in.

11             He didn't flip the government.  He didn't say

12   something is -- "I'm going to just testify differently now."

13   He said, "Having seen things I didn't see, I now have a

14   different view or -- or a different understanding."

15             So -- so that was the point that I made.

16             THE COURT:  Okay.

17             MR. BLEGEN:  Secondly --

18             THE COURT:  Let me respond to that.

19             MR. BLEGEN:  Okay.  Go ahead.

20             THE COURT:  Isn't -- well, this is a rhetorical

21   question.  I'm not asking.  But isn't a lack of memory a

22   classic attack on credibility?  Person doesn't remember.  And

23   this -- these are emails, many of which were shown -- most of

24   which were shown to him, he was on but simply didn't remember.

25             MR. BLEGEN:  It is not an attack on credibility.

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 12 of 301 PageID #:14268
Case: 24-2230    Document: 34      Filed: 04/04/2025    Pages: 322

1710

1          THE COURT:  I -- I --

2          MR. BLEGEN:  Nobody expects him -- who -- who would

3   expect him to remember all those emails?  I literally said,

4   "There are thousands of emails, mountains of them," you -- I

5   mean, part of the reason I did that is 'cause you told me we

6   would get some sort of curative instruction if I did it a

7   different way.

8          But I also think it's true.  He -- he sat with the

9   government and saw a bunch of emails, right?  He doesn't

10  remember.  Clearly, he doesn't know about the ones he hasn't

11  seen --

12          THE COURT:  Right.

13          MR. BLEGEN:  -- and he doesn't remember.  That's not

14  an attack on his credibility in any way, shape, or form.

15          THE COURT:  Sure it is.  It's on memory.  We're not

16  saying he needs to have a superhuman memory, and that would be

17  unrealistic.  But in a -- in a theoretical sense, anything he

18  wrote that he doesn't remember now, or anything he was copied

19  on that he doesn't remember now is an attack on his memory.

20          Now, in a practical sense, you're absolutely right.

21  But in a strictly theoretical sense for purposes of the -- of

22  this -- this exercise in going through whether this rule is

23  satisfied, an attack on his credibility can be that he doesn't

24  remember something he was copied on or wrote.

25          I believe that's an attack on his memory, and memory

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 13 of 301 PageID #:14269
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1711

1    is a credibility issue.  It goes to credibility.  And that's

2    why I think that portion of this rule -- outside of the recent

3    fabrication, that portion of the rule is satisfied.

4              MR. BLEGEN:  Well, I think they used the word

5    "attack" for a reason.  It's not -- or "challenge."  It was

6    neither of those things.  It was a reminder of things that had

7    happened.

8              THE COURT:  That's wordsmithing.  There's no way I

9    could sit here and not understand what you were doing was

10   attacking his inability to remember something and reminding

11   him of it then.  And him saying, "Well, now that you remind me

12   of that, I do feel differently on a certain subject."

13             That's -- we're just talking about the same thing;

14   you're using it in a different form of words than I am.  But

15   in looking at the rule, I view that as something that

16   satisfies it.

17             MR. BLEGEN:  Judge, I guess, I disagree.  I mean, you

18   know --

19             THE COURT:  Sure.

20             MR. BLEGEN:  -- words are important in statutes and

21   in rules --

22             THE COURT:  They are.

23             MR. BLEGEN:  -- right?

24             It's not -- they didn't pick those -- let me pull the

25   rule up.  Just -- what is it?  Is it "attack" or "challenge"?

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 14 of 301 PageID #:14270
Case: 24-2230   Document: 34        Filed: 04/04/2025   Pages: 322

1712

1    Let me look it up real quick.  I didn't do any of those --

2            THE COURT:  Attacked.  Attacked.

3            MR. BLEGEN:  Attacked.  Right.  They didn't pick that

4    word randomly.  If somebody mentions that you haven't seen

5    something before and says, "But I'm not blaming you for that,

6    sir, because I understand you wouldn't have -- you couldn't

7    possibly remember that," how was that an attack on his

8    credibility?

9            THE COURT:  The rule doesn't -- well, go ahead.  I --

10           MR. BLEGEN:  I mean, that's -- they didn't -- I don't

11   think picked that word meaninglessly.

12           THE COURT:  Okay.

13           MR. POULOS:  Your Honor, I --

14           MR. BLEGEN:  I'm not done, Ted; sorry.

15           MR. POULOS:  Pardon me.

16           MR. BLEGEN:  Secondly, how can they be permitted to

17   just read in an entire grand jury testimony that is filled

18   with inadmissible evidence?

19           It has got objectionable statements in there.  There

20   is -- there is lack of foundation for many things.  There are

21   many instances where he says things like, "Ms. Shah and

22   Mr. Agarwal told me things."

23           THE COURT:  Well, that was his direct testimony too.

24           MR. BLEGEN:  No.  I objected when he -- when he did

25   not keep it specific to which defendant he was --

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 15 of 301 PageID #:14271
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

1713

1    THE COURT:  I had --

2    MR. BLEGEN:  -- talking about.

3    THE COURT:  I -- I specifically recall a number of

4    times he lumped in Mr. Shah and Ms. Agarwal without objection.

5    Not that you had to.  But without objection where he said,

6    "They both directed me to do this; they both knew this; they

7    both told me to do that."

8    Now, you did object in some occasions for foundation

9    and for specificity.  But even then he said -- you know, he

10   gave examples, I recall at least on direct, where he said

11   both.

12   MR. BLEGEN:  And there may have been instances where

13   I either forget to object or didn't think it was necessary to

14   object.

15   THE COURT:  Sure.

16   MR. BLEGEN:  But the ones that are in the grand jury

17   are objectionable.  He also testifies to conclusions in there

18   that are not admissible.

19   For example, "When we agreed to do this, Shah and I

20   intended to deceive the client."

21   This is not a backdoor to get in inadmissible

22   testimony.  Just -- and remember, it's a grand jury where

23   there's no one there to object.

24   THE COURT:  That's why you get to cross-examine him

25   after they put it in.

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 16 of 301 PageID #:14272
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

1714

1    MR. BLEGEN:  I know, but cross-examination is not

2   intended to be a cure for inadmissible evidence.  It's --

3    MR. MADDEN:  They all --

4    THE COURT:  Mr. Madden's jumping up while he's

5   standing there.

6    Go ahead.

7    MR. MADDEN:  They specifically asked him, "Did you

8   intend to defraud?"  "Did my client intend to defraud?"

9    And he said answered that negatively.  Of course -- I

10  mean, that's -- that's -- they did exactly that during his

11  cross-examination, Your Honor --

12   MR. BLEGEN:  No, we did not.  I recall --

13    (Indiscernible crosstalk.)

14   THE COURT:  Hang on.  One at time.

15   MR. MADDEN:  Mr. --

16   THE COURT:  You know what?  You finish.

17   MR. BLEGEN:  Okay.  Good.

18   THE COURT:  You still had another point to make.

19   Go ahead.

20   MR. BLEGEN:  I would like to address this point here.

21   THE COURT:  Yeah.

22   MR. BLEGEN:  I think we can look at the transcript,

23  but what I recall Mr. Hueston saying at the end is, "You,

24  Mr. Ketchum" --

25   COURT REPORTER:  Slow down.  Slow down.

1            MR. BLEGEN:  Sorry.

2            What I recall at the end is Mr. Hueston said, "You,

3    Mr. Ketchum, did not intend to defraud."

4            He never said, "Mr. Desai didn't intend to defraud."

5    That would have been, I assume, objected to by the government.

6    I'm pretty confident -- we can check -- that he did not say

7    that.

8            THE COURT:  Right.

9            MR. BLEGEN:  There are -- what I would request,

10   Judge, is that you read -- at a minimum, if you wouldn't mind,

11   take a look at the entire grand jury testimony.

12           THE COURT:  I did.

13           MR. BLEGEN:  Oh.  It is -- it is filled with

14   inadmissible evidence that are -- that are conclusions.  I

15   mean, I can -- I tabbed up some this morning.

16           On page 13, "Shah and Agarwal instructed me not to

17   reveal Outcome -- to Outcome's own salespeople that the

18   list-match results contained projections."

19           That would have been objected to at trial, and you

20   would have required some foundation for it.

21           THE COURT:  Isn't that cured by the

22   cross-examination?

23           MR. BLEGEN:  No, because it's -- it's inadmissible in

24   the first place.  It would have come in, in a different way.

25   That's why it's -- I mean --

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 18 of 301 PageID #:14274
Case: 24-2230    Document: 34      Filed: 04/04/2025    Pages: 322

1716

1    THE COURT:  What -- give me the examples of

2  inadmissible testimony that was not already, in some ways,

3  covered through consistent statements on his direct

4  examination.

5    MR. BLEGEN:  Page 13.

6    MR. MADDEN:  It's only eight pages, isn't it?

7    THE COURT:  It's only eight pages.  I have the

8  attachment to their reply.  It's an eight-page statement.

9    MR. BLEGEN:  We're not putting in the grand jury

10  statement, I assume.  That was an exhibit to his testimony.

11    MR. MADDEN:  That's his sworn statement --

12    MR. BLEGEN:  No, That's --

13    MR. MADDEN:  He signed -- he signed it and read it to

14  the grand jury.

15    MR. BLEGEN:  Yeah.  And he also said -- excuse me.

16  They can't put in the exhibit, which is the

17  government-prepared statement.  They have to put in his actual

18  grand jury testimony.

19    THE COURT:  That I haven't seen --

20    MR. BLEGEN:  Well, that's what I --

21    (Indiscernible crosstalk.)

22    THE COURT:  I didn't know you wanted the whole thing

23  in.

24    MR. BLEGEN:  I'm sure it's substantially similar,

25  but --

1        MR. MADDEN:  It's the same.

2        MR. BLEGEN:  It's -- it's not the same.  There are

3    questions --

4        THE COURT:  Let's stop.  Let's go off the record for

5    a minute, because this is not helping.

6        (Off-the-record discussion.)

7        THE COURT:  We'll go back on the record.

8        Go ahead and complete your argument.

9        MR. BLEGEN:  Judge, I'm sorry, but I only have it

10   marked up by the actual grand jury testimony.  So I'll just

11   read the examples that I think are objectionable.

12       This one is on page 13 of the grand jury transcript.

13       MR. MADDEN:  Under which subheading, Pat?  Or what

14   topic?

15       MR. BLEGEN:  I didn't mark it up by topic, so that'll

16   take me a minute.  I don't have the statement tabbed up.

17       (Pause in the proceedings.)

18       MR. BLEGEN:  I'll just read it directly and then

19   it'll be in the record as to the part we're objecting to.

20       THE COURT:  Okay.  Do it slowly.

21       MR. BLEGEN:  From page 13 of the grand jury

22   testimony:

23       "For one thing, Shah and Agarwal instructed me not to

24   reveal to Outcome's own salespeople that the list-match

25   results contained projections."

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 20 of 301 PageID #:14276
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1718

1    THE COURT:  All right.

2    MR. BLEGEN:  This is on page 15 of the transcript:

3    "Based on my interactions with Shah and Agarwal

4    during 2012 and 2013, I believed they approved of the

5    misrepresentations being made to clients.  They wanted clients

6    to believe that Outcome had a higher number of doctors'

7    offices and devices installed as of the date of the list match

8    than Outcome really had."

9    THE COURT:  And I think when -- oh, go ahead.  Let

10    me -- you complete that.

11    MR. BLEGEN:  Page 17 of the transcript:

12    "When we agreed to do this, Shah and I -- Shah and I

13    intended to deceive the client."

14    18:  "Shah and Agarwal would say they never wanted a

15    client to see that there was a doctor or a device shortfall

16    because they did not want to have -- to have to answer."

17    Page 21:  "Shah and Agarwal instructed me on when and

18    how to pull list of offices to send to IMS.  Usually the list

19    pulled for IMS was in a doctor's office where the client's

20    advertisement actually played and did not include offices on

21    the list match sent to the client if those offices did not

22    actually receive advertising."

23    And that's the -- that's the list.

24    THE COURT:  All right.  Any additional argument?

25    MR. POULOS:  Yes, Your Honor.

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 21 of 301 PageID #:14277
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

1719

1            THE COURT:  Well, from Mr. Blegen.

2            MR. BLEGEN:  So my -- the summary of my argument is

3    that, one, inadmissible testimony from the grand jury or from

4    the statement should be -- should not be allowed in as

5    evidence.

6            It's not -- my view is this is not a backdoor to get

7    in inadmissible evidence.  And the government should be

8    required to specify which parts of this statement are prior

9    consistent statements that were attacked based on one of these

10   reasons they're alleging to be attacked.

11           The entirety of the grand jury statement cannot be in

12   a prior consistent statement.  They should have to pick out

13   which parts and tell us which ones they are, and then we can

14   lodge objections to those if need be.

15           But the answer is not simply because a witness

16   testified in the way that they don't like that they,

17   therefore, get to put in the entirety of his grand jury

18   statement or testimony.

19           THE COURT:  Okay.  Thank you.

20           Mr. Poulos, briefly.

21           MR. POULOS:  Your Honor, I echo what Ms. Chou and

22   Mr. Blegen had said.  But I submit, Your Honor, that this is

23   not a situation contemplated by -- by the new -- any

24   modification of Rule 801, that as the Court's noted, his

25   testimony on direct examination was consistent with his

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 22 of 301 PageID #:14278
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

1720

1    grand jury testimony.

2            There was no claim by any defense counsel that since

3    the grand -- that he's changed his grand jury testimony or was

4    impeached with his grand jury testimony.

5            In fact, the situation was, I think, essentially

6    this:  Mr. Hueston pointed out that when he came in the first

7    time and was interviewed without a lawyer present, he said

8    certain things.  Most specifically, he said that Rishi Shah

9    and Shradha Agarwal disclosed the fact of projections to

10   clients.

11           And then he -- that witness said -- and then

12   Mr. Hueston took him through, you got immunity, you got a

13   proffer letter, you got a lawyer, and then you got -- and then

14   you got immunity.  And then in the -- when you get -- by the

15   time you get to the grand jury, you changed what you said from

16   that first interview.

17           And he explained that the reason he changed from the

18   first interview was all the documents that the government had

19   shown him.  Defense counsel, through both Mr. Hueston and

20   Mr. Blegen, showed him other documents that the government had

21   not shown him.  And then it got to the point where the

22   government objected to the defense counsel pointing out that

23   the government had not showed him certain specific documents.

24           And so the entire basis of the cross-examination was

25   simply that he changed his testimony by the time he got to the

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 23 of 301 PageID #:14279
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1721

1    grand jury.  And -- and that was the issue, not that there had

2    been any change.  So the grand jury is not a prior consistent

3    statement to rebut anything that defense counsel did.

4         I submit, Your Honor, that what the rule contemplates

5    is only the first 302.  If they want to bring in and impeach

6    their own witness by statements that he had made in that first

7    proffer, so be it.

8         But the whole point was that the motive to fabricate

9    was after that, when he got his lawyer, when he -- when he got

10   the protections, even before that.  And then it changed into

11   the grand jury, and his grand jury was entirely consistent

12   with that.

13        Beyond that, Your Honor, I have a more narrow and

14   specific issue to raise.

15        Does -- Your Honor, do you have a copy of the written

16   statement?  Because that's all I'm working off of.

17        THE COURT:  Yes.

18        MR. POULOS:  Judge, if you go to page 7, the first

19   full paragraph, Your Honor, is as follows:

20        "It was also well-known to Shah, Agarwal, Purdy, and

21   me that the company was struggling to keep up with the growth

22   projections pushed by Shah and Agarwal.  The terms 'delta' and

23   'shortfall' were terms used by Shah, Agarwal, Purdy, and

24   others.

25        "Purdy and Shah used the terms frequently.  'Delta'

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 24 of 301 PageID #:14280
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

1722

1    was used by Shah, Agarwal, Purdy, both in a broad

2    sales-related context, and also more specifically to refer to

3    the number of devices needed to make up existing delivery

4    shortfalls to clients."

5            And, Your Honor, I object to the government bringing

6    that paragraph into this redirect.  One, it is well beyond the

7    scope of any cross-examination.

8            MR. MADDEN:  We'll agree to that paragraph coming

9    out, Your Honor, so we can short-circuit that.

10           MR. POULOS:  Okay.

11           THE COURT:  All right.  And is there any -- well, any

12   additional argument, Mr. Poulos?

13           MR. POULOS:  Well, I appreciate that.

14           And then the other point, Your Honor, just for the

15   record, is Mr. Pruitt hasn't completed his cross-examination.

16   But you did see that Mr. Pruitt's cross-examination did not in

17   any way at all challenge his credibility or his prior

18   testimony or -- or any of that.

19           And I would ask that if the government is permitted

20   to go down this road that the jury be instructed that they

21   cannot consider this prior grand jury testimony against

22   Mr. Purdy in any way.

23           THE COURT:  All right.  Well, this goes to the issue

24   that Mr. Blegen raised about a severance.

25           Are you asking for a severance --

SA34

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 25 of 301 PageID #:14281
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

1723

1           MR. POULOS:  I'm only asking for that --

2           THE COURT:  -- if I put this in?

3           MR. POULOS:  I'm only asking for the limiting

4   instruction, because I think the limiting instruction can cure

5   what I believe to be the prejudice, Your Honor.

6           THE COURT:  Mr. Blegen, you were going to consult

7   with counsel about whether you wanted a severance?

8           MR. BLEGEN:  We're going to need more than a couple

9   of minutes, Judge.  It's a pretty monumental request,

10  particularly if it's granted.  So can we have five minutes to

11  discuss it?

12          THE COURT:  Well, let's hear from the government in

13  response to the arguments.

14          MR. MADDEN:  First, Your Honor, the -- the defendants

15  are not really dealing with how broad this rule is now.  I

16  mean, the plain language of the statute is that the -- the

17  prior consistent statement comes in if it's offered -- this is

18  No. 2 -- "to rehabilitate the declarant's credibility as a

19  witness when attacked on another ground."

20          Another ground is not limited.  And since 2014, these

21  statements come in all the time, Your Honor.  And that was the

22  whole intent of amending the rule.

23          The first part of -- the first part of it led to

24  confusing discussions about when the motive to fabricate

25  began, inconsistent results, so they -- the rule writers

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 26 of 301 PageID #:14282
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1724

1  looked at that and broadened the rule because the reality is,

2  the bottom line is prior consistent statements given years

3  before testimony at trial do aid a jury in evaluating the

4  credibility after that person's credibility has been attacked.

5          It's hard to imagine someone who is more thoroughly

6  impeached by defense attorneys than Mr. Ketchum has been for

7  the last couple of days.  The -- Mr. Blegen seemed to think

8  that there needs to be an aggressive attack.  There doesn't

9  need to be an aggressive attack; it just needs to be

10  impeachment.

11          Mr. Blegen was the one who was saying, "That was ten

12  years ago, right?  You don't -- how could you remember that?"

13  He was -- and after -- they all benefitted from the aggressive

14  attack by Shah's attorney, right?  Once he's attacked by the

15  first person who cross-examines him, then the others can

16  benefit from that.  There's a softer attack, but it's an

17  attack nonetheless.

18          So those attacks on memory, "You didn't see these

19  documents; you don't remember those documents; you weren't

20  shown those documents," they all put this into play.  I'm

21  surprised the defense is so surprised by this.

22          It's such a given that we're going to seek to put

23  something like this into evidence after that type of attack on

24  him.  And really, all of their arguments -- and Mr. --

25  Mr. Poulos said the grand jury statement is consistent with

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 27 of 301 PageID #:14283
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1725

1    his testimony -- testimony on direct.  It absolutely is.

2    Of course, it is.

3         And you -- you've -- you read this.  You saw his

4    testimony.  This is the same things that Ketchum said on the

5    stand as supported by documents.  So to -- to cut -- you know,

6    to cut out all of these statements that they want doesn't make

7    sense.  That's why you have the cross requirement.

8         They're going to -- I'm sure they're going to cross

9    him on it.  They can.  The jury should see this to understand

10   that four years ago, he sat in the grand jury under oath and

11   this is what he said.

12        MR. BLEGEN:  Judge, can I make a couple of final

13   comments?  I'm sorry.

14        THE COURT:  Briefly.  We're after 9 o'clock, so we're

15   going to start.

16        Go ahead.

17        MR. BLEGEN:  Okay.  First of all, we're not

18   discussing the actual statement being given to the grand jury

19   as an exhibit, are we?  It shouldn't be given more prominence

20   than actual testimony.  It should be read in, at most,

21   obviously --

22        THE COURT:  Oh, yeah, no.  I don't think there's a --

23   this is not a -- it's going to be read in.  It's not going to

24   be an exhibit admitted into evidence.

25        MR. MADDEN:  We've done that in past cases, but you

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 28 of 301 PageID #:14284
Case: 24-2230   Document: 34        Filed: 04/04/2025    Pages: 322

1726

1    know --

2            THE COURT:  I -- I -- I don't understand why it

3    should be.  You're simply saying he said the following things.

4    It's -- why would we put -- what, we put the 302 in if that

5    was the prior inconsistent statement --

6            MR. MADDEN:  If --

7            THE COURT:  -- or prior consistent statement?

8            MR. MADDEN:  Well, we would -- I mean, that's not the

9    statement of a witness, so we would -- we're not asking for

10   that.  But, you know, when we move to admit evidence that's

11   not hearsay, whether it's in an email or something else, we

12   move to admit it, and the jury gets to see it.

13           MR. BLEGEN:  Secondly --

14           THE COURT:  Response?

15           MR. BLEGEN:  That -- first of all, then, I guess,

16   we'll ask to put the cross-examination transcript in.  That's,

17   frankly -- I -- I don't know that -- I -- you know, I know

18   Mr. Madden's in the building much more than I am, but this

19   does not happen all the time.

20           And -- and, thirdly, what Mr. Madden seems to be

21   suggesting from the rule is that any cross-examination opens

22   the door.  What -- what -- what could -- what could you

23   possibly do on cross-examination other than saying, "Gee, sir,

24   you're right," and sit back down that Mr. Madden would not say

25   falls under this new subsection.  It has to be an attack on

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 29 of 301 PageID #:14285
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

1727

1    credibility, and I never did that.

2            I -- I tried to enhance his credibility.  "Sir, it's

3    not your fault.  You didn't see all the emails.  You don't

4    remember all of them."  That's not -- I --

5            THE COURT:  Well, a --

6            MR. BLEGEN:  I really think they chose those words

7    intentionally.  It's not if you talked to a witness on cross,

8    therefore, his prior grand jury testimony comes in.

9            THE COURT:  I'll go back to what I said at the start.

10   You challenged his memory --

11           MR. BLEGEN:  Right.

12           THE COURT:  -- and if he didn't remember -- attacks

13   on memory are attacks on credibility.  And an attack on his

14   memory for not remembering something he wrote, although

15   understandable, is still an attack on his credibility.

16           MR. BLEGEN:  I would say I refreshed his -- his

17   memory.  I didn't attack it.

18           THE COURT:  Well --

19           MR. BLEGEN:  I helped him remember.

20           THE COURT:  We're --

21           MR. BLEGEN:  And that's a -- that's a difference.

22           THE COURT:  -- we're fencing on words.  I don't find

23   the difference substantive for purposes of this rule.  You

24   attacked his credibility by challenging his memory.  You can

25   attack credibility for a variety of reasons.

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 30 of 301 PageID #:14286
Case: 24-2230   Document: 34      Filed: 04/04/2025   Pages: 322

1728

1       One, one that often happens in every case, is memory.

2    And you attacked it for that reason.  Whether you attacked it,

3    whether you challenged it, whether -- whatever words you want

4    to use, there was a -- in my mind, a -- using the words of the

5    rule -- an attack on his credibility as a -- and this is being

6    used to rehabilitate his credibility as a witness when

7    attacked on another ground.  The other ground can be an attack

8    on memory.  So they are rehabilitating him through this.

9       Now, I hadn't -- there's two issues you've raised,

10   which I haven't addressed, which is if there's inadmissible

11   testimony that would be -- if there was a lawyer in the

12   grand jury for the defendant and they objected, saying

13   foundation or some other objection, does that make the

14   statement -- is that something I have to rule on, or is that

15   cured by the ability of defendants to cross-examine the

16   witness on the statement he made in the grand jury?

17       And, two, does it come in as a piece of evidence, the

18   actual statement, or is it simply read?  You both disagree on

19   what is the common practice.  You both say, never; and he says

20   always.  I don't know how to resolve that other than, I

21   suppose, talk to some other judges and see what their practice

22   is.

23       The rule doesn't talk about -- I don't believe --

24   it's -- it's not hearsay.  But, you know, whether you can

25   offer it in -- the statement is not hearsay under this rule.

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 31 of 301 PageID #:14287
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

1729

1  Whether you can offer in the statement as a document or simply
2  read it in, I'm not certain.
3        MR. HUESTON:  Your Honor, may I just address that one
4  point?
5        THE COURT:  Sure.
6        MR. HUESTON:  I do think it's just unfair if he --
7  assuming it's coming in, he reads it.  It's testimony like
8  anything else.  It just becomes unfair to us then --
9        THE COURT:  And I'll stop you right there.  I -- I
10  agree.
11        MR. HUESTON:  Okay.
12        THE COURT:  I really think to put this in as a
13  document highlights a -- in effect, some testimony where
14  they're not getting transcripts of what he said on direct or
15  cross.
16        I think reading it is the fairer way of doing it so
17  it's not magnified as the one statement that they'll likely
18  have in their -- the jury when they deliberate.  I don't know
19  they're going to get anything else back there that's in this
20  kind of form.
21        So unless you can point to me some case law that
22  supports it, I -- I agree with Mr. Hueston and what Mr. Blegen
23  raised earlier about the fact this be -- being read rather
24  than actually introduced where they can sit back in the
25  jury room and have the one -- the one thing they'll have back

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 32 of 301 PageID #:14288
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

1730

1  there other than an email is this somewhat government-friendly
2  statement that contains a fair amount of information that were
3  he to read this in court as testimony would have been subject
4  to objection that I likely would've -- possibly could've
5  sustained or allowed -- certainly allowed a -- a reforming of
6  the question to make it permissible.
7            MR. HUESTON:  Your -- your --
8            THE COURT:  Hang on.  Mr. Madden is about to agree
9  with me, I think.
10           MR. MADDEN:  So I -- I think -- I want to talk to my
11 colleagues about it.  But, like, what we'd like to do -- I
12 mean, just as we present -- as we've done with all the other
13 evidence here, and the defense has, is put it up either on the
14 ELMO or on the -- you know, just so everyone can see it and
15 then read along with it.
16           And then I think that's -- I think that's enough.
17           MR. BLEGEN:  Why?  Why?  I don't under --
18           MR. MADDEN:  Why --
19           MR. BLEGEN:  I object to that.
20           MR. MADDEN:  Why?  Yeah, they did it with the
21 depositions.  They have thrown up so many things on the
22 screen, Your Honor, including deposition transcripts.
23           So, I mean, why would we be -- why are they
24 micromanaging how we get to publish our evidence?
25           THE COURT:  Yeah, I think this is within my

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 33 of 301 PageID #:14289
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

1731

1  discretion.  I'm not going to allow the statement to go back
2  to the jury.  I will allow it to be displayed.  It's too long
3  to read in the sense that it's going to have any impact.

4          And they're allowed to put in evidence as I --
5  this -- I'm allowing it in.  And they're allowed to put it in
6  in the manner in which they choose.  Putting it up on an ELMO
7  is no different than deposition testimony that was displayed
8  to the jury.

9          And the jury won't have it back in the jury room.
10  It's not going to be admitted as a -- the statement itself as
11  a document admitted into evidence.  It's simply being read.

12          All right.  Anything else that hasn't been raised
13  already?

14          MR. POULOS:  Very briefly, Your Honor.  The -- I
15  appreciate what the government said about the paragraph and
16  issue I raised.  I'm sure that'll be redacted from what is
17  displayed.

18          My only question is:  Does the government intend to
19  not cover anything else?  Or do they intend to go over the
20  entirety of the rest of the statement?

21          MR. MADDEN:  I don't understand the question.

22          THE COURT:  I don't either.

23          MR. POULOS:  Well, he's agreed not to get into this
24  paragraph.  Is it the government's intent to cover everything
25  else --

**SA43**

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 34 of 301 PageID #:14290
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

1732

1    MR. MADDEN:  Correct.

2    MR. POULOS:  -- or are they going to leave other --

3  certain parts out?

4    MR. MADDEN:  Correct.  We'll read -- other than that

5  paragraph, we'll read in either --

6    MR. POULOS:  That's all I wanted to know.  Thank you.

7    THE COURT:  All right.  And I think -- well, I think

8  that's appropriate.  It puts context into the particular

9  statements that are prior consistent statements.  And the

10  attack on credibility was general, in my mind, because it was

11  a general attack on his memory.

12    So that'll be the ruling.  I don't think we'll get

13  there quite yet anyway.

14    And do we have all our jurors?

15    THE CLERK:  We do.

16    THE COURT:  Okay.  Let's bring in the jury.

17    Let's have the witness retake the stand.

18    (Pause in the proceedings.)

19    COURT SECURITY OFFICER:  All rise.

20    (Jury in at 9:20 a.m.)

21    THE COURT:  All right.  Please be seated, ladies and

22  gentlemen.

23    Good morning.  We have a school group here today.  We

24  often get school groups visiting the courthouse to observe

25  what happens.  And why don't you stand up.  And they're from

Case: 1:19-cr-00864 Document #: 588 Filed: 11/29/23 Page 301 of 301 PageID #:14557
Case: 24-2230    Document: 34         Filed: 04/04/2025    Pages: 322

1999

1    THE COURT:  Okay.  Very good.

2         Anything else we need to put on the record from

3  defense?

4         MR. LOWDER:  No, Your Honor.

5         MS. CHOU:  No, Your Honor.

6         THE COURT:  Nothing from defense?  Okay.

7         All right.  We're off the record.

8      (Court adjourned, to reconvene at 8:45 a.m. on 2/9/23.)

9                         CERTIFICATE

10      I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12  */s/ Elia E. Carrión*          *9th day of February, 2023*

13  *Elia E. Carrión*                    *Date*
    *Official Court Reporter*

14

15  */s/ Kelly M. Fitzgerald*      *9th day of February, 2023*

16  *Kelly M. Fitzgerald*                *Date*
    *Official Court Reporter*

17

18  */s/ Sandra M. Tennis*         *9th day of February, 2023*

19  *Sandra M. Tennis*                   *Date*
    *Official Court Reporter*

20

21  */s/ Kathleen M. Fennel*       *9th day of February, 2023*

22  *Kathleen M. Fennel*                 *Date*
    *Official Court Reporter*

23

24

25

**SA45**

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 1 of 289 PageID #:15389
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2830

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    UNITED STATES OF AMERICA,        )
                                      )    Docket No. 19 CR 864
4                    Plaintiff,       )
                                      )    Chicago, Illinois
5       v.                            )    February 15, 2023
                                      )    9:02 a.m.
6    RISHI SHAH, SHRADHA AGARWAL,     )
     BRAD PURDY,                      )
7                                     )
                     Defendants.      )
8

9         TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 11A
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:    MR. MATTHEW F. MADDEN
13                          MR. SAURISH APPLEBY-BHATTACHARJEE
                            Assistant U.S. Attorneys
14                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
15

16                          MR. WILLIAM E. JOHNSTON
                            MR. KYLE C. HANKEY
17                          U.S. Department of Justice
                            Criminal Division, Fraud Section
18                          Washington, D.C.  20530

19

20

21

22                    ELIA E. CARRIÓN
                    Official Court Reporter
23               United States District Court
              219 South Dearborn Street, Room 1432,
24                  Chicago, Illinois 60604
                       (312) 408-7782
25              Elia_Carrion@ilnd.uscourts.gov


                          **SA46**

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 79 of 289 PageID #:15467
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2908

 1            THE COURT:  Well, I want him to look at this
 2  document.  If you've got a hard copy, just give it to him.
 3            MR. POULOS:  Should I leave -- we could have this
 4  discussion at sidebar, perhaps.
 5            THE COURT:  Well, all right, the witness can be
 6  excused.  If you can come back in 13 minutes, we'll show you a
 7  document for a minute or two before the jury comes in.
 8            THE WITNESS:  Thank you.
 9            THE COURT:  Okay.  He'll -- once he's out, you can --
10  yeah, you can show it to him --
11            MR. TODISCO:  All right.
12            THE COURT:  -- during the break.
13            Go ahead.
14            MR. POULOS:  Your Honor, the government has --
15  somebody close the door, please.
16            THE COURT:  All right.
17            MR. POULOS:  The government has filed a motion now to
18  once again seek permission to read the entirety of Mr. Ma's
19  grand jury statement to -- to the jury.
20            THE COURT:  Yeah, it was an amazing document.  It
21  actually had references to events in the courtroom that
22  occurred five minutes ago.  It was my -- my congratulations to
23  whoever prepared it because they must have been typing it as
24  the cross-examination was occurring.  It was truly an amazing
25  feat.

1           And I'm not -- I'm being completely candid.  I was
2    shocked how contemporaneous it was compared to the testimony
3    of the witness.
4           Go ahead.
5           MR. POULOS:  And, Your Honor, I did not challenge
6    Mr. Ma's --
7           THE COURT:  Mr. Poulos, stop.
8           MR. POULOS:  Judge, I didn't --
9           (Indiscernible crosstalk.)
10          THE COURT:  All right.  I'll let you finish in a
11   minute.
12          MR. POULOS:  I'm sorry to interrupt, Your Honor.
13          THE COURT:  And I'm sorry; I interrupted you.  You're
14   entitled to give your whole argument.
15          But, Mr. Poulos, that's a tough hill to climb,
16   because I thought you challenged his credibility in many
17   different ways as did every -- whether it was indirectly,
18   which I think it was done more subtly through Mr. Ketchum, but
19   I still allowed it in, because I thought there was a general
20   challenge to his credibility.
21          I thought this was a full-on assault, but let me --
22   you should finish what you're saying.  And I apologize for
23   interrupting you.
24          MR. POULOS:  Your Honor, what I did is simply
25   establish that he and Mr. Desai committed fraud and deception

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 81 of 289 PageID #:15469
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2910

1  and lied to everybody, that he bears -- that he and Mr. Desai
2  have responsibility for that conduct.

3          As far as what he said about Mr. Purdy, I didn't
4  challenge his credibility at all.  I challenged his perception
5  of the events.  He talked about loose match.

6          With respect to loose match, I said, "You said this
7  about Brad -- about Brad Purdy."  And he just simply said
8  this.  And, in fact, what Brad Purdy said to you is true and
9  accurate, that -- that you don't have the suite numbers, that
10 it does give you a broader cut."

11         And then I went into all the other ways that he did
12 that.

13         With respect to the shrug, I didn't challenge that
14 credibility at all.  It was all about his perception of -- of
15 the event.

16         With respect to the metrics, I simply pointed out
17 that Brad Purdy and he were part of discussions with the
18 engineering group that dealt with the -- that dealt with
19 the -- the faulty data that they had.

20         And then I think the evidence established quite
21 conclusively that with respect to the massive inflation of
22 those, that's something Desai did on his own, in fact, lied to
23 Ma -- Ma about it.

24         Your Honor, I do not plan to call David Ma a liar in
25 terms of his testimony as to Brad Purdy at all.

SA49

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 82 of 289 PageID #:15470
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2911

1          And so, yes, I did establish that he lied and lied
2    and lied with respect to the conduct, the underlying conduct
3    as part of his establishing that that -- that that fraud
4    occurred.  I did not challenge his credibility about his
5    testimony.
6          In fact, I elicited truthful testimony from him that
7    he repeatedly was -- that he engaged in that conduct.
8          So, you know, Judge, if that opens the door now to
9    the government reading an entirety of a grand jury statement,
10   I just -- I just don't understand.  And -- and I did bring out
11   the SEC -- that he went to -- that in going to the SEC, he
12   sought whistleblower status so he could cash in on that
13   conduct.
14         The grand jury testimony occurred after that event.
15         THE COURT:  But doesn't the challenge to his -- the
16   reason why he's testifying, supposed reason why he's
17   testifying to cash in on his testimony --
18         MR. POULOS:  Well, Your Honor --
19         THE COURT:  Now you're interrupting me.
20         MR. POULOS:  Forgive me, Judge.
21         THE COURT:  It's all right.
22         MR. POULOS:  I really do apologize.
23         THE COURT:  No, that's okay.  I'm reminded of an
24   interchange between, I think it was Ed Jensen and Judge Darrah
25   where Judge Darrah said, "Do you mind if I interrupt your

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 83 of 289 PageID #:15471
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2912

1    interruption?"

2           No.  But doesn't the -- doesn't the challenge to -- a

3    general challenge to the veracity of his testimony by bringing

4    out that he is attempting -- or may be trying to cash in on

5    his testimony, isn't that a broad challenge to his

6    credibility?

7           No matter what the timing of when he went in the

8    grand jury versus when he was -- made his whistleblower

9    complaint to the SEC, because the grand jury testimony is

10   meant to rehabilitate any challenge to credibility that, at

11   least as we went through this exhaustively last time with

12   Ketchum, with the amendment to the rule, it's not restricted

13   to prior consistent statements.  It's any challenge to

14   credibility can be -- you can bring in as nonhearsay the prior

15   sworn testimony such as grand jury testimony of a witness.

16          I don't know that the challenge -- your -- your

17   argument -- perhaps your cross was focused primarily on him

18   lying about numbers but not lying to the jury.

19          But there's no reasonable way you can look at a --

20   questions about if a person's going to get monetary

21   remuneration for his testimony as a whistleblower, that that's

22   not a practical challenge to a person's credibility.

23          MR. POULOS:  It -- that issue, Your Honor, only went

24   to -- that issue only went to the additional reason beyond

25   what he -- what he -- beyond the nobility of -- that he

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 84 of 289 PageID #:15472
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

2913

 1  conveyed of going to the *Wall Street Journal* that he couldn't
 2  live with it any longer.

 3         Judge, I will not in closing argument, or ever, claim
 4  that David Ma lied about Brad Purdy.

 5         THE COURT:  But the -- the inquiry isn't what you'll
 6  do with it later.  It's what -- whether on cross-examination
 7  his credibility and veracity was challenged.

 8         It's not a matter of how you use that later, because
 9  the opportunity to rehabilitate that challenge occurs when
10  he's on the stand, not later in the middle of a closing
11  argument and say, "Hang on.  We want to put in this grand jury
12  testimony."

13         Of course, that's too late.  The time to do it is
14  during redirect, which is what the government's suggesting.

15         Let's go off the record for a minute.

16         (Off-the-record discussion.)

17         (A recess was had from 10:46 a.m. to 11:02 a.m.)

18

19

20

21

22

23

24

25

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 85 of 289 PageID #:15473
Case: 24-2230   Document: 34       Filed: 04/04/2025   Pages: 322

2914

1          THE COURT:  All right.  We're back on the record.

2   Any additional, now that the defense has seen this, presumably

3   seen the government's motion, any additional arguments on this

4   that were not raised last time when the similar attempt to

5   put -- successful attempt to put Ketchum's grand jury was

6   made?

7          Anything else first from Defendant Shah?

8          MR. HUESTON:  Your Honor, I will remind you of one

9   important distinction.  I specifically remember, because I

10  thought of it as a badge of honor, when Mr. Madden stood up

11  and said, Your Honor, to justify the entire transcript coming

12  in with all his prior statements, he said I don't think I've

13  ever seen a witness more thoroughly impeached on basically

14  everything.  And I think Your Honor considered that and said,

15  yeah, you know what, we have -- you pounded him and he's

16  redirected on everything that's in that grand jury transcript,

17  so it ought to come in.

18         And I think the distinction here is we're talking

19  about the tail of the dog.  So, well, there's, you know,

20  something here that was touched upon, so we're going to yank

21  the whole dog in and he gets -- the entire transcript gets

22  read in.

23         I think that's really -- we're in very much a

24  different situation in this case than what was justified, and

25  I think rationally so, for Ketchum.

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 86 of 289 PageID #:15474
Case: 24-2230   Document: 34     Filed: 04/04/2025   Pages: 322

2915

1     THE COURT:  Okay.  Anything else from Defendant

2 Agarwal?

3     MR. BLEGEN:  Yes, Judge.

4     THE COURT:  Go ahead.

5     MR. BLEGEN:  I think the concern here for this

6 witness is the second point we were making regarding Ketchum,

7 which is that, one, this -- the government's position seems to

8 be that any cross-examination opens the door to putting the

9 entirety of a grand jury testimony -- grand jury statement.

10     What they're allowed to put in is prior consistent

11 statements, not prior statements that they liked better at the

12 time, not prior statements that maybe come off better, prior

13 consistent statements.  And my view is, and this is consistent

14 with the -- what I think the position is in the military

15 justice case that I provided the cite to earlier off the

16 record, is that -- if you want me to give the cite, Judge, I

17 will, but I don't have it up in front of me at the moment.

18     THE COURT:  It's 78 MJ 781.

19     MR. BLEGEN:  Yes.  This rule does not open up the

20 door to repeating prior testimony, which is what grand jury --

21 this grand jury statement is, it's prior testimony, just

22 because a witness's credibility was challenged on any ground.

23 It's not meant to just be a repeatal, and, you know, just for

24 my general purposes, that's what we're going to get from now

25 until the end of time.  If that's what the rule is going to

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 87 of 289 PageID #:15475
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2916

1  be, every witness is going to go in the grand jury and they're

2  going to get to read in every witness's testimony.  What

3  they -- from the grand jury.

4          What they should have to do is point to the portions

5  of the grand jury, that is, the prior consistent statement

6  that they want to put in, and then provide the basis that it

7  rehabilitates the witness on the specific ground for which the

8  witness's credibility was challenged, and that military

9  justice case I think says that.

10          But the rule suggests that itself because subsection

11  (b)(ii) says to rehabilitate the declarant's credibility as a

12  witness when attacked on another ground.

13          Our position is it has to be specific to that ground

14  on which the witness was attacked.  A good point that that

15  case makes that I cited you is that let's say that you put in

16  on cross-examination, well, sir, you were convicted of a

17  felony.  That's a pretty standard cross-examination.

18          Does the government then get to read in the entirety

19  of the person's grand jury testimony that occurred also after

20  they were convicted of a felony?  They should not be able to

21  because it doesn't rehabilitate the witness on that ground.

22          What the government is really trying to do here, I

23  believe, is just repeat the person's testimony, and --

24          THE COURT:  Well, let me interrupt.  Of course, they

25  are, but that's the point of it.  They are repeating a

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 88 of 289 PageID #:15476
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2917

1  person's testimony -- well, if the -- if there's a challenge
2  to the credibility of the testimony, they're allowed to put in
3  a prior statement that's been under oath and is subject to
4  cross-examination here if it's consistent with the direct
5  testimony.

6         And the hurdle that the part that I raised with
7  Mr. Poulos earlier is there is a broadside attack to this
8  witness's credibility -- he's not here -- broadside attack to
9  this witness's credibility by suggesting that he is testifying
10 in order to -- whether he denies it or not, but the suggestion
11 is made he's got a pecuniary interest in the outcome of this
12 case.

13        And that would seem to be a general, broad challenge
14 to his overall credibility so that any time he makes a
15 statement that is consistent with his direct testimony, that
16 enhances his credibility in front of the jury, which is the
17 point of the rule.

18        I don't know that this rule requires a picking and
19 choosing of phrases.  Now, maybe it does, and maybe that's the
20 argument you're making, but picking and choosing of particular
21 sentences and phrases out of it that may not have been
22 challenged on cross-examination, but when you have an overall
23 umbrella challenge by suggesting he has a pecuniary interest
24 in this case, I'm not sure that that -- there's a requirement
25 of picking and choosing particular statements that he

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 89 of 289 PageID #:15477
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2918

1  testified to inconsistently on cross but consistently on
2  direct.

3          But I interrupted you.  Finish your argument.

4          MR. BLEGEN:  I guess what I should have said is it
5  doesn't allow them to put in the -- that is our position.  It
6  should not allow them to put in the entirety of the statement.

7          I mean, look, I don't do civil work, but does this
8  rule mean now that you can read in a witness's entire
9  deposition testimony if the other side attacks his credibility
10 because it is a prior consistent statement?  It seems to me
11 that that -- the exception is going to swallow the rule here
12 and that every -- so, for example, on this smoke bomb issue,
13 the grand jury is not consistent with what he said on the
14 stand.

15         So if they're asking to put that in under this rule,
16 that shouldn't be allowed in.  It's not the same.  He says
17 something different in the grand jury than he does -- than he
18 did on the witness stand.  And so it can't be admitted under
19 that -- it's not consistent, and so it shouldn't come in under
20 the rule.  And I know it's -- it takes a lot of time and it's
21 difficult, but prior grand jury testimony is not meant to be
22 admitted whole cloth by this rule.  It cannot be.

23         THE COURT:  Here's what we're going to do.  We're
24 going to stop the argument right now but not prevent you from
25 finishing it.  I'll give Mr. Poulos a chance to argue and the

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 90 of 289 PageID #:15478
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2919

1  government to respond.

2          We're not going to get to this before lunch.  We'll

3  take an early lunch if we have to because if there is going to

4  be a slicing of this grand jury testimony, it's going to take

5  more time than we have right now, and I don't like the jury

6  waiting.

7          So the additional cross of the witness is not going

8  to get into it.  The redirect can cover other subjects rather

9  than this if you get to redirect before lunch.  And when

10  you've exhausted everything else you have and it's time for

11  the grand jury testimony that you believe you ought to be able

12  to introduce, we'll take our break and address this in a more

13  orderly way so everyone has their chance to say what they want

14  to say.

15          Okay.  Let's bring in the jury.

16          We're off the record.

17      (Discussion held off the record.)

18          COURT SECURITY OFFICER:  All rise.

19      (Jury enters courtroom.)

20          THE COURT:  All right.  Please be seated.

21          You may continue cross-examination.

22          Sorry for the lengthy delay, ladies and gentlemen.

23  Apologize.  We were trying to deal with some issues that

24  hopefully will expedite things, and we needed to do that

25  outside your presence.  So I apologize for the longer break

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 136 of 289 PageID #:15524
Case: 24-2230    Document: 34      Filed: 04/04/2025    Pages: 322

2965

1    things -- go off the record.

2         (Discussion held off the record.)

3              THE COURT:  Let's go back on the record.

4              The Defendant Agarwal wished to make additional

5    arguments on the inadmissibility of the grand jury testimony

6    of Mr. Ma.

7              Mr. Todisco, you can have a seat, if you'd like.

8              MR. TODISCO:  I was just gathering my papers.

9              THE COURT:  Sure.  Go ahead.

10             All right.  Proceed.

11             MS. BELL:  Thank you, Your Honor.  I'm just going to

12   add to -- I believe Mr. Blegen finished with his point about

13   the statement-by-statement process and the kind of exception

14   swallowing the rule.  Our specific concern here relates to the

15   testimony that was elicited on direct examination regarding

16   the smoke bomb, which, of course, is a critical piece of

17   negative testimony regarding our client.

18             It was fundamentally different than what the witness

19   said in his grand jury statement.  And I will elaborate, but

20   the government had two options on direct when the testimony

21   elicited on direct was fundamentally different than his prior

22   testimony, one of which would have been to refresh his

23   recollection, and another of which would have been to impeach

24   their own witness with a prior inconsistent statement.

25             They did neither of those two things.  They accepted

1  the witness's testimony as it came out on direct, and they
2  moved on.

3       Now they've lost the opportunity to go back to a
4  prior inconsistent statement or to try and refresh him with a
5  prior statement.  And so they're trying a third avenue, which
6  is a prior consistent statement, but the problem being it's
7  not consistent.

8       And so let me be more specific here if I can.

9       So the testimony on direct was at page 2425, and the
10 question was -- let me see if I back up to the -- I believe
11 the passage starts on 2424.

12      THE COURT:  Can I stop you for one second?  Let's go
13 off the record.

14      (Discussion held off the record.)

15      THE COURT:  Back on the record.  Sorry to interrupt
16 you.

17      MS. BELL:  Thank you, Your Honor.

18      Sorry, we're working with multiple screens here
19 without the paper copies, but -- so on 2425 of the transcript,
20 line 12, the prosecutor asked:

21      "What did she say?"  Meaning Ms. Agarwal.

22      "Answer:  The parts that I remember most clearly are
23 she used the words 'we throw smoke bombs to' and then I
24 remember hearing 'to clean up our operations.'"

25      The prosecutor then goes on to ask about what those

1  comments meant to Mr. Ma, but that was the sum total of the
2  statements elicited in terms of what were the words that came
3  out of Ms. Agarwal's mouth.
4         Now, contrast that with the grand jury statement.
5  Here is what the government authored for Mr. Ma in his
6  prepared grand jury statement, and I'm not sure if Your Honor
7  has a copy of this.
8         THE COURT:  I do.
9         MR. MADDEN:  We -- if you want to turn on the Elmo,
10  we can put it up there, Your Honor.
11        THE COURT:  I've got it.
12        MR. MADDEN:  Okay.
13        MS. BELL:  Okay.  So this is at the bottom of -- I
14  see the Bates stamp is the bottom of -- it says 0006.  And so
15  the witness, Mr. Ma, or the government wrote for Mr. Ma:  "I
16  told Agarwal that I was not comfortable with the business
17  practice of selling inventory that we did not have.  Agarwal
18  responded to my concern by saying that Context throws 'smoke
19  bombs' and that others could not see what was happening behind
20  the smoke."  That part was not elicited on direct.
21        "She further stated that by the time the smoke
22  dissipated, Context would have cleaned up its operations and
23  everything would be fine."  That was not elicited on direct.
24        "Agarwal stated that Context had inconsistent growth
25  cycles where the company grew fast one year and then spent the

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 139 of 289 PageID #:15527
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2968

1    next year cleaning up."  That was not elicited on direct.

2         "Agarwal appeared unconcerned with this practice and

3    stated that this was how Context had grown in the past."  That

4    was not elicited on direct.

5         "The conversation about deltas lasted less than

6    15 minutes even though the meeting itself lasted longer."

7    That also was not elicited -- well, my colleague is telling me

8    I'm wrong, but I don't -- at least -- I'll doublecheck that,

9    but I don't remember him saying that that conversation lasted

10   15 minutes, which would have implied that there was more said

11   by Ms. Agarwal than lines 13 through 15.

12        So, Your Honor, this is a classic example of a prior

13   inconsistent statement.  Again, the government certainly had

14   tools available to it to elicit further content from Mr. Ma

15   had they chosen to do so.  They left it at lines 13 through

16   15, and at this point, it's simply not a prior consistent

17   statement within the meaning of the rule.

18        Moreover, as the Court has recognized in prior -- in

19   prior conversations on this topic, there's also a 403

20   balancing analysis, is this more prejudicial than probative,

21   even if it were a -- something that fit within, you know, an

22   exception to the hearsay rule, which it does not.

23        And in this context, this is extraordinarily

24   prejudicial testimony which the government, for strategic

25   reasons, opted not to elicit on direct, and at this point in

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 140 of 289 PageID #:15528
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2969

1    time to double down at the very end of this witness's

2    testimony when the government often gets the last word with

3    this elaboration of many things that purportedly came out of

4    Ms. Agarwal's mouth, which he did not testify to on direct,

5    would be irreparably prejudicial, and we don't really have a

6    response because the only suitable response would be

7    additional cross-examination, which would only further

8    underscore this very negative aspect of testimony.

9             So for all of those reasons, Your Honor, we quite

10   forcefully would object.  To the extent that the Court permits

11   any portions of the grand jury statement to be read into the

12   record, we would forcefully request that the Court excise this

13   portion, anything other than "Agarwal responded to my concern

14   by saying that Context throws smoke bombs," which is really

15   all that was elicited.

16            THE COURT:  What did your colleague get out on this

17   that's inconsistent in his cross-examination?  Or Mr. Lowder,

18   you can address it, but --

19            MR. LOWDER:  Sure.

20            THE COURT:  -- what did the witness say in response

21   to cross-examination?

22            MR. LOWDER:  I didn't challenge him on whether the

23   statement "smoke bombs" was made.  What I pointed out in my

24   cross-examination was that he testified on direct that he used

25   euphemisms.  He didn't identify the euphemism he used and also

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 141 of 289 PageID #:15529
Case: 24-2230   Document: 34        Filed: 04/04/2025   Pages: 322

2970

1   that he didn't have any other details about what he told
2   Ms. Agarwal, nor did he try to confirm that her understanding
3   matched his.
4            So that's what I did.  But I didn't challenge
5   directly that he used the term "smoke bomb."  I just pointed
6   out that in his direct and also in his prior testimony, he
7   didn't add any details to support that statement.
8            THE COURT:  Okay.
9            All right.  Any further -- Mr. Poulos, you had put
10  your objections out there already.  Anything in addition to
11  what you already put out?
12           MR. POULOS:  Well, Your Honor, I would like to --
13  yes.
14           Your Honor, my main concern here is that the
15  government is using a minor -- a minor adjustment to the rule
16  to swing open the barn doors to allow an entire grand jury
17  statement to be admitted.  The prior rule allowed for prior
18  consistent statements to rebut a claim of recent fabrication.
19  It was modified to say if there is a prior consistent
20  statement that is offered to rehabilitate the defendant's
21  credibility as a witness when attacked on another ground.
22           And I think Mr. Blegen's points were well-taken on
23  the issue of some -- an analysis of how what the government is
24  proposing to do actually rehabilitates based on the attacks
25  that were lodged.

**SA64**

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 142 of 289 PageID #:15530
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2971

1              I know that we are all, the Court included, operating

2    on somewhat new ground here without a lot of guidance from the

3    appellate court, but I believe that the committee's comments

4    provide some guidance.

5              The committee comments, which the government

6    helpfully quotes at page -- top of page 3 of their submission,

7    notes that the prior rule only covered consistent statements

8    to rebut a claim of recent fabrication.

9              THE COURT:  Slow down, please.

10             MR. POULOS:  Sorry.  To rebut a claim of recent

11   fabrication, but then it offers two I think insightful

12   examples.

13             The first example says:  "To provide for substantive

14   admissibility of a consistent statement that are probative to

15   explain what otherwise appears to be an inconsistency in the

16   witness's testimony."

17             And I would submit, Your Honor, that if the

18   government can point to something that the defense did to note

19   any inconsistency in the witness's testimony, that they would

20   be allowed to offer the prior consistent statement under this

21   amended rule on a targeted basis to demonstrate that, no, he

22   had said -- he had made this prior consistent statement.

23             The other example that the committee provides is the

24   prior -- nor did the prior rule cover consistent statements

25   that would be probative to rebut a charge of faulty memory.

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 143 of 289 PageID #:15531
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

2972

1         And on that point, to the extent there was a claim

2    of -- to rebut a claim of faulty memory, only that portion of

3    the prior statement going to what issue the issue or fact on

4    which a challenge of faulty memory was lodged would be

5    admissible.

6         And so when you look at the requirements of the

7    rules, I do note that the government ends its submission by

8    saying that it seeks to admit -- at the bottom of page 4 --

9    that they have evidence of a prior consistent statement.  I

10   don't know exactly what statement they are claiming is

11   consistent.  I think Ms. Bell has pointed out that there are

12   plenty of inconsistent statements, inconsistent with his

13   testimony that they're seeking to put in, for obvious reasons.

14        Yes, Mr. Ma will be subject to cross-examination on

15   the grand jury statement if it is admitted; and that the

16   statement will be consistent with his testimony on direct

17   exam, I think Ms. Bell just did a very fine job of pointing

18   out how it's not consistent with his testimony on direct exam.

19        And what's missing here from the government's

20   submission is any explanation, any analysis of how throwing in

21   this entire grand jury statement, which is I think a foreign

22   concept to many of us who have been trying federal criminal

23   cases for a long time, Judge, and there is no analysis offered

24   on a targeted basis of specific testimony and how it actually

25   would serve to rehabilitate the witness's credibility when, as

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 144 of 289 PageID #:15532
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2973

1    I noted, I really did not lodge an attack on the credibility
2    of his actual testimony.

3         I elicited credible testimony from him establishing
4    that he was deeply involved in this criminal conduct.

5         THE COURT:  All right.  Response?

6         MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.  I will
7    start -- we acknowledge that there's perhaps a paucity of case
8    law in the Seventh Circuit.  There is not -- there are other
9    circuits that have addressed the 2014 amendment.  I'll start
10   with *United States v. Cox*, 871 F.3d 479, and this is at
11   page 488, and I'll quote directly from the opinion:  "In 2014,
12   (b) was split into two clauses, including the new clause (2)
13   which allows prior consistent statements to be admitted for
14   the truth of the matter asserted if offered" and now quoting
15   from the rule "to rehabilitate the declarant's credibility as
16   a witness when attacked on another ground."

17        The opinion continues quoting the advisory
18   committee's notes to the 2014 amendment:  "The intent of the
19   amendment is to extend substantive effect to consistent
20   statements that rebut other attacks on a witness, such as the
21   charges of inconsistency or faulty memory."

22        Inconsistency and faulty memory are not an exhaustive
23   list of other attacks but only illustrative risks.

24        On the topic of faulty memory, Mr. Lowder, with
25   respect to the smoke bombs conversation, specifically attacked

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 145 of 289 PageID #:15533
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2974

1  the witness's memory by noting such things as he did not have

2  notes of the conversation or any contemporaneous records of

3  the conversation, and then drawing the point that this is a

4  conversation that predated the witness's in-court testimony by

5  a number of years.

6        Now, as to the consistency of the testimony, Ms. Bell

7  read two lines of the transcript.  I'm going to start at

8  page 2425 at line 20 and continue from there:

9        "Question:  Did she," meaning Ms. Agarwal, "elaborate

10  at all on what she meant by cleaning up operations?

11        "Answer:  From my memory, it's more sort of the

12  general idea that, you know, the idea of the smoke bomb is

13  that you have smoke that people can't see behind the smoke

14  screen.

15        "Question:  And who are the people who can't see

16  behind?

17        "Answer:  Our -- our customers and our sponsors,

18  clients, pharma clients.

19        "Question:  Continue, please.

20        "Answer:  And that at a point is that the smoke

21  creates a, you know, a distraction or a, you know, a time lag

22  or a gap so that in the background, we can scramble and try to

23  figure out how to handle the situation or, you know, do things

24  perhaps in a better way."

25        So that's the full context of the prior -- or of the

1    in-court testimony, which is entirely consistent with the
2    grand jury testimony.

3                THE COURT:  All right.  Anything else?

4                MS. BELL:  Yes, Your Honor.  On that --

5                THE COURT:  Well, anything else from the government?

6                MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.

7                Really what this is an argument about is 403
8    balancing.

9                The defendants cannot plausibly argue that under the
10   2014 amendment, they have not attacked the witness's
11   credibility on another ground and that a prior consistent
12   statement is not substantively admissible.

13               There is a parade of horribles that Mr. Blegen cited,
14   such that you can have the entire deposition transcript read
15   into the record.  And under that, the committee notes speak to
16   that.  That even prior consistent statements are subject to
17   403 balancing, including on issues of cumulativeness.

18               As the Court has noted, we're looking at an
19   eight-page written statement.  It's not lengthy.  It's not
20   going to take a long time, and there are subheadings to the
21   grand jury statement, and each of those subheadings are
22   matters that Mr. Ma testified to on direct examination.  Each
23   of those subheadings are matters that he was attacked on on a
24   number of bases by each of the defendants' counsel.

25               THE COURT:  Okay.  Anything else?  Then we're going

1    to take a break while I consider your arguments.

2              MS. BELL:  Yes, Your Honor.

3              Sorry, I'm trying to -- go ahead.

4              MR. BLEGEN:  I wrote her a very sloppy note.  Can I

5    just explain it, Judge?

6              MS. BELL:  One other point, but go ahead.

7              MR. BLEGEN:  The biggest issue of this, and I don't

8    know this was fully addressed by the government, is we're not

9    saying we did not attack this witness's credibility, okay?

10   That was a Ketchum argument.

11             The argument here is that they can't put in the

12   entirety of the grand jury testimony, particularly when it is

13   not consistent, which is what they have to be doing here, with

14   the testimony at trial.  And here's the biggest one.

15             Can I have my note back, by the way?

16             On direct in the smoke bomb area, David Ma said that

17   he used euphemisms to talk about what he wanted -- what he

18   wanted to say and doesn't remember the exact words.  He

19   said -- so he did not say exact words.  But in the grand jury,

20   they have him saying exact words:  "I told Agarwal that I was

21   not comfortable with the business practice of selling

22   inventory that we did not have."

23             He definitely did not say that on direct in this

24   courtroom.  He used the word "euphemisms" to describe what he

25   was talking about.

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 148 of 289 PageID #:15536
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

2977

1           Those two things are not consistent.  As Ms. Bell
2    pointed out, if they wanted to address that, they should have
3    done it as a prior inconsistent statement or refresh his
4    memory.  They didn't do that.  And, of course, there's a big
5    distinction between the two because one comes in
6    substantively, which they want to do now and will argue that
7    in closing.  The other does not.
8           THE COURT:  All right.
9           MS. BELL:  And, Your Honor, I'm sorry, I just wanted
10   to -- sorry, because I know you don't like us to tag team, but
11   this is a very important issue for us, and I did want to
12   actually directly respond to what the prosecutor just brought
13   up.
14          Two points on that:  The passage that he read, again,
15   makes it quite clear that this is not -- the testimony on
16   direct was not these were her exact words.  He says, well,
17   from my memory this is more of a general idea.  It's not even
18   clear if this is part of his understanding, which is what was
19   asked at line 16, or if he's attributing this to her.
20          Certainly, certainly the statement is extraordinarily
21   specific and is quite clear about what he's attributing to
22   her, and I would say at best then, I would expand our request
23   to say that everything should be excised except for "Agarwal
24   responded to my concern by saying that Context throws smoke
25   bombs and that others could not see what was happening behind

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 149 of 289 PageID #:15537
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2978

1    the smoke."

2          That's at best what you get, and even then, I don't

3    think that's faithful to what was actually elicited on direct.

4    Again, the government had the tools at its disposal to clean

5    this up and to have very precise testimony exactly along the

6    lines previously elicited.  They chose not to do that.  They

7    have to live with those consequences.

8          The second point, again, the case that was cited by

9    the prosecutor, we've just pulled it up, but our quick read

10   here is that the Court took exactly the approach that we're

11   advocating for, that Mr. Blegen advocated for, where there was

12   a statement-by-statement -- I think nine statements listed

13   there, and it was an individualized assessment of whether

14   these, in fact, fit within the rule.

15         And, again, I haven't had time to absorb it all, but

16   that's based on our quick read here.  Perhaps I can cite the

17   page to the Court.  It's at -- go ahead.

18              MR. LOWDER:  I think it was 488 was --

19              MS. BELL:  This is *United States v. Cox*.  No?

20              MR. LOWDER:  Yeah, admissibility of prior statement.

21              MS. BELL:  We'll take another look at the case, Your

22   Honor.

23              THE COURT:  All right.

24              MS. BELL:  But certainly the case, again, stands for

25   the proposition what we're talking about is prior consistent

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 150 of 289 PageID #:15538
Case: 24-2230    Document: 34         Filed: 04/04/2025    Pages: 322

2979

1    statements, and that's the crux of our issue is that this just

2    is not one.

3              MR. POULOS:  Very briefly, Your Honor, if I may.  The

4    *Cox* case right at the beginning of page 47, I believe -- 847,

5    it points out that the child victim in a child sex abuse case

6    testified that a photograph was taken of him during the

7    incident.  It goes on to say:  "During cross-examination,

8    Child 3 told defense counsel he did not recall the events of

9    the night until he was shown photographs.  On redirect exam,

10   Child 3 clarified that he recalled the events prior to being

11   shown the photographs.

12             "Subsequently, an agent testified that prior to the

13   agent showing Child 3 the images, Child 3 informed the agent

14   that he was aware of the fact that nude photographs were taken

15   of him."

16             So that is -- that, too, that is at least one of the

17   examples in this case, where the entire -- the agent -- the

18   agent wasn't allowed to testify here's everything the child

19   told me, but it was that targeted approach to introducing the

20   prior consistent statement on specific issues that -- on --

21   where credibility had been attacked.

22             Thank you.

23             THE COURT:  All right.  Any last word by the

24   government?

25             MR. APPLEBY-BHATTACHARJEE:  I would just cite as a

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 151 of 289 PageID #:15539
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2980

1    continuation of our discussion about what Mr. Ma said on

2    direct, if the Court could look at 2426, starting at line 9,

3    and continuing through line 17.

4            THE COURT:  Okay.  There may -- I think on some of

5    these -- before I say any more, let me read over some of the

6    cases and cites to the transcript you noted.

7            We broke at 12:10, I believe.  So let's come back

8    here at -- let's come back here at 1:00, and you may have to

9    redact some of this grand jury transcript and read in parts

10   that you can argue are consistent with the witness's

11   testimony.

12           This mechanism is not meant to bolster a witness's

13   testimony by simply repeating what they said on direct exam

14   and was not shaken on cross.  It's -- I think even the

15   advisory notes say that the amendment does not change the

16   traditional and well-accepted limits on bringing prior

17   consistent statements before the fact finder for credibility

18   purposes.  It does not allow impermissible bolstering of a

19   witness.

20           So you may want to discuss with the defense if there

21   are portions of this that don't satisfy the requirements of

22   the rule.  I'm not sure just -- I am -- I think the general

23   challenge to credibility may not be enough to just put in an

24   entire grand jury statement, even though it's limited, it's

25   only eight pages.

**SA74**

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 152 of 289 PageID #:15540
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2981

1          But -- and the other part I'm wondering is why the
2   government on redirect could not simply exhaust the witness's
3   memory on an incident; ask if the grand jury testimony
4   refreshes memory, show it to him, and have him testify from
5   his refreshed memory.  It comes in substantively if it's
6   refreshed memory.  If it's not, it's not, he doesn't remember.

7          But that seems another way to presumably accomplish
8   what the government's trying to do with this statement, at
9   least on particular areas.

10          MS. BELL:  And --

11          THE COURT:  Go ahead.

12          MS. BELL:  Your Honor, we would object to that
13   because that would be beyond the scope.  They could have done
14   that on direct, but that was not something that was challenged
15   in that fashion on cross-examination.  It wasn't -- it wasn't
16   probed beyond that.  So now to get -- to have the government
17   get back up and bolster the witness's testimony in a fashion
18   that they chose not to elicit on direct, I think that would be
19   improper.

20          THE COURT:  That objection will be overruled if
21   that's how it happened.

22          Okay.  See you at 1:00.

23      (Court adjourned, to reconvene at 1:00 p.m. on 2/15/23.)

24

25

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

UNITED STATES OF AMERICA,           )
3                                   )
                                    )      Docket No. 19 CR 864
4                Plaintiff,         )
                                    )      Chicago, Illinois
5        v.                         )      February 15, 2023
                                    )      1:06 p.m.
6   RISHI SHAH, SHRADHA AGARWAL,    )
    BRAD PURDY,                     )
7                                   )
                 Defendants.        )
8

9            TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 11B
           BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:    MR. MATTHEW F. MADDEN
13                          MR. SAURISH APPLEBY-BHATTACHARJEE
                            Assistant U.S. Attorneys
14                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
15

16                          MR. WILLIAM E. JOHNSTON
                            MR. KYLE C. HANKEY
17                          U.S. Department of Justice
                            Criminal Division, Fraud Section
18                          Washington, D.C.  20530

19

20

21

22                     ELIA E. CARRIÓN
                      Official Court Reporter
23                 United States District Court
              219 South Dearborn Street, Room 1432,
24                  Chicago, Illinois 60604
                       (312) 408-7782
25              Elia_Carrion@ilnd.uscourts.gov

**SA76**

```
 1    APPEARANCES (Continued:)

 2
      For Defendant
 3    Shah:                    MR. JOHN C. HUESTON
                               Hueston Hennigan LLP
 4                             620 Newport Center Drive, Suite 1300
                               Newport Beach, California  92660
 5
                               MS. VICKI CHOU
 6                             MR. MICHAEL H. TODISCO
                               MS. KAREN DING
 7                             Hueston Hennigan LLP
                               523 West 6th Street, Suite 400
 8                             Los Angeles, California  90014

 9
      For Defendant
10    Agarwal:          MS. KOREN L. BELL
                               MR. A. ALEXANDER LOWDER
11                             MR. STEPHEN G. LARSON
                               Larson LLP
12                             555 South Flower Street, Suite 4400
                               Los Angeles, California  90071
13
                               MR. PATRICK W. BLEGEN
14                             MS. KELSEY H. KILLION
                               Blegen & Garvey
15                             53 West Jackson Boulevard, Suite 1437
                               Chicago, Illinois  60604
16
17    For Defendant
      Purdy:                   MR. THEODORE T. POULOS
18                             MR. ERIC PRUITT
                               MR. JOHN PAVLETIC
19                             Cotsirilos, Tighe, Streicker, Poulos &
                               Campbell, Ltd.
20                             33 North Dearborn Street, Suite 600
                               Chicago, Illinois  60602
21

22

23

24

25
```

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 155 of 289 PageID #:15543
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2984

1          (Proceedings heard in open court, jury out:)

2          THE COURT:  All right.  We're bringing the jury back

3   in a few minutes.

4          At least as to the part that was highlighted, I read

5   over the direct testimony of Mr. Ma -- why don't we shut that

6   door, please.

7          I read over the direct testimony of Mr. Ma.

8          Thank you.

9          And he did say in -- either in substance or

10  identically the following things that I've discerned from the

11  grand jury testimony:

12          "I told Agarwal that I was not comfortable with the

13  business practice of selling inventory that we did not have.

14  Agarwal responded to my concern by saying that Context throws

15  smoke bombs and that others could not see what was happening

16  behind the smoke.  She further stated that by the time the

17  smoke dissipated, Context would have cleaned up its operations

18  and everything would be fine."

19          The part at the beginning of this section, I was

20  reporting to Shradha Agarwal, I had a conversation with her

21  about the deltas, there's nothing in her -- in his direct

22  testimony about reporting deltas to Shradha Agarwal.

23          And then after the last sentence I read where we

24  begin, Agarwal stated Context had inconsistent growth cycles

25  where the company grew fast one year and then spent the next

**SA78**

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 156 of 289 PageID #:15544
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

2985

1   year cleaning up, that was not in direct testimony.

2           Agarwal appeared unconcerned with this practice and

3   stated this is how Context had grown in the past, the Context

4   conversation about deltas lasted less than 15 minutes even

5   though the meeting itself lasted longer, none of that was in

6   the direct testimony that I could discern.  For it to come in

7   as a prior consistent statement, it has to be in the direct

8   testimony.  There were questions raised on cross-examination

9   about how much of this discussion was by euphemisms and no

10  direct statements were made.  No direct statements were made

11  about these topics, but that's inconsistent with what was said

12  on direct, and therefore, this prior consistent statement,

13  this portion of it, will be admissible as a prior consistent

14  statement, be read to the jury if that's the method the

15  government is going to use it.

16          For the same reason that the credibility of the

17  witness was challenged on this statement, you could, if you

18  chose to do so, seek to refresh his memory.  I don't think

19  that's improper when his credibility has been challenged on

20  this particular portion of the conversation with Ms. Agarwal.

21  If he says that the grand jury testimony might refresh his

22  memory, he's free to look at it and can testify from refreshed

23  memory.  That would be admitted substantively just as this

24  portion of the consistent grand jury testimony, consistent

25  with his direct testimony, is also admitted substantively

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 157 of 289 PageID #:15545
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2986

1    under the 801(d)(2) rule we've been talking about.

2           Now, that doesn't address the other seven and a half

3    pages of this.  I don't know if the government intends to

4    offer it.  I don't know if you've reached agreement with the

5    defense on portions that are redacted that are not consistent

6    with his direct testimony or were not even mentioned in his

7    direct testimony.  That will be improper.  That's just

8    bolstering.  But -- or just adding things in the grand jury

9    that were not brought out on direct.

10          So have you talked to the defense about this at all?

11          MR. APPLEBY-BHATTACHARJEE:  We have, Your Honor.  The

12   conversation we were able to have during the lunch break was

13   with counsel for Purdy, and we did discuss in good faith.  I

14   just think there's too much daylight between the parties'

15   positions here.  Purdy is of the position that none of the

16   grand jury testimony should come in.  What I am prepared to

17   proffer, and I may put it up on the ELMO if it would help the

18   parties --

19          THE COURT:  Sure.

20          MR. APPLEBY-BHATTACHARJEE:  -- is other portions that

21   we would intend to read in instead of the whole thing.

22          So first, I have page 1 of the grand jury statement

23   on the record.  We're not intending to read any of that in.

24   Starting on page 2, I've highlighted a paragraph related to

25   conversations that Mr. Ma had with Purdy about list-match

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 158 of 289 PageID #:15546
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2987

 1   methodology and specifically the loose-match methodology that
 2   was questioned about both on direct examination and cross.
 3            THE COURT:  All right.  This was covered on direct.
 4            MR. POULOS:  Judge, I do object to the reference
 5   to -- at the end of that first sentence saying "overstating
 6   inventory."  He never said anything along those lines with
 7   respect to Brad Purdy.  He only said Brad Purdy discussed with
 8   him using the first statement, loose match, to get a larger
 9   cut.
10            So I don't mind the -- you know, well, when I say I
11   don't mind, so I would ask that it end -- the first sentence
12   end at used just -- "methodology used in the list match."
13   There wasn't any direct testimony from him involving Brad
14   Purdy involved in projecting and overstating inventory.  In
15   fact, his testimony is that that is something that he and
16   Desai ended up deciding after employing methodology and list
17   match.
18            THE COURT:  All right.  So you're suggesting it stop
19   at "list-match process"?
20            MR. POULOS:  That sentence stop at "list match."
21            THE COURT:  "Process."  The word "process," I mean,
22   it adds nothing, subtracts nothing, but you're suggesting a
23   period after "process"?
24            MR. POULOS:  And --
25            THE COURT:  And does the government object?  Do you

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 159 of 289 PageID #:15547
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2988

1    want the rest of that sentence in?

2        MR. APPLEBY-BHATTACHARJEE:  Well, we do believe he

3    discussed the implication -- in the context of discussing the

4    list-match methodology he was taught by Brad Purdy, he did

5    discuss the implication of that was to project and overstate

6    inventory.  There was attacks on cross-examination along the

7    lines that the overstating inventory piece was something that

8    was done solely between Ma and Desai, and this is a prior

9    consistent statement.

10       THE COURT:  All right.  I agree.  Keep going.  Is

11   there any other objection to this paragraph?

12       MR. BLEGEN:  Judge, I don't believe the last

13   sentence, my understanding was these list-match results were

14   often represented by salespeople to clients as Context's

15   current inventory, I don't think that was brought out on

16   direct.

17       MR. APPLEBY-BHATTACHARJEE:  We can remove the last

18   sentence.

19       THE COURT:  All right.

20       MR. APPLEBY-BHATTACHARJEE:  So just for the record, I

21   understand we're doing this with blue and red ink.  The blue

22   as we go along will indicate the paragraphs that the

23   government has narrowed, and the red will indicate further

24   redactions.  We will circulate the revised redacted version

25   before redirect to make sure we're all on the same page.

1          THE COURT:  All right.  So I've ruled on the portion

2    of the Agarwal statement that's coming in.

3          On this one, you're seeking this entire paragraph,

4    and you're taking out the last sentence?

5          MR. APPLEBY-BHATTACHARJEE:  The last sentence, that's

6    right.

7          THE COURT:  Otherwise I do believe this is consistent

8    with his direct testimony in all substantive requests --

9    substantive aspects.

10         Go ahead.  Is there anything else you're attempting

11   to offer?  And I'll hear argument on why it shouldn't if --

12         MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.  Just

13   jumping ahead to the Agarwal statement, I want to make sure

14   that what I have here conforms with the Court ruling.  We'll

15   redact everything here except for the sentence starting, "I

16   told Agarwal," through the sentence ending, "operations and

17   everything would be fine."

18         THE COURT:  That's correct.

19         MR. APPLEBY-BHATTACHARJEE:  Okay.

20         THE COURT:  The rest is out.

21         MR. BLEGEN:  Judge, do we need to repeat our

22   objections to that or address your comments?

23         THE COURT:  No, you've addressed them.

24         MR. BLEGEN:  Okay.

25         THE COURT:  And I reviewed the direct testimony of Ma

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 161 of 289 PageID #:15549
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2990

1    over lunch, or over the break, and I believe these are all

2    statements he made on his direct testimony, certainly in one

3    form or another.  They weren't all consecutive.  They weren't

4    in this form in the sense that sentence after sentence after

5    sentence.  But I reviewed different parts of his direct

6    testimony where these were all included, and I believe there's

7    been a challenge to his credibility relating to in general,

8    but in particular to his statement that he used euphemisms, he

9    said that in his direct testimony too, but then he got into

10   the particulars beyond euphemisms.

11        So your objections are noted; but I believe for the

12   reasons I just stated, this is admissible as substantive

13   evidence when it's read in.

14        MS. BELL:  Your Honor, just to complete the record on

15   that, there was one -- one point that I wanted to make sure

16   was clear because my colleague told me I had not been

17   sufficiently clear which was just our position, and I'm not --

18   I know the Court has ruled so I'm not asking the Court to

19   revisit.  Simply that our position is to the extent these

20   other portions were discussed, they were discussed in the

21   context of a question about Mr. Ma's understanding and not

22   Ms. Agarwal's words.  But I understand the Court has overruled

23   that.  I simply wanted our position to be clear, and I was

24   told I had not been sufficiently clear about that.

25        THE COURT:  No, I read the testimony carefully.

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 162 of 289 PageID #:15550
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

2991

1              MS. BELL:  I understand.

2              THE COURT:  It was not Ms. Agarwal's understanding.

3      That was not something I considered.  I considered what he

4      said the defendant said, what he testified the defendant said.

5              And on all these, I'm making an additional ruling

6      that under 403 these are more probative than prejudicial.

7      This is not new material that's coming in.  Were this

8      something new the government was throwing in and grand jury

9      testimony that was not elicited on direct, that would be

10     unfair and would be overly prejudicial.

11             And none of this is on unrelated topics.  This is the

12     wheelhouse of the case.  So it's not a matter of something

13     unrelated being put in to bolster a witness's credibility.

14     These are statements that go directly to relevant issues in

15     the case.

16             Anything else you're attempting to offer?

17             MR. APPLEBY-BHATTACHARJEE:  Yes, Your Honor.  So

18     page 3, we are not offering anything.  That will all be

19     redacted.

20             Page 4, starting at the bottom, let me see if I can

21     fit this on the screen at the same time.

22             THE COURT:  Yeah, do it for everyone else.  I have it

23     here.

24             MR. APPLEBY-BHATTACHARJEE:  So starting with "in

25     early 2015" and continuing to the next page on the bottom,

1    just the bottom of the section above "False Tablet Metrics."

2              THE COURT:  Okay.  And first question is, is there an

3    objection to this?

4              MR. POULOS:  I'm sorry.  Forgive me.  I'm trying to

5    keep track.  You're going to scratch the last sentence at the

6    bottom of page 2?  You're not going to offer anything on

7    page 3?

8              MR. APPLEBY-BHATTACHARJEE:  Correct.

9              MR. POULOS:  And now we're -- nothing on page 4?

10             MR. APPLEBY-BHATTACHARJEE:  So we're starting on

11   page 4 at the bottom, the paragraph starting "in early 2015."

12             MR. POULOS:  Thank you.  Okay.

13             MR. APPLEBY-BHATTACHARJEE:  Continuing on to the next

14   page through the -- just the bottom of that -- everything

15   under the subheading before "False Tablet Metrics."

16             MR. LOWDER:  Do you have anything else, Ted?

17             MR. POULOS:  On page 4, no.

18             MR. LOWDER:  So the objection there, Your Honor, is

19   to that last sentence where -- just so we're on the same page,

20   where it says, "I started calculating deltas for particular

21   campaigns no later than November 2014."  And then he writes,

22   or then the statement writes:  "Senior management, including

23   Rishi Shah and Shradha Agarwal, used the delta reports."  So

24   we would object to that reference to the delta report because

25   his testimony even on direct wasn't that he gave those delta

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 164 of 289 PageID #:15552
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

2993

 1  reports to senior management or that they were relying on
 2  them.  In fact, he said he didn't know one way or the other
 3  whether they used them.  I do think it got out that the growth
 4  model was something that was used and relied on.  I think he
 5  did testify that he even met to discuss the growth models.
 6  But I think this is a very material difference between his
 7  direct testimony and what this statement says.
 8              THE COURT:  Okay.
 9              Response?
10              MR. APPLEBY-BHATTACHARJEE:  I think to expedite this,
11  Your Honor, this sentence starting at "senior management" and
12  continuing to "growing the network" on the next page, we would
13  be willing to redact in the middle of that paragraph and then
14  keep everything -- our position would be to keep -- everything
15  else is consistent with his direct testimony.
16              MR. LOWDER:  For team Agarwal, we'll appreciate that
17  concession.  And it's still our objection that we don't think
18  this should come in, but we're willing to move forward with
19  that.
20              THE COURT:  All right.  Anything else from any other
21  defendant on that -- on these two paragraphs with -- with the
22  redactions noted?
23              MR. TODISCO:  No further objection.
24              MR. POULOS:  And then you intend to introduce the
25  remainder of the grand jury statement?

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 165 of 289 PageID #:15553
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2994

1            MR. APPLEBY-BHATTACHARJEE:  I haven't gotten there

2    yet.

3            THE COURT:  Off the record.

4          (Off the record.)

5            THE COURT:  Back on the record.

6            Any other objection to these two paragraphs under

7    the -- that begin on the bottom of page 4, complete on top of

8    page 5?  He's got them, so the last words are "significant

9    inventory gap."

10           MR. LOWDER:  I just confirmed with Mr. Todisco.  I

11   think we're --

12           THE COURT REPORTER:  Microphone, please.

13           MR. LOWDER:  I'm sorry.

14           For Ms. Agarwal, I think with that one sentence that

15   was marked from page -- I've got my pages mixed up.  At the

16   top of the page pulled over, I think we're fine.

17           THE COURT:  All right.  Reserving all previous

18   objections, and that applies to everyone.

19           Anything from -- for defendant Shah that hasn't been

20   stated already?

21           MR. TODISCO:  Nothing further.

22           THE COURT:  Okay.  Yeah, I think this was all

23   testified to on direct examination.  And I've already

24   testified -- I've already found that there was significant

25   challenges by each defendant to the credibility of the

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 166 of 289 PageID #:15554
Case: 24-2230    Document: 34         Filed: 04/04/2025    Pages: 322

2995

1    witness.

2              Okay.  What else?

3              MR. APPLEBY-BHATTACHARJEE:  So then we would intend

4    to move in everything under the subheading "False Tablet

5    Metrics."

6              THE COURT:  All right.  This -- the easy part.  Any

7    objection by Agarwal and Shah?

8              MR. TODISCO:  No objection.

9              MR. LOWDER:  No objection.

10             THE COURT:  All right.  Mr. Purdy?  For Mr. Purdy?

11             MR. POULOS:  Your Honor, first at the bottom of

12   page 5, the sentence about, "However, pharma clients expected

13   to receive," I think we -- look, anything is admissible in the

14   grand jury, Judge.  He clearly had no personal knowledge of

15   that.  And when asked on cross-examination, he said, well,

16   that was my conclusion because they bought tablets.  So I

17   would ask that that be stricken.

18             THE COURT:  If this came in on direct, it was

19   probably -- if the question was asked undoubtedly would have

20   been objected to.

21             MR. APPLEBY-BHATTACHARJEE:  I have no quarrel with

22   redacting that statement.

23             THE COURT:  All right.

24             MR. APPLEBY-BHATTACHARJEE:  And we'll take care of

25   that.

**SA89**

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 167 of 289 PageID #:15555
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2996

 1              THE COURT:  All right.  Anything else on that

 2     paragraph?

 3              MR. POULOS:  Going on to page 6.  Nothing with

 4     respect to page 5 further on tablet metrics.

 5              THE COURT:  All right.  Anything on 6?

 6              MR. POULOS:  Are you --

 7              THE COURT:  I mean, you're obviously disputing what

 8     he says.  That's your case.  But I don't -- none of this jumps

 9     out at me as inconsistent with his direct testimony.  If you

10     can point this out, but this was, again, this is the

11     wheelhouse of the case, what it's about.

12              MR. POULOS:  Yeah, as to this, I will -- well, I'm

13     going to stand on my objection that I did not impeach him on

14     any of these things, Judge.

15              THE COURT:  Understood.

16              MR. POULOS:  I just want to be clear.  And I will

17     establish on recross how misleading this is.

18              THE COURT:  Okay.  Then this can be read in.

19              MR. APPLEBY-BHATTACHARJEE:  We've talked about the

20     smoke bomb section.

21              THE COURT:  Correct.

22              MR. APPLEBY-BHATTACHARJEE:  The only -- so we're

23     obviously not going to read in the conclusion paragraph --

24              THE COURT:  Right.

25              MR. APPLEBY-BHATTACHARJEE:  -- unless the defendants

Case: 1:19-cr-00864 Document #: 592 Filed: 11/29/23 Page 168 of 289 PageID #:15556
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

2997

 1    want us to.

 2          We'd move in the entirety of the paragraph under the

 3    subheading "Leaving ContextMedia."  And to --

 4          MR. LOWDER:  Yeah.  So, Your Honor, I think one of

 5    the pieces here that is really jumping out about the repeated

 6    references to fraud in this paragraph which he refrained even

 7    on assertion to say throughout his testimony, like, well, I

 8    don't know what fraud is, I'm not a lawyer.  And so that's

 9    definitely inconsistent with his testimony over the last, you

10    know, two and a half days, three days.

11          THE COURT:  Response?

12          MR. APPLEBY-BHATTACHARJEE:  I agree with that.  So I

13    suppose we could just end, "I left Context in October 2015,"

14    and redact the rest.

15          MR. LOWDER:  I think that's great.

16          THE COURT:  Sure.  Redact the rest of the paragraph.

17          MR. APPLEBY-BHATTACHARJEE:  No, the rest of the

18    sentence.

19          THE COURT:  Rest of the sentence, okay.  All right.

20          MR. LOWDER:  Well, it's throughout though,

21    Your Honor.

22          MR. POULOS:  It's in the second sentence too.

23          THE COURT:  And it's -- he decidedly refrained, in

24    fact, wouldn't buy into the idea fraud was being committed as

25    part of the cross.  And the use of the word "fraud" here is

 1  not something he admitted to on direct, nor on cross.  So

 2  references to fraud and -- have to be taken out.

 3          MR. APPLEBY-BHATTACHARJEE:  If we ended it at

 4  "bothered," would that address the objection?

 5          MR. LOWDER:  Sorry.

 6          MR. TODISCO:  To that sentence.

 7          MR. APPLEBY-BHATTACHARJEE:  To that sentence.

 8          THE COURT:  Yeah.  Well, certainly he didn't say on

 9  direct that Context was regularly defrauding its clients.  So

10  put a period after bothered, that I think that takes out the

11  defrauding.

12          Anything -- the false numbers he admitted to.

13          MR. APPLEBY-BHATTACHARJEE:  We're going to volunteer

14  to just take out the "as time passed" sentence.

15          THE COURT:  All right.

16          MR. APPLEBY-BHATTACHARJEE:  In its entirety.

17          MR. POULOS:  And the next one too, please.

18          MR. TODISCO:  Yeah, the next one is related.

19          THE COURT:  One at a time.

20          MR. POULOS:  Sorry, Judge.

21          MR. APPLEBY-BHATTACHARJEE:  No objection to that from

22  the government.  So we would pick up at "in the first half of

23  2017."

24          THE COURT:  Okay.  That also appears consistent with

25  his direct testimony.

1           Any objection to that being read in by the defense?

2           MR. LOWDER:  No additional objections, Your Honor.

3           MR. POULOS:  Nothing further.

4           MR. TODISCO:  Nothing further.

5           THE COURT:  All right.  So --

6           MR. APPLEBY-BHATTACHARJEE:  I'm going to make the

7  redactions right now.  I'll circulate it to the defense group.

8           THE COURT:  That's fine.

9           MR. APPLEBY-BHATTACHARJEE:  We'll just communicate by

10  e-mail, make sure everyone is on the same page and then we'll

11  load it into TrialDirector.

12          THE COURT:  Okay.  And you've got some more --

13  Mr. Todisco, you've got some more direct testimony -- or

14  cross-examination, correct?

15          MR. TODISCO:  Yeah.  I hope it will be brief.

16          MR. POULOS:  Saurish, would you be kind enough to

17  bring hard copies of it?  I don't have --

18          MR. APPLEBY-BHATTACHARJEE:  I'll ask someone to bring

19  one up.

20          THE COURT:  We're going to bring in the jury, and you

21  could have the witness come in, please.

22          Off the record.

23       (Off the record.)

24       (Jury enters.)

25          THE COURT:  Okay.  Please be seated.

1          MS. CHOU:  Nope.

2          MR. POULOS:  Ubriaco followed by Teal?

3          THE COURT:  Actually, let's go off the record.

4       (Discussion had off the record.)

5          THE COURT:  Okay.  Anything you want to put on the

6    record at all?  Government?

7          MR. MADDEN:  No, your Honor.

8          THE COURT:  Defense?

9          MS. CHOU:  No, your Honor.

10         MS. HALL:  No, your Honor.

11      (Trial adjourned at 4:22 p.m.)

12                        CERTIFICATE

13      I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled matter.

15   */s/ Elia E. Carrión*          *16th day of February, 2023*

16   *Elia E. Carrión*                      *Date*
     *Official Court Reporter*

17

18   */s/ Kathleen M. Fennell*     *16th day of February, 2023*

19   *Kathleen M. Fennell*                 *Date*
     *Official Court Reporter*

20

21   */s/ Kelly M. Fitzgerald*     *16th day of February, 2023*

22   *Kelly M. Fitzgerald*                 *Date*
     *Official Court Reporter*

23

24   */s/ Sandra M. Tennis*        *16th day of February, 2023*

25   *Sandra M. Tennis*                    *Date*
     *Official Court Reporter*

5296

1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                         EASTERN DIVISION

3    UNITED STATES OF AMERICA,          )
                                        )    Docket No. 19 CR 864
4                    Plaintiff,         )
                                        )    Chicago, Illinois
5        v.                             )    March 6, 2023
                                        )    8:46 a.m.
6    RISHI SHAH, SHRADHA AGARWAL,       )
     and BRAD PURDY,                    )
7                                       )
                     Defendants.        )
8

9         TRANSCRIPT OF PROCEEDINGS - TRIAL VOLUME 20A
         BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11   APPEARANCES:

12
     For the Government:    MR. MATTHEW F. MADDEN
13                          MR. SAURISH APPLEBY-BHATTACHARJEE
                            Assistant U.S. Attorneys
14                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois  60604
15

16                          MR. WILLIAM E. JOHNSTON
                            MR. KYLE C. HANKEY
17                          U.S. Department of Justice
                            Criminal Division, Fraud Section
18                          Washington, D.C.  20530

19

20

21

22                     ELIA E. CARRIÓN
                     Official Court Reporter
23                United States District Court
            219 South Dearborn Street, Room 1432,
24                 Chicago, Illinois 60604
                      (312) 408-7782
25             Elia_Carrion@ilnd.uscourts.gov


                         **SA95**

1          (Proceedings heard in open court; jury out.)

2          THE COURT:  All right.  Ms. Bell, you had indicated

3     you wanted to put something else on the record and discuss the

4     redaction request by the government to the grand jury

5     testimony of Mr. Desai.

6          MS. BELL:  Yes, Your Honor.

7          THE COURT:  Go ahead.

8          MS. BELL:  Thank you, Your Honor.  We certainly

9     appreciate the time the Court has spent with this, and I know

10    the Court took time over the weekend to review the

11    supplemental briefing.

12         So I will address what I wanted to say with respect

13    to this tablet metric issue in particular, but this goes for

14    really almost everything in the grand jury statement.

15         And I'll explain why I say that.

16         THE COURT:  And is this something not in your brief?

17         MS. BELL:  It --

18         THE COURT:  I read your brief, and I read it several

19    times.  It was a supplemental brief, and I just want to make

20    sure.

21         If it's a matter of preserving something on the

22    record that you put in your brief, it's preserved.  If it's a

23    matter of adding a new argument, and in particular the issue

24    of the redaction of 2000 -- or the --

25         MS. BELL:  Yes.

**SA96**

1          THE COURT:  -- I think it was 2014 versus 2015, the

2    government offered to redact part of the grand jury statement.

3    In looking at it, I thought maybe you wouldn't want to redact

4    it, but --

5          MS. BELL:  That's correct, Your Honor.  And I will

6    specifically address that.

7          I think it was -- it was in my brief, but I'm not

8    sure that it was adequately conveyed.  And that's what I want

9    to make sure.  So it may be a matter of preserving the record,

10   it may be a matter of additional argument, but I will be brief

11   about it in -- in either way.

12         THE COURT:  Go ahead.

13         MS. BELL:  So, Your Honor, and just to set the stage,

14   as I think the brief conveyed, our position is that the -- the

15   rule, the plain text of the rule but also the committee's

16   notes to the rule, make quite clear that the rule only applies

17   where the declarant testifies and is subject to

18   cross-examination about a prior statement.  So it's a

19   statement-by-statement analysis.

20         That preamble did not change with the addition of --

21   of Subsection 2.  And then Subsection 2 itself, it's -- you've

22   got Subsection 1 which deals with attacks to -- where -- where

23   the attack is based on a motive to lie.  And then you've got

24   Subsection 2 which on its face says, okay, where the declarant

25   testifies and is subject to cross-examination about a prior

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 5 of 307 PageID #:17863
Case: 24-2230    Document: 34      Filed: 04/04/2025    Pages: 322

5300

1    statement and the statement -- meaning that specific

2    statement -- is consistent with the declarant's testimony and

3    is offered -- and that's where you get into either, one, which

4    goes to -- where it's challenged on -- to rebut an express or

5    implied charge of a motive to lie, or, in the disjunctive,

6    two, to rehabilitate the declarant's credibility as a witness

7    when attacked on another ground.

8          And we know, and the Court has held, that that other

9    ground goes to things like faulty memory or inconsistency.  So

10   we're talking about when the declarant -- when testimony is

11   elicited on direct that's challenged on cross-examination as

12   to that particular statement and then the prior consistent

13   statement rehabilitates.

14         Here's the issue with the tablet metrics.  It's not

15   just about the date.  It's materially different in almost

16   every respect, which is precisely why, Your Honor, we made the

17   very careful strategic decision not to challenge that

18   statement or the other significant statements as to our

19   clients mentioned in the grand jury statement.

20         And I'll just go through them.  That includes

21   Pradaxa, it includes deltas, and it includes the David Jundt

22   text message.  Those were all areas in addition to this tablet

23   metric testimony which we excised from our planned

24   cross-examination because the testimony came in in a way that

25   was much better and materially different for us than what was

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 6 of 307 PageID #:17864
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

5301

1    drafted by the government in the grand jury statement.

2          Now, just to focus on the tablet metric, the reason

3    why I say that I do not see how under the plain text of the

4    rule and under the committee's notes to the rule this can

5    reasonably or plausibly be read to rehabilitate the witness is

6    that when there's no -- when there's no cross-examination at

7    all, the only purpose would be to bolster the witness's

8    testimony.  And that's exactly what we see here.

9          We have the added problem with the tablet metrics

10   that it really is materially different.  And I'll explain to

11   the Court.  That's the part that perhaps was not clear enough

12   in our submission, why am I saying it's materially different.

13         But just on the first part, the text of the rule, it

14   has to rehabilitate.  It can't just bolster.  And that is

15   quite clear in the committee's notes, that it is not a proper

16   use of the prior consistent --

17             THE COURT:  Slow down a little.

18             MS. BELL:  Sorry.

19         It is not a proper application of the prior

20   consistent statement rule to use it as a -- as a way to

21   bolster testimony.

22         And I'll just tell the Court, in my experience, I

23   have never seen -- and perhaps things are different, I've

24   never tried a case in this district or this circuit -- but I

25   have never, ever seen a nonsurgical application of the rule

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 7 of 307 PageID #:17865
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

5302

1 where the government just dumps in wholesale an entire
2 statement drafted the way the government wants, paragraph
3 after paragraph, when we did not -- not only did we not touch
4 certain areas of this, we actually underscored, so things
5 about Desai's background that are also drafted into the
6 grand jury statements were things we actually elicited and
7 underscored and -- and, we think, are helpful to our case and
8 our theory, the -- which -- which goes to, as I said in the
9 brief, blaming Desai for the fraud, showing that he had the
10 motive and the motivations is materially different than
11 challenging his credibility.

12        And the prior consistent statement rule, the way --
13 for what it's worth, the way it's always come up in my trials
14 is it's a very surgical application, such as when a witness
15 invokes under the Fifth Amendment.  It's a
16 statement-by-statement analysis based on the plain text of the
17 rule which, again, requires that the declarant testifies about
18 a particular statement, is subject to cross-examination about
19 that statement.  And then the prior consistent statement on
20 that very specific point is introduced in order to
21 rehabilitate the witness on that point.

22        Not dumped in wholesale.  It's not rehabilitating the
23 witness because you're blaming the witness or rehabilitating
24 the witness because you challenged the witness on another
25 basis.  I did challenge the witness's credibility, and I

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 8 of 307 PageID #:17866
Case: 24-2230   Document: 34      Filed: 04/04/2025   Pages: 322

5303

1    challenged the -- the motive to lie on other points, which are

2    not even covered in the grand jury testimony, such as

3    Exhibit 271, 273, which is the depression studies example.

4         So there -- and the -- another example would be the

5    analysis -- the analysts.  I certainly challenged his

6    credibility on that.  I did not challenge his credibility

7    about the tablet metrics.  So let me just go to that in

8    addition to that sort of overarching issue with the

9    government's approach here.

10        With respect to the tablet metrics in particular, as

11   I mentioned, it's not just the date.  It's pretty much

12   everything about the statement is different.  So what was

13   testified on -- on direct -- and again, this was -- this --

14   and I will explain the significance, Your Honor, of this

15   statement, as it's the single only example Mr. Desai gave of

16   ever relaying -- purportedly relaying false information to our

17   client.

18        So it's a critical, critical point for us.  It was

19   the subject of much consideration how to address this.  And

20   the testimony on direct was as follows.  So this is at 3927 of

21   the transcript, lines 11 through 25.  And so I'll shortcut it

22   a bit.

23        But the government asked Mr. Desai on direct:  "Did

24   you share it with anyone else in the senior management team?"

25        And Mr. Desai responded:  "Yes.  I also shared it

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 9 of 307 PageID #:17867
Case: 24-2230   Document: 34       Filed: 04/04/2025   Pages: 322

5304

 1   with Shradha that we were using the top 5 percent of the
 2   tables" --

 3          And then it goes on, 3930 at lines -- 3930, line 13,
 4   to 3931, line 19.  And then Mr. Desai underscores three times
 5   over in the passage I'm going to read into the record that he
 6   raises this with her in the context of the operational issues.
 7   And he kind of sua sponte offers that up and makes it quite
 8   clear that that was the context of this discussion.

 9          And I'll explain why that's significant to us in
10   terms of our defense.  So he goes on as follows:  "With
11   Shradha, the discussions were more about the operational
12   issues with the tablet.  There were a number of problems we
13   had with the tablet either not being connected to the internet
14   or being unplugged.  And as part of that, I had shared how we
15   were doing the tablet metric reports using the best performing
16   tablets and extrapolating from them.

17          "Are you referring to the top 5 percent inflation
18   method?

19          "Yes.

20          "How did Agarwal -- was it a one-on-one meeting?

21          "It was during the discussions we had about the
22   tablet operational issues."

23          Second time he underscores that.

24          "Was this one conversation or multiple
25   conversations?"

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 10 of 307 PageID #:17868
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

5305

1            And then the witness says:  "I can't recall

2    specifically how the tablet metrics were being produced, was

3    one or multiple conversations.

4            "Was it a one-on-one conversation between you and

5    Agarwal?"

6            I guess that was asked twice.

7            "Yes.

8            "How did she respond when you explained how you were

9    inflating the metrics?

10           "She wasn't surprised the way we were doing it.

11           "When, approximately, did you discuss it with

12   Agarwal?"

13           Third time.

14           "During the same times that I was raising the

15   operational issues with the tablets with her.

16           "What year would that have been, approximately, if

17   you recall?

18           "ANSWER:  I believe sometime in 2015."

19           And so I'm going to stop there.

20           So that's quite different than what we see at the

21   grand jury statement at page 11 where the -- what the

22   government drafted for the witness is as follows:

23           "During approximately" --

24           THE COURT:  I've got it in front of me.

25           MS. BELL:  You've got it.  Okay.

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 11 of 307 PageID #:17869
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

5306

1        And so it's quite different because the whole -- to
2   start, the whole context of this was raised within the setting
3   of broader real operational issues.  And as the Court will
4   recall, we spent quite a bit of time on our cross-examination
5   flushing out that when the products department started
6   reporting up to Ms. Agarwal, one of the ways in which she
7   communicated with Mr. Desai, in addition to the HR and the
8   marketing and the office build, was with respect to these very
9   real operational problems.

10       And we discussed two of them on our
11  cross-examination, the Afrezza tablet exhibit and the
12  Invokana -- the audit that was done by Ms. Pierce.  So it's
13  quite significant and quite exculpatory, in our view, that
14  Mr. Desai three times over underscored that the -- any
15  discussion about tablet metric extrapolation was in the
16  context of these very real operational problems.  And we've
17  seen a lot of about that.

18       It's totally different the way this is presented in
19  the first sentence at page 11, which is just like, boom, I
20  told Ms. Agarwal how we were inflating the tablet metrics that
21  we sent to clients, including how we falsely extrapolated the
22  numbers using the top 5 percent of the results.  That's
23  entirely different.

24       It's also materially different --
25           COURT REPORTER:  Can you slow down, please?

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 12 of 307 PageID #:17870
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

5307

1          MS. BELL:  I'm sorry.

2          It's also materially different insofar as in his

3   direct testimony, he couldn't remember whether this was one

4   conversation or multiple conversations.  The way it's

5   presented in the grand jury testimony, it's as if he had a

6   discrete recollection of a conversation.

7          Third point, he says in the grand jury statement

8   drafted by the government, during approximately 2014 -- which

9   is presumably anytime between January of 2014 and December

10  of 2014, so you've got a whole swath of 12 months there --

11  that this -- what is presented, at least implied to be a

12  discrete conversation on this narrow point, a very direct

13  conversation on this narrow point.

14          Then what you have in the direct testimony, by

15  contrast, is sometime -- he can't exactly remember whether it

16  was one or multiple conversations.  But he believes it was

17  sometime in 2015.

18          So there are multiple ways -- this is really an

19  entirely different statement couched in an entirely different

20  way.  That's a huge part of our defense, as -- based on what I

21  explained to the Court, that we spent significant time

22  eliciting that there were these very real operational problems

23  that effectively camouflaged Mr. Desai's fraud.  That's our

24  argument.

25          And you can't just then excise the portions of the

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 13 of 307 PageID #:17871
Case: 24-2230    Document: 34        Filed: 04/04/2025    Pages: 322

5308

1    statement that make it materially inconsistent.  But I would

2    say, Your Honor, we don't even need -- this just illustrates

3    why this statement cannot reasonably be read to rehabilitate

4    Mr. Desai.  But we don't even really need to get to the fact

5    that it's materially inconsistent because I did not question

6    him about this at all.  I simply accepted his testimony on

7    direct because it was materially different.

8         And, again, that goes, Your Honor, for almost

9    everything in the grand jury statement with the exception of,

10   I think, one line.  The one line where I actually did

11   challenge Mr. Desai relates to, for example, at page 3, where

12   Mr. Desai says:  "In most cases, these projections were not

13   disclosed" -- I'm sorry.  This is the government's grand jury

14   statement.

15        "In most cases, these projections were not disclosed

16   to the Outcome salesperson who was communicating directly with

17   the client and, thus, the projections were not disclosed to

18   the clients."

19        That's an example where I did challenge him.  I did

20   challenge him based on prior inconsistent statements and other

21   examples.  And so that would go to the use of this particular

22   rule when it -- and that would be a Subsection 2 issue.

23        The other point I'll raise is that the government

24   doesn't dispute this.  I mean, if you look at the government's

25   brief at page 6, they don't claim that I touched deltas or

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 14 of 307 PageID #:17872
Case: 24-2230   Document: 34        Filed: 04/04/2025    Pages: 322

5309

1  Pradaxa or David Jundt's text message, who was one of the
2  analysts who complained, or -- or this issue of the tablet
3  metrics.
4          They say that I touched a whole bunch of other topics
5  there, and I explained why those topics don't constitute
6  attacks on credibility in -- in -- under the -- under the
7  meaning of --
8          THE COURT:  We're at 9 o'clock.  We're at 9 o'clock,
9  so...
10         MS. BELL:  Thank you, Your Honor.
11         THE COURT:  All right.  Well, do you want the -- the
12 excise that the -- the redaction the government wanted or not?
13         MS. BELL:  No, Your Honor.
14         THE COURT:  You do not.  Okay.
15         Don't redact that part.
16         I'll give you a chance to respond.  I suspect we're
17 not getting to this before the morning break.  I'll give you a
18 chance to respond.
19         And did you challenge his credibility overall, based
20 on his plea deal?
21         MS. BELL:  No.  I didn't touch his plea agreement.  I
22 didn't even mention it.
23         THE COURT:  In the opening?
24         MS. BELL:  The opening statement, I --
25      (Counsel conferring.)

 1            THE COURT:  You've got to go to the mic.

 2            MR. LOWDER:  Sorry about that.

 3            I did mention that he's a witness that should be

 4    dealt with great care because of the benefit.

 5            THE COURT:  Okay.

 6            MR. LOWDER:  But other than that, no, Your Honor.

 7            THE COURT:  All right.  Okay.  Let's see if we have

 8    our 9 jurors or -- 19 jurors.

 9            Go ahead.  Were you going to say something?

10            MR. APPLEBY-BHATTACHARJEE:  Two points, Your Honor.

11            I don't think we heard anything that's not already

12    been addressed in the briefing.

13            THE COURT:  We'll address this at the morning break.

14            So, Mr. Poulos, where are you and the government with

15    respect to these exhibits?

16            Move the mic forward, the one that's in front of you.

17            MR. POULOS:  I think we've resolved many of them.

18    The first objection is going to be to -- about the 23rd.

19            THE COURT:  Hold on one second.

20            (Pause in the proceedings.)

21            THE COURT:  All right.  We're going to bring in the

22    jury.  Do everything you can with exhibits that are not at

23    issue.

24            (Pause in the proceedings.)

25            THE COURT:  We've got a question, a reasonable

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 81 of 307 PageID #:17939
Case: 24-2230    Document: 34    Desai - Filed: 04/04/2025    Pages: 322

5376

1  make-goods that -- that were being worked on.  I just can't
2  recall specifically this one.
3  Q.  Okay.  In addition to Rexulti, do you recall that the
4  Bryan Morgans and the Liane Pierces of the company, also in
5  late 2016, disclosed under-delivery?
6        Let me back that up.  Bryan Morgan disclosed ROI
7  issues in connection with -- with Novartis campaigns?
8  A.  Yes.
9  Q.  The Novartis campaigns were Entresto and Gilenya, correct?
10 A.  Yes.
11 Q.  I want to focus on those for a minute.
12        THE COURT:  Well, it's 10:30.
13        Let's take our morning break, 15 minutes, ladies and
14 gentlemen.  Please don't discuss the case among yourselves or
15 with anyone else.
16        COURT SECURITY OFFICER:  All rise.
17     (Jury out at 10:30 a.m.)
18        THE COURT:  All right, sir, 15 minutes.
19        THE WITNESS:  Thank you, Your Honor.
20        THE COURT:  Is Mr. Bhattacharjee here or no?
21        MR. MADDEN:  He's not.  I can handle it.  I caught
22 the tail end of it, so I mean, I can...
23        THE COURT:  All right.  Brief response to what
24 Ms. Bell raised.
25        MR. MADDEN:  Your Honor, from what I heard, nothing

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 82 of 307 PageID #:17940
Case: 24-2230    Document: 34    Desai - recross/Pozolo    Pages: 322

5377

1   new has really been offered.  I mean, it really just covers

2   things that have already been addressed here.

3         There is absolutely ample basis -- your ruling is the

4   right one.  You -- you -- you know, you split the baby and

5   ruled against the government on the plea agreement, but the

6   grand jury statement should absolutely come in.  And it's

7   consistent with your prior rulings.

8         Desai's credibility has been impeached to an

9   extraordinary degree, of course, over the past -- probably

10  maybe setting a record in this courthouse for a full week of

11  cross-examination that who knows when it's going to -- who

12  knows when it will be over.

13        THE COURT:  Yeah, at this stage, I'm not sure either.

14        MR. MADDEN:  Yeah.  But anyways, there's -- they've

15  done nothing to undermine your ruling.  Your ruling is

16  accurate.  And it's very clear that Desai's prior statement is

17  consistent and it does rehabilitate him.

18        They're trying to add in additional requirements that

19  are not reflected by the rule.  If you look at the plain

20  language of the rule, his credibility has been attacked on

21  other grounds.  And we've established that in great detail in

22  our filings, and you should -- you should deny the motion to

23  reconsider your well-conserved ruling.

24        THE COURT:  All right.  The ruling is the same.

25  We'll give you a written order.

**SA110**

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 85 of 307 PageID #:17943
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

Desai - recross - Poulos

5380

1  at the two pages of exhibits that were given to me this
2  morning.

3         You know what they are, let us know as soon as
4  you know.  Then I can at least read them.  That's a good start
5  to deciding whether they're admissible or not.

6         I'll give you a few minutes to do that on the
7  assumption you're still working through it.

8         Okay.  Let's take a 15-minute break.

9         MR. PAVLETIC:  Your Honor, can I just put something
10 on the record very briefly?

11        THE COURT:  Go ahead.

12        MR. PAVLETIC:  I just wanted to clarify in terms of
13 the prior consistent statements that all our arguments are
14 preserved.  I seem to recall a comment made on the
15 government's reply that we were arguing some of these things
16 for the first time.  I just want to clarify that we've been
17 making these arguments since the first cooperator's --
18 cooperator's statement came in.

19        And all we've done in this recent briefing has just
20 been to articulate those objections in writing, synthesize
21 them into these two main arguments, and then support them with
22 authority.

23        And I understand, you know, Your Honor's ruled on
24 that.  But I want to be clear that, you know, we've been
25 making these objections from the jump.

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 86 of 307 PageID #:17944
Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322

Desai - recross - Poulos

5381

```
 1              THE COURT:  Okay.

 2              MR. PAVLETIC:  Thank you.

 3         (A recess was had from 10:36 a.m. to 10:48 a.m.)

 4              THE COURT:  Okay.  Anything we need to put on the

 5    record?  Pardon?

 6              MR. POULOS:  I don't think so.

 7              THE COURT:  Okay.  All right.  You can have the

 8    witness come in, then.

 9         (Off-the-record discussion.)

10              COURT SECURITY OFFICER:  All rise.

11         (Jury in at 10:50 a.m.)

12              THE COURT:  All right.  Please be seated.

13              Mr. Poulos, you may continue.

14    BY MR. POULOS:

15    Q.  I -- I had mentioned the Novartis campaigns for Entresto

16    and Gilenya.  Do you recall those?

17    A.  Yes.

18    Q.  So starting first with Entresto, there was a bad ROI.  You

19    recall that?

20    A.  Yes.

21    Q.  And then that was something that was discussed with

22    Adam Prowker, Liane Pierce, and others.

23              Do you generally recall that?

24    A.  Yes.

25              MR. POULOS:  Let's go to Exhibit 9049.
```

Case: 1:19-cr-00864 Document #: 601 Filed: 11/29/23 Page 307 of 307 PageID #:18165
Case: 24-2230    Document: 34       Filed: 04/04/2025    Pages: 322

5602

1      Kelly, you're done.  Thank you.

2         (Trial adjourned until 9:00 a.m., 3/7/202.)

3

4                          CERTIFICATE

5         We certify that the foregoing is a correct transcript

6     from the record of proceedings in the above-entitled matter.

7

8    */s/ Elia E. Carrión*              *March 7, 2023*
     _____        _____
9    *Elia E. Carrión*                       *Date*
     *Official Court Reporter*
10

11   */s/ Amy M. Spee*                 *March 7, 2023*
     _____        _____
12   *Amy M. Spee*                          *Date*
     *Official Court Reporter*
13

14   */s/ Kelly M. Fitzgerald*         *March 7, 2023*
     _____        _____
15   *Kelly M. Fitzgerald*                  *Date*
     *Official Court Reporter*
16

17

18

19

20

21

22

23

24

25

**SA113**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
|            ) | |
|        Plaintiff,    ) | Case No.: 19 CR 864-1, 2, 3 |
|            ) | |
| v.            ) | |
|            ) | Hon. Thomas M. Durkin |
| RISHI SHAH,        ) | United States District Judge |
| SHRADHA AGARWAL, and    ) | |
| BRAD PURDY        ) | |
|            ) | |
|        Defendants.    ) | |
|            ) | |

## <u>ORDER</u>

The Government filed a motion to admit a prior consistent statement, namely Jason Ketchum's statement to the grand jury given three and a half years ago. R. 366. Defendants Shah, Agarwal, and Purdy opposed the motion. R. 368. For the reasons stated in Court, that motion is granted. This Order supplements that ruling.

Federal Rule of Evidence 801(d)(1)(B) provides that a declarant-witness's prior statement is not hearsay where "the declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . . is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground . . . ." Fed. R. Evid. 801(d)(1)(B). The Rule was amended in 2014 to provide for the substantive admissibility of other categories of prior consistent statements. *See* Committee Notes on Rules – 2014 Amendment ("The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness -- such as the charges of inconsistency or *faulty memory*.") (emphasis added). As noted in the Committee Notes, the prior consistent statement must still satisfy Rule 403.

Ketchum's statement to the grand jury satisfies the Rule 801(d)(1)(B) criteria. First, it is undisputed that he will be subject to cross-examination about his statement to the grand jury, with the exception of one paragraph redacted based on an objection by Defendant Purdy. To the extent Defendants object to parts of Ketchum's statement to the grand jury for containing what they believe to be improper statements without foundation and other similar objections, Defendants can explore those statements on re-cross examination. Second, Ketchum's statement to the grand jury is consistent with his testimony on direct examination, with the exception of one paragraph that Defendant Purdy raised, which was redacted, as reflected in the record.

Third, Ketchum's statement to the grand jury is offered by the government both to rebut the charge that Ketchum recently fabricated his testimony before the jury or acted from an

improper influence or motive in so testifying and to rehabilitate his credibility having been attacked on other grounds. All three Defendants challenged Ketchum's credibility in a variety of ways. Defendant Shah pointed to the fact that Ketchum received letter immunity and, within the past week, statutory immunity. Defendant Shah also suggested that Ketchum changed his story over the course of 15 meetings with the government leading up to *and following* his grand jury testimony and showed Ketchum excerpts from FBI reports that suggested inconsistencies in his testimony. Defendant Agarwal highlighted Ketchum's faulty memory by showing Ketchum exhibits, including emails that he received, to suggest that his testimony on direct examination was based on an incomplete and inaccurate recollection of events. Defendant Purdy more subtly suggested inconsistencies in Ketchum's testimony regarding Defendant Purdy's involvement in the alleged criminal scheme.

To the extent that Defendant Purdy merely clarified Ketchum's perspective as opposed to meaningfully challenging Ketchum's credibility, there is still no prejudice to the admission of the prior consistent statement. The specific portion of the grand jury statement to which Defendant Purdy objected was not read into evidence or shown to the jury. The remaining content includes two statements related to Defendant Purdy's familiarity with spreadsheets that contained projections and knowledge that Outcome made ad sales to clients based on projections, both of which Ketchum testified to on direct examination. And notably, while Defendant Purdy maintains that he did not attack Ketchum's credibility, he has withdrawn his earlier request for any type of limiting instruction.

In short, Ketchum's statement to the grand jury was consistent with his direct examination, and his credibility was significantly challenged on cross-examination. Additionally, the probative value of the prior consistent statement is not substantially outweighed by any prejudicial impact. The prior consistent statement does not add anything new. There is no material difference between the statement and Ketchum's direct testimony. To the extent that the grand jury statement contains summary statements, those same summaries were either testified to on direct examination without objection or spelled out in greater detail upon objection.

Accordingly, Ketchum's statement to the grand jury, excluding the aforementioned paragraph, is admissible as a prior consistent statement under Rule 801(d)(1)(B). The Government may read the statement into evidence, but a copy of Ketchum's statement will not be sent back to the jury as an exhibit. If Defendants want the entire grand jury transcript read to the jury, not just Ketchum's statement, they should so request under the Rule of Completeness.

Dated: <u>February 9, 2023</u>

<u>Thomas M Durkin</u>
Hon. Thomas M. Durkin
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA,

      v.

RISHI SHAH, SHRADHA AGARWAL, AND
BRAD PURDY.

No. 19 CR 864

Judge Thomas M. Durkin

**ORDER**

The Government moved to admit David Ma's statement to the grand jury as a prior consistent statement. R. 381. Defendants Shah, Agarwal, and Purdy opposed the motion. That motion is granted in part and denied in part.

Federal Rule of Evidence 801(d)(1)(B) provides that a declarant-witness's prior statement is not hearsay where "the declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . . is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground . . . ." Fed. R. Evid. 801(d)(1)(B). The Rule was amended in 2014 to provide for the substantive admissibility of other categories of prior consistent statements. *See* Committee Notes on Rules – 2014 Amendment ("The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness -- such as the charges of inconsistency or faulty

1

memory."). As noted in the Committee Notes, the prior consistent statement must still satisfy Rule 403.

On the record, Defendants objected that Ma's statement to the grand jury was not entirely consistent with his testimony on direct examination. Following the Court's review of the transcripts from Ma's direct examination, the Court told the parties that certain parts of the grand jury statement appeared to go beyond what Ma testified to on direct examination. The Government thereafter amended its request to only seek admission of certain excerpts of the grand jury statement as prior statements consistent with Ma's direct testimony. Defendants agreed certain excerpts were consistent with Ma's direct testimony and objected to others as not consistent with his direct testimony. The Court ruled on those objections on the record. The Government then submitted a redacted version of Ma's grand jury statement, which is consistent with the parties' agreements and the Court's rulings. GX 1188.

The excerpts of Ma's statement to the grand jury that remain in the redacted version satisfy the Rule 801(d)(1)(B) requirements. First, Ma will be subject to cross-examination about those excerpts. To the extent that Defendants object to those excerpts for containing what they believe to be improper statements without foundation and other related objections, Defendants can explore those statements on re-cross examination. Second, based on the Court's review of the transcripts from the direct examination, the excerpts are consistent with Ma's direct testimony, as discussed on the record. Though Ma may not have used the exact phrasing in the

2

**SA117**

precise order on direct examination as he did in his grand jury statement, the excerpts closely track his testimony on direct examination.

And third, the excerpts are offered by the Government both to rebut the charge that Ma recently fabricated his testimony before the jury or acted from an improper influence or motive in so testifying and to rehabilitate his credibility having been attacked on other grounds. Each Defendant significantly attacked Ma's credibility on a variety of fronts, including improper motive, faulty memory, inconsistency, and general bias against Defendants. Purdy suggested that he was looking to "cash in" by filing an SEC complaint and that his immunity agreement with the Government meant he had a "free pass on getting prosecuted for [his] criminal conduct." 2/13/23 Tr. 2461, 2554. He also highlighted Ma's own participation in fabricating data that was sent to clients. Agarwal, for her part, challenged Ma's recollection of his purported conversation with Agarwal about "smoke-bombs," noting Ma lacked any contemporaneous notes; sought to impeach Ma based on his SEC deposition testimony, suggesting inconsistency with his testimony on direct examination; referenced Ma's immunity agreement; and highlighted Ma's text messages with Joyce Chen about his desire to see Shah "go to jail" and laughing about the possibility that Agarwal "may get deported." 2/15/23 Tr. 2864. Finally, Shah examined Ma on his "deep relationship" with Desai, who Shah and the other Defendants cast as the mastermind of the fraud, and similarly characterized Ma as part of a "small bubble" of those committing fraud at Outcome, with Desai at the head. 2/15/23 Tr. 2867, 2876.

3

In short, the redacted version of Ma's statement to the grand jury was consistent with his direct examination, and his credibility was significantly challenged on cross-examination.

Additionally, the probative value of the prior consistent statement is not substantially outweighed by any prejudicial impact such that it runs afoul of Rule 403. The prior consistent statement does not add new facts. The redacted version of the grand jury statement is not meaningfully different from Ma's direct testimony. Further, the excerpts do not concern an unrelated matter, which might otherwise suggest an effort to bolster Ma's credibility. Rather, the excerpts go directly to the central issues of this case.

Therefore, the redacted version of Ma's statement to the grand jury is admissible as a prior consistent statement under Rule 801(d)(1)(B). The Government may read the redacted version of the statement into evidence, but a copy of the same will not be sent back to the jury as an exhibit. In addition, Defendants' overall objection to any part of the grand jury statement coming in under the Rule is preserved.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: February 16, 2023

4

**SA119**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA,

      v.

RISHI SHAH, SHRADHA AGARWAL, AND
BRAD PURDY.

No. 19 CR 864

Judge Thomas M. Durkin

**ORDER**

The Government moved to admit Ashik Desai's statement to the grand jury and the factual basis from Desai's plea agreement as prior consistent statements under Federal Rule of Evidence 801(d)(1)(B). *See* R. 397. Defendants Shah, Agarwal, and Purdy opposed the motion. *See* R. 398. Agarwal filed a supplemental brief in opposition, and the Government filed a reply. *See* R. 401, 402. The Government's motion is granted in part and denied in part.

Rule 801(d)(1)(B) provides that a declarant-witness's prior statement is not hearsay where "the declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . . is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground . . . ." Fed. R. Evid. 801(d)(1)(B). The Rule was amended in 2014 to provide for the substantive admissibility of other categories of prior consistent statements. *See*

1

Committee Notes on Rules – 2014 Amendment ("The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness -- such as the charges of inconsistency or faulty memory."). As stated in the Committee Notes, the prior consistent statement must still satisfy Rule 403.

The Government argues that Desai's grand jury statement is admissible as a prior consistent statement under both Rule 801(d)(1)(B)(i) and (ii) in light of what the Government claims was a multi-faceted attack on Desai's credibility. The Court need not reach the broad language of Rule 801(d)(1)(B)(ii) because the grand jury statement satisfies the criteria of Rule 801(d)(1)(B)(i) as a statement that rebuts a charge of recent fabrication or improper influence or motive in so testifying.

To begin, Desai will be subject to cross-examination about the grand jury statement. To the extent that Defendants object to certain excerpts of the grand jury statement for containing what they believe to be improper statements without foundation and other related objections, Defendants can explore those statements on re-cross examination.

Second, the excerpts are generally consistent with Desai's direct testimony. The Government included a detailed table in their brief which matches sections of the grand jury statement to the corresponding consistent testimony on direct. R. 397 at 7-8. While Desai may not have used the exact phrasing in the precise order on direct examination as he did in his grand jury statement, the grand jury statement substantively tracks his testimony on direct examination.

**SA121**

And third, the statement rebuts the charge that Desai recently fabricated his testimony before the jury or acted from an improper influence or motive in so testifying. Each Defendant directly attacked Desai's credibility based on his plea deal, specifically that the Government will determine their sentencing recommendation based on their satisfaction with Desai's cooperation. Shah's counsel cross-examined Desai at length on his plea agreement, which Shah's counsel described as a "lifesaver," "gift," and "reward" comprised of "incentives" from the Government. 2/27/23 Tr. 4310-12, 4317. Shah's counsel also referenced that "the starting point is that the government is going to assess [his] cooperation and make a recommendation," that the Government agreed not to exceed a certain maximum recommendation if Desai "complete[d] what [he was] supposed to do for cooperation," and that Desai "still h[e]ld out hope at the end of the day that [he] could get a zero or just probation." 2/27/23 Tr. 4316-18. Purdy's counsel similarly highlighted that the Government can recommend less than the maximum if they are "pleased with [his] testimony" and Desai's "hope [for a] significantly reduced sentence as a result of testifying in this case." 3/1/23 Tr. 4989-91. Although Agarwal's counsel did not cross-examine Desai on his plea agreement, they did "caution" the jury in their opening statement that Desai's testimony should be "consider[ed] with great care" because he had pled guilty and "agreed to testify in this trial, all with the hope of shaving time off a years-long sentence, off a decades-long prison sentence that he faces for his actions." 1/30/23 Tr. 146-47. Defendants' attack was not specific to a particular topic. Rather, the accusation that Desai was testifying pursuant to a cooperation agreement

3

**SA122**

and in order to get the lowest recommendation possible from the Government permeates his direct testimony on the nature of the alleged scheme and his and the Defendants' purported involvement in it.

Moreover, the grand jury statement satisfies the requirement of *Tome v. United States*, 513 U.S. 150, 157 (1995). Desai made the statement to the grand jury before he received a plea deal from the Government. *See* 2/27/23 Tr. 4309. At the time of his grand jury testimony, Desai did not know "what type of deal the government might offer" him or "what would be contained in a possible agreement." 2/27/23 Tr. 4308; *see also* 2/27/23 Tr. 4310-11 ("Q. Okay. So you were there in the grand jury, but the government had not yet told you what could possibly be in this cooperation deal, right? A. I believe they had not, yes."). His prior consistent statement to the grand jury thus rebuts the charge that his testimony on direct is the product of recent fabrication or improper influence or motive, at least since the time he made the statement to the grand jury. The clear import to the defense of all three Defendants is that Desai has the motive to lie because his trial testimony will affect the Government's sentencing recommendation. As noted, from Desai's perspective, the grand jury statement predates the agreement with the Government and its memorialization at the time of the guilty plea. To the extent Defendants challenge

**SA123**

that Desai had a motive to lie in making his statement to the grand jury because he hoped to get a plea deal, that can be explored on re-cross examination.[1]

Agarwal contends that Rule 801(d)(1)(B) does not apply outside of the cross-examination of the witness whose credibility is being challenged. R. 401 at 6. But there is nothing in Rule 801(d)(1)(B) that limits its application to credibility challenges that occur during cross-examination. Agarwal does not offer any case law that supports such a construction.[2]

Additionally, the probative value of reading in the grand jury statement is not substantially outweighed by any prejudicial impact under Federal Rule of Evidence 403. As with other prior consistent statements this Court has admitted, Desai's grand jury statement does not add new facts and is not meaningfully different from his direct testimony. Indeed, the substance of the grand jury statement would be the proper subject of questioning on redirect examination, given the broad and multi-faceted challenge to his credibility that occurred over nearly five days of cross-examination. Further, the grand jury statement does not concern an unrelated

---

[1] Alternatively, the grand jury statement is admissible as a consistent statement that rehabilitates Desai's credibility, which was attacked on numerous other grounds. Defendants challenged Desai's memory on particular topics and inconsistencies in his testimony. For example, Purdy's counsel significantly attacked Desai's recollection of a phone call that Desai contended took place while Purdy was on vacation.

[2] In response to Agarwal's supplemental brief, the Government offered to redact one excerpt from the grand jury statement. R. 402 at 5. Following additional argument, counsel for Agarwal stated that they did not want the proposed redaction, which is reflected in the record for March 6, 2023.

matter, which might otherwise indicate an effort to bolster Desai's credibility, but instead goes directly to the central issues of this case.

With respect to the factual basis in Desai's plea agreement, after the Government filed their motion, the Court questioned whether there was any part of the factual basis that was substantively different from the grand jury statement, and if not, why it should not be excluded as cumulative. *See* Committee Notes on Rules – 2014 Amendment ("As before, the trial court has ample discretion to exclude prior consistent statements that are cumulative accounts of an event."). In response, the Government identified two sections that they assert are not cumulative and withdrew their request to admit other portions of the factual basis.

However, even if the two excerpts satisfy the criteria of Rule 801(d)(1)(B), both are inadmissible under Rule 403. The "Capital Raise" section is misleading in that it suggests that Desai necessarily knew what was said to investors. R. 397-2 at 10 ("Since DESAI knew about Outcome's deltas and because he knew that the deltas had been concealed from clients and Auditor A, DESAI knew that some of the financial information provided to investors, including revenue, was inflated."). That risk of jury confusion substantially outweighs any probative value from reading in this section of his grand jury statement. Additionally, the "Departure from Outcome Health" section in the factual basis is no different from and therefore cumulative of the "Departure from Outcome Health" section in the grand jury statement. *Compare* R. 397-1 at 21 *with* R. 397-2 at 11.

**SA125**

Therefore, the redacted version of Desai's statement to the grand jury is admissible as a prior consistent statement under Rule 801(d)(1)(B). The Government may read the redacted version of the statement into evidence, but a copy of the same will not be sent back to the jury as an exhibit. In addition, Defendants' objection to the grand jury statement coming in under Rule 801 (d)(1)(B) is preserved. The factual basis from Desai's plea agreement is inadmissible as a prior consistent statement and may not be read into evidence.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: March 7, 2023

**SA126**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| | No. 19 CR 864 |
| v. | |
| | Judge Thomas M. Durkin |
| RISHI SHAH, SHRADHA AGARWAL, BRAD PURDY, AND ASHIK DESAI. | |

## MEMORANDUM OPINION AND ORDER

Rishi Shah, Shradha Agarwal, and Brad Purdy ("Defendants") have filed motions for judgment of acquittal on all counts for which they were found guilty pursuant to Federal Rule of Criminal Procedure 29, and motions for a new trial pursuant to Federal Rule of Criminal Procedure 33. R. 486; R. 487; R. 489. They challenge the sufficiency of the evidence against them. Because the evidence is sufficient to support the jury's verdict, and none of Defendants' arguments for a new trial are meritorious, the motions are denied.

## Background

Defendants are former executives at Outcome Health ("Outcome"), a company that placed television screens, tablets, and wallboards that displayed educational content in doctor's offices and sold advertising space on those devices to pharmaceutical companies and other clients. The superseding indictment charged that from 2011 to at least 2017, Defendants and another Outcome employee, Ashik Desai, knowingly and intentionally devised a scheme to defraud Outcome's clients,

1

lenders, and investors.[1] R. 14. Specifically, the indictment alleged that Defendants falsely represented to Outcome's clients that the company's network included specific doctors and doctor's offices that the clients were targeting for advertising; lied to clients about how many screens the clients' advertisements were running on; falsely inflated patient engagement metrics associated with Outcome's tablets; caused material under-delivery on advertising campaigns; caused clients to pay for advertising that was not delivered; caused the material inflation of revenue in Outcome's financial statements; and used Outcome's inflated financial statements to obtain a $110 million loan in April 2016, a $375 million loan in December 2016, and $487.5 million in equity financing in 2017. *Id.* The indictment further alleged that to conceal that scheme, Defendants marginalized, undermined, and ignored whistleblowers who raised concerns; at times siloed information by directing Outcome employees not to include salespeople who were interacting directly with the clients on certain communications; discouraged clients from conducting their own campaign performance studies and instead encouraged the use of Outcome's chosen measurement company; and hid under-delivery on advertising campaigns from the auditor, investors, and lenders. *Id.*

Defendants were charged with mail fraud, wire fraud, and bank fraud, Shah was also charged with money laundering, and Purdy was also charged with making a false statement to a financial institution. *Id.* Defendants pled not guilty to all counts, and proceeded to an eleven-week-long jury trial. Over the course of nearly

---

[1] Desai pled guilty on December 9, 2019. R. 45; R. 48.

nine weeks of evidence presentation, the jury heard from former Outcome employees Desai, Sameer Kazi, Jason Ketchum, David Ma, Collin Williams, and Bridget O'Donnell; pharmaceutical company victims and advertising agency representatives Yesenia Bautista (Target Health), Matthew Ubriaco (Zenith), Tameka Teal (Compas), Courtney Cruz (Pfizer), Joseph DiFoglio (Carat), Lyndon Chin (Assembly), Tom Coyle (Initiative), Lynn Meier (Starcom), and David Dobbins (Boehringer Ingelheim); lender and investor victims Ken Eberts (Goldman Sachs), James McHugh (JPMorgan Chase), Todd Cozzens (Leerink), and Laela Sturdy (CapitalG); auditor Tracy Harrison (Deloitte & Touche LLP ("Deloitte")); expert Michael Petron; and FBI Special Agent Megan Poelking. Shah and Purdy called one witness: data analyst Amanda Malusky Krauss. Agarwal called no witnesses.

At the close of the government's case and again at the close of the defense case, Defendants moved for a Rule 29 judgment of acquittal, and those motions were taken under advisement. On April 11, 2023, after nearly three days of deliberations, the jury returned a verdict of guilty for Shah on Counts 1, 2, 4, 5, 9–19, 22, and 24–26, for Agarwal on Counts 1, 2, 4, 9, 11, 13–18, 22, and 24–26, and for Purdy on Counts 1–4, 7–9, 13, and 22–26. R. 447. The jury returned a verdict of not guilty for Shah on Counts 20, 21, 23, for Agarwal on Counts 20 and 23, and for Purdy on Counts 11 and 21. *Id*. Defendants each renewed their motions for acquittal pursuant to Rule 29 or, in the alternative, for a new trial pursuant to Rule 33. R. 486; R. 487; R. 489. This ruling applies to both the pre- and post-verdict Rule 29 motions.

**SA129**

## Discussion

### I.    Motions for Judgment of Acquittal

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In reviewing a challenge to the sufficiency of the evidence, courts must "afford great deference to jury verdicts, view the evidence in the light most favorable to the jury's verdict, and draw all reasonable inferences in the government's favor." *United States v. Brown*, 973 F.3d 667, 681 (7th Cir. 2020). Courts "do not re-weigh the evidence or second-guess the jury's credibility determinations." *United States v. Taylor*, 637 F.3d 812, 815 (7th Cir. 2011). Put differently, a court will only overturn a jury's verdict "if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Fitzpatrick*, 32 F.4th 644, 650 (7th Cir. 2022). That burden is "nearly insurmountable." *Id.* at 649. Additionally, a challenge to the sufficiency of the evidence proving intent "is exceedingly difficult to win." *United States v. Dingle*, 862 F.3d 607, 614 (7th Cir. 2017).

### A.  Mail Fraud, Wire Fraud, and Bank Fraud Counts

Defendants were each convicted of several counts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and bank fraud (18 U.S.C. § 1344). In order to prove Defendants guilty of mail or wire fraud, the government had to prove the following elements beyond a reasonable doubt: (1) that the defendant knowingly devised or participated in a scheme to defraud; (2) with the intent to defraud; (3) that

4

the scheme involved a materially false or fraudulent pretense, representation, or promise; and (4) that the defendant used or caused the use of the United States Mails or caused interstate wire communications to take place for the purpose of carrying out the scheme or attempting to do so. R. 444 at 23 (Instruction No. 22); Seventh Circuit Pattern Criminal Jury Instructions at 538. Further, in order to prove Defendants guilty of bank fraud, the government had to prove the following elements beyond a reasonable doubt: (1) that there was a scheme to defraud a bank; (2) that the defendant knowingly executed or attempted to execute the scheme; (3) that the defendant acted with an intent to defraud; (4) that the scheme involved a materially false or fraudulent pretense, representation, or promise; and (5) that at the time of the offense, the Federal Deposit Insurance Corporation ("FDIC") insured the deposits of the bank. R. 444 at 235 (Instruction No. 23); Seventh Circuit Pattern Criminal Jury Instructions at 635.

Relevant to all three charges, intent to defraud requires proof that the defendant "act[ed] knowingly with the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant or another, or the potential loss of money or property to another." R. 444 at 30 (Instruction No. 28); *see also United States v. Faruki*, 803 F.3d 847, 853 (7th Cir. 2015). Additionally, a scheme is "not limited to an isolated instance of conduct" but rather understood as a "continuing course of conduct, during a discrete period of time." *United States v. Thomas*, 986 F.3d 723, 729 (7th Cir. 2021).[2] Moreover, since the elements for wire fraud directly

_____

[2] The scheme charged in Count 1 was incorporated into each of the other counts.

5

**SA131**

parallel those for mail fraud, the Seventh Circuit treats "'cases construing one [as] equally applicable to the other.'" *United States v. Kelerchian*, 937 F.3d 895, 909 n.2 (7th Cir. 2019) (quoting *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006)).

### 1. Defrauding Pharmaceutical Companies (Counts 1, 2, 4, 5, 11, 23, and 25)

Defendants argue there is insufficient evidence of their knowing participation in the scheme to defraud or intent to defraud the pharmaceutical companies or their advertising agencies (collectively, "pharma-clients"). The relevant counts are as follows:

- Count 1 charged Defendants with the February 2, 2015 mailing of a $53,790 check from Pfizer (GX 438) to pay Outcome's November 1, 2014 invoice for the Xeljanz campaign (GX 410).

- Count 2 charged Defendants with the February 4, 2015 mailing of a $229,170 check from AbbVie (GX 439) to pay Outcome's November 1, 2014 invoice for the Humira campaign (GX 409).

- Count 4 charged Defendants with the May 14, 2015 mailing of a $89,100 check from Biogen (GX 466) to pay Outcome's February 1, 2015 invoice for the Tecfidera campaign (GX 437).

- Count 5 charged Shah with the November 14, 2015 email from Shah to Dave DiCosola and Desai stating in part, "[Y]ou have to make sure not to talk about total installs in the everyone email – this is a big deal because sponsorship is on there too and they're selling much larger quantities for next year." GX 494.

- Count 11 charged Defendants with the July 22, 2016 mailing of a $1,071,202.56 check from Boehringer Ingelheim (GX 597) to pay Outcome's June 1, 2016 invoice for the Jardiance campaign (GX 582).[3]

---

[3] Only Shah and Agarwal were found guilty of this charge, and thus they are the only defendants who challenge the sufficiency of the evidence on this count.

-   Count 23 charged Defendants with the March 16, 2017 mailing of a
    $458,261.62 check from Merck (GX 897) to pay Outcome's December 1, 2016
    invoice for the Belsomera campaign (GX 675).[4]

-   Count 25 charged Defendants with the April 24, 2017 mailing of a $566,799
    check from Pfizer (GX 930) to pay Outcome's February 1, 2017 invoice for
    the Xeljanz campaign (GX 836).

A review of the evidence illustrates how Defendants knowingly and
intentionally engaged in a scheme to defraud Outcome's pharma-clients through
overselling Outcome's inventory and concealing pervasive under-deliveries. At the
start, by nature of its business, Outcome faced a "two-sided market." GX 70. That is,
Outcome needed to install enough screens in doctor's offices to attract advertisers,
while also generating enough advertising revenue to fund the installation of new
screens. That aspect of Outcome's business precipitated the first part of the scheme:
inflating list matches. Pharma-clients sent Outcome lists of doctor's offices they
wanted to target for advertising campaigns. Outcome compared the lists with its
inventory of offices where screens were installed and generated a "list match." Trial
Transcript ("Tr.") 2167. But instead of using current inventory, Outcome often used
"projected inventory" to entice clients to buy larger, more expensive advertising
contracts. Tr. 2170, 2172.

The evidence showed that in the early days of the company, Shah and Agarwal
were heavily involved in day-to-day sales and promoted the use of projected
inventory. For example, with Shah's approval, a salesperson emailed a client in
February 2011 that Outcome was "currently in the waiting rooms of 1/3 of all

---

[4] Only Purdy was found guilty of this charge, and thus he is the only defendant who
challenges the sufficiency of the evidence on this count.

endocrinologists in the US." GX 2. When Agarwal asked whether that assertion was "inaccurate," Shah acknowledged that as a standalone statement, it was. *Id*. And when Agarwal pointed out that Shah had made that representation "a lot," Shah added, "Let's just get to [the claimed number] quickly." *Id*. In November 2012, Agarwal herself, with Shah's awareness, directed an employee to conduct a list match using projected inventory, GX 67, and one year later, admitted that the list the client had wasn't the "true list" as Outcome did not have even one-third of the inventory "installed at the time," GX 265.

The evidence also demonstrated that by 2013, Purdy became involved, albeit to a lesser extent, in the effort to sell pharma-clients on "the future," i.e., projected inventory. Outcome employee David Ma testified that Purdy taught him how to conduct list matches using methods that would sweep in offices where Outcome did not have installed screens. Tr. 2184–87. Ma also recounted that when he expressed his concern that these methods "would yield inaccurate results" and "overrepresent [Outcome's] inventory," Purdy shrugged, "that's just kind of the way we do it," and "I think it's okay." *Id*. 2187–88.

To be sure, some pharma-clients were content with buying projected inventory, either through growth schedules or weighted average delivery written into the contracts.[5] But the evidence showed that growth and weighted average contracts

---

[5] Generally speaking, "weighted average" contracts promised delivery of a weighted average number of offices or devices over the duration of the contract rather than a specific number of offices or devices per month. For these contracts, Outcome would bill clients for the same amount each month, even if the actual delivery for that month exceeded or fell short of the weighted average amount. "Growth" contracts promised

8

**SA134**

were the exception, not the norm. *E.g.*, *id.* 2202, 2398, 5492. And testimony from pharma-clients revealed that they intended to buy existing inventory and were generally not told that the list matches did not reflect Outcome's current inventory. *Id.* 2031–32, 6094, 6256, 8105.

The evidence showed that Defendants helped conceal that fact by siloing information about how the list matches were created away from the salespeople who directly interfaced with pharma-clients. For example, Shah wrote to Agarwal directly asking whether a salesperson knew a certain list match was projected, removing that salesperson from the email. GX 140. Agarwal responded that while she wasn't sure in that specific case, "generally, the team doesn't know it's a projection because they get confused about how to represent it, even though they need not say it any differently." *Id.* The evidence featured additional conversations between Defendants of a similar nature. *See* GX 494 (Count 5) (Shah instructing Dave DiCosola "you have to make sure not to talk about the total installs in the everyone email – this is a big deal because sponsorship is on there too and they're selling much larger quantities for next year"), 274 (Agarwal telling Desai to take salespeople off email chains when discussing "what data to use," noting "I've noticed their confidence level in our data change dramatically when presenting to clients if they believe it's accurate vs made up."), 1099 (Purdy stating "we should probably make some sort of barrier between the

---

delivery for a certain number of offices or devices at the start of performance and increasing numbers over the duration of the contract. For these contracts, Outcome would bill clients for the specific growth targets set by the contract. *See* Tr. 609–10, 864–65, 2397–98.

9

**SA135**

[sales] team and ops with regards to tablets and/or take off the cumulative counts. With all the projecting I want [sales] to stay focused on selling the future and realized that the below [data] may even be inaccurate for them[.]"); *see also* Tr. 2175, 3414–15, 3429–30, 3436, 3473–74, 5501.

Other evidence indicated that on numerous occasions, Defendants knew that pharma-clients were being misled. For instance, in August 2013, the same month that Desai began working at Outcome, Shah, Agarwal, and Desai discussed an email from Boehringer Ingelheim about "ensuring proper ROI [return on investment] measurement"[6] of the Pradaxa campaign. GX 263. After Agarwal admitted that the Pradaxa list match wasn't the "true list" as Outcome did not have even one-third of the inventory "installed at the time" the list was provided, Shah added that if the client started asking questions about the list, they could shift to a weighted average approach. *Id.* Later in the month, Desai told Ketchum that he had spoken to Shah about the Pradaxa list and shared, "In the end, we're open to being honest if it's caught[.]" GX 284. Along the same lines, in October 2013, Shah, Purdy, and Desai discussed presenting a list of offices to Novo Nordisk that included a number of offices not installed at the time as if they were current inventory. GX 322, 324; Tr. 3421–22, 3596–3603.

---

[6] Some of Outcome's contracts included ROI guarantees, which promised a certain amount of return for every dollar spent on advertising. *See* Tr. 2400–01 ("If a [pharma-client] is paying us $1 million and they require 3:1, that means that we had to deliver $3 million in value."). Outcome generally contracted with third party vendors to conduct studies of ROI, such as IMS. *See id.* 2414–19.

10

**SA136**

Ma testified that in early 2015, he shared his concerns about selling inventory Outcome did not have and Agarwal's "jarring" response were words to the effect of, "we throw smoke bombs . . . to clean up our operations." Tr. 2422–25, 3030; *see also* GX 265. Agarwal's comments echoed Shah's remarks to a room full of Chicago entrepreneurs in November 2012 that Outcome "threw a smoke bomb": Outcome had doctor's offices "commit to taking the installation" of a device, while having advertisers "commit to buying the network," acknowledging "You cannot be late. Otherwise it's fraud. Right? I mean it . . . You know, you're selling something you don't have." GX 70.

Because Outcome was "selling devices that were not there," it "had significant under-delivery on a number of [its] programs, even while [it was] billing [its] clients as if [it was] delivering in full. Tr. 3431; *see also* Tr. 2200. The evidence demonstrated that under-deliveries—coined "deltas"—were pervasive, recurring, and well-known by Defendants. There was evidence that Shah, Agarwal, and Purdy were each aware of ongoing under-deliveries, first through emails and small groups and then through formal "delta reports" and "growth models" shared with Outcome's senior leadership and discussed in off-site retreats. *See, e.g.*, GX 357, 360, 397, 441, 442, 460, 461, 624, 1027, 1098, 1153; Tr. 2211–12, 2237–39, 2254, 2261–62, 2273, 2275, 3653–57, 3768–69. In March 2016, Shah acknowledged the recurring nature of deltas when he noted, in an email to Agarwal and his chief of staff, that he didn't "want to spend every meeting" with Outcome's executive team [including Desai and Purdy] on the issue of

11

**SA137**

deltas. GX 557. He added that he didn't want to hear "new ideas not cleared by me," concerned that it would turn into an "inquisition." *Id.*

Yet, testimony from the pharma-clients revealed that they were not made aware of under-deliveries. *See, e.g.*, Tr. 2032, 2200–01, 3313, 3519, 6094. Some evidence indicated that pharma-clients were unaware because of active concealment at Defendants' direction or with their approval. The jury saw several examples of Desai working with Defendants to conceal the deltas from pharma-clients by reassigning inventory from one client to another, e.g., GX 330, 337, 1928; inflating patient-engagement data on Outcome's tablets, e.g., GX 345, 432, 1144, 1908; Tr. 3024; and filtering data used in ROI studies, e.g., Tr. 3568–69, 5514–15. Later, when Outcome was faced with even larger deltas, Desai began changing performance data received from the third-party vendor IMS such as "the total number of doctors studied, the percentage lift, the ROI" before sharing it with clients. Tr. 3870–71, 3883–84, 3917. By November 2016 at the latest, Shah and Agarwal were aware of reports by a salesperson named David Jundt that Desai was changing ROI data. GX 673, 747; Tr. 3916–17. Indeed, they discussed with Desai how to address ongoing talks between the offices about the legitimacy of the ROI data. GX 673. But neither Shah nor Agarwal ever confronted Desai about the accusation. Tr. 3925.

All the while, Outcome continued billing its clients as if it had delivered what was asked. Tr. 2210–11, 3431, 3651–52. The evidence, viewed in the light most favorable to the verdict, further indicates that Defendants knew this was happening. Desai testified that he discussed revenue at meetings with Shah and Agarwal and

**SA138**

sent all three Defendants regular revenue reports, showing Outcome meeting its revenue targets and some including campaign-specific billing data. *E.g.*, Tr. 3652, 3831–32, 3833, 3838–40; GX 1035, 1036, 1037, 1038, 1039, 1040, 1041, 1043, 1044, 1044a, 1045, 1046, 1047, 1048. Further, despite frequent reminders about massive inventory shortages in certain therapeutic categories, like rheumatology and neurology, Defendants knew that Outcome continued to sell larger advertising campaigns, with growing deltas, year after year. GX 107, 136, 193, 205, 221, 330, 357, 359, 461, 461a, 594, 594a, 704, 1098, 1153. Moreover, Shah supplied the revenue goals, Tr. 3844, and pushed for increasing sales goals despite deltas, *id.* 3027–29. *See also id.* 2348–49, 3033, 3628–29.

In June 2016, Shah, Agarwal, and Desai encountered a "massive" issue, where there was "essentially no delivery" of advertising for two months of a campaign for the brand Invokana. GX 588, 589 (Shah texting Agarwal that "all of [the campaigns] may be totally under delivering"). A few weeks later, the three received the results of an internal audit of what Outcome was "delivering versus what was in the contract" for "2016 programs." Tr. 3781–82; GX 594. The audit revealed under-deliveries of 10% or more on 77 of 137 active campaigns and six campaigns with "dark" periods during which no advertisements were played, even though clients were billed in full. GX 594, 594a; Tr. 3782. The audit further found 31 exam-room tablet and 12 waiting-room TV campaigns with under-deliveries of 50% or more. GX 594a. Yet, none of the under-deliveries were disclosed to the pharma-clients. Tr. 3787–88.

13

**SA139**

Several months later, on Christmas Eve 2016, Shah sent Purdy and Desai a Voxer (a voice memo sent between employees) summarizing "grave concerns" that Purdy had shared about Outcome's "ability to fulfill the current standing of 2017 contracts." GX 701. Desai replied two days later, observing how Outcome had, for years, sent monthly proof-of-performance affidavits to clients, which falsely attested all contractual requirements had been met despite recurring under-deliveries. GX 704. Desai recommended they "change this practice," so that affidavits are a "source of truth as to what, in fact, ran in the 30-day period." *Id.* He also noted that, for "a longtime [therapeutic] category" like rheumatology where Outcome had been under-delivering on campaigns for years, "starting to call attention to massive inventory gaps" by suddenly submitting accurate affidavits would "open up a whole and historical legacy of potential issues," including recalling revenue and "more drastic impact[s]" like losing clients entirely. *Id.* In response, Shah tasked Purdy and Desai with finding a solution that balanced "the goal[s] . . . of correctly reporting on affidavits while not . . . causing a bunch of account-level issues." GX 707.

Viewing this evidence altogether and drawing all reasonable inferences in the government's favor, a jury could conclude that Defendants knowingly participated in a scheme to defraud and intended to defraud Outcome's pharma-clients. Nonetheless, Defendants contend that the convictions on these counts cannot stand.

First, they claim that a rational jury could not have found them guilty of these charges without evidence they were specifically aware of (1) the terms of each contract in question and whether it allowed for growth or weighted average delivery;

14

**SA140**

(2) what Outcome delivered on each contract during the relevant time period; (3) that Outcome was providing each client with false proof of performance documents; and (4) what Outcome billed each client during the relevant time period. *See* R. 489 at 5; R. 486 at 6–9, 11. But those requirements are found nowhere in the case law cited by Defendants. Instead, the jury had to find beyond a reasonable doubt that Defendants knowingly participated in the scheme with the intent to defraud. And here, as described, there was significant evidence that Defendants knew and intended to deceive or cheat pharma-clients. Considered in the light most favorable to the verdict, the evidence showed that Defendants knew that Outcome was consistently inflating list matches, under-delivering on its contracts, and concealing that under-delivery through a variety of means. That there may not have been evidence that Defendants knew the precise terms of each contract and delivery and billing data does not mean that they did not knowingly participate in the scheme with the intent to defraud Outcome's clients. Further, the jury was properly instructed that they had to find beyond a reasonable doubt that each Defendant acted with the intent to defraud. R. 444 at 23, 30, 42.

Relatedly, Defendants assert that the government invited the jury to speculate about their knowledge and intent. Defendants claim there was no evidence that they knew that clients were billed in full despite under-deliveries and knew there had been no make goods[7] in 2015. It is true that the Court "must take special care to guard

---

[7] "Make goods" refer to offers made to clients to compensate, or "make good," for what was under-delivered. It may take the form of a credit back to the client or running

**SA141**

against the possibility that a defendant may be found guilty by either speculation or mere association." *United States v. Garcia*, 919 F.3d 489, 503 (7th Cir. 2019). But that's not what happened here. Instead, the jury made a reasonable inference based on Defendants' awareness of ongoing and pervasive under-deliveries and their simultaneous knowledge of Outcome's increasing revenue quarter after quarter through Desai's revenue reporting. If Outcome was only billing on what was delivered, it would not have met its revenue targets. Likewise, Desai testified that there were no make goods in 2015 and when Outcome began giving make goods in late 2016, Shah and Agarwal talked about them extensively. The reasonable inference from the absence of any conversations between Defendants about make goods in 2015, in stark contrast to 2016, is that they knew there were no make goods in 2015.

Defendants recast the evidence in a number of ways to argue that there was insufficient proof of their knowing participation in the scheme and intent to defraud. Primarily, they maintain—as they did at trial—that the fraudulent scheme was wholly of Desai's making and hidden from them. Similarly, Shah claims that the evidence at most shows that he had a general sense that Outcome occasionally had "operational errors." GX 489 at 5. But contentions "that the evidence supports equally rational inferences are unavailing, giving this court's obligation to view the evidence in the light most favorable to the government." *United States v. Moede*, 48 F.3d 238,

---

advertising for a longer period of time or at additional offices at no cost. *See, e.g.*, Tr. 2036, 2941.

**SA142**

241 (7th Cir. 1995); *see also United States v. Huels*, 31 F.3d 476, 479 (7th Cir. 1994). In addition, this argument runs headlong into the evidence showing Defendants' involvement in manipulating list matches before Desai arrived at the company. *E.g.*, GX 67, 265. While there was evidence that Desai kept the fact that he changed ROI data from Defendants, there was other evidence showing how Desai directly collaborated with Defendants and sought their guidance in executing the scheme.

Desai testified at length about how he followed Defendants' model and conducted the fraud with their direction and approval. That testimony did not stand alone. It was extensively corroborated by other evidence, including the testimony of Ma regarding Defendants' knowledge and lies to clients (e.g., Tr. 2371, 2393, 3036, 3396, 3927); the testimony of Ma and pharma-clients undermining the inference that Defendants believed Outcome routinely entered growth or weighted average contracts (*id.* 2202, 2398, 3173–75, 3279, 6043–44, 6049, 6092, 6144, 6241–42); communications showing the general practice before Desai's arrival of siloing information from salespeople (e.g., GX 140, 183, 274, 326, 494); Desai's grand jury testimony (Tr. 5649–73); and the emails, Voxers, and text messages shown to the jury that matched Desai's assertions. A large part of the defense case was to portray Desai as a master criminal and that he was lying about Defendants' involvement in the fraud. The jury apparently found Desai credible, and it is not the province of this Court, in weighing a Rule 29 motion, to "reweigh the evidence or 'second guess'" that determination. *United States v. LeBeau*, 949 F.3d 334, 346 (7th Cir. 2020) (quoting *United States v. Coscia*, 866 F.3d 782, 795 (7th Cir. 2017)).

**SA143**

Additionally, Defendants highlight how the government largely ignores Ketchum's testimony. But the favorable testimony they highlight reveals the pitfall of their argument. That Ketchum answered "yes" or "correct" to several helpful propositions on cross-examination after reviewing select documents does not do the work that Defendants claim. *E.g.*, Tr. 1342 (answering "correct" that certain emails shown on direct examination did not include any instruction from Shah to tell a client that the list match had projections), 1325 (answering "yes" to whether he would agree that in "2012, back when Mr. Shah was in the room with the clients, Outcome is explicitly disclosing how many sites it is currently in and what it projects to be in the future"). Rather, Ketchum's willingness to answer "yes" dozens of times and to nearly every question posed by both the government and defense suggests that the jury in all likelihood did not find him credible. As previously stated, it is not the job of this Court to "second guess" that conclusion. *LeBeau*, 949 F.3d at 346.

In its simplest form, Defendants engaged in a scheme to over-sell, under-deliver, and conceal under-delivery from Outcome's pharma-clients. That is fraud when done knowingly with the intent to deceive or cheat the victims, and there was ample evidence that Defendants acted with that intent. The defense in this case was not that there was no fraud. It was that it was Desai's fraud that he executed with his team and concealed from Defendants. Desai and Ma said otherwise. They were thoroughly cross-examined, and their motives were extensively picked apart. The jury apparently found them credible, and that conclusion is not surprising given the

amount of evidence corroborating their testimony. All told, the evidence is sufficient to sustain the convictions on the counts related to defrauding pharma-clients.

### 2. Wire Fraud as to the May 4, 2015 Email (Count 3)

Purdy also challenges the sufficiency of the evidence on Count 3, which charged him with wire fraud in connection with an email exchange with Ma and Desai on May 4, 2015. Around that time, Purdy was preparing to pitch a hospital system about installing Outcome devices at its facilities. Tr. 2383. For the pitch, he asked Ma to send him tablet engagement metrics that were reported to pharma-clients. Ma cautioned Purdy that the metrics were "not real" and asked whether Purdy was "comfortable sharing non-real stats," to which Purdy confirmed he was. DX 3456. When Ma emailed the data to Purdy and Desai, he again flagged that the metrics were "inflated." GX 465. Purdy followed up asking for the false data in a presentation deck form, DX 3456, and Ma sent a deck that was created for a presentation to one of Outcome's pharma-clients, GX 465. The email transmitting the deck, including Ma's previous warning that the data was "inflated," is charged as Count 3.

Purdy argues that this email was not in furtherance of the scheme because he was collecting the data to pitch health systems that might join Outcome's network, not pharma-clients. But the charged wire is not an email from Purdy to the health systems. Instead, the email is an internal discussion between Purdy and Ma about how pharma-clients were receiving fake, "inflated" data. Indeed, the deck that Ma sent was created for a presentation to a specific pharma-client. To be "in furtherance" of the fraud, it is enough that an email is "'incident to an essential part of the

**SA145**

scheme.'" *See United States v. Sheneman*, 682 F.3d 623, 629 (7th Cir. 2012) (quoting *Schmuck v. United States*, 489 U.S. 705, 710 (1989)). Viewed in the light most favorable to the verdict, this internal discussion about how pharma-clients were being deceived through inflated tablet metrics was, at the very least, "incident to" concealing under-delivery from pharma-clients. Moreover, the fact that Purdy responded without shock or surprise to Ma's multiple comments that the data being given to pharma-clients was false further supports Purdy's knowing participation in the scheme and his intent to defraud pharma-clients. For those reasons, the evidence is sufficient to sustain the conviction on Count 3.

### 3. Silencing Whistleblowers (Counts 14–19)

Shah and Agarwal argue that there is insufficient evidence that they silenced whistleblowers as part of the scheme. The relevant counts are as follows:

- Count 14 charged Shah and Agarwal with the January 23, 2017 Voxer from Agarwal to Shah, which provided in part: "[Sameer Kazi] said that we are operating an unethical business . . . that [Desai] is changing numbers . . . It sounds like he may even share this with others . . . if [Adam Prowker and Lianne Pierce], in [Kazi's] first week, are coming to him and sharing this, that is not very good leadership on their part and we may just have to clean up in a lot of different areas of that org." GX 747.

- Count 15 charged Shah and Agarwal with the January 24, 2017 iMessage from Shah to Agarwal and Desai, which provided: "My sense is you potentially quickly cycle [Kazi] and [Prowker] and [Pierce] out and bring in people who can fix the issues." GX 778.

- Count 16 charged Shah and Agarwal with the January 24, 2017 Voxer from Shah to Agarwal, which provided in part: "Did [Madan Nagaldinne] share how the conversation ended . . . It seems striking that he would say things like, 'once this goes public,' or 'Once I tell [headhunter], once I tell [another Outcome executive].' And I'm a little nervous about not firing him tomorrow if I can't figure out that he's really trustworthy." GX 771.

20

**SA146**

- Count 17 charged Shah and Agarwal with the January 24, 2017 Voxer from Nagaldinne that Agarwal forwarded in part to Shah, which provided in part: "he opened up the spreadsheet and he said, 'Take a look at this,' and he shows me all' of this, that he has kind of done this analysis with a bunch of people . . . and then there are at least 25, 30 probably even more contracts where we are not hitting those ROI guarantees of 3 to l or 2 to l . . . then he brought up the same issue of the affidavit again . . . saying that that is fraud . . . He kind of said, 'This is a humongous operational problem that we have. This is terrible.' . . . 'Those contracts where you have collected something and we haven't been able to deliver otherwise.' And then he said, 'I am concerned that more than 50% of our revenue can be recalled. . . ." GX 760.

- Count 18 charged Shah and Agarwal with the January 24, 2017 iMessage from Shah to Agarwal, which provided, "It sounds like [Kazi] has been walking around all day affronting people on affidavits et al[.]" GX 778.

- Count 19 charged Shah with his February 1, 2017 email to Desai, forwarding a letter from an attorney representing Prowker, which provided in part, "Based on information available to [Prowker], including the data reports from [the measurement company], it appears that the Company is artificially inflating the performance results it reports to clients to create the false appearance that it is providing content to more physician offices than is actually the case and is also inflating actuals by measuring offices that are not live[.]" GX 1911.

A review of the events surrounding the charged communications illustrates how they were made for the purpose of executing the scheme, and further supports Defendants' knowing participation in the scheme.

Sameer Kazi began working at Outcome on January 9, 2017 as the COO for Outcome's life sciences group, and quit two weeks and three days later. GX 1123; Tr. 215–25, 231–32, 237. During his second week, he met with two employees he supervised, Adam Prowker and Liane Pierce, who told him that Outcome sold inventory it did not have, sent clients monthly affidavits with falsely inflated inventory and delivery figures, and manipulated ROI results before sending them to clients. Tr. 277–80. Concerned about revenue being called back and that "this was at

least to some degree fraudulent," *id.* 282, Kazi promptly scheduled a meeting with Shah for January 25, 2017. He told Outcome's head of human resources, Madan Nagaldinne, about the issues he planned to raise, who in turn shared those concerns with Agarwal. GX 747; Tr. 308–09.

Agarwal immediately reached out to Shah in a Voxer, relaying Kazi's claim that they were "operating an unethical business" and acknowledging that it "wasn't the first time" they had heard about Desai "changing numbers." GX 747 (Count 14). She noted that "it sounds like [Kazi] may even share this with others," and flagged that if Prowker and Pierce were raising this issue in Kazi's first week, it wasn't "very good leadership on their part" and they might need to "clean up" that area of the company. *Id.* Later that day, Shah sent a Voxer to Agarwal expressing his concern that Kazi might "go[] public" with his concerns, adding, "I'm a little nervous about not firing [Kazi] tomorrow if I can't figure out that he's really trustworthy." GX 771 (Count 16).

The next day, Shah checked back in with Agarwal for any updates from Nagaldinne. GX 779. Agarwal forwarded him Nagaldinne's Voxer, which relayed Kazi's concerns that "it is fraud" and they risked more than 50% of the revenue being recalled because of ROI misses. GX 760 (Count 17). Shah sent that Voxer to Desai, GX 760a, and later texted Agarwal and Desai about how Kazi had "been walking around all day affronting people with affidavits et al," GX 778 (Count 18). Shah suggested that they "quick cycle [Kazi, Prowker, and Pierce] out and bring in people who can fix these issues," *id.* (Count 15); *see also* GX 780A (Agarwal messaging Shah

**SA148**

on January 25, 2017 that Prowker was refusing to turn decks "because all the numbers are [']misrepresentations[']" and Shah responding that he thought Prowker had "very strong philosophical disagreements" and needed "to be fired immediately").

Shah met with Kazi on January 25, 2017. Shortly after the start of the meeting, Shah claimed there was a "cultural misfit" between Kazi and Outcome and that Shah "had received several reports of people stating that [Kazi] was a 'bull in a China shop' poking his nose into parts of the business." Tr. 309–10. Kazi tried to redirect the conversation toward his concerns, namely "inventory shortfall," "misrepresentation of inventory on affidavits," and "misrepresenting [ROI] results and inflating them." *Id.* 310–11. Shah did not respond with alarm, instead noting that he was aware of these issues, and showed no interest in discussing them with Kazi. *Id.* 312–13, 315. Based on this response, Kazi decided to quit immediately. *Id.* 315. Shah sent a Voxer to Purdy, describing how Kazi was not a "cultural fit," recounting Kazi's concerns about affidavits, ROI, and forecast, and commenting, "if you talk to people who were at Google or Facebook from, you know a hundred million to a billion [in revenue], they will tell you these are very normal things . . . Google data was false and totally crazy in the foreign markets in [the] early years." GX 785.

Days after Kazi's departure, Prowker requested a meeting with Shah to discuss his "concerns about how the company was doing business." Tr. 4090. At the meeting, Prowker described feeling "on the defensive as of late" with Kazi's quick exit and his belief that some of the "contributing factors" for Kazi's departure were conversations with Prowker and Pierce about company operations. GX 818; Tr. 4092. In response,

Shah called Prowker "dangerous," and the conversation devolved into an argument. GX 818. Two days later, Shah told Desai that Prowker was "basically threatening to sue us and make it public with clients" and that he was "just gonna fire this guy." GX 831. The following afternoon, Prowker's lawyer emailed Shah and Outcome's general counsel, Collin Williams, a whistleblower letter, GX 1911 (Count 19), which was forwarded to Purdy. That letter accused Outcome of "fraudulent" business practices, including: (1) "artificially inflating the [ROI] results it reports to clients to create the false appearance that it is providing content to more physician offices than is actually the case"; and (2) "inflating actuals by measuring offices that are not live." *Id.* Following this letter, Shah and Purdy discussed how to go about terminating Prowker. GX 846, 847.

These were not the only occasions where employees shared concerns about Outcome's business practices and Defendants ignored or dismissed the concerns, or sought to silence the employees. In late January 2017, Outcome employee Sahir Raoof met with the Nagaldinne to "formally lodge a complaint alleging willful misrepresentation of inventory data by 'sales and management.'" GX 820. Agarwal shared this with Shah and Desai, including Raoof's report that "the entire [growth strategy] team is worried that we might be perpetuating fraud and some of them have gone to lawyers to ask for advi[c]e." *Id.* Over the next few weeks, Shah discussed with Agarwal and Desai whether employees such as Raoof were "the right fit" and if they weren't, they should "quickly take decisive action" to rid Outcome of "toxic" personnel. GX 850, 865; *see also* GX 856.

**SA150**

In February 2017, Shah convened a company-wide town hall to address the recent departures, attributing the exits to "cultural differences" and inviting employees to meet with him one-on-one. GX 1945; Tr. 7436–39. Bridget O'Donnell was a newly hired employee working under Prowker who had noticed differences between the ROI results calculated by third-party vendor IMS and those reported to clients, which her team had shared with Prowker before his meeting with Shah and subsequent departure. GX 774, 774a; Tr. 7408, 7411, 7414, 7418–19. At the end of the town hall, O'Donnell approached Shah and relayed her concerns about Prowker's abrupt exit and that Outcome was "misleading clients based on the discrepancies" her team had found. Tr. 7440–43. O'Donnell testified that Shah responded that there were "operational inefficiencies that would explain the discrepancies," *id.* 7444, and asked O'Donnell to email him the documents, which she declined to do fearing termination, *id.* 7449.

Another Outcome employee who reported to Prowker, Bryan Morgan, emailed Purdy and Desai two weeks later about his previously raised "concerns regarding how Outcome Health programs deploy vs how they are contracted, in addition to the glaring inconsistencies between [ROI] results presentations received from IMS and presentations that are ultimately delivered to clients." GX 862; Tr. 4120–21.[8] After forwarding the email to Shah, GX 862, Purdy responded to Morgan the next day that they had accepted his resignation, GX 863.

---

[8] Shah and Purdy were acquitted on the wire fraud charge brought in connection with Purdy's forwarding of Morgan's email to Shah.

**SA151**

Purdy had heard about and disregarded employee concerns about Outcome's business practices almost a year prior. Between March and July 2016, several analysts working under Desai left Outcome in quick succession. Tr. 3961–66, 6370–80. Before leaving, the analysts completed exit questionnaires, sent initially to Williams, who forwarded them to Purdy. GX 580, 585, 586, 592. One analyst wrote that the "key qualities and skills" that Outcome should seek in her replacement were "[s]omeone for whom integrity is not a #1 concern; they should be willing to operate in ethical shades of gray," adding that she "did not enjoy the ambiguity around what was considered the truth." GX 580. Another analyst wrote that he began looking for a new job because of "[i]nconsistencies in what was promised and what was delivered" and the "[l]ack of sincerity and integrity from supervisors and leadership and ultimately being put in situations that felt morally compromising." GX 586 (describing how he felt Outcome's "approach and actions" were "governed by . . . a need to churn profits often at the expense of ethics"). Another analyst quit because of "[e]thical issues with how [sales team] 1) reports ROI 2) fulfills contracts and 3) uses the analytics team to cover up these issues." GX 592. Williams testified that he raised his concerns about what was being said in the exit interviews with Purdy, who responded "that the analysts were young and didn't necessarily understand the business model." Tr. 6380–81.

In October 2017, the Wall Street Journal published an article reporting years-long fraud and unethical business practices at Outcome. Tr. 2459–60. Shah discussed the article at a company-wide townhall shortly thereafter. GX 1012. When asked

26

**SA152**

about when "the allegations of [ROI report] manipulation [were] first raised directly
to [him]," Shah claimed he had "learned about this specific concern . . . about a few—
few weeks ago," *id.*, despite what Kazi, Prowker, Morgan, Raoof, and O'Donnell
reported months prior.

Shah and Agarwal argue that the charged communications were not "for the
purpose of executing" the alleged scheme. They highlight that they have found no
case holding that such "internal corporate communications" satisfy the "for the
purpose of executing" element of the mail and wire fraud statutes. They distinguish
the communications at issue from "lulling" communications involving an alleged
victim. R. 487 at 8–9. But the Seventh Circuit recently held, outside of the lulling
context, that "[w]ire communications 'that assist the defendant in avoiding detection
may be sufficient to further a scheme.'" *United States v. Lee*, 77 F.4th 565, 572–73
(7th Cir. 2023) (quoting *United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009)).
Shah and Agarwal's discussions about potentially firing employees who raised
concerns served precisely that purpose. The backdrop of these communications in
early 2017 was the effort at that time to secure hundreds of millions in capital
funding. If the whistleblowers' concerns became public, that funding effort would
undoubtedly have been at risk. Viewed in the light most favorable to the verdict, Shah
and Agarwal's discussions about firing Kazi, Pierce, and Prowker were part and
parcel of executing the scheme to defraud, or at the very least were "a step in the
plot." *Sheneman*, 682 F.3d at 629 (quoting *Schmuck*, 489 U.S. at 710–11). As such,
there is sufficient evidence to sustain the convictions on Counts 14 through 19.

####    4.    Defrauding Lenders and Investors (Counts 7, 9, 13, 22, 24, and 26)

Defendants argue that there is insufficient evidence that they knowingly participated in the scheme to defraud lenders and investors and intended to do so. The relevant counts are as follows:

- Count 7 charged Purdy with his email to James McHugh and others at JPMorgan with the borrower authorization letter on March 17, 2016 (GX 551).

- Count 9 charged Defendants with the closing of the $110 million loan on April 8, 2016.

- Count 13 charged Defendants with the closing of the $375 million loan to acquire AccentHealth on December 23, 2016.

- Count 22 charged Defendants with the investment from Goldman Sachs on March 1, 2017.

- Count 24 charged Defendants with the investment from CapitalG on March 20, 2017.

- Count 26 charged Defendants with the investment from Leerink on April 28, 2017.

The evidence showed that Defendants each knowingly and intentionally engaged in this part of the scheme, first by misleading the auditor, and then by using the auditor's opinions that Outcome's financial statements were free from material misstatement and other misrepresentations to obtain funding from lenders and investors.

By 2016, Defendants had started to look for outside investors, which required that a "Big Four" accounting firm audit Outcome's financial statements. Tr. 3977–78, 6886–87, 7767. Outcome hired Deloitte to audit its 2015 financial statements ("2015 audit") in 2016, and its 2016 financial statements in 2017 ("2016 audit"). *Id.* 6893.

28

**SA154**

For both audits, Deloitte reviewed records provided by Outcome, interviewed Defendants and other employees, and used testing procedures to determine whether, in its professional opinion, Outcome's financial statements were free from material misstatement. *Id.* 6887–93. The evidence, viewed in the light most favorable to the verdict, demonstrated how Defendants misled Deloitte at each step of the way.

First, Defendants declined to say anything about overselling, under-delivering, or concealing under-deliveries during their "fraud-inquiry meetings" with Deloitte. The very purpose of those meetings was to inform Deloitte about what Defendants viewed "as risks to the financial statement, including fraud, and then to confirm or get any understanding as to what they may know about fraud, suspected fraud, alleged fraud, [and] noncompliance with laws and regulations." Tr. 6978; *see also* GX 652. Additionally, before the audit closed, Deloitte checked back in with Purdy to ask whether there was anything else they should know about allegations of fraud, to which Purdy responded there was not. Tr. 7114–16. Indeed, the written engagement letters signed by Purdy provided that Deloitte expected fulsome and continuing disclosures of actual, suspected, or alleged fraud. GX 1932, 1933; Tr. 6984–85.

Along these lines, Deloitte expected Defendants to disclose that Outcome routinely: (1) sold advertising campaigns to pharma-clients based on projected inventory; (2) reassigned inventory between pharma-clients' campaigns; (3) inflated patient engagement metrics for tablets; and (4) created reports tracking the gap between contracted and installed inventory for campaigns. Tr. 6985, 6990, 7009. Deloitte also expected Defendants to disclose that numerous employees had either

quit or been fired after raising allegations of fraud and that Desai had been accused of manipulating ROI reports. *Id.* 7108–7110, 7116–17. Yet Defendants did not tell Deloitte about these practices or about employees who shared their concerns about the practices, including Kazi, Prowker, Morgan, Raoof, and O'Donnell, all of whom raised their concerns while the 2016 audit was ongoing. GX 652; Tr. 7083–84, 7096, 7113, 7116, 7118, 7120.

Defendants also signed "management representation letters," which Deloitte relied upon in issuing its opinions. Tr. 6984, 7004–06, 7121. The letters stated, contrary to the evidence discussed above, that Outcome had made available to Deloitte "all financial records and related data"; Defendants "ha[d] no knowledge of any fraud or suspected fraud affecting the company involving management"; and Defendants "ha[d] no knowledge of any allegations of fraud or suspected fraud affecting the company's financial statements." GX 562, 910; Tr. 7008–10, 7123–25. Despite the fact that Deloitte had multiple interactions with Defendants, made numerous visits to Outcome's offices during the audits, and obtained contracts, campaign activity reports, and other documentation from Outcome, Deloitte had never heard of a "delta report" or "growth model." Tr. 7008–10, 7125.

There was also evidence that Purdy knew the campaign activity reports sent to Deloitte were false. In the early stages of the 2015 audit, Desai emailed Purdy that Deloitte had asked for advertising contracts and related campaign activity reports to compare screens or offices where Outcome was playing advertisements against contractually-required numbers. *Id.* 3982–83, 7048–49. Desai forwarded Purdy an

30

**SA156**

analyst's (Kathryn Choi) email identifying programs with deltas of 50% or more. *Id.*
3988–92; GX 530. Six days later, in response to Purdy's email asking if the two should
have a phone call, Desai responded that they planned to "backfill" the campaign
activity reports submitted to Deloitte with devices that were not playing
advertisements to cover up the deltas. Tr. 4003–04; GX 530 (Desai explaining,
"Between pulling in other installed scale, showing device assets (even those
uninstalled/repair), we should be pretty good. . . ."). Desai testified that he spoke with
Purdy in the intervening period by phone about how much delta they could show on
the reports and about backfilling, though the phone records did not reveal any call
between the two during that time, Tr. 3997–4001, 5243, 5548; DX 3280 at 81; Tr.
5243. Desai and his team backfilled in the same exact way for the 2016 audit. Tr.
4005, 5549. Yet Deloitte never learned that the reports it received were false. *Id.*
6949, 7049.

Relying on Defendants' representations, Deloitte issued opinions that
Outcome's 2015 and 2016 financial statements were free from material
misstatement. GX 1298, 1301; Tr. 7012–15, 7127–29. Expert testimony revealed that
in reality, Outcome's revenue for those years was overstated by $15 million and $29.8
million, respectively. Tr. 8540.

Outcome used those audits to secure an $110 million loan from JPMorgan and
other lenders in April 2016 (Count 9), a $375 million loan from JPMorgan and other
lenders in December 2016 to acquire Outcome's competitor AccentHealth (Count 13),
and over $487 million from numerous investors between March and July 2017,

**SA157**

including $100 million from Goldman Sachs (Count 22), $50 million from CapitalG (Count 24), and $15 million from Leerink (Count 26). GX 573, 698, 1081; Tr. 6695, 7920, 8642. The April 2016 loan could not close until the lenders received the audited financial statements. *See* GX 559 (March 2016 Voxer from Shah to Purdy noting how "central" getting the audit to the lenders was to the timing of the financing and directing Purdy to get it "wrapped up" by the next day). Further, the revenue numbers presented for the December 2016 loan mirrored the audited 2015 financial statements. GX 671, 1298. Additionally, testimony from lenders and investors made clear that the audits were important to them and they would have expected to know if Deloitte's opinions had been obtained by concealing material information about Outcome's contractual obligations or if revenue were overstated by millions. Tr. 6684–85, 6689, 6704–06, 7748–49, 7760, 7767, 7903–05, 8006, 8621–23, 8643–44.

Defendants had several opportunities to inform the lenders and investors of Outcome's fraudulent business practices, concealment from Deloitte, and the overstated revenue as part of the diligence process. *Id.* 7745, 7747–48, 7786–87, 7779–82. In March 2016, all three Defendants met with JPMorgan and other lenders and gave a detailed presentation about Outcome. GX 535. Purdy put together the presentation, seeking out Shah and Agarwal's feedback before the meeting. *Id.* At the meeting, Defendants did not say anything about over-selling, under-delivering, and concealing its gaps from clients. Instead, the presentation touted historical performance, rapid growth, and accelerating revenue. GX 535 at 17. Three days after the meeting, Purdy executed the borrower authorization letter, representing that

32

**SA158**

Outcome's disclosures to the lenders "did not contain any untrue statement of material fact or omit to state a material fact necessary in order to make [the disclosures] not materially misleading[.]" GX 551 (Count 7). In November 2016, Shah and Purdy met with lenders and again presented on Outcome's strong growth and revenue. GX 671; Tr. 7786–87. But Shah and Purdy did not disclose that Outcome had obtained contractual renewals from pharma-clients by hiding delivery shortfalls, that it had conducted an internal audit revealing massive under-deliveries, or that numerous analysts had left that year citing ethical concerns.

During the capital raise in early 2017, Shah asked Desai about the downward modification of forecasted revenue for the first quarter, noting that he wasn't sure Outcome "can afford to have the revision. [Purdy] thinks it may violate a leverage covenant in the [December 2016] loan," which would result in their "los[ing] the company to its lenders." GX 714. Desai explained that the revenue losses were due to a "significant operational issue" in 2016 with the Entresto campaign, where there was a missed delivery by nearly 50% in the first six months, which resulted in poor ROI results and Outcome owing a sizable make good to the pharma-client. GX 715. Desai also identified other brands for which Outcome had missed its contractual ROI guarantees in 2016, requiring millions more in make goods and a lower revenue forecast for Q1 2017. Shah discussed the issue with Agarwal, raising the possibility of "severe repercussions." GX 736. Shah and Purdy discussed the issue as well. *Id.*

Yet, Defendants never raised these issues with Deloitte as it conducted the 2016 audit or during multiple meetings with the investors they met with over the

**SA159**

same time period. GX 729, 777; Tr. 6694–95, 6705, 6713, 7917, 7923, 8624. Instead, Shah and Purdy reiterated that Outcome had never missed an ROI guarantee, despite knowing that was not the case, and gave alternative explanations for Outcome's revenue miss. GX 697A, 715, 736, 757, 932; Tr. 7914–18, 8628–29.

Additionally, both Shah and Agarwal stood to benefit from the loans and investments. Shah and Agarwal received dividends of $30.2 million and $7.5 million, respectively, with the April 2016 loan and a $225 million distribution from the 2017 capital raise. GX 571, 572, 1033, 1071, 1078; Tr. 6673–74. Further, Defendants each held an ownership stake in Outcome, while Desai did not. GX 1064, 1941. This evidence, taken altogether and in the verdict's favor, is sufficient to show Defendants' knowing participation in defrauding lenders and investors and intent to do so.

Defendants challenge the sufficiency of the evidence on these counts in several ways. First, they reiterate their argument that it was Desai's fraud, which was entirely hidden from them, and they could not disclose information they did not know. Relatedly, they argue that there is no evidence that they knew the revenue was inflated or the ROI numbers were inaccurate. For the reasons previously discussed, those arguments do not hold water.

Defendants similarly argue that they did not understand the parade of employees to be raising concerns about fraud but merely operational problems. But the reasonable inference—drawn in the government's favor—from the volume and content of the concerns raised is that Defendants were aware of, at a minimum, suspected or alleged fraud. *E.g.*, GX 760 (relaying Kazi's statement that "it is fraud");

34

**SA160**

GX 1911 (relaying Prowker's allegation of "fraudulent" conduct); GX 820 (relaying Raoof's report that "the entire [growth strategy] team is worried that we might be perpetuating fraud"). Defendants highlight the sub-certifications by Outcome managers who did not raise material concerns. DX 10714–54. But the fact that others certified that they were not aware of any fraud does not change the fact that Defendants were each independently aware of concerns raised by employees about the integrity of Outcome's practices and decided not to raise them to Deloitte notwithstanding several opportunities to do so.

Shah and Purdy further challenge the contention that they "misrepresented" that Outcome had never missed an ROI guarantee. Shah says that Outcome's presentation decks "tell the real story": that Outcome had never paid *out of pocket* for a missed ROI guarantee. R. 489 at 9 (citing GX 729, 777). Defendants' argument that such hair-splitting interpretations were accepted by investors risking tens or hundreds of millions of dollars is simply not plausible and is belied by the investor testimony itself. First, Sturdy and Cozzens recalled the verbal representations made by Shah and Purdy that Outcome had never missed an ROI guarantee. Tr. 7914–18, 8628–29, 8717. Purdy calls out Sturdy's and Cozzens' imprecise recollections of who made the statements and who was in the room at the time and how the audited financial statements that the investors received differentiated between a make good and a cash refund. *See id.* 8755; GX 723, 917. However, Cozzens testified that he mostly spoke about such matters with Shah and Purdy, and Sturdy's testified that she recalled asking Shah and Purdy specifically whether Outcome had "missed an

35

**SA161**

ROI guarantee" and there were no discussions of make goods before the investment. Tr. 7616, 8716–17. Drawing all reasonable inferences in the government's favor, the evidence supports that Shah and Purdy misrepresented that Outcome had never missed an ROI guarantee.

Shah also claims that the decision to hire an auditor and give them "full access" to Outcome's information is counter to an intent to defraud. He similarly points out that one whistleblower's complaint that Outcome "sold digital advertising inventory that it did not have to a [pharma-client]" was disclosed to investors, DX 4737, and that he and Purdy disclosed the revenue shortfall to Leerink, DX 12255. But the voluntary nature of the audit and those select disclosures do not negate testimony and other evidence, which must be viewed in the light most favorable to the verdict, that Defendants did not tell Deloitte, lenders, or investors about overselling inventory, under-deliveries, falsified affidavits, altered ROI studies, and employees' reports of fraud concerns. Half-truths are still false.

Agarwal contends that the jury's verdict on these counts was grounded in speculation. As to the loans, Agarwal highlights testimony that she "had no role in providing financial information" to McHugh; that she was not a presenter at the March 2016 presentation; and that she was not present for the November 2016 presentations. Tr. 7781–82, 7842–45; *see also* GX 671. As to the capital raise, she emphasizes that there is no evidence that she provided financial information in connection with the investments; that she never met with Eberts; that her conversations with Sturdy were "mostly around product, content, and culture"; and

36

**SA162**

that she had limited interactions with Cozzens about the company and its mission. Tr. 6859–60, 7894, 8612–13. Critically, however, Agarwal provided information to Deloitte during the audits, through fraud inquiry meetings and management representation letters. The lenders and investors relied on Deloitte's sign-off. Additionally, while Agarwal's communications with lenders and investors were less frequent than Shah or Purdy, they did occur, and Agarwal did not share the truth about Outcome's practices or reports of fraud.

Purdy argues that the only evidence of his knowledge of the falsity of Outcome's financial statements was Desai's testimony about their phone call. In so arguing, Purdy asks this Court to find that testimony incredible as a matter of law. He argues that Desai's testimony about when the call took place cannot be reconciled with the evidence that Purdy was vacationing in Mexico at that time, the lack of any phone records showing a call between the two during the period, the timing and content of Purdy's email in response, GX 530, and Desai's emails with Choi, DX 3680, 3695.

But Desai's testimony about the phone call is not "contrary to the laws of nature or so internally inconsistent or implausible on its face that no reasonable factfinder would credit it." *United States v. Faulkner*, 885 F.3d 488, 493 (7th Cir. 2018); *see also United States v. Sophie*, 900 F.2d 1064, 1079 (7th Cir. 1990) (referring to testimony that is "inherently unbelievable in the sense that it contradicted the laws of nature or other indisputably true evidence"). First, the fact that Desai's phone records also do not include a call during the time frame does not rule out the

37

**SA163**

possibility that the call occurred. *See* DX 3649. The evidence showed that Purdy's phone records also omitted a call that indisputably took place between Purdy and Deloitte while he was in Mexico during the same period. DX 3280, 5189.1; Tr. 5534–35, 7003–04. And Purdy's email in response does not rule out the possibility that he and Desai could have spoken over the phone in the intervening six days. For this reason, the jury could have disregarded the phone records as a credible source of information. Second and as discussed, the phone call was not the only evidence of Purdy's misrepresentations to the auditor, investors, and lenders. The jury could have set aside the issue of the phone call and found that Purdy signed off on the plan to send false activity reports to Deloitte based on the fact that Desai told him explicitly what he and Choi planned to do, and Purdy did not direct them to do otherwise. *See* GX 530, Tr. 5542–43, 5545.

Considering all of the evidence in the light most favorable to the verdict and drawing all reasonable inferences for the government, the evidence is sufficient to sustain the convictions on the counts relating to defrauding investors and lenders.

## B. False Statement to a Financial Institution (Count 8)

The jury convicted Purdy of making a false statement to a financial institution (18 U.S.C. § 1014). In order to prove him guilty of this offense, the government had to prove beyond a reasonable doubt that (1) he made a false statement to a financial institution; (2) knowing the statement was not true when it was made; (3) with the intent to influence the financial institution to take some action; and (4) the financial institution was FDIC insured. R. 444 at 41 (Instruction No. 38); *see also* Seventh

Circuit Pattern Criminal Jury Instructions at 453. Count 8 charged Purdy with the transmission of the audited financial statements for 2015 to JPMorgan on March 23, 2016. As discussed previously, the evidence, considered in the light most favorable to the verdict, showed that Purdy and the other Defendants deceived Deloitte in obtaining the audited 2015 financial statements, that the lenders would not have authorized the April 2016 loan without the audited financials, and that Shah instructed Purdy to get the audit wrapped up as quickly as possible because it was critical to securing the loan. That evidence, along with the stipulation that JPMorgan was FDIC insured, is sufficient to sustain the guilty verdict on Count 8.

### C. Money Laundering (Counts 10 and 12)

The jury convicted Shah of money laundering (18 U.S.C. § 1957) in connection with the payments made for his residence and flight transportation. *See* GX 571, 577, 587, 1242. In order to prove Shah guilty of this offense, the government had to prove beyond a reasonable doubt that he (1) engaged or attempted to engage in a monetary transaction; (2) knowing the transaction involved criminally derived property; (3) the property had a value of greater than $10,000; (4) the property was derived from bank fraud; and (5) the transaction occurred in the United States. R. 444 at 38 (Instruction No. 35); *see also* Seventh Circuit Pattern Criminal Jury Instructions at 807. There is no dispute that the charged transactions involved proceeds from the April 2016 bank loan, were initiated by Shah, and occurred in the United States for over $10,000. Shah's only challenge is that there was insufficient evidence that he knowingly and intentionally engaged in any fraud. As discussed in detail in the preceding sections,

**SA165**

the Court finds otherwise. The evidence is sufficient to sustain the guilty verdict on these counts.

## II.    Motions for New Trial

Defendants argue that even if the Court denies their motions for judgment of acquittal, they are entitled to a new trial. A district court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Unlike a motion for acquittal under Rule 29, in considering a motion for a new trial under Rule 33, the Court does not review the evidence in the light most favorable to the government. *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). Instead, courts "may reweigh the evidence, taking into account the credibility of the witnesses." *Id.* at 658. Yet despite this more lenient standard, granting a new trial is "reserved for only the most extreme cases." *Coscia*, 4 F.4th at 465; *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) ("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly."). "A new trial should be granted only if the evidence preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Friedman*, 971 F.3d 700, 713 (7th Cir. 2020) (citations omitted).

This is not one of the extreme cases that warrants a new trial. After viewing the trial, carefully observing the testimony and demeanor of the witnesses, and thoroughly reviewing the extensive record, the Court does not have "strong doubt" as to Defendants' guilt on the charged offenses. *See Washington*, 184 F.3d at 658. Given all of the incriminating testimony and exhibits described above that illustrate

**SA166**

Defendants' knowledge and intent, it is not a manifest injustice to let the verdict stand.

While Shah and Agarwal nominally move in the alternative for a new trial under Rule 33, they offer no new argument beyond that raised for acquittal. Purdy specifically argues that even if Desai's testimony in connection with his phone call with Purdy about the information to be shared with Deloitte does not require a judgment of acquittal, it leaves strong doubt as to Purdy's guilt. But Desai's testimony over the course of 11 days was incredibly detailed and corroborated by an extensive documentary record. With regard to the phone call specifically, Desai maintained his clear recollection of his conversation with Purdy. *E.g.*, Tr. 5548. And in any case, Desai's testimony did not stand alone as evidence of Purdy's knowing participation in the scheme and intent to defraud pharma-clients, investors, and lenders. For those reasons, the Court denies Defendants' Rule 33 motions for a new trial.

### Conclusion

For the foregoing reasons, the Court denies the motions for judgment of acquittal and the motions for a new trial.

ENTERED:

*Thomas M. Durkin*
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: March 21, 2024

41

**SA167**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 19 CR 864 |
| RISHI SHAH AND SHRADHA AGARWAL, et al., | Judge Thomas M. Durkin |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Rishi Shah and Shradha Agarwal move to dismiss the indictment or alternatively for a new trial alleging that the pretrial restraint of their untainted assets violated the forfeiture laws and their Fifth and Sixth Amendment rights. R. 488, 490. For the following reasons, the Court denies the motions.

**Background**

On November 21, 2019, a federal grand jury returned a superseding indictment charging Shah and Agarwal ("Defendants") with mail, wire, and bank fraud and Shah with money laundering. Shah Ex. 8007 (R. 14) ("Indictment"). That indictment included forfeiture allegations, stating in relevant part that the grand jury found probable cause to believe that "all right, title, and interest in [certain assets] including but not limited to [certain amounts]" were subject to forfeiture. *Id.* at pp. 49–57. The following day, the government sought a protective order with matching language to preserve the availability of the property allegedly subject to forfeiture, which the Court entered. *See* R. 11; Shah Ex. 8005 (R. 27) ("11/22/2019 Protective

1

Order") (restraining "all right, title, and interest in [certain assets] including but not limited to [certain amounts]").

Shortly after the indictment and the protective order were issued, William Burck and Jonathan Bunge (Quinn Emanuel) entered limited appearances for Shah, and Christina Egan (McGuireWoods) entered a limited appearance for Agarwal. On January 3, 2020, Defendants moved to amend the protective order, asking the Court to unfreeze $10.3 million that Defendants had received in a settlement with their former company (Outcome Health), lenders, and investors so that they could use the funds to pay for their defense. *See* Shah Ex. 8103 (R. 75-1). The Court denied that motion on April 8, 2020, holding that the settlement did not cleanse the funds of their taint, and thus the funds were unavailable to pay counsel regardless of whether Defendants needed them. *See* R. 108 at 7. At the end of May 2020, the Court granted Defendants' request that it allow them until June 30, 2020 to have either current or new counsel appear on their behalf, stating that "[n]o further extensions will likely be granted." Shah Ex. 8108 (R. 111); Shah Ex. 8109 (R. 112).

Defendants engaged new counsel, Hueston Hennigan for Shah and Larson LLP and Blegen & Associates for Agarwal. Shah agreed to pay Hueston Hennigan $4 million up front and the remainder of the $6.5 million flat fee following the future sale of Shah's interests in Alto Pharmacy and Healthfinch. Shah Ex. 8025. Agarwal agreed to pay Larson LLP $2 million up front and agreed to pay Blegen & Associates $250,000 up front and another $100,000 within 90 days or $125,000 thereafter.

Agarwal Ex. 3, 5. Counsel from Quinn Emanuel and McGuireWoods subsequently

withdrew, and new counsel appeared for Defendants.

Two and half years later, the case proceeded to trial. The trial lasted nearly

three months. The performance of Defendants' counsel during that trial, and their

diligent and detailed work leading up to it, was nothing short of extraordinary. As

the Court commented at the conclusion of the trial:

> I would like to say, I've been a law clerk for two years, a federal
> prosecutor for 13 years, a defense lawyer for 20, and a judge for 10. So
> I've seen a lot of trials. . . . [The] attorneys did an extraordinary job
> representing the defendants in this case. . . . [I]n 45 years, I haven't seen
> a performance like this, ever. The amount of evidence you marshalled,
> presented to the jury in a way that I think they can understand it. Every
> nuance of every document . . . was examined, sometimes repeatedly by
> the attorneys. But always done professionally [and with] a lot of work
> that went into it. So I hope the defendants, their families, and the agents
> all realize that the work the attorneys did in this case, at least in my
> judgment with the experience I've had . . . is unparalleled.

R. 623 (4/5/2023 Trial Transcript) at 10454–55.

On April 11, 2023, the jury returned guilty verdicts against Defendants on

most of the charges. Following the verdicts, new counsel from Bryan Cave Leighton

Paisner LLP appeared for Shah and met with the government about their concern

that the protective order's language was overbroad and had restrained property it

shouldn't have. Shah Ex. 8851.

Before diving into the language, it is worth discussing how the protective order

came to be. Given the complexity of the potential forfeiture, in July 2019, the

prosecution team (then comprised of Assistant United States Attorney Matthew

Madden and Department of Justice attorneys William Johnston and Kyle Hankey)

3

**SA170**

and FBI forensic accountant Megan Poelking reached out to the Department of Justice Money Laundering and Asset Recovery Section ("MLARS") for guidance about how "to forfeit the traceable proceeds" from the fraudulently obtained 2016 bank loans and 2017 capital raise. Shah Ex. 8800. In October 2019, MLARS assigned one of its attorneys, Daniel Olinghouse, to work with Poelking, and they engaged the United States Marshals Service ("Marshals") Complex Asset Unit for more assistance.[1] *Id.*; Shah Ex. 8802, 8803. The plan was to "list in the indictment everything our tracing suggests is forfeitable and then seek a post-indictment restraining order of those assets." Shah Ex. 8805.

Poelking was responsible for the tracing analysis. She traced the proceeds of the bank loans and capital raise to Defendants' entities, Gravitas Holdings, LLC ("Gravitas") and Jumpstart Ventures II, LLC ("Jumpstart II"), and then to transfers of funds by those entities into certain private equity entities and private companies.[2] These transfers are called "capital contributions." Olinghouse was responsible for drafting the forfeiture allegations and the protective order. He drafted the language at the center of this litigation: "all right, title and interest in [the private equity entities and private companies] held by [Gravitas and/or Jumpstart II] including but not limited to [certain amounts] in capital contributions." He plugged in the amounts

---

[1] MLARS is located at Main Justice in Washington D.C. and is not part of the United States Attorney's Office for the Northern District of Illinois, although of course they are all part of the Department of Justice. Johnston and Hankey both worked in the Fraud Section at Main Justice.

[2] In this opinion, "private equity interests" refer to investments in private equity funds, which in turn invest in various portfolio companies, and "private company interests" refer to direct investments in private companies.

4

**SA171**

that Poelking identified as traceable in the spreadsheets she sent him. And the prosecutors used that language in the final indictment and protective order.

Olinghouse and Poelking's intent and understanding was that the language in the protective order would capture only the traceable amounts "plus any increases in value, in whatever form it was in." Tr. at 1020–21; *see also id.* at 137 ("When I was reading that, I thought it meant that . . . it would be [restraining] the $15,000, plus whatever it turned into. . . . I just read it in English, and that's what I thought it meant.").[3] In practice, the effect of the "all right, title, and interest" was the restraint of Gravitas or Jumpstart II's interests in private equity entities and private companies ("assets") in their entirety. That was not a problem where the asset was acquired with only traceable capital contributions. The entire asset was tainted, so the protective order properly restrained "all right, title, and interest" in it. But where an asset was acquired with both traceable and nontraceable capital contributions, such as when part of the investment was made before the loans and capital raise, only part of the asset was tainted, so the protective order should not have restrained "all right, title, and interest" in it. That was issue that Shah's new counsel raised with the government in June 2023.

That month, the Court granted agreed motions for preliminary orders of forfeiture as to Agarwal and co-defendant Brad Purdy and held a hearing on the contested motion for a preliminary order of forfeiture as to Shah. *See* R. 480

---

[3] The Court cites the transcript from the evidentiary hearing as "Tr." The volumes of the transcript are found at R. 700, 701, 725, 726, 736, 737, 738, 739.

("Forfeiture Hr'g Tr.").[4] At the hearing, the government implicitly acknowledged that certain restrained assets were not traceable to criminal proceeds. *Id.* at 16, 229. After that hearing, Shah moved to amend the protective order to release those assets, and the government, in parallel, moved for a prejudgment writ of garnishment for the same assets. *See* R. 472, 474. In the course of that briefing, the government explicitly acknowledged the excessive restraint. *E.g.*, R. 482 at 12; R. 482-11. Then, on July 14, 2023, Defendants moved to dismiss the indictment, or for a new trial, based on alleged violations of the Fifth and Sixth Amendments and the forfeiture laws in connection with the pretrial restraint of the untainted assets. R. 490 ("motion to dismiss").[5]

On August 8, 2023, the Court granted Shah's motion to amend the protective order to release certain restrained assets and denied the government's motion for a prejudgment writ of garnishment. *See* Shah Ex. 8852 (R. 500). The Court thereby ordered released the assets that the government conceded were not traceable to criminal proceeds. *Id.*; R. 506. Shah moved for the release of additional restrained assets in September 2023, which the Court granted in part and denied in part. R. 524, 551; *see also* R. 550, 555. The returned assets included approximately $9.6 million in

---

[4] The Court subsequently granted in part and denied in part the government's motion for a preliminary order of forfeiture as to Shah. *See* R. 580. The preliminary order of forfeiture used different language than the forfeiture allegations and protective order. *Compare* R. 622 ("All right, title and interest in Leerink Transformation Partners, LTP BHE LP, held in the name of [Gravitas] that was acquired by or exchanged for $319,489 in capital contributions submitted on or about June 28, 2019, plus any appreciation on that right, title and interest[]") *with* Indictment ("All right, title, and interest in [Leerink Transformation Partners LTP BHE LP], held by [Gravitas], including, but not limited to, $319,489 in capital contributions submitted on or about June 28, 2019").

[5] Agarwal joined Shah's motion. *See* R. 488.

**SA173**

liquid funds from one of the private equity entities, Guild Capital. While litigating these motions and others,[6] the parties completed their briefing on the motion to dismiss.

The Court heard argument on the motion to dismiss on October 27, 2023, and then granted Defendants' request for an evidentiary hearing on the Fifth and Sixth Amendment claims and the timeliness of the motion. R. 624, 626, 629. The Court also allowed discovery on these issues, including the issuance of subpoenas to third parties. R. 629.

The evidentiary hearing began on January 3, 2024. During its opening statement, the government asserted that of the $9.6 million it had returned to Shah pursuant to the Court's orders in August and September 2023, $8.4 million was in fact traceable to criminal proceeds. Tr. at 57–60. Because that claim raised potential conflicts as some of the returned funds were used to finance the defense, the Court recessed the hearing. *Id.* at 250–52. In the months that followed, defense counsel worked through the potential conflict issues and the parties reached an agreement regarding a clawback of certain funds. R. 679. Defendants nonetheless contested the traceability of the $8.4 million and filed a motion to preclude the government from shifting its position on the traceability of those funds and exclude related evidence.

---

[6] During this time, Defendants and Purdy completed the briefing on their motions for judgment of acquittal and for a new trial. On March 21, 2024, the Court denied the motions. R. 678.

**SA174**

R. 688. The Court heard argument on that motion during the reconvened hearing on April 8, 2024. *See* Tr. at 457–80.[7]

Throughout the spring of 2024, the Court heard argument on the government's objection to the production of certain evidence as protected by the attorney-client privilege, work product doctrine, and the deliberative process privilege, specifically the testimony of and declarations submitted by government attorneys and certain internal email communications between government attorneys and agents. The Court ultimately held that only the work product doctrine applied to protect the documents, but—for most of the documents, including the government attorneys' declarations—Defendants showed a substantial need sufficient to overcome the protection. R. 695, 707, 724, 727. Defendants requested and the Court ordered the testimony of Madden and Olinghouse. *Id.* All of these rulings were made over the objections of the government.[8]

The evidentiary hearing continued on April 8th and on May 7th, 8th, and 21st, during which the following evidence was presented:

- Testimony from Poelking, Madden, Olinghouse, Burck, Patrick Blegen (Agarwal's counsel), Koren Bell (Agarwal's counsel), Kevin Lane (trustee of the Baroda Trust), and Kenneth Mathieu (Defendants' expert);

- Declarations from government attorneys Madden, Olinghouse, Johnston, Hankey, Saurish Appleby-Bhattacharjee and government agents Poelking, Mark Stakem, Cory Johnsrud, and Christopher Santangelo;

---

[7] The Court decided to allow the evidence at the hearing and instead consider the motion to exclude as a motion to strike.

[8] Shah's motion to compel disclosure, R. 711, is denied as moot in light of the government's agreement to produce certain documents and the Court's other rulings. *See* R. 714, 724, 727.

**SA175**

- Financial records including Defendants' bank and investment accounts and expenditures and declarations and related documentation from third-party entities subject to the protective order;

- Internal communications between government attorneys and agents before and after the indictment;

- Communications between government attorneys and agents and third-party entities subject to the protective order;

- Engagement documents, invoices, and email communications involving Hueston Hennigan, Larson LLP, Blegen & Associates, Quinn Emanuel, and McGuireWoods; and

- Mathieu's reports and select materials cited in the reports.

The Court also considered the declarations of Defendants, Burck, Mathieu, and Lane from the 2020 motion to amend litigation and additional declarations of Agarwal and Burck from the briefing on the instant motion. *See* Gov. Ex. 2004, 2005, 2019, 2047, 2015; Shah Ex. 8100; R. 103-4, 488-1, 490-1, 528-1. Neither Shah nor Agarwal testified at the hearing. The evidentiary hearing concluded with closing arguments on May 22, 2024.

## Discussion

Defendants raise three grounds for their motion to dismiss. First, they argue that the government's pretrial restraint of untainted assets violated their Sixth Amendment right to hire their counsel of choice, Quinn Emanuel and McGuireWoods, based on the Supreme Court's decision in *Luis v. United States*, 578 U.S. 5 (2016). Second, Defendants argue that the government knowingly presented false testimony to the grand jury that "all right, title, and interest" in the property described in the indictment was subject to forfeiture and failed to correct that testimony (or the

9

**SA176**

excessive restraint) in violation of the Fifth Amendment. Third, Defendants argue that the pretrial restraint of nontraceable assets violates the forfeiture laws. The government contests each of these arguments and also challenges the timeliness of the motion. The Court addresses timeliness first.

## I.     Timeliness

At the start, the Court must decide whether Defendants can properly bring the motion to dismiss at this late stage. "A criminal defendant forfeits an argument if negligently fails to assert a right in a timely fashion." *United States v. McMillian*, 786 F.3d 630, 635–36 (7th Cir. 2015) (citations omitted). Federal Rule of Criminal Procedure 12(b)(3) requires a motion "alleging a defect in instituting the prosecution" or "a defect in the indictment" to be raised before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." An error in the grand jury proceeding is one of the defects in instituting the prosecution contemplated by Rule 12(b)(3). Fed. R. Crim. P. 12(b)(3)(A)(v). However, a court may consider an untimely motion "if the party shows good cause." Fed. R. Crim. P. 12(c)(3).

Defendants raise several arguments in support of dismissal: the pretrial restraint of untainted property in violation of the Sixth Amendment and the forfeiture laws, and the presentation of false testimony to the grand jury and the failure to correct that testimony in violation of the Fifth Amendment. Certainly, the argument that the government presented false testimony to the grand jury that "all right, title, and interest" in the property described in the indictment was subject to

**SA177**

forfeiture can fairly be characterized as "an error in the grand-jury proceeding." Fed. R. Crim. P. 12(b)(3)(A)(v). While Defendants argue that the types of indictment defects contemplated by Rule 12(b)(3)(B) relate to the form of the allegations, not their veracity, Defendants do not argue that such a limitation applies to Rule 12(b)(3)(A). Nor would such an argument change the outcome, where Rule 12(b)(3)(A) expressly refers to errors in grand jury proceedings. *Id.*; *see also United States v. Whitfield*, 590 F.3d 325, 358–59 (5th Cir. 2009) (affirming denial of motion to dismiss that was filed after trial began in which defendant claimed government presented false testimony to grand jury and presented a factually incorrect indictment). And for the reasons that follow, Defendants' arguments that this ground for dismissal was not "reasonably available" to them before trial and there is "good cause" for the delay fall flat. However, unlike the presentation of false testimony to the grand jury, the other two bases for Defendants' motion—that the government failed to correct grand jury testimony and that untainted assets were unlawfully restrained—focus on conduct arising after the indictment, and thus neither allege "a defect in instituting the prosecution" or "a defect in the indictment." Those bases are not rendered untimely by the express provisions of Rule 12(b)(3).

That does not mean, however, that a motion on these grounds can be brought at any time. Several courts have held that defendants forfeit Sixth Amendment counsel of choice challenges by failing to object to the restraint of untainted funds before trial. *See United States v. Lindell*, 766 F. App'x 525, 528 (9th Cir. 2019) (defendant forfeited the Sixth Amendment challenge by failing to object to the

11

**SA178**

pretrial restraint of untainted funds until after trial) (citing *Puckett v. United States*, 556 U.S. 129, 134 (2009); *United States v. Ripinsky*, 20 F.3d 359, 365 (9th Cir. 1994)); *United States v. Balotin*, 2023 WL 2264181, at *21 (M.D. Fla. Feb. 28, 2023) (denying motion for new trial where defendant "fail[ed] to show any cause for his decision to wait to raise this Sixth Amendment challenge only after he was convicted at trial"). Notably, *Luis*, the primary case on which Defendants rely, involved a *pretrial* challenge to a restraining order. 578 U.S. at 9 (plurality opinion).

Indeed, criminal defendants have an avenue to lodge such a challenge at the earliest stages of a case. Under longstanding Seventh Circuit case law, defendants are entitled to an "immediate, postrestraint, adversary hearing at which the government is required to prove the likelihood that the restrained assets are subject to forfeiture." *United States v. Moya-Gomez*, 860 F.2d 706, 731 (7th Cir. 1988); *see also United States v. Jones*, 844 F.3d 636, 640–41 (7th Cir. 2016). That procedure aligns with the practice of courts across the country. *See Kaley v. United States*, 571 U.S. 320, 324 (2014) ("Since *Monsanto*, the lower courts have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer. In that hearing, they have uniformly allowed the defendant to litigate . . . whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment."). And a post-indictment restraining order and a district court's order refusing to vacate it are immediately appealable. *See United States v. Kirschenbaum*, 156 F.3d 784, 788 (7th Cir. 1998).

**SA179**

Defendants never sought a *Moya-Gomez* hearing as to the assets at issue in this motion. Instead, they waited more than three and a half years after indictment, seven months after the start of trial, and three months after conviction to raise the issue of an excessive restraint with the Court. Defendants say they could not have discovered the restraint was overbroad until March 2023, when the government first produced Poelking's tracing spreadsheets and email correspondence with the government pursuant to the Jencks Act (18 U.S.C. § 3500) shortly before her trial testimony. But within three months of the entry of the protective order, Defendants and their counsel had all of the information they needed to discover the excessive restraint, or at least challenge the traceability or seek greater clarity from the government. By February 2020, they had received copies of the indictment, protective order, grand jury testimony and exhibits, bank records, and records from the private equity entities and private companies. Gov. Ex. 2115. Though those materials did not include Poelking's tracing spreadsheets, there was nothing preventing Defendants from asking for more information about the government's tracing analysis or performing their own tracing analysis.

After all, it was their *own property* being restrained. Defendants were the ones who made the investments in the first place, orchestrated the relevant transactions, and set up and maintained the numerous corporate entities and bank accounts at issue. Indeed, Defendants would have received periodic account statements in real time. By that token, in the unlikely event that Defendants did not know which of

13

**SA180**

their assets were funded by what sources, including the loans and capital raise, they certainly had the ability to figure it out.

Defendants say they were under the "impression" that the government had traced "all right, title, and interest" in the restrained assets to not only the loans and capital raise but to the pharmaceutical company fraud too.[9] Tr. at 825. Burck attributed that impression to the fact that the forfeiture allegation in the indictment cites the wire and mail fraud counts associated with the pharmaceutical company fraud, *see* Indictment at p. 49, and a phone call with the government in December 2019. Tr. at 815, 825, 892–93, 970–71. According to Burck, on the call, defense counsel explained their understanding that "the allegation was the entire business was a fraud," and the government "confirmed that." *Id.* at 815. He understood the government to assert that anything that had come from Outcome Health could be forfeited as criminal proceeds, including Defendants' salaries. *Id.* at 815, 970–72. He further recalled that one of the government attorneys (either Madden or Johnston) said that the "indictment spoke for itself" and confirmed that the amounts listed in the protective order were not meant to be limiting or exclusive. *Id.* at 892–93, 901, 970–71.

There are no notes from this conversation with the government. *Id.* at 894–95. Madden testified that he did not recall a conversation with Burck or any member of

---

[9] In addition to alleging that Defendants defrauded lenders and investors, the indictment alleged that Defendants defrauded Outcome's pharmaceutical company clients through over-selling Outcome Health's inventory and concealing pervasive under-deliveries.

**SA181**

the defense group about the scope of the protective order outside of the issues related to the settlement money. *Id.* at 1256–57. He did not recall a conversation where he or Johnston stated that the "indictment speaks for itself." *Id.* at 1257. And he did not recall a conversation where he or Johnston characterized the entirety of Outcome Health as a fraud and further stated that he wouldn't have characterized it as such because it was not their theory and would not have been consistent with the evidence. *Id.* at 1247–49. Additionally, some of the Defendants' affidavits from the motion to amend litigation around this time suggest their contemporaneous belief that the forfeiture was focused on the "Company's fundraising," as opposed to the pharmaceutical fraud. Gov. Ex. 2004, 2005.

But even if the Court resolves these inconsistent recollections by taking Burck at his word that the defense team had the impression—based on the indictment and the phone call with the government—that the government was seeking to forfeit proceeds of the pharmaceutical fraud along with the investor and lender fraud, the grand jury materials that Defendants received in January 2020 say otherwise. Gov. Ex. 2115 Those materials make explicit that the government was seeking to forfeit proceeds of the 2016 loans and the 2017 capital raise. At the grand jury, Poelking testified that as part of her investigation, she "identified a few transactions that resulted in large payments" to Defendants, specifically the 2016 loans and the 2017 capital raise. Gov. Ex. 2114 ("Grand Jury Tr.") at 5:18–6:20. She testified that she "traced" money going to Defendants from the loans and capital raise. *Id.* She then reviewed several charts she prepared that illustrated the flow of funds from these

**SA182**

sources. *Id.* at 6:21–12:25. She followed with testimony about three other charts titled, "Assets Subject to Forfeiture Attributable to the Loans Obtained in 2016," "Assets Subject to Forfeiture Attributable to the Capital Raise in 2017," and "Assets Subject to Forfeiture Attributable to the Loans Obtained in 2016 and the Capital Raise in 2017," respectively. *Id.* at 14:13–17:25; Gov. Ex. 2113. Those charts included columns for the source of the funds; the entities where the funds were transferred to; the asset identified (e.g., "all right, title and interest in investments made with [the entities]"); and the "amount traceable to criminal proceeds." Gov. Ex. 2113. Poelking then testified that the assets on the chart were the same as those listed in the indictment. Grand Jury Tr. at 18:1–13.

Burck received these materials after the conversation he recalls with the government. He chose not to review them. Tr. at 922–23. Had he read them, it is hard to imagine he would be left with the impression that the government had traced restrained assets to proceeds from the fraud against Outcome Health's pharmaceutical clients. Indeed, there is no mention of the pharmaceutical company fraud or of Defendants' salaries in Poelking's grand jury testimony or the accompanying charts. Defendants make much of a reference to "the fraud" in testimony that followed Poelking's testimony about her charts:

> Q: Have you reviewed the [forfeiture] allegations in Pages 47 -- 49 to 57 [in the indictment]?
> A: I have.
> Q: And do they truly and accurately, to the best of your knowledge, list items for which there is probable cause that they came from the proceeds of *the fraud*?
> A: Yes.

16

**SA183**

Grand Jury Tr. at 18:15–22 (emphasis added). But viewing the testimony and charts in their entirety belies an interpretation of "the fraud" as referring to something other than the loans and the capital raise. Indeed, the testimony that immediately followed the above expressly clarified that the "fraud" referred to the investor and lender fraud:

> Q: And just so we're clear, the -- the April 2016 loan would be proceeds of – proceeds of bank fraud?
> A: Yes.
> Q: And the – and the capital raise being proceeds of wire or mail fraud?
> A: That's correct.

*Id.* at 18:23–19:4. Separately, when a grand juror asked her what "criminal proceeds" were, Poelking answered, "In this indictment, we're alleging that the capital raise [and] the loans that they received will be criminal proceeds[.]" *Id.* at 13:19–25. Ultimately, Defendants had every opportunity to question and explore the appropriateness of the pretrial restraint based on this testimony years before they finally did.

That Defendants waited until after the verdict to explore this issue is made even more surprising by the fact that they moved to amend the protective order in early 2020, approximately five weeks after the protective order was entered, and argued in that motion that they needed certain funds to pay counsel. *See* Shah Ex. 8011, 8101, 8105; R. 86, 103. At no point in that motion did Defendants raise the argument that they raise now: that the protective order unlawfully restrained "all right, title, and interest" in assets that contained, in certain instances, portions that were not traceable to criminal proceeds. Instead, they solely argued for the release of

17

**SA184**

the $10.3 million they claimed was cleansed of its taint by the settlement agreement with the company, lenders, and investors. *See* R. 108 at 3, 7–8. Defendants, who were represented at the time by their preferred counsel and arguing about funds needed to retain counsel, could have raised this additional line of attack on the protective order at that time. Defendants also could have raised it after they obtained new counsel, at any point in the nearly three years before trial commenced, or in the middle of trial, when they claim they received the information they needed to discover the issue.

Had either party brought the excessive restraint to this Court's attention, this Court could have taken any number of actions short of dismissing the indictment. As stated, the Court could have held a *Moya-Gomez* hearing. The Court also could have amended the protective order on the motion of either party. It bears noting that when Shah moved twice to amend the protective order after his conviction, the Court reviewed those motions on an expedited basis and ordered the release of the assets the government acknowledged were untainted. Before trial, the Court could have granted a continuance for the parties to investigate the issue, resolve any disputes, and consider any other request Defendants would have made. Indeed, the Court granted a lengthy, over eleven-month continuance of the trial over the government's objection when a health matter prevented one of Shah's attorneys from participating at the previously scheduled date.[10] *See* R. 201. And had the parties raised the issue

---

[10] Shah argued in that motion that denying a continuance would impinge upon his Sixth Amendment right to his counsel of choice. R. 193.

during trial, the Court could have declared a mistrial to allow an investigation of the relevant issues and fair consideration of any related requests. In short, the situation in which the parties now find themselves was entirely avoidable. Which of these remedies would have been best would have been for the Court to decide, not Defendants. But the issue was never brought to the Court until this very late stage.

In sum, Defendants have forfeited their Sixth and Fifth Amendment and statutory challenges. Because Defendants had all of the information they needed to realize and challenge the restraint of their untainted assets well before their trial and conviction, but never did, they cannot now claim that the restraint warrants a dismissal of the indictment or a new trial. But even if the Court were to consider Defendants' challenges to have been made in a timely manner, they are without merit for the reasons that follow.[11]

## II.    Sixth Amendment

The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel, including "a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932); U.S. Const. Amend. VI. That "fair opportunity" has limits. *Wheat v. United States*, 486 U.S. 153, 159 (1988). Relevant here, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise

---

[11] Defendants argue that a finding that they forfeited these arguments does not foreclose review altogether, but instead subjects their claims to plain error review. Plain error review is an appellate standard of review. Defendants do not cite any cases where a district court applied plain error review to its own proceedings. But because the Court considers the merits of Defendants' claims in the alternative, it need not reach this issue.

19

**SA186**

qualified attorney *whom that defendant can afford to hire.*" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–25 (1989) (emphasis added).

Defendants argue that the pretrial restraint of untainted assets violated their Sixth Amendment right to counsel of choice. Specifically, they claim that the restraint precluded them from using those assets to retain the lawyers they wanted (Quinn Emanuel for Shah and McGuireWoods for Agarwal) and forced them to retain different counsel.

In *Luis*, four members of the Supreme Court held, in an opinion written by Justice Breyer, that "the pretrial restraint of legitimate, untainted assets *needed* to retain counsel of choice violates the Sixth Amendment." 578 U.S. at 10 (emphasis added). Justice Thomas concurred in the judgment but omitted the "need" requirement. *Id.* at 24 ("I agree with the plurality that a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice."). The parties disagree about whether the Court should consider Justice Breyer's opinion or Justice Thomas's opinion to be the controlling one.[12] But explicit in both of those opinions is the limiting principle that a defendant only has a Sixth Amendment right to be represented by an attorney that he or she can afford to hire. *See Luis*, 578 U.S. at 12 (Breyer, J.); *id.* at 34 (Thomas, J.). And here, even if the restraint had not been excessive, Defendants would not have been able to afford the lawyers they wanted.

---

[12] The Seventh Circuit appears to view Justice Breyer's as the controlling opinion. *See United States v. Balsiger*, 910 F.3d 942, 949 (7th Cir. 2018); *Jones*, 844 F.3d at 639.

**SA187**

The keystone of this analysis is June 30, 2020, the date Defendants themselves requested as an extended deadline to secure counsel. Defendants acknowledged that this was the relevant date in their briefing. R. 537 at 18. There was some suggestion by counsel during the hearings that this deadline—over seven months after indictment and proposed by Defendants—was not reasonable. That proposition runs headlong into the well-settled principle that "[a] court retains wide latitude to balance the right to choice of counsel against the needs of fairness to the litigants and against the demands of its calendar." *United States v. Sellers,* 645 F.3d 830, 834 (7th Cir. 2011) (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006); *United States v. Smith*, 618 F.3d 657, 666 (7th Cir. 2010); *United States v. Carrera*, 259 F.3d 818, 824–25 (7th Cir. 2001)). What's more, Defendants never asked for more time. *Cf. Carrera*, 259 F.3d at 825 ("Only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" violates the Sixth Amendment.). Defendants point out that the Court said in its order that further extensions were "not likely" to be granted. But "not likely" was not an outright ban and left plenty of room for argument by counsel about why more time was needed. Indeed, Burck acknowledged that his team "certainly understood that the Court was not saying that was a hard-and-fast deadline." Tr. at 852.[13]

The first question then is how much Defendants needed in order to hire the lawyers they wanted by June 30, 2020. Quinn Emanuel required $9-10 million to

---

[13] Burck further testified that at the time, he thought one additional month would "give [Shah] enough time" to find substitute counsel and acknowledged that "the Court had already shown a great deal of patience." Tr. at 852.

**SA188**

represent Shah. *Id.* at 817–18; *see also* Shah Ex. 8100 (estimating $14-15 million for representation of both Defendants by the two firms). Shah had approximately $4 million in liquid assets to pay for counsel at that time; that was the amount he wired to Hueston Hennigan on July 1, 2020.[14] Tr. at 585–86. Accordingly, Shah needed an additional $5-6M to hire his preferred counsel.

McGuireWoods required $5.8 million to continue its representation of Agarwal. Agarwal had $2.25 million; that was the amount Agarwal paid by July 1, 2020 to retain both Larson LLP and Blegen & Associates.[15] *Id.* at 160, 719; Gov. Ex. 2001, 2007. Thus, Agarwal needed another $3.5 million to hire her preferred counsel. *Id.* at 104–05. Together, Defendants needed another $8.5-9.5 million, though Burck testified to his belief in hindsight that $7.8 million in additional funds would have been sufficient. *Id.* at 861–62.

The availability of *liquid* funds was absolutely essential. Burck testified that, unlike Hueston Hennigan, his firm was not willing accept the promise of future payments from the proceeds of potential sales or distributions from illiquid assets,

---

[14] The Court credits Shah's argument that what he paid to Hueston Hennigan was the amount he had available to pay counsel at that time. The government claimed that Shah had access to additional funds through the Baroda Trust. But Shah was not a beneficiary of the trust. He could only obtain assets by substituting other assets of equal value. And Lane, the trustee of the Baroda Trust, testified that it was unlikely he would have permitted Shah further substitutions. Additionally, the evidence related to Shah's expenditures before the indictment do not show he had more money to spend on counsel as of June 30, 2020.

[15] The Court similarly credits Agarwal's argument that what she paid to Larson LLP and Blegen & Associates was the amount she had available to pay counsel at that time. While the government argued that Agarwal had other liquid assets, she was advised by her tax preparer that she should expect a 2019 tax liability of over $2 million, which exceeded the liquid funds she had in early 2020. Gov. Ex. 2005.

**SA189**

which were "too risky and too uncertain." Tr. at 838–40, 849–50, 856–57. In fact, Shah asked Quinn Emanuel if they would consider such an arrangement. *Id.* at 839. Burck testified that his firm does not accept fees in that form for a variety of reasons, including tax-related issues and, at the time, the volatility of the markets with the onset of the COVID crisis. *Id.* While there was no parallel testimony from Egan, there is no suggestion in the record that McGuireWoods would have been open to the promise of future proceeds from these illiquid assets.

The next question is how much Defendants would have had but for the overbroad restraint. This is a more complicated question. The restraint at issue dealt with investments in private equity funds and private companies held by Gravitas and Jumpstart II. R. 27. Defendants' expert, Kenneth Mathieu, analyzed the total distributions from nontraceable portions of the interests that were withheld from Gravitas and Jumpstart II. Mathieu determined that absent the overbroad restraint, Gravitas and Jumpstart II would have received $1.739 million in distributions by June 30, 2020.

There are a few caveats to Mathieu's conclusion. The first relates to the approximately $563,030 in nontraceable distributions from 7Wire Ventures Fund L.P. ("7Wire") during this period. Before the indictment, on October 30, 2019, Jumpstart II failed to fully fund a capital call (paying only $16,200 of the $334,000 due) and became a defaulting partner. Gov. Ex. 2118. Due to the default, as 7Wire made distributions in 2020, Jumpstart II did not receive them. *Id.* 7Wire's representative stated that had Jumpstart II attempted to fully fund the capital call

23

**SA190**

before the Court issued the protective order, 7Wire likely would have allowed it to do so and avoid the default. Shah Ex. 8870. The problem is that Jumpstart II did not attempt to pay, and the evidence suggests that Shah could have paid during the relevant period but chose not to. During that time, Shah spent more than the approximately $317,800 owed toward the capital call on beach resort fees, artwork, cleaning and personal assistant services, and travel through a company called First Business Flights. Gov. Ex. 2063, 2110. In other words, Defendants did not receive the $563,030 of the $1.739 million in nontraceable distributions because of their own choices, not the protective order.

Additionally, Mathieu's analysis began in 2017, such that Defendants received some portion of the calculated nontraceable distributions before the protective order was even in place. Tr. at 732. For example, of the $75,918 distributed by GreatPoint Ventures Innovation Fund, L.P. ("GreatPoint") before June 30, 2020, $32,487 was distributed in 2017. Gov. Ex. 2143. Likewise, of the $13,381 distributed by HealthX Ventures Fund I, LP before June 30, 2020, $6,456 was distributed in late 2018. Gov. Ex. 2122. It cannot be said that Defendants did not have access to these distributions because of the protective order.

Further, it is not clear how the improperly restrained distributions would have been split between Shah and Agarwal. The record reflects that Shah and Agarwal had 80% and 20% interests, respectively, in Gravitas and its investments, and 85% and 15% interests, respectively, in Jumpstart II and its investments. *See* Gov. Ex. 2005 ¶ 2. Agarwal's attorney separately argued at the evidentiary hearing that she

would have received 50% of the improperly restrained assets, consistent with Shah giving her approximately half of the money held by Quinn Emanuel to use for her own counsel. As far as the Court can tell, that decision was entirely discretionary on Shah's part.

In any case, $1.739 million is well short of the $7.8 million that Burck said would be sufficient for the representation of both Defendants. Put differently, even if Defendants had received the distributions they should have, they would not have had sufficient liquid funds to hire their preferred counsel, by a long shot.

Defendants try to get around this math problem in two ways. First, they argue that the government should be held to its original position that the returned Guild Capital distributions were untainted. As previously discussed, in its opening statement at the evidentiary hearing, the government claimed that $8.4 million of the $9.6 million it released to Shah were in fact traceable to criminal proceeds. But $9.6 million covered the period from when protective order was entered in November 2019 through the amendment in late 2023. Under the government's original position, there were only $365,022 in nontraceable distributions before June 30, 2020.[16] That is less than the amount calculated by Mathieu under the government's new approach ($427,939). So, holding the government to its original position about Guild Capital's

---

[16] This value was calculated by adding the nontraceable distributions by Guild Capital listed in Exhibit 1 to Mathieu's report dated January 2, 2024, the day before the government's opening statement. *See also* Tr. at 619–21.

distributions brings Defendants no closer to the amount they needed to hire their preferred counsel.[17]

Defendants also argue that the Court should consider not just the liquid distributions that they would have received absent the excessive restraint, but also the hypothetical proceeds from the sale of nontraceable portions of the restrained assets. Mathieu characterized these private equity interests as meaningfully more liquid than interests in private companies because of a robust secondary market for the former. *E.g.*, Tr. at 750–51. Mathieu estimated $6.29 million in proceeds from the sale of these interests by applying a 10% discount to the capital account balances at that time. But that analysis turns on a number of assumptions.

First, Mathieu assumes that Defendants would have been able to sell these interests at all. He acknowledged that each of the assets at issue had transfer restrictions. Tr. at 697. In particular, the interests could not be sold or transferred without the consent of the general partner, who could withhold consent in their sole discretion. *E.g.*, *id.* at 564, 700–03. Defendants offered some evidence that entities such as Institutional Venture Partners ("IVP") XV and XVI permitted several transfers per year of limited partner interests. Shah Ex. 8032. But ultimately,

---

[17] Shah's motion to strike this evidence and preclude the government from shifting its position is denied. R. 688. The question of whether the funds Shah claims he could have used to hire different counsel are tainted is plainly relevant. There is no prejudice to Shah from considering this updated analysis. For one, Shah reached an agreement with the government on the clawback of funds. Further, the Court permitted Defendants to gather new evidence, update their expert's analysis, and make new arguments over the four months following the government's revelation. The Court considered the new analysis alongside Mathieu's original analysis and the extensive cross-examination of Poelking.

**SA193**

whether the entities would have given consent to the sale of each of Defendants'
interests and how quickly they would have given it are open questions.

Second, assuming that Defendants would have been able to get the consent
they needed within the relevant time period, there is also the question of whether
there would have been willing buyers. Mathieu acknowledged that such restrictions
would have diminished the marketability of these private equity interests, just as
they would for private company interests. Tr. at 701, 703. In his view, however,
private equity interests are more liquid than the private company interests because
there is a secondary market for them, with an annual overall market volume of over
$100 billion. *Id.* at 703, 751. But the existence of a secondary market does not
necessarily mean there were willing buyers of the assets at issue. As Mathieu
acknowledged, his testimony was about the overall market for private equity
interests. He did not assess the market for each of the specific interests at issue. *Id.*
at 704–05, 745–76.

Third, even if there had been permission to sell and willing buyers, Mathieu
assumes that Defendants would have been able to complete the sale of their interests
in the 11 weeks between April 8, 2020, when the Court ruled that Defendants could
not use the settlement money to pay counsel, and June 30, 2020. That seems unlikely.
Shah's affidavit from March 5, 2020 offers a helpful comparison. He relayed how,
about six weeks before the indictment, Defendants sold Gravitas' interest in IVP XVI.
Gov. Ex. 2124. Shah stated that was the "only time [he had] ever been able to sell a
fund interest or private security." Gov. Ex. 2047. That sale was "unique," because IVP

**SA194**

was an "established fund that is consistently oversubscribed, meaning that there are more investors looking to invest in the fund than the fund will permit," his interest was "relatively large," and the fund itself was large. *Id.* Even under those "ideal" circumstances, it took over six months to arrange the sale and have it approved by the fund. *Id.*; Tr. at 772–73. There is no evidence in the record that suggests the sale of the private equity interests at issue would have moved any quicker. Instead, the fact that the markets were in turmoil with the onset of the COVID pandemic at that time suggests the sales might have taken even longer.

Fourth, Mathieu assumes that the proceeds Defendants would have received from the sale of these interests was 90% of their capital account balances. Mathieu chose a 10% discount as a value slightly more conservative than the average discount of 7.46% he observed across studies of transactions in the secondary market. Tr. at 561–62. Some of those studies are from the early 2020 time period; others are not. Additionally, there was no representation on the part of the private equity entities, for example, that the discounted capital account balances are what the interests would have sold for. *Id.* at 745. Nor is it clear that the 10% discount accounts for any broker fees, separate from the management fees. *See id.* at 557.

Two specific examples in the record suggest a more significant discount. Defendants sold the previously discussed IVP XVI interest at a loss. *See* Tr. at 437; Gov. Ex. 2047, 2060. Additionally in February 2022, GreatPoint sought to sell Defendants' interest at cost basis less the fund's expenses for the interest. Gov. Ex. 2143; Tr. at 711–13. That would be an estimated discount of nearly 35% of the last

28

**SA195**

reported capital account balance. Tr. at 731. Shah disputed the valuation and wanted to sell the interest at fair market value, which the buyers declined. Gov. Ex. 2143; Tr. at 711–13. While Mathieu did not believe this offer to have any probative value as to what the terms of the hypothetical sales might have been, Tr. at 770, the Court disagrees. More critically, the limited time period that Defendants had to liquidate, which coincided with a time of tremendous market volatility, would have almost certainly negatively affected the offers buyers would be willing to make and Defendants would be willing to accept. Indeed, Mathieu recognized in his 2020 affidavit that "a forced immediate liquidation gives an advantage to the buyer in the transaction due to the seller's lack of control regarding the timing of the sale." R. 103-1.

In the end, Mathieu acknowledged that his analysis was necessarily speculative. It required him to speculate whether there might be an interested buyer for each of the assets, and what the sale price would be. Tr. at 559–60. Some speculation is unavoidable for the purpose of this motion. Defendants were not able to attempt a sale of these assets during the relevant period because the assets were restrained. But in examining whether the protective order infringed on Defendants' Sixth Amendment right to counsel of choice in the way they claim—that is, by depriving them of representation by Quinn Emanuel and McGuireWoods—there must be some assurance that Defendants could have made up the significant difference between what they had and what they "needed" by liquidating the interests before June 30, 2020.

In sum, Defendants needed liquid assets to secure representation by their preferred counsel. But the improperly restrained assets did not include nearly enough liquid funds in distributions to retain them. And Defendants have not shown by a preponderance that their illiquid assets were sufficiently great or that they could have been liquidated fast enough to close the gap. Further, the fact that Quinn Emanuel and McGuireWoods would not represent Defendants based on a combination of liquid and illiquid assets does not violate the Sixth Amendment. It simply means that Defendants could not have afforded to hire those attorneys on terms adequate to them. *See United States v. Mann*, 140 F. Supp. 3d 513, 536 (E.D.N.C. 2015) (the fact that counsel of choice would not represent defendant based on a promissory note or transfer of real property did not violate Sixth Amendment).

Such a finding does not run afoul of *Luis* for several reasons. For one, *Luis* involved a challenge to a protective order before trial. As previously discussed, notwithstanding numerous opportunities to do so, Defendants did not challenge the protective order until after they were convicted. Had Defendants raised this issue before trial, the remedy would have been to modify the protective order, just as the Court did when Defendants raised the issue after trial. Additionally, the protective order in *Luis* effectively restrained all the defendant's assets. By preventing the defendant from dissipating any assets up to the equivalent value of $45 million, she was left with no funds to pay for a lawyer. *Id.* at 9. In other words, "the restraint itself suffice[d] to *completely* deny [her] constitutional right." *Id.* at 20 (citing *Gonzalez-Lopez*, 548 U.S. at 148) (emphasis added). That is not what happened here.

**SA197**

Defendants had and spent millions of dollars on private counsel. And as explained in the preceding analysis, the Court cannot conclude that Defendants were "erroneously prevented from being represented by the lawyer [they] want[ed]" because of the excessive restraint. *Gonzalez-Lopez*, 548 U.S. at 148. Quite simply, even without the overbroad restraint, they could not have afforded to hire Quinn Emanuel and McGuireWoods. Therefore, the Court finds that the excessive pretrial restraint did not violate Defendants' Sixth Amendment right to counsel of choice.

## III. Fifth Amendment

"The government's knowing use of false testimony, or failure to correct testimony, violates due process." *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005) (citations omitted). Defendants argue that Poelking's testimony before the grand jury was false. Specifically, they focus on the following exchange:

> Q: Have you reviewed the [forfeiture] allegations in Pages 47 – – 49 to 57 [in the indictment]?
> A: I have.
> Q: And do they truly and accurately, to the best of your knowledge, list items for which there is probable cause that they came from the proceeds of the fraud?
> A: Yes.

Grand Jury Tr. at 18:15–22. According to Defendants, in that testimony, Poelking vouched for the accuracy of the inaccurate forfeiture allegation, which had the "all right, title, and interest . . . including, but not limited to" language. Defendants further argue that the government failed to correct that testimony. In reality, Defendants contend that the government failed to correct *the consequence* of that testimony: the restraint. In other words, Defendants say the government knowingly

31

**SA198**

restrained their untainted assets without probable cause in violation of the Fifth Amendment. The asserted harm is the same as the alleged Sixth Amendment violation: that because of the excessive restraint, Defendants could not hire their counsel of choice.

Poelking did not lie. She answered "yes" to the question of whether the indictment's forfeiture allegations "truly and accurately, to the best of your knowledge, list items for which there is probable cause that they came from proceeds of the fraud." *Id.* To the best of her knowledge, the indictment only sought the forfeiture of the assets she had traced. She reiterated that mistaken belief on at least three separate occasions under oath. *E.g.*, Forfeiture Hr'g Tr. at 88:3–9 ("Q. So my question was: Are you aware that the indictment in this case suggested that there – that all right, title, and interest in each of the assets the government sought to forfeit was traceable to criminal proceeds? A. Right. And again, I'll just say I was under the impression that it meant all right, title, and interest of those funds that were sent on that date to the fund."); Tr. at 83, 141, 231–32; R. 640 ¶ 3 (affidavit). And the allegations did include "items" for which there was probable cause to believe they came from criminal proceeds. But the allegations included other, nontraceable items too. And while Poelking's testimony was certainly not perjurious, it inevitably suggested to the grand jury that all of the property covered by the forfeiture allegations was derived from criminal proceeds. That was not accurate. *See Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (a witness's testimony need not be knowingly false (and hence perjury) to succeed on a due process claim).

Even so, Defendants are unable to show that the government knew that the testimony was inaccurate, or knew the protective order was overbroad. The record on the government's knowledge is extremely well-developed. The Court permitted extensive discovery on the issue. The Court compelled, over objection, the disclosure of over one hundred internal government communications related to the forfeiture allegations and the protective order. Those communications spanned from May 16, 2019, months before the indictment, to July 10, 2023, shortly after Shah first requested an amendment to the protective order. The communications were undoubtedly work product, but the Court found Defendants had a substantial need for them in order to explore the Fifth Amendment issue.[18] The Court also ordered disclosure of sworn affidavits from members of the prosecution team and other DOJ and FBI personnel involved in the drafting of the initial forfeiture allegations and the application for a protective order restraining those assets. The Court permitted Defendants to call former Chief of the Criminal Division and trial attorney Madden and Assistant United States Attorney Olinghouse as witnesses over the government's

---

[18] The Court initially reviewed those communications and others in camera. The government agreed to turn over all of Poelking's communications that it had previously withheld. The Court subsequently ordered the government to produce all of the emails that Madden and Olinghouse sent or received. Shortly thereafter, the Court ordered the disclosure of the remaining emails on the privilege log and the portion of the final prosecution memo relating to forfeiture. R. 727. The Court denied Defendants' request for communications that Madden and others had with Poelking after July 10, 2023, when the litigation on the asset restraint began. *Id.* Such communications would have dealt with the instant litigation itself, and besides being irrelevant, were work product for which Defendants did not demonstrate a substantial need.

33

**SA200**

objections. And the Court permitted Defendants to examine Poelking on the stand four separate times on these issues.

After thoroughly examining those materials and closely reviewing the testimony, the Court finds that the government intended to forfeit and restrain only traceable proceeds and did not know Poelking's grand jury testimony was inaccurate or that the protective order was restraining nontraceable property. Moreover, there is no evidence of any knowing non-disclosure of the fact that nontraceable portions of assets were being restrained. The government did not act in bad faith.

The language originated with Olinghouse. He understood that the government could only restrain traceable property before trial. And both he and Poelking knew that some of the assets were paid for with both traceable and nontraceable funds. But they believed that the protective order, as written, restrained only the traceable portions and any change in the value or form of those traceable portions. *E.g.*, Forfeiture Hr'g Tr. at 89; Tr. at 136, 231–33, 1019–21, 1144. They did not believe the protective order's language would have the effect of restraining nontraceable property. *E.g.*, Tr. at 1019–22, 1097, 1134, 1144.

To be sure, their read of this language defies the meaning of the words themselves. "All right, title, and interest" means everything, and "including but not limited to" means "not only." But the Court found their testimony to be credible for several reasons. From the start, the forfeiture was incredibly complex. Shah Ex. 8800; Tr. at 1024–25, 1040 (noting "these are tricky investments"). That is why the prosecutors reached out to MLARS to work alongside Poelking to draft the forfeiture

34

**SA201**

allegations and the protective order. Yet, when Olinghouse was assigned to work on the case, he "didn't really have that much expertise in forfeiture." Tr. at 1025. He did not have any experience with the forfeiture of private equity or private company interests. *Id.* at 1027–28. And he had not received any specific training on the drafting of forfeiture allegations or protective orders in criminal cases. *Id.* at 1009–10. In fact, he asked the Marshals' Complex Asset Unit for samples of protective orders. *Id.* at 1040; Shah Ex. 8803.[19] What's more, Olinghouse's involvement in the case ended when he handed off the drafts. He was not aware of what was ultimately restrained. Tr. at 1023.

Poelking, for her part, was not a lawyer. She did not recall having any concern about the forfeiture allegations or the protective order language when she read it. *Id.* at 1127. After the indictment and protective order were issued, she fielded questions from Madden related the protective order at least twice. Shah Ex. 8825, 8833. But in those communications, she consistently conveyed her view that the protective order restrained only what was traceable. Forfeiture Hr'g Tr. at 89–91; Tr. at 1131–34. Moreover, both Olinghouse and Poelking were vigorously examined by defense counsel on their understanding of this language, for Poelking on several different occasions over more than ten months. The Court, as the factfinder, observed their

---

[19] The sample protective order provided by the Marshals' Complex Asset Unit had the "all right, title, and interest . . . including, but not limited to" language. Shah Ex. 8803. Olinghouse did not testify that this was his model for the language at issue in this litigation, but the Court makes the observation nonetheless.

manner of testifying and found them to be honestly conveying their sincere belief at the time.

As to Johnston, Hankey, and Appleby-Bhattacharjee, none of them knew that any part of the assets listed in the forfeiture allegations or the protective order had been acquired using nontraceable funds or that any nontraceable property was being restrained. *See* R. 642, 648, 710-2, 712-2, 712-3, 721-1, 721-2. Indeed, Johnston's "clear" and "explicit" instruction to Olinghouse and Poelking was that the government was "going after what was traceable to the fraud." Tr. at 1049–50, 1062. As such, in questioning Poelking before the grand jury, Johnston did not know that her "yes" response was inaccurate.

Madden, for his part, had very little involvement in drafting the forfeiture allegations and protective order. *Id.* at 1055–56. However, his name was listed in the protective order as a point of contact for the affected private equity entities and private companies. *Id.* at 1191. Madden followed the letter of the protective order in his communications with those entities. On several occasions, Madden instructed those entities to place proceeds payable to Defendants into the Marshals' escrow, consistent with the restraint of "all right, title, and interest." *E.g.*, Shah Ex. 8830, 8832. And by the same token, Madden instructed Guild Capital to *release* certain funds to the Baroda Trust, because they were not covered by the protective order. Shah Ex. 8834 at 13; Tr. at 1250–51.

Madden testified that he did not know that the protective order was overbroad. He did not recall focusing on or even thinking about the "all right, title, and interest"

**SA203**

language or considering the possibility that there was anything problematic about that language until defense counsel raised the issue for the first time in June 2023. Tr. at 1173, 1185, 1235–38. Even at that point, recognizing his own lack of expertise in forfeiture law, he felt "confident" that MLARS had "done it right" in light of their expertise. *Id.* at 1155–56, 1187.

Defendants primarily focus on two email exchanges in 2020 that they say show Madden knew the restraint was excessive.[20] The first was an email exchange between Madden and Poelking on February 18, 2020. The context was Defendants' effort to use the settlement money to pay for counsel, which included the issue of their bona fide need for those funds. Madden referenced Defendants' mention of "remaining assets" in their affidavits, and asked Poelking, "Do you know what assets Jumpstart and Gravitas has that are not subject to the restraining order?" Shah Ex. 8825. Poelking responded with a copy of the spreadsheet she used the year prior "to help with the list of assets for the protective order." *Id.* She added, "One item is in yellow – 7 Wire – as we only were able to trace \$280k to the fraud, the remainder is not protected." *Id.*

Nothing in this email suggested that the protective order was restraining nontraceable assets. In fact, the opposite is true. Poelking was saying (and she so testified) that for 7Wire, the amount she was able to trace was restrained, and the remainder was not restrained by the protective order (i.e., "not protected"). Tr. at 97,

---

[20] These emails were produced in advance of Poelking's trial testimony pursuant to the Jencks Act.

1131–32. And that was how Madden understood her email, as he testified. *Id.* at 1184,
1243. This email may show Madden's awareness that one of the entities subject to
the protective order had received both traceable proceeds and nontraceable funds.
But this email does not show that Madden knew that the protective order was
restraining that nontraceable property. Defendants emphasize that the Court's order
a few months later stated that the law does not permit the pretrial restraint of
substitute assets. But the subject of the Court's order was different; it was about the
settlement money. And Madden did not recall that legal principle standing out to
him, nor did he recall having any concern, based on the Court's order, that there was
a problem with the way the government went about forfeiture in this case. *Id.* at
1228–30.

The second email highlighted by Defendants is an exchange between Poelking
to Madden in August 2020. The context of this email was that Impact Engine
Ventures II, LP ("Impact II") reached out to Madden seeking guidance because
Defendants had stopped fulfilling the capital commitments. Shah Ex. 8833. Madden
asked why the protective order covered Impact Engine Ventures IV, LP, but not
Impact II. *Id.* Specifically, he wanted to know "if the money that went into Impact II
was traceable and we did not realize it, or if we knew about it but concluded it was
not traceable." *Id.* Poelking replied that Defendants funded their capital
contributions to Impact II with funds they had received from Guild Capital and
another entity (I2A). *Id.* Poelking went on, "Our subjects & their companies made
investments in Guild & I2A with traceable funds, but there were also investments in

**SA205**

these entities that dated back to 2015 and 2013, respectively." *Id.* She added, "I probably did not include the Impact II investments in the [protective order] due to the fact that they were not directly traceable to the fraud, but perhaps indirectly they were." *Id.*

Madden acknowledged that this email indicates that Defendants made investments in Guild Capital with nontraceable funds. Tr. at 1209. But again, this email does not flag that the protective order is restraining nontraceable property. *Id.* at 1208. To the contrary, Poelking is again stating that she did not include nontraceable investments in the protective order. This email did not cause Madden any concern that the protective order was overbroad. *Id.* at 1230, 1250. Additionally, Madden's question about the traceability of the funds that went into Impact II supports his understanding at the time that they were only restraining what was traceable.

Defendants highlight Madden's email to Guild Capital about two weeks later on September 1, 2020. In that email, Madden sent a copy of the protective order and instructed Guild Capital to put certain distributions in escrow. *See* Shah Ex. 8834 at 21–24. In Defendants' view, Madden gave those instructions while knowing that there were nontraceable assets at Guild Capital restrained by the protective order. But the evidence does not show Madden had the awareness that Defendants attribute to him. Tr. at 1207–10.

Ultimately, Madden did not put the pieces together. As discussed, Poelking told him that Defendants transferred both traceable and nontraceable funds to

39

**SA206**

certain private equity entities affected by the protective order. At the same time, he applied the "all right, title, and interest . . . including but not limited" language of the protective order. But he did not put two and two together. *E.g.*, *id.* at 1185. He did not come to the realization—or even consider the possibility—that there was any problem with the protective order or that for certain assets, the protective order was restraining nontraceable property until Shah's counsel pointed it out in June 2023. *Id.* at 1173, 1235–38.

As with Poelking and Olinghouse, the Court found Madden's testimony that he was not aware of the excessive nature of the restraint to be credible for a number of reasons. For one, he acknowledged that he was not a forfeiture expert and had never done a pretrial restraint like the one in this case. *Id.* at 1151–52. That is why the prosecution team consulted MLARS, the forfeiture experts, to draft the forfeiture allegations and the protective order. *Id.* Madden trusted, with good reason, that MLARS had "done it right." *Id.* at 1156, 1235–36. True, Madden did not double check. But there was never any suggestion of a problem. No one—not Olinghouse, Poelking, any members of the prosecution team, or any defense counsel—ever raised a concern that the protective order was overbroad or that nontraceable property was being restrained until June 2023. Furthermore, the Court observed Madden's testimony firsthand, and found his manner of testifying to be entirely consistent with a truthful recollection of the events of the past four and a half years.

The government, as a unit, undoubtedly fell short. The protective order restrained more of Defendants' assets than it should have. But a mistake is different

than misconduct. There is no evidence even tending to suggest that the government realized the problem with the protective order and ignored it or concealed it from Defendants. And Defendants were equally if not better positioned to realize that error and bring it to the attention of the Court well before they were tried and convicted.

In all, Defendants' Fifth Amendment challenge is without merit because even if Poelking's grand jury testimony was inaccurate, the evidence did not show that the government knew that was the case or that the protective order was overbroad and failed to correct it.

### IV.    Statutory Violation

That leaves the statutory violation. The Court does not understand the government to be contesting that such a violation of the forfeiture laws occurred. *See Jones*, 844 F.3d at 641 (21 U.S.C. § 853 permits the restraint of "tainted assets prior to trial, but not the restraint of substitute assets"). What the government challenges is Defendants' request for dismissal of the indictment or a new trial. Even if Defendants raised this violation in a timely way, neither proposed remedy is appropriate.

In advocating for dismissal of the indictment based on the statutory violation, Defendants rely exclusively on the Court's inherent supervisory power under Article III, citing *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008). In that case, the Second Circuit upheld the dismissal of an indictment after the government pressured KPMG not to provide indemnification for several executives who were separately prosecuted, thereby preventing those defendants from retaining their counsel of choice. *Id.* at 141.

41

**SA208**

Of course, that case is not binding on this Court. And the district court in *Stein* dismissed the indictment *before* those defendants had been tried and convicted. Dismissing an indictment with prejudice before trial is a serious matter. *See United States v. Stein*, 495 F. Supp. 2d 390, 415 (S.D.N.Y. 2007) ("The Court has reached this conclusion only after pursuing every alternative short of dismissal and only with the greatest reluctance."). Dismissing an indictment with prejudice after Defendants have been tried and convicted is, in effect, setting aside the verdict and issuing a judgment of acquittal.

But most critically, the prosecutorial misconduct that occurred in *Stein* is a far cry from what happened here. There is no evidence that the government deliberately intervened with the goal of depriving Defendants of their counsel of choice. Indeed, it is hard to see why the government would care whether Defendants were represented by formidable counsel at Quinn Emanuel and McGuireWoods as opposed to the equally formidable private counsel who ultimately represented them. Instead, the government inadvertently used overbroad language in a protective order and did not catch it. Neither did Defendants until after the verdict, even though they had all the information to discover and raise it with the Court well before that time. This is not the type of outrageous government misconduct or manifest injustice that calls out for tossing a verdict.

Defendants offer little support for the proposition that a violation of the forfeiture laws, standing alone, requires a new trial. Indeed, they acknowledge a lack of precedent and instead cite cases where the Seventh Circuit granted a new trial

42

**SA209**

upon finding a violation of a criminal defendant's Sixth Amendment right to counsel of choice. *See Sellers*, 645 F.3d at 840 (granting new trial upon finding that district court's denial of a continuance to substitute new counsel violated defendant's Sixth Amendment right to counsel of choice); *United States v. Turner*, 594 F.3d 946, 955 (7th Cir. 2010) (granting new trial upon finding that district court's erroneous disqualification of counsel violated defendant's Sixth Amendment right to counsel of choice). That remedy makes sense because with the deprivation of counsel of choice, "it is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings." *Gonzalez-Lopez*, 548 U.S. at 150. But here, as discussed, even without the improper restraint, Defendants would not have been able to hire their preferred lawyers. A new trial is not appropriate in these circumstances.

*     *     *     *

While the effectiveness of counsel is not at issue in this litigation, it nevertheless bears reiterating what the Court said at the conclusion of the trial in this case. From the start of this case through the trial years later, Defendants received what is indisputably the highest quality representation a criminal defendant can receive. Their legal teams collectively consisted of more than 12 attorneys who entered appearances, and undoubtedly numerous other associates who did not, along with considerable support staff. Those attorneys were from reputable firms, with decades of experience and expertise in white collar criminal defense and trial practice. Those attorneys were thorough and diligent in combing through millions of

43

**SA210**

documents and other materials in this case. And their talent in written and oral advocacy was on full display in the motion practice and over the course of the three-month-long trial. Having observed the performance of counsel firsthand, there is no doubt that Defendants received far beyond the adequate representation the Constitution requires.

### Conclusion

For these reasons, the Court denies Defendants' motions to dismiss the indictment or alternatively for a new trial.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: June 12, 2024

44

**SA211**

# UNITED STATES DISTRICT COURT
## Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| RISHI SHAH | ) | Case Number:      1:19-CR-00864(1) |
| | ) | |
| | ) | USM Number:      54788-424 |
| | ) | |
| | ) | |
| | ) | Richard Finneran |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)         which was accepted by the court.

☒ was found guilty on count(s) 1, 2, 4, 5, 9-19, 22, and 24-26 of the Superseding Indictment after a plea of not guilty. The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18:1341 Mail Fraud | 02/02/2015 | 1 |
| 18:1341 Mail Fraud | 02/04/2015 | 2 |
| 18:1341 Mail Fraud | 05/14/2015 | 4 |
| 18:1343 Wire Fraud | 11/14/2015 | 5 |
| 18:1344 Bank Fraud | 04/08/2016 | 9 |
| 18:1957 Money Laundering | 06/15/2016 | 10 |
| 18:1341 Mail Fraud | 07/22/2016 | 11 |
| 18:1957 Money Laundering | 08/12/2016 | 12 |
| 18:1344 Bank Fraud | 12/23/2016 | 13 |
| 18:1343 Wire Fraud | 01/23/2017 | 14 |
| 18:1343 Wire Fraud | 01/24/2017 | 15-17 |
| 18:1343 Wire Fraud | 01/25/2017 | 18 |
| 18:1343 Wire Fraud | 02/01/2017 | 19 |
| 18:1343 Wire Fraud | 03/01/2017 | 22 |
| 18:1343 Wire Fraud | 03/20/2017 | 24 |
| 18:1341 Mail Fraud | 04/24/2017 | 25 |
| 18:1343 Wire Fraud | 04/28/2017 | 26 |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count(s) Any remaining dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

June 26, 2024
Date of Imposition of Judgment

*Thomas M. Durkin*
Signature of Judge

Thomas M. Durkin, United States District Judge
Name and Title of Judge

July 1, 2024
Date

Case: 1:19-cr-00864 Document #: 805 Filed: 07/01/24 Page 2 of 23 PageID #:30026
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case.
Sheet 2 – Imprisonment
Case: 24-2230     Document: 34     Filed: 04/04/2025     Pages: 322     Judgment – Page 2 of 8

DEFENDANT:  RISHI SHAH
CASE NUMBER:  1:19-CR-00864(1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: 90 months as to counts 1, 2, 4, 5, 9-19, 22, and 24-26. Terms to run concurrently.

☒    The court makes the following recommendations to the Bureau of Prisons: It is recommended that the defendant serve his term of imprisonment at FPC Montgomery Minimum Security and participate in RDAP.

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

☐        at 2:00pm on

☐    as notified by the United States Marshal.

☒    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☒        before 2:00 pm on 9/26/2024

☐        as notified by the United States Marshal.

☐        as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

Case: 1:19-cr-00864 Document #: 805 Filed: 07/01/24 Page 3 of 23 PageID #:30027
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release   Case: 24-2230      Document: 34      Filed: 04/04/2025      Pages: 322      Judgment – Page 3 of 8

DEFENDANT:  RISHI SHAH
CASE NUMBER:  1:19-CR-00864(1)

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of: three (3) years as to counts 1, 2, 4, 5, 9-19, 22, and 24-26, terms to run concurrently. The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall not commit another Federal, State, or local crime.

☒ (2) you shall not unlawfully possess a controlled substance.

☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence.  [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]

☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act (**42 U.S.C. § 16913**).

☒ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

☒ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release.  [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in § **3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in § **3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**.
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall provide financial support to any dependents if you are financially able to do so.

☐ (2) you shall make restitution to a victim of the offense under § **3556** (but not subject to the limitation of § **3663(a)** or § **3663A(c)(1)(A)**).

☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of § **3555**, as follows:

☒ (4) you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s))

☒ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:

    ☐ visit the following type of places:

    ☐ knowingly meet or communicate with the following persons:

☒ (7) you shall refrain from ☒ any or ☐ excessive use of alcohol (defined as ☐ having a blood alcohol concentration greater than 0.08; or ☐          ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.

☒ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.

☒ (9)   ☒ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.

    ☐ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.

    ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify:          .)

☐ (10) (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling          [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in

## SA214

Case: 1:19-cr-00864 Document #: 805 Filed: 07/01/24 Page 4 of 23 PageID #:30028
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release    Case: 24-2230    Document: 34    Filed: 04/04/2025    Pages: 322    Judgment – Page 4 of 8

DEFENDANT: RISHI SHAH
CASE NUMBER: 1:19-CR-00864(1)

§3563(b)(10) shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period _____.

☐ (11)    (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of _____ months.

☐ (12)    you shall work in community service for _____ hours as directed by a probation officer.

☐ (13)    you shall reside in the following place or area: _____, or refrain from residing in a specified place or area: _____.

☒ (14)    you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15)    you shall report to a probation officer as directed by the court or a probation officer.

☒ (16)    ☒    you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified: _____,
         ☒ at home        ☒ at work        ☒ at school        ☒ at a community service location
         ☒ other reasonable location specified by a probation officer
    ☒    you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17)    you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18)    you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19)    (home confinement)
         ☐    (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
         ☐    (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
         ☐    (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
         ☐    from the times directed by the probation officer; or ☐ from __ to __.
         ☐    (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
         ☐    (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20)    you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21)    (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22)    you shall satisfy such other special conditions as ordered below.

☐ (23)    You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

☐ (24)    Other:

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

DEFENDANT:  RISHI SHAH
CASE NUMBER:  1:19-CR-00864(1)

- ☐ (1)   if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

- ☐ (2)   you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

- ☒ (3)   you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed 300 hours.

- ☐ (4)   you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

- ☒ (5)   you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

- ☒ (6)   you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

- ☒ (7)   within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

- ☒ (8)   you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

- ☐ (9)   you shall participate in a sex offender treatment program.  The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

  - ☐   You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent.  The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations.  A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

  - ☐   The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

  - ☐   You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

  - ☐   You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

  - ☐   You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2),** regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

  - ☐   You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

  - ☐   This condition does not apply to your family members:         [Names]

  - ☐   Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer.  Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity.  You shall not participate in any volunteer activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

  - ☐   You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

  - ☐   You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

DEFENDANT: RISHI SHAH
CASE NUMBER: 1:19-CR-00864(1)

☒ (10)   you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒ (11)   you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐ (12)   you shall pay to the Clerk of the Court $_____ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to _____ (list both Agency and Address.)

☒ (13)   if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐ (14)   You shall observe one Reentry Court session, as instructed by your probation officer.

☐ (15)   Other: _____

**SA217**

Case: 1:19-cr-00864 Document #: 805 Filed: 07/01/24 Page 7 of 23 PageID #:30031
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

Case: 24-2230      Document: 34      Filed: 04/04/2025      Pages: 322      Judgment – Page 7 of 8

DEFENDANT: RISHI SHAH
CASE NUMBER: 1:19-CR-00864(1)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $1,900.00 | TBD | $.00 | $.00 | $.00 |

☒ The determination of restitution is deferred until a restitution hearing takes place. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**. All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the         .

☐ the interest requirement for the      is modified as follows:

☐ The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:  RISHI SHAH
CASE NUMBER:  1:19-CR-00864(1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☒  Lump sum payment of $1,900.00 due immediately.

      ☐  balance due not later than        , or

      ☒  balance due in accordance with ☐ C, ☐ D, ☐ E, or ☒ F below; or

**B**  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C**  ☐  Payment in equal     *(e.g. weekly, monthly, quarterly)* installments of $     over a period of     *(e.g., months or years)*, to commence     *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal     *(e.g. weekly, monthly, quarterly)* installments of $     over a period of     *(e.g., months or years)*, to commence     *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within     *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☒  Special instructions regarding the payment of criminal monetary penalties: you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings**.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☒  Joint and Several with co-defendants Shradha Agarwal and Brad Purdy, amount TBD.

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee, if<br>Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States: See attached Amended Preliminary Order of Forfeiture.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)   No. 19 CR 864-1
v. )
)   Judge Thomas M. Durkin
RISHI SHAH )

## AMENDED PRELIMINARY ORDER OF FORFEITURE

On motion of the United States, this Court previously entered a Preliminary Order of Forfeiture (Doc. #622) with respect to Defendant Rishi Shah. The United States now asks this Court to issue an amended preliminary order of forfeiture pursuant to of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), Title 28, United States Code, Section 2461(c), and Fed. R. Crim. P. 32.2 to correct certain errors and update the Preliminary Order of Forfeiture and to execute a stipulation reached by the parties as to certain funds previously released to Defendant Shah under this Court's orders. Defendant Shah preserves the objections previously raised to the entry of the original Preliminary Order of Forfeiture, which the Court addressed in its prior Order (Doc. #580), but does not further object to the form of this order in light of the Court's ruling.

(a)     On November 21, 2019, a superseding indictment was returned charging RISHI SHAH with mail fraud, in violation of Title 18, United States Code, Section 1341 (Counts 1, 2, 4, 11, 23, and 25); wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts  5, 14, 15, 16, 17, 18, 19, 20, 21, 22, 24, and 26),

**SA220**

and bank fraud, in violation of Title 18, United States Code, Section 1344 (Counts 9 and 13).

(b)    The superseding indictment sought forfeiture to the United States of any and all right, title and interest defendant RISHI SHAH may have in any property which constitutes and is derived from proceeds traceable to the charged mail and wire fraud offenses, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c); and any property which constitutes and is derived from proceeds obtained, directly or indirectly as to the bank fraud offenses, as provided in Title 18, United States Code, Section 982(a)(2)(A).

(c)    Beginning on January 24, 2023, a jury trial was held before this Court.

(d)    On April 11, 2023, the jury returned a verdict of guilty against defendant RISHI SHAH on Counts 1, 2, 4, 5, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 22, 24, 25, and 26 of the superseding indictment, thereby making certain property subject to forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

(e)    Defendant RISHI SHAH waived his right to have the forfeiture allegations in the superseding indictment considered by the jury. It was agreed instead that this Court would consider the issues relating to the forfeiture.

(f)    The government is entitled to entry of a personal money judgment in the amount of $55,000,000 against SHAH, which represents proceeds traceable to the offenses.

(g)     The government is further entitled to the forfeiture of specific property listed in Exhibit A to the United States, as property which represents proceeds defendant obtained as a result of the fraud offenses of conviction. The property is to be applied in partial satisfaction of the personal money judgment.

(h)     The government is further entitled to the forfeiture of substitute property listed in Exhibit B to the United States, to be applied in partial satisfaction of the personal money judgment.

(i)     In addition, the parties have entered into a Stipulation in which Mr. Shah has agreed to forfeit $1.5 million to the United States as substitute property, in exchange for the Government's agreement not to pursue other funds released to Mr. Shah under this Court's prior orders. That $1.5 million is identified in paragraph xx of Exhibit B.

(j)     Because of the defendant's conviction of the above violations, funds in the amount of $55,000,000 are subject to forfeiture as property which constitutes and is derived from proceeds traceable to the violations of conviction, and the property is therefore subject to forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, Section 2461(c). Furthermore, because of the defendant's conviction of the mail, wire, and bank fraud violations, the foregoing property is subject to forfeiture as property which constitutes and is derived from proceeds obtained as result of the violations of conviction, and are therefore subject to forfeiture pursuant to the provisions of Title

18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

(k)    The United States requests that this Court enter a personal money judgment in the amount of $55,000,000, and further enter a preliminary order of forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A), and Title 28, United States Code, Section 2461(c), forfeiting all right, title, and interest defendant RISHI SHAH has in the foregoing property, as property constituting and derived from proceeds of the violations of conviction as charged in the indictment.

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED:

1.    A judgment is entered against RISHI SHAH in the amount of $55,000,000 (the "$55 million money judgment").

2.    Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), Title 28, United States Code, Section 2461(c), and Fed. R. Crim. P. 32.2, all right, title, and interest RISHI SHAH may have in the property listed in Exhibit A, is hereby forfeit to the United States of America for disposition according to law as which constitutes and is derived from proceeds obtained as result of the violations of conviction.

3.    Further, the property listed in Exhibit A and Exhibit B is hereby restrained, and forfeit to the United States of America, up to the value of the $55 million money judgment, though at this time the Court will not order the seizure and liquidation of the property in Exhibit B. If the government obtains authority to seize

**SA223**

and liquidate any property in Exhibit B and in fact liquidates such property, it will be applied in partial satisfaction of the $55 million money judgment.

4.     Pursuant to the provisions of Title 21, United States Code, Section 853(g), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), upon entry of this preliminary order of forfeiture, United States Marshals Service, Federal Bureau of Investigation, or any other authorized law enforcement agency, shall seize and take custody of the property listed in Exhibit A for disposition according to law, and shall post notice of the forfeiture at the subject real property located at 924-926 N. Clark Street, Chicago, Illinois 60610.

4.     Specifically, at the direction of representatives of the United States Department of Justice, including the United States Attorney's Office for the Northern District of Illinois, the Fraud Section, and the United States Marshals Service, the property and accounts listed in Exhibit A shall be liquidated and distributed to the United States.

5.     Further, pursuant to the provisions of Title 21, United States Code, Section 853(n)(1), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), upon entry of this preliminary order of forfeiture, the United States shall publish notice of this order and of its intent to dispose of the subject property according to law. The United States may also, to the extent practicable, provide written notice to any person known to have alleged an interest in the property that is the subject of the preliminary order of forfeiture,

including but not limited to: BLG RES LLC, Chicago Title Land Trust Company, the Cook County Treasurer's Office, and AA Service Company.

6.      Further, pursuant to the provisions of Title 21, United States Code, Section 853(n)(2), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), if, following notice as directed by this Court and Title 21, United States Code, Section 853(n)(1), any person, other than the defendant, asserts a legal interest in the subject property that has been ordered forfeited to the United States within thirty days of the final publication of notice or this receipt of notice under paragraph 5, whichever is earlier, and petitions the Court for a hearing to adjudicate the validity of this alleged interest in the property, the government shall request a hearing. The hearing shall be held before the court alone, without a jury.

7.      Following the Court's disposition of all third party interests, the Court shall, upon the government's motion, if appropriate, enter a final order of forfeiture as to the subject property which shall vest clear title in the United States of America.

8.      If by any act or omission on the part of defendant RISHI SHAH, funds in the amount of $55,000,000 cannot be located to satisfy the forfeiture judgment, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), the United States has the authority to forfeit substitute assets up to the amount of the outstanding balance to satisfy the money judgment entered by this Court.

9.     Should assets become available to satisfy the forfeiture judgment in the future, the United States shall at that time file a motion for substitution of assets before this Court requesting permission to seize such assets and publish notice of the United States' intent to forfeit the property in satisfaction of the forfeiture money judgment according to law.

10.    Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), Title 28, United States Code, Section 2461(c), and Fed. R. Crim. P. 32.2, the terms and conditions of this preliminary order of forfeiture entered by this Court be made part of the sentence imposed against defendant RISHI SHAH and included in any judgment and commitment order entered in this case against him.

11.    The government shall provide notice of this order to the entities referenced in Exhibits A and B.

12.    This Court shall retain jurisdiction in this matter to take additional action and enter further orders as necessary to implement and enforce this forfeiture order.

_Thomas M Durkin_
_____
THOMAS M. DURKIN
United States District Court Judge

Dated:  6/18/2024

**SA226**

Exhibit A

(a)   All right, title and interest in 7Wire Ventures Fund LP, regardless of whether such interest is held in cash, stock or otherwise, held in the name of Jumpstart Ventures II, LLC that was acquired by or exchanged for $280,000 in capital contributions submitted on or around January 5, 2017, and $60,000 in capital contributions submitted on or around May 31, 2018, plus any appreciation on that right, title and interest;

(b)   the property located at 924-926 N. Clark Street, Chicago, Illinois 60610 and legally described as:

LOT 6 (EXCEPT THE SOUTH 23.00 FEET THEREOF) AND ALL OF LOTS 7 AND 8 IN SUBDIVISION OF THE SOUTH HALF (EXCEPT THE WEST 171.25 FEET THEREOF) OF BLOCK 11 BUSHNELLS'S ADDITION TO CHICAGO IN SECTION 4, TOWHHSIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT ENTITLED "PLAT OF SUBDIVISION CONTINUED OF THE SOUTH HALF OF BLOCK 11 IN BUSHNELL'S ADDITION RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS IN BOOK 12 OF PLATS PAGE 68 AS DOCUMENT 143621, IN COOK COUNTY, ILLINOIS.

PIN: 17-04-431-014-0000;

(c)   All right, title and interest in AP 100 W Huron Investors, LLC, or any successor entity, held in the name of Gravitas Holdings, LLC, that was 17.747958% of 100 W Huron Investors, LLC on or about October 10, 2017, acquired by $2,537,695 from Gravitas Holdings, LLC and RISHI SHAH, on or about that same date, plus any appreciation on that right, title and interest;

(d)   All right, title and interest in Eight Partners VC Fund I, LP held in the name of Jumpstart Ventures II, LLC, that was acquired by or exchanged for $175,000 in capital contributions submitted between approximately July 15, 2016 and June 14, 2017, and $15,000 in capital contributions submitted on or about April 24, 2018, plus any appreciation on such right, title and interest;

(e)   All right, title and interest in Guild Capital and investments made by Guild Capital, held in the name of or for the benefit of Gravitas Holdings, LLC and Jumpstart Ventures II, LLC, that were acquired by or exchanged for $75,000 in capital contributions submitted on or about August 12, 2016, and $475,000 in capital contributions submitted between approximately August 1, 2017, and November 27, 2018, plus any appreciation on such right, title and interest;

(f)   All right, title and interest in Healthx Ventures Fund, held in the name of Jumpstart Ventures II LLC, Gravitas Holdings, LLC, and RISHI SHAH that

1

**SA227**

Exhibit A

was acquired by or exchanged for $22,000 in capital contributions submitted on or about October 27, 2016, and $12,000 in capital contributions submitted on or about May 2, 2018, plus any appreciation on that right, title and interest;

(g)    All right, title and interest in Institutional Venture Partners XVI, LP, and in Institutional Venture Partners XV, LP, held in the name of Gravitas Holdings, LLC and Jumpstart Ventures II LLC, that was acquired by or exchanged for $80,000 in capital contributions submitted on or around January 5, 2017, and $1,800,000 in capital contributions submitted between approximately March 2, 2018, and July 9, 2019, plus any appreciation on that right, title and interest;

(h)    All right, title and interest in L Squared Capital Management, LP, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $35,000 in capital contributions submitted on or around January 5, 2017, and $303,045 in capital contributions submitted between approximately September 27, 2017, and July 17, 2019, plus any appreciation on such right, title and interest;

(i)    All right, title and interest in L Squared Capital Partners II, LLC, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $2,235,621 in capital contributions submitted between approximately June 2, 2017, and July 18, 2017, plus any appreciation on that right, title and interest;

(j)    All right, title and interest in Leerink Transformation Fund I, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $2,980,631 in capital contributions submitted between July 28, 2017, and July 1, 2019, plus any appreciation on that right, title and interest, including $3,642,189 seized by the government on or about September 30, 2021, currently held in a United States Marshals Service escrow account, plus any appreciation on those funds;

(k)    All right, title and interest in Leerink Transformation Partners, LTP BHE LP, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $319,489 in capital contributions submitted on or about June 28, 2019, plus any appreciation on that right, title and interest;

(l)    All right, title and interest in Monarch Capital Partners IV, LP, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $1,526,821.96 in capital contributions submitted between approximately May 9, 2019, and July 25, 2019, plus any appreciation on that right, title and interest, including $1,223,066.35 currently held in a United States Marshals Service escrow account, plus any appreciation on those funds;

**SA228**

Exhibit A

(m)   All right, title and interest in approximately 60,053 shares of Series A2 Preferred Stock of Swipesense, which were converted into interest in SC Johnson, held in the name of Jumpstart Ventures II, LLC; 90,425 shares of Series B3 Preferred Stock of Swipesense, converted into interest in SC Johnson, held in the name of Gravitas Holdings, LLC,; 252,045 shares of Series B4 Preferred Stock of Swipesense, converted into interest in SC Johnson, held in the name of Gravitas Holdings, LLC; and 361,702 shares of Series B Preferred Stock of Swipesense, converted into interest in SC Johnson, held in the name of Gravitas Holdings, LLC and Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest;

(n)   All right, title and interest in Valor Equity Partners IV, LP, held in the name of Gravitas Holdings, LLC, that was acquired by or exchanged for $2,222,238 in capital contributions submitted on or about August 14, 2017, plus any appreciation on that right, title and interest;

(o)   $7,461,413.17 in Account XAZ006290 and all linked accounts at Pershing, LLC, held in the name of Gravitas Holdings, LLC, including, but not limited to, Accounts XEJ006076, XEJ006159, XEJ003123, XA6063129, XEJ007090, and XEJ007108, plus any appreciation on those funds;

(p)   All right, title and interest in approximately 3,291 shares of common stock of Instructure, Inc., held in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest;

(q)   All right, title and interest in Boom Train, currently known as Zeta Global Holdings Corp, held in the name of Gravitas Holdings, LLC, Jumpstart Ventures II LLC, and RISHI SHAH that was acquired by or exchanged for $18,161 in capital contributions on or about January 5, 2017, plus any appreciation on that right, title and interest;

(r)   All right, title and interest in I2A Ventures SPV held in the name of Jumpstart Ventures II, LLC that was acquired by, or exchanged for $1,000,000 in capital contributions submitted on or about May 9, 2016, plus any appreciation on those funds;

(s)   All right, title and ownership in Chicago Ventures Founders Fund LP held in the name of Jumpstart Ventures II, LLC that was acquired by, or exchanged for $100,000 in capital contributions submitted on or about June 28, 2016, plus any appreciation on that right, title and interest, including $329,933.80[1] currently held in a United States Marshals Service escrow account, plus any appreciation on those funds;

---

[1] Updated to include $14,152.26 that was previously listed in paragraph (r)

**SA229**

Exhibit A

(t)    All right, title, and interest in Diversified 321 N Clark, LLC, held by or in the name of Jumpstart Ventures II, LLC, that was acquired by, or exchanged for $200,000 in capital contributions submitted on or about August 8, 2016, plus any appreciation on that right, title and interest;

(u)    All right, title and interest in Greatpoint Ventures Innovation Fund, LP, held in the name of Jumpstart Ventures II LLC, that was acquired by or exchanged for $158,879 in capital contributions submitted between approximately August 8, 2016, and April 28, 2017, including 209 shares (38% of 549 shares) of Beyond Meat held in the name of Jumpstart Ventures II LLC, which were held in a Merrill Lynch account, plus any appreciation on that right, title and interest;

(v)    All right, title and interest in MATH Venture Partners, LP held in the name of Jumpstart Ventures LLC, that was acquired by or exchanged for $45,000 in capital contributions submitted on or about October 11, 2016, plus any appreciation on that right, title and interest;

(w)    All right, title and interest in approximately 250,454 shares of Series Preferred AA stock of Silvervue, Inc., and 751,362 shares of common stock of Silvervue, Inc., held in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest;

(x)    All right, title and interest in approximately 705,417 shares of Wisercare that was acquired by or exchanged for $250,000 on or about August 5, 2016, held in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest;

(y)    Funds in the amount of $6,500,000 turned over to the government by Quinn Emanuel Urquhart & Sullivan LLP on or about July 7, 2020, currently held in a United States Marshals Service escrow account, plus any appreciation on those funds.

(z)    All right, title and interest in Corazon Capital II, LP, held in the name of Jumpstart Ventures II, LLC that was acquired by or exchanged for $50,000 in capital contributions submitted on or about January 5, 2017, plus any appreciation on that right, title and interest, including $38,923.25 currently held in a United States Marshals Service escrow account, plus any appreciation on those funds;

(aa)   All right, title and interest in Impact Engine IV, LLC, held in the name of Rishi Shah, Shradha Agarwal, Brad Purdy, Gravitas Holdings, LLC, and Jumpstart Ventures LLC, that was acquired or exchanged for $35,000 in capital contributions, plus any appreciation on that right title and interest, and

4

**SA230**

Exhibit A

(bb)   All right, title and interest in Institutional Venture Partners XV, LP held in the name of Jumpstart Ventures, LLC and/or Gravitas Holdings, LLC, that was acquired by, or exchanged for $40,000 in capital contributions submitted on or about July 15, 2016, plus any appreciation on those funds.

**SA231**

Exhibit B

i.    All right, title, and interest in 7Wire Ventures Fund, held by or in the name of Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $60,000 and $280,000 in capital contributions (plus any appreciation) directly forfeitable;

ii.   All right, title, and interest in Eight Partners VC Fund I, LP, held by or in the name of Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $15,000 and $175,000 in capital contributions (plus any appreciation) directly forfeitable;

iii.  All right, title, and interest in Guild Capital and investments made by Guild Capital, held by or in the name of Gravitas Holdings, LLC or Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $475,000 and $75,000 in capital contributions (plus any appreciation) directly forfeitable;

iv.   All right, title, and interest in Healthx Ventures Fund held by or in the name of RISHI SHAH, Gravitas Holdings, LLC, or Jumpstart Ventures II LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $12,000 and $22,000 in capital contributions (plus any appreciation) directly forfeitable;

v.    All right, title, and interest in Institutional Venture Partners XVI, LP, and in Institutional Venture Partners XV, LP, held by or in the name of RISHI SHAH, Gravitas Holdings, LLC, or Jumpstart Ventures II LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $1,800,00000, $80,000 and $200,000 in capital contributions (plus any appreciation) directly forfeitable;

vi.   All right, title, and interest in L Squared Capital Management, LP, held by or in the name of Gravitas Holdings, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $303,045.00 in capital contributions (plus any appreciation) directly forfeitable;

vii.  All right, title, and interest in L Squared Capital Partners II, LLC and L Squared Capital Partners II, LLC – Series Oracle, held by or in the name of Gravitas Holdings, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $2,235,621.00 in capital contributions (plus any appreciation) directly forfeitable;

**SA232**

viii.    All right, title, and interest in Leerink Transformation Partners – LTD BHE LP, held by or in the name of Gravitas Holdings, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $319,489.00 in capital contributions (plus any appreciation) directly forfeitable;

ix.    All right, title, and interest in Monarch Capital Partners IV, LP, held by or in the name of Gravitas Holdings, LLC, plus any appreciation on such right, title and interest, less the right, title, and interest acquired by or equivalent to $1,526,821.96 in capital contributions (plus any appreciation) directly forfeitable;

x.    All right, title, and interest in Swipesense, Inc., converted into interests in SC Johnson, held by or in the name of Jumpstart Ventures II, LLC, plus any appreciation on such right, title and interest, less the 60,053 shares of Series A2 Preferred Stock directly forfeitable, less the 90,425 shares of Series B3 Preferred Stock directly forfeitable, less the 252,045 shares of Series B4 Preferred Stock directly forfeitable, and less the 361,702 shares of Series B Preferred stock, converted into interest in SC Johnson, (plus any appreciation) directly forfeitable;

xi.    All right, title, and interest in Account XAZ006290 and all linked accounts at Pershing, LLC, held in the name of Gravitas Holdings, LLC, including, but not limited to, Accounts XEJ006076, XEJ006159, XEJ003123, XA6063129, XEJ007090, and XEJ007108, plus any appreciation on such right, title and interest, less the $7,461,413.17 (plus any appreciation) directly forfeitable;

xii.    All right, title, and interest in Boom Train, currently known as Zeta Global Holdings Corp, held by or on behalf of RISHI SHAH, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $18,161 in capital contributions (plus any appreciation) directly forfeitable;

xiii.    All right, title, and interest in I2A Fund II LLC, held by or in the name of Jumpstart Ventures II LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $1,000,000 in capital contributions (plus any appreciation) directly forfeitable;

xiv.    All right, title, and interest in Chicago Ventures Founders Fund LP, held by or in the name of Jumpstart Ventures II LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $100,000 in capital contributions (plus any appreciation) directly forfeitable;

xv.  All right, title, and interest in Diversified 321 N Clark, LLC, held by or in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $200,000 in capital contributions (plus any appreciation) directly forfeitable;

xvi.  All right, title, and interest in Greatpoint Ventures Innovation Fund, LP, held by or in the name of Jumpstart Ventures II, LLC, including 340 shares of Beyond Meat, which were held in a Merrill Lynch account, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $158,879.00 in capital contributions and 209 shares of Beyond Meat (plus any appreciation) directly forfeitable;

xvii.  All right, title, and interest in MATH Venture Partners, LP, held in the name of Jumpstart Ventures LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $45,000 in capital contributions (plus appreciation) directly forfeitable;

xviii.  All right, title and interest in Corazon Capital II, LLC, held in the name of Jumpstart Ventures II, LLC, plus any appreciation on that right, title and interest, less the right, title and interest that was acquired by or exchanged for $50,000 in capital contributions (plus any appreciation) directly forfeitable;

xix.  All right, title and interest in Impact Engine IV, LLC, held in the name of Gravitas Holdings, LLC, Jumpstart Ventures II LLC and RISHI SHAH, plus any appreciation on that right, title and interest, less the right, title and interest that was acquired by or exchanged for $35,000 in capital contributions (plus any appreciation) directly forfeitable;

xx.  All right, title and interest in $1.5 million in funds held in a client trust account at the Bryan Cave Leighton Paisner law firm for credit to RISHI SHAH; and

xxi.  All right, title and interest in Institutional Venture Partners XV, LP held in the name of Jumpstart Ventures, LLC and/or Gravitas Holdings, LLC, plus any appreciation on that right, title and interest, less the right, title, and interest acquired by or equivalent to $40,000 in capital contributions (plus any appreciation) directly forfeitable.

## Trial Transcripts – Volumes/Pages

| Record No. | Volume No. | Trial Date | Transcript Pages |
|---|---|---|---|
| R.582 | 1 | 01/30/2023 | 1-245 |
| R.583 | 2 | 01/31/2023 | 246-554 |
| R.584 | 3 | 02/01/2023 | 555-822 |
| R.585 | 4 | 02/02/2023 | 823-1095 |
| R.586 | 5 | 02/06/2023 | 1096-1388 |
| R.587 | 6 | 02/07/2023 | 1389-1698 |
| R.588 | 7 | 02/08/2023 | 1699-1999 |
| R.589 | 8 | 02/09/2023 | 2000-2290 |
| R.590 | 9 | 02/13/2023 | 2291-2576 |
| R.591 | 10 | 02/14/2023 | 2577-2829 |
| R.592 | 11 | 02/15/2023 | 2830-3118 |
| R.593 | 12 | 02/16/2023 | 3119-3388 |
| R.594 | 13 | 02/21/2023 | 3389-3667 |
| R.595 | 14 | 02/22/2023 | 3668-3953 |
| R.596 | 15 | 02/23/2023 | 3954-4149 |
| R.597 | 16 | 02/27/2023 | 4150-4476 |
| R.598 | 17 | 02/28/2023 | 4477-4793 |
| R.599 | 18 | 03/01/2023 | 4794-5046 |
| R.600 | 19 | 03/02/2023 | 5047-5295 |
| R.601 | 20 | 03/06/2023 | 5296-5602 |

| Record No. | Volume No. | Trial Date | Transcript Pages |
| --- | --- | --- | --- |
| R.602 | 21 | 03/07/2023 | 5603-5899 |
| R.603 | 22 | 03/08/2023 | 5900-6193 |
| R.604 | 23 | 03/09/2023 | 6194-6493 |
| R.605 | 24 | 03/13/2023 | 6494-6780 |
| R.606 | 25 | 03/14/2023 | 6781-7104 |
| R.607 | 26 | 03/15/2023 | 7105-7433 |
| R.608 | 27 | 03/16/2023 | 7434-7724 |
| R.609 | 28 | 03/20/2023 | 7725-8026 |
| R.610 | 29 | 03/21/2023 | 8027-8304 |
| R.611 | 30 | 03/22/2023 | 8305-8585 |
| R.612 | 31 | 03/23/2023 | 8586-8860 |
| R.613 | 32 | 03/24/2023 | 8861-8953 |
| R.614 | 33 | 03/27/2023 | 8954-9136 |
| R.615 | 34 | 03/28/2023 | 9137-9374 |
| R.616 | 35 | 03/29/2023 | 9375-9612 |
| R.617 | 36 | 03/30/2023 | 9613-9856 |
| R.618 | 37 | 04/03/2023 | 9857-10073 |
| R.619 | 38 | 04/04/2023 | 10074-10252 |
| R.620 | 39 | 04/05/2023 | 10253-10455 |
| R.621* | 40 | 04/06/2023 | 10456-10477 |
| R.623 | 41 | 04/11/2023 | 10478-10491 |

*Filed Under Seal