IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

RISHI SHAH and SHRADHA AGARWAL,
Defendants–Appellants.

———————————

On Appeal from the United States District Court for the
Northern District of Illinois, No. 1:19-CR-864
(Hon. Thomas M. Durkin)

———————————

**RESPONSE BRIEF FOR THE UNITED STATES**

———————————

ANDREW S. BOUTROS
United States Attorney

JASON A. YONAN
Assistant United States Attorney
Northern District of Illinois

MATTHEW R. GALEOTTI
Acting Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES ....................................................................... v

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION............................................................ 1

ISSUES PRESENTED ............................................................................. 2

STATEMENT OF THE CASE ................................................................... 2

    A.    Procedural History...................................................................... 2

    B.    Relevant Facts ............................................................................ 3

            1.    Shah and Agarwal founded ContextMedia, later renamed Outcome Health. ............................................................... 4

            2.    Shah and Agarwal schemed to defraud pharmaceutical clients................................................................................... 6

                    a.    Falsified list-matching............................................. 6

                    b.    Under-delivery on contracts ................................... 10

                    c.    False proofs of performance ................................... 14

                      d.    Manipulated return-on-investment studies .............. 16

            3.    Outcome employees repeatedly raised concerns with Shah and Agarwal about the business's practices. ..................... 18

            4.    Shah and Agarwal schemed to defraud lenders and investors....................................................................... 24

SUMMARY OF ARGUMENT ................................................................. 26

ARGUMENT ....................................................................................... 32

I.  Shah and Agarwal waived their primary Fifth and Sixth Amendment claims, and those claims are meritless in any event—particularly on plain-error review.................................................................. 32

    A.  Background .............................................................. 33

        1.  The overbroad protective order......................................... 33

        2.  The district court's post-trial decision............................. 36

            a.  Timeliness.................................................... 37

            b.  The Sixth Amendment.......................................... 38

            c.  Fifth Amendment.............................................. 39

    B.  Standard of review ..................................................... 40

    C.  Defendants cannot show good cause for failing to raise their primary claims before trial, so this Court should not consider those claims................................................................. 42

    D.  No Sixth Amendment violation occurred, much less a clear or obvious one. ............................................................ 45

        1.  The district court correctly considered whether the untainted funds would have allowed Shah to hire his identified counsel of choice................................................... 47

        2.  The district court correctly placed the burden on Shah to demonstrate that the over-restraint deprived him of counsel of choice................................................... 49

        3.  The district court did not clearly err in estimating the amount of liquid funds Defendants would have had in June 2020 but for the overbroad restraint. ......................... 50

        4.  The district court correctly held that the settlement agreement did not purge traceable funds of their taint....... 56

        5.  Agarwal's additional claims also fail............................... 58

E.   No Fifth Amendment violation occurred, much less a clear or obvious one. ............................................................................. 60

F.   Defendants' unpreserved Fifth and Sixth Amendment claims do not satisfy the fourth plain-error prong either............................ 64

II.   The district court did not abuse its discretion in admitting grand jury statements as prior consistent statements........................................... 64

A.   Background ........................................................................... 65

B.   Standard of review ................................................................ 66

C.   The district court correctly exercised its discretion by admitting the statements under Rule 801(d)(1)(B)........................................ 67

1.   The prior statements were admissible as pre-motive statements under Rule 801(d)(1)(B)(i). ............................ 67

2.   Many of the prior statements were also admissible to rebut credibility attacks on "[]other ground[s]" under Rule 801(d)(1)(B)(ii)................................................................. 72

D.   The district court properly exercised its authority in admitting the full statements with limited redactions. ..................................... 74

E.   Any error in admitting the prior consistent statements was harmless. ............................................................................... 75

III.   The district court did not plainly err in instructing the jury on the elements of mail, wire, and bank fraud............................................. 78

A.   Background ........................................................................... 79

B.   Standard of review ................................................................ 80

C.   The instructions did not allow the jury to convict based solely on under-delivery on a contract. ................................................. 84

D.   The jury instructions did not misstate the law regarding fraudulent inducement............................................................................ 90

E.  Any instructional error did not prejudice Defendants or seriously undermine the integrity of judicial proceedings. ......................... 94

CONCLUSION ........................................................................ 97

CERTIFICATE OF COMPLIANCE ........................................... 98

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland,*
  373 U.S. 83 (1963) ................................................................. 62

*Ciminelli v. United States,*
  598 U.S. 306 (2023) ............................................................... 94

*Cleveland v. United States,*
  531 U.S. 12 (2000) ................................................................. 82

*Corley v. Rosewood Care Center, Inc. of Peoria,*
  388 F.3d 990 (7th Cir. 2004) ............................................. 84, 85

*Davis v. United States,*
  411 U.S. 233 (1973) ............................................................... 43

*Durland v. United States,*
  161 U.S. 306 (1896) ......................................................... 86, 87

*Evans v. United States,*
  153 U.S. 584 (1894) ............................................................... 86

*Greer v. United States,*
  593 U.S. 503 (2021) ............................................................... 83

*Hedgpeth v. Pulido,*
  555 U.S. 57 (2008) .......................................................... 32, 95

*Johnson v. United States,*
  520 U.S. 461 (1997) ............................................................... 83

*Kaley v. United States,*
  571 U.S. 320 (2015) ......................................................... 46, 63

*Kousisis v. United States,*
  145 S. Ct. 1382 (2025) ........................................... 31, 86, 91, 94

*Kyles v. Whitley,*
514 U.S. 419 (1994) ............................................................ 62

*Luis v. United States,*
578 U.S. 5 (2016).................................................. 27, 46, 48

*Marks v. United States,*
430 U.S. 188 (1977) ........................................................46, 47

*Medina v. California,*
505 U.S. 437 (1992) ............................................................ 50

*Miller v. Greenleaf Orthopedic Associates, S.C.,*
827 F.3d 569 (7th Cir. 2016) ........................................68, 75

*Musacchio v. United States,*
577 U.S. 237 (2016) ............................................................ 83

*Napue v. Illinois,*
360 U.S. 264 (1959) ............................................................ 60

*Neder v. United States,*
527 U.S. 1 (1999) ................................................................ 90

*Perlman v. Zell,*
185 F.3d 850 (7th Cir. 1999) ............................................ 84

*Puckett v. United States,*
556 U.S. 129 (2009) ............................................41, 42, 64, 97

*Ramos v. Louisiana,*
590 U.S. 83 (2020) .............................................................. 47

*Skilling v. United States,*
561 U.S. 358 (2010) ............................................................ 95

*Tome v. United States,*
513 U.S. 150 (1995) .........................................29, 66, 67, 68, 70, 71, 72, 77

*U.S. ex rel. Main v. Oakland City University,*
426 F.3d 914 (7th Cir. 2005) ............................................ 84

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
  822 F.3d 650 (2d Cir. 2016) .......................................................... 84, 85, 88

*United States v. Anderson*,
  881 F.3d 568 (7th Cir. 2018) ................................................................ 42

*United States v. Batio*,
  No. 21-3195, 2023 WL 8446388 (7th Cir. Dec. 6, 2023) .......................... 85

*United States v. Begay*,
  116 F.4th 795 (8th Cir. 2024) ................................................................ 72

*United States v. Benitez*,
  92 F.3d 528 (7th Cir. 1996) ................................................................... 82

*United States v. Blagojevich*,
  794 F.3d 729 (7th Cir. 2015) ............................................................95, 96

*United States v. Bonin*,
  932 F.3d 523 (7th Cir. 2019) ................................................................. 67

*United States v. Borrero*,
  771 F.3d 973 (7th Cir. 2014) ............................................................82, 95

*United States v. Brooks*,
  125 F.3d 484 (7th Cir. 1997) ............................................................61, 64

*United States v. Burke*,
  425 F.3d 400 (7th Cir. 2005) ..................................................... 60, 61, 64

*United States v. Cardena*,
  842 F.3d 959 (7th Cir. 2016) ................................................................. 96

*United States v. Carpenter*,
  104 F.4th 655 (7th Cir. 2024) ............................................................... 46

*United States v. Collicott*,
  92 F.3d 973 (9th Cir. 1996) ................................................................... 75

*United States v. Coscia*,
  866 F.3d 782 (7th Cir. 2017) ................................................................. 80

*United States v. DiSantis*,
565 F.3d 354 (7th Cir. 2009) .................................................. 95

*United States v. Dominguez Benitez*,
542 U.S. 74 (2004).............................................................. 50

*United States v. Echols*,
104 F.4th 1023 (7th Cir. 2024)........................................71, 75

*United States v. Fattah*,
858 F.3d 801 (3d Cir. 2017)................................................. 87

*United States v. Fuertes*,
805 F.3d 485 (4th Cir. 2015) .............................................. 84

*United States v. Fulford*,
980 F.2d 1110 (7th Cir. 1992) ............................................. 71

*United States v. Gan*,
54 F.4th 467 (7th Cir. 2022) ............................................... 81

*United States v. Gee*,
226 F.3d 885 (7th Cir. 2000) ............................................... 82

*United States v. Gonzalez-Lopez*,
548 U.S. 140 (2006) ........................................................... 45

*United States v. Hamzeh*,
986 F.3d 1048 (7th Cir. 2021)............................................. 67

*United States v. Jacobs*,
134 F.4th 977 (7th Cir. 2025) ............................................. 45

*United States v. James*,
464 F.3d 699 (7th Cir. 2006) ............................................... 82

*United States v. Jones*,
844 F.3d 636 (7th Cir. 2016) ..............................40, 41, 43, 47

*United States v. Leahy*,
464 F.3d 773 (7th Cir. 2006) ........................................91, 93

*United States v. Lindell,*
 766 F. App'x 525 (9th Cir. 2019) ............................................ 41

*United States v. Lozada-Rivera,*
 177 F.3d 98 (1st Cir. 1999) .................................................... 75

*United States v. Maez,*
 960 F.3d 949 (7th Cir. 2020) .................................................. 42

*United States v. Masquelier,*
 210 F.3d 756 (7th Cir. 2000) .................................................. 86

*United States v. Medrano,*
 83 F.4th 1073 (7th Cir. 2023) ................................................ 75

*United States v. Morris,*
 80 F.3d 1151 (7th Cir. 1996) .................................................. 63

*United States v. Moya-Gomez,*
 860 F.2d 706 (7th Cir. 1988) ............................................47, 49

*United States v. Nelson,*
 39 F.3d 705 (7th Cir. 1994) ................................................... 68

*United States v. Olano,*
 507 U.S. 725 (1993) .............................................................. 41

*United States v. Portillo,*
 969 F.3d 144 (5th Cir. 2020) .............................................73, 74

*United States v. Radziszewski,*
 474 F.3d 480 (7th Cir. 2007) .................................................. 86

*United States v. Ramos-Caraballo,*
 375 F.3d 797 (8th Cir. 2004) .................................................. 75

*United States v. Roth,*
 860 F.2d 1382 (7th Cir. 1988) ................................................ 81

*United States v. Sellers,*
 645 F.3d 830 (7th Cir. 2011) .................................................. 45

*United States v. Shields,*
   789 F.3d 733 (7th Cir. 2015) .................................. 63

*United States v. Simonelli,*
   237 F.3d 19 (1st Cir. 2001) .................................. 75

*United States v. Stein,*
   541 F.3d 130 (2d Cir. 2008)................................. 45

*United States v. Stoecker,*
   215 F.3d 788 (7th Cir. 2000) .................................. 71

*United States v. Vincent,*
   416 F.3d 593 (7th Cir. 2005) .................................. 63

*United States v. Wheeler,*
   540 F.3d 683 (7th Cir. 2008) .................................. 81

*United States v. Young,*
   316 F.3d 649 (7th Cir. 2002) .................................. 77

*United States v. Young,*
   470 U.S. 1 (1985)................................. 83

*Weaver v. Massachusetts,*
   582 U.S. 286 (2017) .................................. 50

*Wheat v. United States,*
   486 U.S. 153 (1988) ..................................45, 48

*Yates v. United States,*
   354 U.S. 298 (1957) .................................. 95

## Statutes, Rules, and Constitutional Provisions

U.S. Const. amend. VI .................................. 45

18 U.S.C. § 981 ..................................56, 58

18 U.S.C. § 1341 ..................................2, 3, 84

18 U.S.C. § 1343 ................................................................2, 3, 84

18 U.S.C. § 1344 ................................................................2, 3, 84

18 U.S.C. § 1956 ....................................................................... 56

18 U.S.C. § 1957 ......................................................................... 3

18 U.S.C. § 1961 ....................................................................... 56

21 U.S.C. § 853 ....................................................................46, 53

Fed. R. App. P. 4 ....................................................................... 2

Fed. R. Crim. P. 12 ...............................................................42, 43

Fed. R. Crim. P. 30 .................................................................. 81

Fed. R. Evid. 801 ................................... 29, 30, 64, 67, 71, 72, 73

**Other Authorities**

1A Charles Alan Wright & Arthur R. Miller, Federal Practice and
    Procedure (5th ed. Updated May 2025) ................................... 42

William J. Bauer Pattern Criminal Jury Instructions of the Seventh
    Circuit (2023 ed.).................................................................... 79

# INTRODUCTION

Defendants Rishi Shah and Shradha Agarwal founded and ran a company that defrauded pharmaceutical companies, lenders, and investors out of millions of dollars. They admitted at trial that their company committed fraud but tried to pin all the blame on one employee, Ashik Desai, whom they claimed conducted the years-long fraud under their noses without their knowledge. After the jury rejected that theory, Shah and Agarwal belatedly claimed they had been deprived of counsel of choice in violation of the Sixth Amendment because the pretrial restraints on their assets left them about $4 million and $2.25 million respectively in liquid assets to pay for counsel. The district court rightly determined that claim was waived and that, in any event, the untainted funds that were mistakenly restrained would not have allowed Defendants to obtain their identified counsel of choice. On appeal, Shah and Agarwal provide no basis to disturb the district court's conclusions or its rejection of their related Fifth Amendment claim. Similarly, their challenges to the admission of evidence and the jury instructions lack merit and, in any event, fail for lack of prejudice. This Court should affirm.

# STATEMENT OF JURISDICTION

Appellants' jurisdictional statements are complete but incorrect. The judgments against Shah and Agarwal, though dated "July 1, 2024" on the

1

docket, were actually "entered" on July 2, 2024. *See* Dkt. Entries 805, 807

("Entered: 07/02/2024"); Fed. R. App. P. 4(b)(1)(A)(i) (referring to "entry" of

the judgment).

## ISSUES PRESENTED

1.  Whether Defendants' claims that they were deprived of counsel of

    choice under the Sixth Amendment and that the government introduced

    false grand jury testimony in violation of the Fifth Amendment are

    (a) waived, (b) forfeited, or (c) meritorious under the applicable standard

    of review.

2.  Whether the district court abused its discretion by admitting three

    witnesses' grand jury statements as prior consistent statements under

    Federal Rule of Evidence 801(d)(1)(B).

3.  Whether the district court plainly erred when instructing the jury on

    mail, wire, and bank fraud.

## STATEMENT OF THE CASE

### A.    Procedural History

A jury convicted Shah on five counts of mail fraud, in violation of 18

U.S.C. § 1341 (Counts 1, 2, 4, 11, and 25); ten counts of wire fraud, in

violation of 18 U.S.C. § 1343 (Counts 5, 14-19, 22, 24, and 26); two counts of

bank fraud, in violation of 18 U.S.C. § 1344 (Counts 9 and 13); and two counts

of money laundering, in violation of 18 U.S.C. § 1957 (Counts 10 and 12). R.805:1.[1] The jury convicted Agarwal on five counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 1, 2, 4, 11, and 25); eight counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 14-18, 22, 24, and 26); and two counts of bank fraud, in violation of 18 U.S.C. § 1344 (Counts 9 and 13). R.807:1. The district court sentenced Shah to 90 months of imprisonment, to be followed by three years of supervised release. R.805:2-3. It sentenced Agarwal to one day of imprisonment, to be followed by three years of supervised release. R.807:2-3. It imposed forfeiture money judgments of $55 million against Shah and $13.7 million against Agarwal and ordered forfeiture of specific assets. R.805:12; R.807:12. The court granted Shah's motion for bail pending appeal and stayed the commencement of Agarwal's supervised release. R.882, R.886.

## B.    Relevant Facts

Shah and Agarwal founded and built a company that provided pharmaceutical advertising on screens installed in doctors' offices. In their efforts to grow quickly, they sold advertising on screens that were not yet (and

---

[1] This brief cites district-court documents as "R.[docket #]:[page #]"; trial transcripts as "Tr.[page #]"; transcripts from the post-trial evidentiary hearing as "Hearing.Tr.[page #]"; sentencing transcripts as "Sentencing.Tr.[page #]"; the government's exhibits as "GX[exhibit #]:[page #]"; and Shah's short appendix as "SA[page #]."

often never) installed.  From 2011 to 2017, Shah and Agarwal engaged in a scheme that deprived pharmaceutical clients, lenders, and investors of millions of dollars.

### 1. Shah and Agarwal founded ContextMedia, later renamed Outcome Health.

Rishi Shah founded ContextMedia around 2006, while a student at Northwestern University, and served as the company's chief executive officer. Tr.1937-38, 3370, 3401.  Shradha Agarwal, Shah's Northwestern classmate, joined the company fulltime in 2008.  Tr.3064, 3374.  Agarwal held several titles, including chief marketing officer and chief strategy officer, before being named president and cofounder around 2013.  Tr.580-81, 3033-34, 3402.  Shah and Agarwal held, respectively, 80% and 20% interests in ContextMedia and 63% and 23% interests in ContextMedia's holding company.  Tr.7759, 7793.

In 2017, ContextMedia rebranded as Outcome Health (the name used at trial).  Tr.219-20, 491.  Between 2011 and 2018, the company grew from about 20 employees to nearly 600 employees, with offices in Chicago and New York City.  Tr.573, 3634.  The company provided free screens in willing doctors' offices (what Outcome called "membership") and was compensated by pharmaceutical companies for playing advertisements on these screens (what Outcome called "sponsorship").  Tr.570-73, 2157, 3438-39.  The screens, which originally included only waiting-room televisions but eventually

4

included interactive tablets and wallboards in exam rooms, targeted patients with pharmaceutical advertisements and educational content related to the doctor's specific type of practice. Tr.237, 598-99, 3438, 6041-42.

Shah was "the thought leader behind how sales were done at Outcome," Tr.274, and was "knowledgeable of everything that was going on," Tr.3832. Agarwal oversaw sponsorship sales around 2012 and 2013, but subsequently focused more on marketing, human resources, and media content. Tr.224, 587, 3407, 3834. During her time overseeing sponsorship sales, Agarwal was "knowledgeable about what was happening at a program-by-program level." Tr.3839.

Two other high-level employees were involved in the fraud described below. Brad Purdy began working as chief operating officer in 2012 and later became the chief financial officer as well.[2] Tr.3379, 3402-03, 3840, 3989. Ashik Desai started working for Outcome as vice president of research and analytics in August 2013, at the age of 20. Tr.3378, 3400, 3408. After a few months at the company, Desai became the head of sponsorship sales. Tr.3437. But the fraud did not begin with Desai. "[P]ervasive" fraud was "something

---

[2] The jury convicted Purdy on multiple counts in his joint trial with Shah and Agarwal, *see* R.809 (judgment), but he has not appealed.

that [he] saw when [he] first started at the company" and that continued through his "entire tenure at Outcome."  Tr.3397.

### 2. Shah and Agarwal schemed to defraud pharmaceutical clients.

The fraud at Outcome arose from the challenges of a "two-sided market."  Tr.572-73, 2158.  Specifically, Outcome needed to install enough screens in doctors' offices to entice advertisers, while simultaneously generating enough advertising revenue to install and operate the screens.  *See* Tr.572-73, 2158-59.  As Shah told a group of entrepreneurs in 2016, the company's "hardest problem to solve" initially was that it had to "sell an idea to both sides" and then "couldn't miss timing because that would be fraud, right? You sell something that doesn't exist."  GX606 at 1:14:58-1:15:16; Tr.4145.  Shah told a similar group in 2012 that Outcome "threw a smoke bomb in the room" by having doctors' offices "commit to taking the installation," while having advertisers "commit to buying the network."  GX70 at 1:28-1:52; Tr.8379.  But Shah admitted: "You cannot be late.  Otherwise it's fraud.  Right?  I mean, you're selling something you don't have."  GX70 at 2:05-2:15.  As described below, Outcome did exactly that.

### a. Falsified list-matching

The fraud began when pharmaceutical representatives sent Outcome a list of doctors they wanted to target.  Tr.575-76, 2159-60, 3149.  Outcome then

6

performed a "list match" of offices where its screens were installed "to find the overlap in doctors between the two lists." Tr.2167; *see* Tr.3446-47. Although a handful of clients (such as Novo Nordisk from 2011 to 2013) agreed to "weighted average" contracts, Tr.896, 4354-55, 4452-53, such contracts represented a small fraction of Outcome's contracts, Tr.5492. And clients asking for list matches generally wanted to know current inventory. Tr.1956, 3168-69, 3282-83, 5492. Nevertheless, Outcome regularly used "projected inventory" that included doctors' offices Outcome hoped to bring into the network in the future. Tr.2170-71, 2200, 3451.

This practice, which Shah and Agarwal referred to as "selling the future," allowed Outcome to "show the client a bigger number" and sell "a larger and, therefore, more expensive advertising contract." Tr.2172, 3430. But Outcome could not accurately "project" a list match because clients had specific doctors they "wanted to target" and, when using a "projected" list, Outcome employees "never kn[e]w for certain" whether specific doctors "would sign up." Tr.3452-53, 3456.

Outcome often failed to inform pharmaceutical representatives that its list matches included projections. Tr.2031-32, 6094, 6256-57, 8105. And Outcome covered up its projections in various ways, including falsely claiming that it could not disclose the addresses of supposedly matched doctors because

of "doctor confidentiality agreements." Tr.3622-24. Outcome even concealed the inflated list matches from its own salespeople. Tr.2173, 2195-96, 3414-15, 3429-30, 3473-74. In 2013, Shah removed a salesperson from an email and asked whether the salesman knew the list match "was projected." GX140:1. Agarwal responded, "[G]enerally the [sales] team doesn't know it's a projection because they get confused about how to represent it (even though they need not say it any differently)." GX140:1. In Ashik Desai's first week on the job, Agarwal told him, "[L]et's take the [sponsorship sales] person off the chain. I've noticed their confidence level in our data change[s] dramatically when presenting to clients if they believe it's accurate vs made-up." Tr.3412; GX274:1. Shah chimed in that this was "a very good point." Tr.3417; *see* GX494:1.

Both Shah and Agarwal specifically directed employees to give pharmaceutical representatives inflated lists. In 2012, Shah told employee Jason Ketchum to "go deeper"—including into a list of doctors Outcome had not yet recruited—to "have more locations with more addresses." Tr.733-34, 737-38; GX44. In 2013, when a client asked for Outcome's "full network list," Shah brainstormed with Desai on how to create a list with 2,800 offices—the number Outcome had quoted for the upcoming year—even though Outcome only had "2,067 unique office addresses" at the time. Tr.3419-21, 3594-3602,

3605-09, 3616-21; GX322, GX324, GX329.  Agarwal similarly instructed Ketchum (copying Shah) to conduct a list match for the drug Pradaxa using the "member outreach pipeline" (offices Outcome's sales team was trying to sign up) plus an "overlay combo of the list we'll soon start to call."  Tr.913-14, 918; GX67; *see* Tr.681.  As Ketchum reported back to Shah and Agarwal, that projection increased the "matched" list from 761 offices to 2555 offices.  Tr.916-18; GX71.  Outcome quoted 2555 offices, Tr.6250-51; GX75, and the Pradaxa representative bought 1,819 offices on the understanding that Outcome already had "device[s] in those offices," Tr.918-19, 6252.

In early 2013, Outcome contracted to increase advertising for the drug Humira to 480 offices.  Tr.804-05; GX107.  The Humira representative made clear that she wanted to know "inventory as of today" for "rheum[atologist] offices" with "no" primary care practitioners.  Tr.801-02; GX110:5.  Ketchum alerted Agarwal to a problem: "If Humira wants offices with rheums, then we have a total of 387 sites that have a rheum with a total of 440 screens."  Tr.806; GX107:1.  He added, "I just want to make sure what we send out doesn't raise any eyebrows."  GX107:1.  Despite knowing that Outcome could not deliver 480 offices, Agarwal told Outcome's salesperson that the company "should be fine" to add the screens that Friday.  Tr.820; GX122:1.

### b. Under-delivery on contracts

Because Outcome was "selling devices and screens that were not there," it had "significant under-delivery on a number of [its] programs," even while billing its clients as if "delivering in full." Tr.3431; *see* Tr.2200-01, 2220-22, 2225-26, 3399, 3650-52, 3677; GX397. Outcome leadership referred to these delivery shortfalls as "deltas," which employees such as David Ma tracked in "delta reports." Tr.2210-12, 2237-39, 3653. Ma also created "growth model[s]," which showed "how many screens [Outcome] needed to add" to "deliver" on its contracts. Tr.3769.

Shah and Agarwal received these reports and regularly discussed deltas, Tr.1072-73, 2237-38, 2314, 2320, 2330-31, 2347-51, 3653-57, 3765-66, 3791; GX483, including at a 2015 Chicago meeting that Agarwal dubbed "Delta Day," Tr.3657, 3763-64; GX446. These delta discussions were so frequent that Shah told Agarwal and his chief of staff that "we don't want to spend every meeting on th[e] topic" of "how to fill the gap." Tr.8350, 8352-53. Yet Shah continued to press for higher sales goals. Tr.2348-49, 3028-29. For example, in one 2015 meeting attended by Agarwal, Shah told employees to increase the revenue goal in a category where there was already a shortfall. Tr.2347-50, 2901.

Even beyond these delta reports, Shah and Agarwal were aware of Outcome's persistent under-delivery. In 2012, when a client asked for a list of all 608 offices where Crestor ads were playing, Agarwal told Ketchum to conceal the under-delivery by (a) including offices that were in the pipeline but not yet running ads and (b) listing physicians rather than just locations. Tr.748-51; GX68. After there were shortfalls in early months of the 2013 Humira campaign, Shah acknowledged that delivery would be "soft on April," but said Outcome would "make up for it through over-performance on the lat[]er months" and "hit the weighted average," even though an employee had told him the client bought at "specific monthly goals" and not "a single weighted average." Tr.864-65; GX183. Despite these shortfalls, Shah and Agarwal were involved in a decision in 2013 to switch some offices advertising Humira over to advertising a competitor's drug, Xeljanz, because Outcome had insufficient rheumatology locations to fulfill Xeljanz's contract. Tr.5638-41; GX1928. In 2014, when Shah asked about goals for rheumatology, Desai told him Outcome was "currently contracted" for "1,234 rheumatology network waiting rooms" (including 609 for Humira and 200 for Xeljanz) but had "just under 600" offices. Tr.3683; GX357.

Shah and Agarwal were also aware of dramatic shortfalls for Pradaxa, for which Outcome had contracted to deliver 1,819 offices. Tr.918-19, 6252.

11

Ketchum emailed Shah and Agarwal that, in the first month of the Pradaxa campaign, Outcome had delivered Pradaxa ads to only 708 locations. Tr.946-47; GX194. When Brady Purdy said he thought Outcome had more than 708 Pradaxa screens, Shah responded: "I think this count is accurate. . . . This is why it's critical that we focus on Pradaxa qualified locations right now with a lot of firepower." Tr.8850; GX195, GX196. The shortfalls persisted, and an operations error prevented any Pradaxa ads from playing for several months, yet Outcome continued to bill the client in full. Tr.3511-17. The following demonstrative exhibit reflects this under-delivery:

## Pradaxa Installations

| Date | Contracted Amount | Actual Installations | Amount Invoiced |
|------|-------------------|----------------------|-----------------|
| Apr. 2013 | 1,819 | 708 | $219,371.40 |
| May 2013 | 1,819 | 775 | $219,371.40 |
| June 2013 | 1,819 | 832 | $219,371.40 |
| July 2013 | 1,819 | 1019 | $219,371.40 |
| Aug. 2013 | 1,819 | 1019 | $219,371.40 |
| Sept. 2013 | 1,819 | 0 | $219,371.40 |
| Oct. 2013 | 1,819 | 0 | $219,371.40 |
| Nov. 2013 | 1,819 | 0 | $219,371.40 |
| Dec. 2013 | 1,819 | 0 | $219,371.40 |

GOVERNMENT EXHIBIT
1133n
1:19-CR-00864

GX1133n.

Outcome did not report these shortfalls to Pradaxa's manufacturer but maintained the appearance of having fulfilled the contract during 2013. Tr.3516-17. When Outcome began negotiating a Pradaxa advertising campaign for 2014, Desai told Agarwal, Shah, and Purdy, "I think there are certain match numbers we will have to hit as they are adding back old physicians we claim to have had." Tr.3527; GX308, GX313. Agarwal responded, "Ditto." Tr.3529; GX308.

Outcome's campaigns continued to have significant shortfalls in later years. In June 2016, Shah texted Agarwal about a "massive" and "very scary" issue in which an employee "wasn't properly loading campaigns and all of them may be totally under delivering." Tr.9087; GX589. The following day, Desai told Agarwal that, for one campaign, "there was essentially no delivery of messaging for two months." GX588 at 01:08-01:22. An internal audit of the 2016 advertising campaigns, which was shared with Shah and Agarwal, revealed that 77 of 137 active campaigns had a "delivery that was below the 90 percent threshold" and that six campaigns had "dark" periods where "the advertising just wasn't on." Tr.3782; GX594. The shortfalls for some drugs were dramatic. Tr.3783-87. For example, in July 2016, Outcome was delivering only 19% of the contracted waiting-room devices for Humira and only 8% of the contracted devices for the drug Xeljanz, both of which had been

Outcome clients since 2013.  Tr.3780, 3784, 3787.  Outcome did not disclose these under-deliveries but billed as if delivering in full.  Tr.3782, 3787-88.  And these shortfalls persisted across multiple years.  *See* Tr.3758-62 (2015); Tr.3781-82 (2016); Tr.3793-98 (2017).

Some of Outcome's contracts called for "make-good[s]" in the event of under-delivery, consisting usually of running advertisements for a longer period or in additional offices at no cost.  Tr.2036, 2941.  But Outcome did not regularly provide make-goods before 2016 or 2017.  Tr.3849, 4007, 4125.  For example, even though Outcome failed to run advertisements for Pradaxa for several months in 2013, Outcome did not provide a make-good or disclose the shortfall.  Tr.3498, 3507-09.  In 2014, Outcome provided make-goods on only one advertising campaign (for a drug called Simponi Aria) and only after the pharmaceutical company discovered the problem and forced Outcome to perform an audit.  Tr.2224-25, 2941, 3518-19, 3717-19, 3741.

### c.    False proofs of performance

Outcome covered up its shortfalls by falsifying the monthly proofs of performance it sent to clients, which often included affidavits signed by Ketchum, Desai, or others.  Tr.3271-72, 3690-94.  In early 2013, Ketchum asked Shah what to do about the Humira proof of performance, saying, "We are contracted for 480 sites.  Currently, we have 419. What do you recommend

14

we send them for addresses to fill the gap?" Tr.833-84; GX136. Shah responded that "[t]here isn't a great answer" and that Ketchum should use "the [member services] pipeline" to include any newly added rheumatologists and then use "PCP [primary-care-practitioner] sites." Tr.836; GX136. As Shah knew, the Humira representative had said, "please no PCPs." Tr.801; GX110:5.

In December 2016, Shah contacted Desai and Purdy about Purdy's "grave concerns" regarding Outcome's "ability to fulfill the current standing of 2017 contracts." GX701 at 00:14-00:26. In response, Desai explained that "[h]istorically" Outcome's "affidavit process" was based on the contracted numbers and "was not checked or aligned to what actually played." Tr.4015; GX704 at 00:20-00:44. Desai said, "[W]e want to change this practice and really have the affidavit" be the "source of truth as to what, in fact, ran in that 30-day period." Tr.4015; GX704 at 00:55-01:11. But because some companies had been buying the same number of offices for several years, "starting to call attention to massive inventory gaps" would create "potential issues." Tr.4020-21; GX704 at 02:20-02:47. Desai suggested some stratagems for concealing these problems, such as using offices "beyond the specific list match that the client bought" and "dayparting," in which Outcome would run one company's advertisements in the morning and a competitor's advertisements in the

afternoon. Tr.4023-24, 4026; GX704 at 02:55-05:40. Shah endorsed both "dayparting" and "more broadly defining the network," but he said Desai and Purdy could "make the call." GX707 at 00:55-02:01; Tr.4082.

### d. Manipulated return-on-investment studies

Outcome's contracts often guaranteed a specific return on investment (or "ROI"). *See* Tr.290, 2315. Outcome hired outside companies, typically IMS Health, to conduct "ROI studies." Tr.278, 578, 689-90, 2315, 2415, 3442-43. At Shah's and Agarwal's direction, Outcome employees manipulated those studies by providing IMS with "cherry-pick[ed]" lists of doctors. Tr.760-61, 3565-67; *see* GX8. For example, Shah told Ketchum to "very tightly scrub the test group for all things that could depress returns," including "MIAs [missing in action screens], deinstalls, nonendo[crinologist]s, [and] part-time physicians," adding "I think if we really tightly control the test physicians, that might help us." Tr.902; *see* GX1105:1; Tr.760, 2416, 3599. Agarwal, too, directed Ketchum to "scrub for MIAs" before providing a list to IMS Health. Tr.759-60; GX92.

As Ashik Desai explained, it was "misleading" to filter out underperforming offices. Tr.3569. This practice allowed Outcome to select offices "performing the best way and then represent[] to the client that that is how all of the offices performed in their [advertising] campaign." Tr.3569; *see*

16

Tr.3641-42.  Senior sales analyst David Ma similarly explained that it "might be appropriate" to exclude non-performing screens "to study the effectiveness of an ad," but where the "denominator is the entire dollar amount that [the pharmaceutical client] spent, you shouldn't exclude anything."  Tr.2417-18. Shah himself told Agarwal and Purdy, "[A]s we improve our network integrity . . . , we have to do far less filtering and can just include all the doc[tors] in the study which really makes the results bulletproof."  Tr.3572.  Agarwal replied that "we'll need to clean up quick" because another third-party contractor, Crossix, "will ask for every single doctor, right?"  Tr.3573; GX287.

After Desai began working at Outcome, Pradaxa's manufacturer was "looking to do [its] own research" on the 2013 advertising campaign.  Tr.3467. After a client representative requested a meeting to "ensure proper ROI measurement," Tr.989, GX263, Agarwal told Shah and Desai, "Reminder: the biggest issue here is that the list they have of 1819 matches isn't the true list (not even 1/3 of it was installed at the time)."  Tr.3473; GX263:1.  Shah responded that this was "a big deal"; that Outcome would have to "refresh" the list; and that "[i]f they insist on doing the study internally, we'll have to . . . just go to a 'weighted average' understanding."  Tr.3477; GX263:1.  As Shah separately told Desai, the list the company had "was off a projection" and

"isn't an accurate list of our physicians, so any internal study based on that will be false." Tr.3480-81.

After Desai took over the return-on-investment reports in 2014, he "didn't even have the ability to choose the best offices" on some campaigns because Outcome was "delivering so few." Tr.3871. At that point, "rather than taking the time to cherry-pick the offices," Desai "would send IMS a list of doctors, have [IMS] do the study, and then just change the numbers." Tr.3872, 3883-84. Because of under-delivery on exam-room tablets, Desai and his team cherry-picked "the top five percent of performing tablets" and projected that performance across all the tablets in the program. Tr.3927-28. Desai specifically informed Agarwal that Outcome was "using the best performing tablets and extrapolating from that." Tr.3930-31.

### 3. Outcome employees repeatedly raised concerns with Shah and Agarwal about the business's practices.

Many Outcome employees raised ethical concerns about the business's practices, but Shah and Agarwal dismissed those concerns and labeled those who raised them as "toxic" or "disruptive." Tr.4105, 4113-14; *see* Tr.4117. For example, Jason Ketchum felt "[b]ad" and "uncomfortable" when Shah and Agarwal directed him to lie to clients. Tr.650-51, 653. But when he raised concerns with Agarwal, she told him not to be "pessimistic" and that "Outcome Health doesn't miss numbers," and she redirected him to "the good

18

that was being done." Tr.654-55. When Ketchum told Shah his concerns that some communications to clients were not "truthful," Shah similarly told him, "Hey, don't be pessimistic"; made him feel like a "bit of an idiot"; and told him that Outcome was helping "patients across the country." Tr.657-59.

In early 2015, David Ma expressed to Agarwal his discomfort with Outcome's practices of "[m]isleading" and "overselling"—though he used "euphemisms" because he was afraid of "negative consequences" for "directly imply[ing] that something very unethical was going on." Tr.2424-25; *see* Tr.2773 (may have used "words like mislead or misrepresent or hide"). Agarwal responded, "[W]e throw smoke bombs . . . to clean up our operations." Tr.2425. Ma understood this to mean creating a "distraction" or "time lag" so Outcome could "scramble and try to figure out how to handle the situation . . . perhaps in a better way." Tr.2425-26.

In November 2016, Agarwal texted Shah and Desai about an employee's concerns regarding the "legitimacy of data" in return-on-investment studies. Tr.3916; GX673:1. Shah responded that he had not "heard anything directly" except that an employee "saw Ashik [Desai] changing numbers before going into a presentation." Tr.3920; GX673:1. Shah said that, "[o]f course, this has nothing to do with the legitimacy of data" and suggested "reinforc[ing] this to all employees," but asked "is that too defensive?" Tr.3920-21; GX673:1.

Desai responded that another employee had been "trying to rally folks on the fact that we sell inventory that's not there, don't make good fully on programs, don't have rigor on measurement, et cetera." Tr.3923; GX673:2. Rather than denying those allegations, Desai proposed ways to deal with the "noise" from employees. Tr.3923. Desai did this because it was the "practice at Outcome" to "diminish the past" and "focus on the future solutions." Tr.3924.

In January 2017, Outcome hired Sameer Kazi, an experienced outside executive, as the chief operating officer for the group that handled pharmaceutical contracts. Tr.216-19, 232, 237. During his first two weeks, Kazi learned that Outcome "did not have enough inventory" to fulfill some "contractual commitments," was quoting incorrect inventory to clients, was inflating return-on-investment reports, and was submitting "false" proofs of performance. Tr.267, 277-80. Kazi found this information "shocking" and believed it "was at least to some degree fraudulent." Tr.281-82.

Kazi promptly scheduled a meeting with Shah. Tr.285. Over Voxer (a voice-messaging app), Agarwal alerted Shah to Kazi's concerns that Outcome was "operating an unethical business" and that Desai was "changing numbers," noting that this was "not the first time that you and I have heard this feedback." GX747 at 00:20-01:20; Tr.3800. Agarwal said Kazi "needs some comforting and some perspective" and that it was "not very good

20

leadership" by Kazi's subordinates to "com[e] to him and shar[e] this" in his "first week" and that "we may just have to clean up in a lot of different areas of that org[anization]." GX747 at 01:45-02:55; Tr. 5595.

Rather than confront Desai about Kazi's allegations, Shah asked Desai and Agarwal to check on another new Outcome executive and "make sure S[ameer Kazi] hasn't gotten to him." Tr.4049; GX753. And Agarwal coached Desai to "focus [Desai's] conversation" with Kazi on "what we were hoping that [Kazi] would fix as we were building for the future." Tr.4045-47.

Later that day, Shah sent Agarwal a Voxer expressing concern that Kazi might "go[] public," saying, "I'm a little nervous about not firing [Kazi] tomorrow if I can't figure out that he's really trustworthy." GX771 at 00:14-00:39; Tr.5616-20. The next day, Agarwal forwarded another Voxer relaying Kazi's concern that "more than 50% of our revenue can be recalled, because we haven't met the ROI guarantees that we made to our clients." GX760 at 02:56-03:06; Tr.5620-21. The Voxer also relayed Kazi's concerns about "affidavits" and "ROI guarantees" and that "that is fraud." GX760 at 00:30-00:59.

In Kazi's face-to-face meeting with Shah, before Kazi could even outline his concerns, Shah said Kazi was a "cultural misfit" for Outcome and that he had received "several reports" that Kazi was a "bull in a China shop and being

disrespectful and poking [his] nose into parts of the business." Tr.309-10. Kazi summarized for Shah his concerns that Outcome had insufficient inventory for its "contractual commitments," was "misrepresent[ing]" inventory in affidavits, and was "inflating" return-on-investment results. Tr.310-12. Shah said "these were matters that needed attention," but he did not ask Kazi for details. Tr.312. Instead, he "pivoted back to this idea that [Kazi] was not a cultural fit." Tr.315-16. Because Kazi would not work "where [he] believed there was fraud happening and the CEO didn't see it as a major red flag," Kazi resigned on the spot, Tr.316, walking away from a $600,000 salary and long-term equity worth $30 million. Tr.233-36.

The day Kazi resigned, Agarwal texted Shah to say that Adam Prowker, who had been under Kazi's supervision, "isn't turning [slide] decks around because all the numbers are 'misrepresentations.'" Tr.4086; GX780a. Shah responded that Prowker "has very strong philosophical disagreements" and "needs to be fired immediately." Tr.4086; GX780a. A few days later, Prowker met with Shah and Desai to express his "concerns about how the company was doing business." Tr.4090; *see* Tr.4093. After the meeting, Prowker sent Shah an email identifying various Outcome contracts that he thought were at risk of underperformance, including one program that was "currently running on only approximately 20 percent of the contracted

devices." Tr.4094-95; GX833. Prowker's attorney also sent Shah a whistleblower letter alleging that Outcome was "artificially inflating the performance results it reports to clients." Tr.4100-01; GX834:3. Shah told Desai that he was "just gonna fire" Prowker, who had been at Outcome less than six months. Tr.4088, 4098; GX831 at 00:01-00:26.

In June 2017, newly hired executive Blake Chandlee told Shah that he was "at a loss [for] words" based on Desai's cavalier response to questions about under-delivery for the rheumatology drug Xeljanz. Tr.5633-35; GX966. As Chandlee told Shah, this was not "a situation where we missed a few offices or mismanaged growth" but "where we intentionally removed an advertiser that had [right of first refusal] from our platform for another advertiser, ran the advertiser in the wrong offices, violating the exclusion guidance, in a category that I find hard to believe we mis-understood." Tr.5636; GX966. Shah's response was to forward this email to Desai. Tr.5637.

Other employees in early 2017 raised concerns that reached Shah and Agarwal directly, including concerns about "willful misrepresentation of inventory data by sales and management," Tr.4107; GX820a (employee Sahir Raoof); concerns that Outcome was "misleading clients" based on "discrepancies" in return-on-investment results, Tr.7443-45 (employee Bridget

O'Donnell); and concerns about "glaring inconsistencies" between the return-on-investment reports and those "ultimately delivered to clients," Tr.4119-21; GX862 (employee Bryan Morgan). In October 2017, after the Wall Street Journal reported on Outcome's unethical business practices, Shah claimed in a company-wide townhall that he had only learned about manipulation of return-on-investment reports a "few weeks ago," Tr.7450-52; GX1012 at 26:52-26:55, even though Kazi and O'Donnell had raised those concerns at least nine months earlier, *see* Tr.308, 311, 7452-53.

### 4. Shah and Agarwal schemed to defraud lenders and investors.

Outcome's fraud extended beyond its pharmaceutical clients. By early 2016, Shah and Agarwal "started to look for outside investors" to propel faster growth. Tr.3977-78. Because raising outside capital required an audit, Outcome hired Deloitte & Touche LLP to audit Outcome's 2015 and 2016 financial statements. Tr.3977, 6893. Desai and Purdy agreed that they should not reveal to Deloitte any "deltas" greater than 10%, even though some programs had shortfalls of 50% or more. Tr.3987-88, 3997-98. To conceal shortfalls, Desai and Purdy schemed to "backfill" delivery reports with devices that were no longer installed, were under repair, or were installed but not yet playing advertisements. GX530; Tr.3989, 4003-05, 6949, 7049.

In "fraud inquiry meetings" with Deloitte in March 2016 and March 2017, Shah and Agarwal failed to disclose any allegations of fraud. Tr.6981, 7111-13, 7118. They also signed "management representation letter[s]," relied upon by Deloitte, stating that they "ha[d] no knowledge of any allegations of fraud or suspected fraud affecting the Company's financial statements communicated by employees, former employees, regulators, or others." GX562, GX910; Tr.7010, 7123, 7126. They did so even though employees Kazi, Prowker, Raoof, Morgan, and O'Donnell all raised concerns in early 2017 while Deloitte was auditing the 2016 financials. Tr.7083-84, 7096.

Deloitte issued opinions that Outcome's 2015 and 2016 financial statements "present[ed] fairly, in all material respects, the financial position of the company." Tr.7015, 7128. In truth, Outcome's fraudulent overbilling caused its revenue to be overstated by at least $15 million and $29.8 million in those same years. Tr.8540; *see* Tr.8511-13, 8525-26, 8530, 8535. Because Outcome's total revenue was $62 million in 2015 and $129 million in 2016, the company's financial statements were overstated by approximately 24% and 23% in each year. Tr.8507, 8542.

Based on the audits, Outcome obtained a $110 million loan from JPMorgan and other lenders in April 2016, and then a $375 million loan from JPMorgan and other lenders in December 2016. Tr.7768-72, 7775-80, 7797-

7801.  Outcome used the $375 million loan to acquire one of its biggest

competitors, AccentHealth, at the end of 2016.  Tr.7775, 7820-21.  The

company also relied on the audits as part of a 2017 capital raise that obtained

over $487 million from numerous investors.  GX1081; Tr.6684-85, 6695, 7903-

04, 7920, 8222-23, 8622-23, 8642.

Shah and Agarwal received dividends of $30.2 million and $7.5 million

after the April 2016 loan, and they obtained a combined $225 million

distribution from the 2017 capital raise.  Tr.8200, 8206-07, 6673-74, 8223-24.

After the fraud at Outcome was publicly reported, the company's revenue and

sales declined so much that, by the time of trial, institutional investors' stakes

in Outcome were worth about "10 cents on the dollar" or "[c]lose to zero."

Tr.7923-24, 8668.

## SUMMARY OF ARGUMENT

1. Shah and Agarwal cannot prevail on their claims that the pretrial

restraint on their assets violated their Sixth Amendment right to counsel or that

the government elicited false grand-jury testimony in violation of the Fifth

Amendment.

a. As an initial matter, Defendants' primary claims are waived and this

Court should not consider them.  Under Federal Rule of Criminal Procedure

12, certain motions must be made before trial, and failure to do so can be

excused only for good cause.  Defendants' Fifth Amendment challenge to the grand jury proceedings and their Sixth Amendment claim that untainted assets were improperly restrained both fall within Rule 12's bar.  The district court found that Shah and Agarwal could have discovered these claims before trial, and they fail to show any clear error in that finding.  So this Court should not consider their claims on appeal.  But, even if it does, Defendants cannot show any constitutional error—much less reversible plain error.

b. Defendants were not deprived of counsel of choice under the Sixth Amendment.  Shah is incorrect in claiming that the restraint of *any* amount of untainted funds is reversible error under *Luis v. United States*, 578 U.S. 5 (2016).  Contrary to Shah's claim, Justice Thomas's concurrence in the judgment does not represent the narrowest ground for decision, and the *Luis* plurality made clear that the Sixth Amendment protects untainted funds "needed" to retain counsel of choice.  *Id.* at 10.

The district court correctly concluded that, even without the over-restraint, Shah and Agarwal would not have been able to afford their counsel of choice.  Without the over-restraint, Defendants would have had access to no more than $1.14 million (and a little as $570,000) in liquid distributions.  And the district court correctly found that the underlying assets could not have been liquidated quickly enough and in large enough amounts to yield the $7.8

27

million needed for Defendants to hire preferred counsel. Defendants cannot establish clear error in those findings. And to the extent Defendants could have liquidated the improperly restrained portions of these assets if given more time, the same is true of their *unrestrained* assets. Indeed, Shah was able to liquidate unrestrained assets worth more than $10 million before trial. And the record suggests that Agarwal might have afforded her counsel of choice even *without* additional funds. At the very least, no clear or obvious error occurred.

Nor can Defendants prevail on their preserved claim that $10.3 million in liquid funds were purged of their taint because Outcome and its investors relinquished those funds as part of a civil settlement. Those funds were still "derived from" or "traceable to" the investor fraud, which is all that matters under the federal forfeiture statutes.

c. The government did not violate the Fifth Amendment by knowingly introducing false testimony in the grand jury about the forfeitability of Defendants' assets. The district court found that the government's tracing analyst did not lie when she told the grand jury that, to the best of her knowledge, the indictment's forfeiture allegations accurately listed assets traceable to fraud. The district court found that the over-restraint resulted from an inadvertent drafting error. And Defendants do not even attempt to show clear error in those findings. Instead, they wrongly contend that this Court

should apply a "collective knowledge" theory, which would not help them in any event.

Moreover, Defendants cannot show prejudice. They cannot show that the grand jury would have declined to indict had it been informed of the proper tracing analysis. And they cannot show Fifth Amendment prejudice without showing that the over-restraint affected the outcome of the trial. They are unable to do so, given that they were represented by highly experienced attorneys who performed effectively.

2. The district court did not abuse its discretion by admitting grand-jury statements from three government witnesses. All three witnesses' prior statements were admissible "(i) to rebut an express or implied charge that the declarant recently fabricated [his testimony] or acted from a recent improper influence or motive." Fed. R. Evid. 801(d)(1)(B)(i). Such a prior statement is admissible if "made before the charged recent fabrication or improper influence or motive." *Tome v. United States*, 513 U.S. 150, 167 (1995). And defense counsel directly accused all three witnesses of fabricating or altering their testimony based on motives and influences that arose *after* their grand jury statements, such as receiving statutory immunity, conducting trial preparation sessions with the government, and (in Desai's case) entering into a plea agreement. Contrary to Defendants' contentions, the fact that the witnesses

may have had *other* motives even earlier does not make their grand jury statements inadmissible to rebut the defense's specific claims.

Substantial portions of the witnesses' grand jury statements were also admissible "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B)(ii). As the district court explained, the defendants sought to impeach all three witnesses based on lack of memory or inconsistency. And, contrary to Shah's contention, *Tome*'s pre-motive requirement does not apply to this part of the rule.

In any event, any error in admitting these prior consistent statements was harmless. The grand jury statements were entirely consistent with the witnesses' trial testimony and therefore did nothing beyond rebutting claims of recent fabrication or motive. The statements made up a very small portion of the trial. And the witnesses' in-court testimony was extensively corroborated by other witnesses and by documentary evidence. There is no reasonable probability that the statements' admission affected the trial's outcome.

3. The district court did not plainly err when instructing the jury on the elements of fraud.

Shah and Agarwal claim for the first time on appeal that the jury instructions and the government's arguments allowed the jury to convict based solely on contractual under-delivery. Consistent with this Court's precedent

and pattern instructions, the jury was instructed that a person's honest belief that she can perform what she has promised does not negate intent to defraud if the person knowingly makes false and fraudulent representations. And, contrary to Defendants' claims, the government did not argue that the jury could convict based solely on under-delivery on Outcome's contracts. The government repeatedly explained that under-delivery was just one step in the fraudulent scheme, which also involved false promises to induce contracts and false statements to conceal shortfalls. Defendants' contrary claims misconstrue the government's closing arguments.

Defendants also contend for the first time that the instructions and arguments allowed them to be convicted based simply on "overselling" without "intent to deprive the other party of the benefit of the contractual bargain." Agarwal.Br.33-34 (emphasis omitted). Much of this argument is foreclosed by *Kousisis v. United States*, 145 S. Ct. 1382, 1388 (2025), which affirmed the validity of the "fraudulent-inducement theory" of wire fraud. And Agarwal's claim that she was convicted despite her intent to give Outcome's advertisers what they bargained for is inconsistent both with the instructions, which required intent to defraud, and with the facts, which overwhelmingly established Agarwal's intent to deprive Outcome's clients of what they were promised.

Even if Defendants could show clear or obvious error in the jury instructions, they could not show prejudice. Defendants concede that the government "pressed other [valid] theories," Agarwal.Br.33, and ordinary harmless-error review applies "in the context of a jury instructed on multiple theories of guilt, one of which is improper," *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam). The evidence overwhelmingly established that Shah and Agarwal did not intend to deliver on Outcome's promises and made false claims about Outcome's inventory, its performance, clients' returns on investment, and their own knowledge of fraud.

## ARGUMENT

### I. Shah and Agarwal waived their primary Fifth and Sixth Amendment claims, and those claims are meritless in any event—particularly on plain-error review.

Defendants contend that the pretrial restraint on some of their untainted funds deprived them of the constitutional right to counsel in violation of the Sixth Amendment. Shah.Br.28-49; Agarwal.Br.52-54. Shah additionally contends that the government violated the Fifth Amendment by presenting false testimony to the grand jury about what assets were traceable to the fraud. Shah.Br.38-40. Defendants largely failed to preserve these claims prior to trial, and the district court properly rejected them.

## A. Background

### 1. The overbroad protective order

The indictment, returned in November 2019, included a forfeiture allegation against "[a]ll right, title, and interest" in certain assets held by Defendants' companies Gravitas Holdings, LLC, and Jumpstart Ventures II, LLC. R.14:49-57. The government sought forfeiture only of assets traceable to the 2016 loans and the 2017 capital raise, not the fraud against the pharmaceutical companies. R.747:15-16. On the government's motion, the district court entered a protective order to preserve forfeitable assets. R.27. As the parties realized after trial, the protective order restrained some untraceable funds because about $6.2 million of the $23.2 million originally invested into the assets held by Gravitas and Jumpstart II came from untainted sources. R.747:6-7, 23-25; Hearing.Exh.2060.

Two years before the November 2019 indictment, Shah and Agarwal paid a $7 million retainer to Quinn Emanuel to represent them in potential investigations and civil suits. Hearing.Tr.792-96. After the indictment in this case, William Burck and Jonathan Bunge (of Quinn Emanuel) and Christina Egan (of McGuireWoods) entered limited appearances for Shah and Agarwal, respectively. R.747:2. The government agreed not to claw back the $4.5 million that remained of Quinn Emanuel's retainer, which came from an

Outcome account but was not traceable to the fraud against lenders and investors. R.75-9; Hearing.Tr.814-16, 1254-55. Shah and Agarwal also had access to about $2.4 million of leftover retainer funds at the Vedder Price law firm. Hearing.Tr.189-90; Hearing.Exh.2013.

In January 2020, Shah and Agarwal moved to amend the protective order by unfreezing for their defense $10.3 million in liquid funds that Gravitas was allowed to keep after a settlement with Outcome's lenders and investors. R.75-1; R.108:1-3. The district court denied the motion, holding that the settlement did not cleanse the funds of their taint. R.108:7. The court then gave Defendants until June 30, 2020, to retain counsel, observing that "[n]o further extensions will likely be granted." R.112.

By the June 30 deadline, Shah hired Hueston Hennigan, agreeing to pay $4 million up front and another $2.5 million once Shah sold his interest in Alto Pharmacy, with costs and fees being paid from Shah's anticipated sale of his interest in Healthfinch. R.747:2; Hearing.Exh.8025. And Agarwal hired two firms, agreeing to pay Larson LLP $2 million up front and to pay Blegen & Associates $250,000 up front and another $100,000 within 90 days (or $125,000 thereafter). R.747:2.

Trial was originally set for February 2022, but the district court continued the trial to January 2023 to accommodate the pregnancy of one of

Shah's attorneys.  R.143, R.193; R.201, R.209.  Before trial, Shah received millions more in liquid assets from unrestrained funds—including an $11.9 million payout from interests in MPulse in August 2022.  Hearing.Tr.154, 193; Hearing.Exh.2061.  Yet Shah did not request an opportunity to rehire Burck as trial counsel.

At the trial in early 2023, Shah was represented by four attorneys, including John Hueston and Vicki Chou.  Hueston had been described by *Chambers* as "[o]ne of the top trial attorneys in the country," had conducted multiple civil jury trials, and had served as the "lead prosecutor for the Enron trial of Kenneth Lay and Jeffrey Skilling."  R.195-5 at 2-4.  Chou similarly had "tried over ten cases as lead counsel" during her time as a federal prosecutor.  R.195-6 at 2-3.  Agarwal was represented by four attorneys, including Koren Bell, who spent more than eight years as an Assistant Federal Public Defender in Los Angeles, and Patrick Blegen, who had secured ten acquittals in federal criminal trials in his nearly 30 years of practice.  Hearing.Tr.166, 173, 724.  At the conclusion of the trial, the district judge said the defense attorneys' performance was "unparalleled" in his 45 years as an attorney and judge.  Tr.10454-55.

Two months after the verdicts, Shah's new counsel (from Bryan Cave) raised concerns that the protective order had been overbroad.  R.747:3, 5.  The

government subsequently acknowledged that portions of the restrained assets were not traceable to the lender and investor fraud and agreed to unfreeze approximately $9.6 million in liquid funds.  R.747:6-7; R.500; R.555.

Shah and Agarwal moved to dismiss the indictment or for a new trial, arguing that the government had violated the Sixth Amendment by restraining untainted assets and the Fifth Amendment by presenting false testimony about those assets before the grand jury.  R.488, R.490.  The district court "permitted extensive discovery" regarding these motions, compelled "the disclosure of over one hundred internal government communications," and held four days of evidentiary hearings, at which it permitted Defendants to examine FBI forensic accountant Megan Poelking and two federal prosecutors.  R.747:8-9, 33-34.  In opposing the motion, the government explained that, after receiving more granular records related to investments held by one entity (Guild Capital), it had found that about $8.4 million of the $9.6 million in liquid assets returned to Defendants after trial was in fact traceable to criminal proceeds.  R.747:7; Hearing.Tr.57-60, 236, 240-41.

### 2.    The district court's post-trial decision

The district court denied Defendants' motions.  R.747.

### a. Timeliness

The court first determined that the motions were untimely because Defendants waited until "three months after conviction to raise the issue of an excessive restraint." R.747:13. The court rejected Defendants' claim that they "could not have discovered the restraint was overbroad" until the government produced tracing spreadsheets and emails during trial. R.747:13. By February 2020 (three years before trial), Defendants had "copies of the indictment, protective order, grand jury testimony and exhibits, bank records, and records from the private equity entities and private companies." R.747:13. And because it was Defendants' "*own property* being restrained," they knew how they had funded the various investments. R.747:13.

The court rejected Defendants' claim that they thought the government was seeking to forfeit all their earnings from Outcome, observing that the grand jury materials "make explicit that the government was seeking to forfeit [only] proceeds of the 2016 loans and the 2017 capital raise." R.747:15. So Defendants had "every opportunity" to challenge the pretrial restraint, and had they done so, the court "could have taken any number of actions short of dismissing the indictment." R.747:17-18. Because Shah and Agarwal "forfeited their Sixth and Fifth Amendment" challenges, the court reasoned, "they cannot now claim that the restraint warrants a dismissal of the

indictment or a new trial." R.747:19. Nevertheless, the court held in the alternative that, even if their challenges were "timely," they were "without merit." R.747:19.

### b. The Sixth Amendment

The court rejected Defendants' Sixth Amendment claim on the basis that "even without the overbroad restraint," they "could not have afforded to hire Quinn Emanuel and McGuireWoods" at the relevant time. R.747:31. "Quinn Emanuel required $9-10 million to represent Shah," and "McGuireWoods required $5.8 million to continue its representation of Agarwal." R.747:21-22. As of June 30, 2020, "Shah had approximately $4 million in liquid assets to pay for counsel" and "Agarwal had $2.25 million." R.747:22. Thus, Shah needed another $5-6 million and Agarwal needed another $3.55 million, "though Burck testified to his belief in hindsight that $7.8 million in additional funds would have been sufficient" to represent both. R.747:22.

Defendants' expert, Kenneth Mathieu, testified that, "absent the overbroad restraint," Defendants' companies (Gravitas and Jumpstart II) "would have received $1.739 million in distributions by June 30, 2020." R.747:23. The district court explained that Mathieu's estimate included some funds that were unavailable for other reasons, but that even $1.739 million was "well short of the $7.8 million" Defendants needed. R.747:25. The court also

rejected Defendants' claim that they could have sold the "nontraceable portions of the restrained assets" to fund counsel. R.747:26. The court observed that those assets were subject to transfer restrictions, would not sell quickly, and would likely be subject to significant discounts. R.747:26-28. Because Defendants could not have hired their preferred counsel "even without the overbroad restraint," the court found that "the excessive pretrial restraint did not violate Defendants' Sixth Amendment right to counsel of choice." R.747:31.

### c.    Fifth Amendment

The district court also rejected Defendants' claim that the government violated the Fifth Amendment by failing to correct forensic accountant Megan Poelking's grand jury testimony that the indictment's forfeiture allegations "truly and accurately, to the best of [her] knowledge, list[ed] items for which there [wa]s probable cause that they came from the proceeds of the fraud." R.747:31 (quoting Grand.Jury.Tr.18). The court recognized that Poelking's testimony was "not accurate" because it "suggested to the grand jury that all of the property covered by the forfeiture allegations was derived from criminal proceeds." R.747:32. But the testimony was "certainly not perjurious" because, "[t]o the best of [Poelking's] knowledge, the indictment only sought the forfeiture of the assets she had traced." R.747:32. And after "closely

reviewing the testimony" from the prosecutors, the court found "that the government intended to forfeit and restrain only traceable proceeds and did not know Poelking's grand jury testimony was inaccurate."  R.747:34. Accordingly, the court found, "[t]he government did not act in bad faith" and did not violate the Fifth Amendment.  R.747:34, 40-41.

## B.    Standard of review

This Court ordinarily "review[s] *de novo* questions of constitutional law." *United States v. Jones*, 844 F.3d 636, 639 (7th Cir. 2016).  But "[w]here a defendant fails to lodge a timely objection before the district court," this Court "review[s] only for plain error, assuming the defendant has not actually waived the point."  *Id.* at 640.

Shah briefly raises one preserved claim on appeal—that the restraint on $10.3 million in settlement proceeds violated his right to counsel of choice. Shah.Br.44-46.  Review of that claim is de novo.

Shah and Agarwal's primary claims on appeal, however, are both waived and forfeited.  It was only after trial that Defendants raised their claims that the mistaken restraint of untraceable assets violated the Sixth Amendment and that the government violated the Fifth Amendment by eliciting false grand jury testimony.  As explained below, Defendants waived those two challenges. But, at the very least, their claims must be reviewed for plain error.  *See Jones*,

844 F.3d at 641. "[F]orfeiture is the failure to make the *timely* assertion of a right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (emphasis added). And an objection is ordinarily timely only when it is made while the alleged error can still be cured. *See Puckett v. United States*, 556 U.S. 129, 140 (2009). By the time Defendants challenged the pretrial restraint, it was too late for the district court to remedy the alleged violations. Where, as here, defendants "failed to object to the government's continued restraint of allegedly untainted funds until after trial," the Ninth Circuit correctly reviewed the defendants' claim "for plain error." *United States v. Lindell*, 766 F. App'x 525, 528 (9th Cir. 2019). Any other rule would put a tardy or sandbagging defendant in the same position as a defendant who timely challenges a pretrial restraint before trial.

To obtain relief under Rule 52(b)'s plain-error standard, a defendant must demonstrate (1) "an error or defect"; (2) that was "clear or obvious, rather than subject to reasonable dispute"; (3) that "affected [his] substantial rights"; and (4) that "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Puckett*, 556 U.S. at 135 (brackets and quotations omitted).

Shah wrongly claims that "even 'unpreserved' structural errors warrant automatic reversal." Br.44. In fact, it remains an open question "whether the third prong of the plain error test is met automatically in cases of structural

41

error," *United States v. Anderson*, 881 F.3d 568, 573 (7th Cir. 2018), a question

the Supreme Court "has several times declined to resolve," *Puckett*, 556 U.S. at

140. At the very least, "[e]ven structural errors remain subject to the fourth

and discretionary prong of the plain-error test." *United States v. Maez*, 960 F.3d

949, 957 (7th Cir. 2020).

### C. Defendants cannot show good cause for failing to raise their primary claims before trial, so this Court should not consider those claims.

Under Federal Rule of Criminal Procedure 12(b)(3), certain defenses

"must be raised by pretrial motion if the basis for the motion is then reasonably

available," including those alleging "a defect in instituting the prosecution" or

"a defect in the indictment or information." Fed. R. Crim. P. 12(b)(3).

Although the Rule enumerates certain types of indictment "defect[s]," the

enumerated motions "are not exhaustive" and "other claims of a defect in the

charging documents can also fall within Rule 12(b)(3) and must be filed prior

to trial." 1A Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 193 (5th ed. Updated May 2025). Where a party fails to raise a

motion that falls within Rule 12(b)(3), a court may consider it only "if the

party shows good cause." Fed. R. Crim. P. 12(c)(3).

Shah's and Agarwal's claim that the government presented false

testimony to the grand jury falls squarely within Rule 12(b)(3) as an asserted

"error in the grand-jury proceedings." Fed. R. Crim. P. 12(b)(3)(A)(v). And their Sixth Amendment claim rests on an asserted "defect in the indictment"; specifically, the indictment's forfeiture allegations that were incorporated into the protective order. Fed. R. Crim. P. 12(b)(3)(B). So that claim too falls within the rule. Requiring these claims to be raised before trial is particularly appropriate given that the district court could have remedied the issue pretrial by "modify[ing] the protective order." R.747:30. Without subjecting such claims to Rule 12's good-cause standard, a defendant would have a strong incentive to save a claim until after a guilty verdict.[3] *See Davis v. United States*, 411 U.S. 233, 241 (1973) (explaining the perverse incentives that Rule 12(b) was designed to address).

Shah and Agarwal cannot demonstrate good cause for their delay. Shah contends that the government did not "reveal[] its forfeiture allegations were false" until "the middle of trial" when it "disclosed its tracing spreadsheets and internal emails." Br.40. He also suggests that he did not know the government was seeking to forfeit only the proceeds of the lender and investor fraud, given the government's "theory that the entire business was fraudulent." Br.41.

---

[3] This Court reviewed for plain error in *Jones*, 844 F.3d at 641, but the government there did not raise a Rule 12 waiver argument, so this Court had no occasion to reach the waiver issue.

In fact, Shah received the grand jury transcripts and exhibits relating to forfeiture in January 2020, less than two months after the indictment was returned. R.512:4; R.512-1 at 1-5. The grand jury exhibits made clear (in their very titles) that the government was seeking to forfeit only assets "Attributable to the Loans obtained in 2016" and "Attributable to the Capital Raise in 2017." R.512-1 at 40-42. And each exhibit had a column labeled, "Amount Traceable to Criminal Proceeds." R.512-1 at 40-42. These documents gave clear notice regarding both the government's forfeiture theory and the exact amounts that had been traced to forfeitable proceeds. The government also provided in discovery complete bank records from Defendant's relevant accounts, which reflected that portions of the restrained investments had been purchased with untraced money. R.512:6, 10; R.512-2 at 2-14. That Defendants received some additional "tracing analysis and several internal emails" during the 2023 trial, Shah.Br.21, does not mean they were unable to raise their over-restraint claim before trial.

In short, Shah and Agarwal cannot show any clear error in the district court's finding that they "had all of the information they needed to realize and challenge the restraint of their untainted assets well before their trial and conviction." R.747:19. Accordingly, they cannot show good cause for failing to raise their primary claims until after trial. And "without good cause," this

Court is "foreclosed by Rule 12(c)(3) from reviewing" Defendants' primary arguments. *United States v. Jacobs*, 134 F.4th 977, 983 (7th Cir. 2025). But their claims would fail in any event.

### D. No Sixth Amendment violation occurred, much less a clear or obvious one.

The Sixth Amendment affords a criminal defendant the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. For a defendant who does not require appointed counsel, this includes the right "to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). And denial of the right to counsel of choice "is not subject to harmless-error analysis" but is a "structural error."[4] *Id.* at 150, 152 (quotation omitted). Nevertheless, this right "is circumscribed in several important respects," including that "a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent [him]." *Wheat v. United States,* 486 U.S. 153, 159 (1988).

Federal forfeiture law "authorizes a court to freeze an indicted defendant's assets prior to trial if they would be subject to forfeiture upon

---

[4] Contrary to Shah's contention, Br.46-49, the appropriate remedy for denial of chosen counsel is a new trial, not dismissal with prejudice. *See United States v. Sellers*, 645 F.3d 830, 834 (7th Cir. 2011). Shah cites a case involving government interference with the attorney-client relationship, *United States v. Stein*, 541 F.3d 130, 155-57 (2d Cir. 2008), but fails to cite any case requiring dismissal based on an excessive pretrial restraint on assets.

conviction." *Kaley v. United States*, 571 U.S. 320, 322 (2015); *see* 21 U.S.C. § 853(e). In *Luis v. United States*, 578 U.S. 5, 10, 23 (2016), a plurality of the Supreme Court held that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment," which protects a defendant's right "to use her own 'innocent' property to pay a reasonable fee for the assistance of counsel." Justice Thomas concurred in the judgment, expressing the view that "a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice." *Id.* at 24 (Thomas, J., concurring in the judgment).

Shah contends that, under Justice Thomas's approach, the Sixth Amendment is violated by *any* restraint on untainted assets—"full stop." Br.31. And he contends that Justice Thomas's opinion "controls because it resolves the case 'on the narrowest grounds.'" Br.31 n.4 (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)). In fact, the opposite is true. Under Justice Thomas's approach (as understood by Shah), the Sixth Amendment would inflexibly require a new trial in every case where untainted assets of any amount were restrained. But the plurality's approach would require a new trial "in only a subset of those cases," *United States v. Carpenter*, 104 F.4th 655, 660 (7th Cir. 2024), that is, where the improperly restrained assets were "reasonable" and "needed to retain counsel of choice," *Luis*, 578 U.S. at 10,

46

23.  Under Shah's backward approach to the *Marks* analysis, this Court would have to find a constitutional violation under *Luis* even where the four-justice plurality would *not* find a violation.  That is not how *Marks* works.  *Cf. Ramos v. Louisiana*, 590 U.S. 83, 102-03 (2020) (opinion of Gorsuch, J.) ("a single Justice" cannot overrule precedent and bind future majorities).  Because the *Luis* plurality opinion resolved the Sixth Amendment question on narrower grounds, it "provided the governing standards."  *Marks*, 430 U.S. at 193-94.

The *Luis* plurality's approach is consistent with this Court's longstanding precedent, under which a defendant is entitled to the release of funds where he "presents a bona fide need to utilize assets subject to [a] restraining order to conduct his defense."  *United States v. Moya-Gomez*, 860 F.2d 706, 730 (7th Cir. 1988).  Since *Luis*, this Court has continued to assume that a defendant claiming entitlement to untainted assets must "genuinely need[]" them "to retain counsel."  *Jones*, 844 F.3d at 641.  As explained below, the district court committed no error—much less reversible plain error—in rejecting Defendants' Sixth Amendment claim.

<blockquote>

**1.    The district court correctly considered whether the untainted funds would have allowed Shah to hire his identified counsel of choice.**

</blockquote>

Shah first contends that the district court erred "as a matter of law" by focusing on "Burck in particular," asserting that he need not "identify which

particular lawyer he would have hired but for an over-restraint." Br.33 (emphasis omitted). Shah is mistaken. Where, as in *Luis*, the government restrains *all* of a defendant's assets, the defendant can likely show a Sixth Amendment violation without identifying a specific attorney she wished to hire. *See Luis*, 578 U.S. at 9. But where, as here, a defendant still has millions of dollars in liquid assets on hand to hire counsel, he must establish he was unable to hire his "chosen attorney." *Wheat*, 486 U.S. at 159. Otherwise, a defendant could automatically establish "need[]" under *Luis* so long as some more expensive lawyer existed—even if he had more than enough money to hire the lawyer he actually wanted.

In any event, the district court committed no error in considering Shah's and Agarwal's "chosen attorney[s]." *Wheat*, 486 U.S. at 159. Shah claims the district court wrongly "fixated on Burck" because of the "happenstance" that "Shah had already hired him." Br.34. That is incorrect. Shah's post-trial motion to dismiss specifically identified Burck as "his counsel of choice." R.491:5. And in a pre-trial affidavit, Shah said he had "developed a close working relationship with Bill Burck and Jonathan Bunge" and that "being forced to substitute counsel" at that point (February 2020) "would be detrimental to [his] defense." R.93-1 at 5. Far from improperly "fixat[ing] on Burck," Shah.Br.34, the district court accepted Shah's own assertions.

48

Shah also contends that several other attorneys "declined to take Shah's case for lack of sufficient funds" and that he "settled on [John] Hueston only because he accepted the promise of payment from assets to be liquidated in the future." Shah.Br.12, 34. In fact, although the record shows that Hueston's firm was willing to accept deferred payment, R.738:34; Hearing.Tr.539-40, it does *not* establish that any other firms declined to accept deferred payment. The parts of the record that Shah cites (Br.12) establish only that Burck did "not know" whether other lawyers were willing to represent Shah and that one attorney had "expressed concern that $2 million wouldn't be sufficient." Hearing.Tr.951. Of course, Shah had twice that amount in liquid assets, R.747:22, and the record does not establish that, given more money, he would have hired some firm other than Quinn Emanuel.

> **2.** **The district court correctly placed the burden on Shah to demonstrate that the over-restraint deprived him of counsel of choice.**

Shah next contends that the district court "improperly plac[ed] the burden on [him] to prove that his untainted assets would have sufficed to hire Burck." Shah.Br.35. Had Shah timely challenged the pretrial restraint before trial, he would have borne the burden of establishing "a bona fide need to utilize assets subject to the restraining order to conduct his defense." *Moya-Gomez*, 860 F.2d at 730. Because Shah failed to challenge the restraint until

*after* trial, it was even more appropriate to place the burden on him.  *Cf. United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (noting the policy of Rule 52(b) "to encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error").   That is entirely consistent with a defendant's burden in similar contexts.  *See Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017) (to establish ineffective assistance of counsel, "the defendant as a general rule bears the burden").

Shah contends that "[a]llocating the burden to the Government" is warranted "to discourage misconduct."  Br.35.  But, unlike the contexts where the Supreme Court has shifted the burden for deterrent purposes, *see Medina v. California*, 505 U.S. 437, 452 (1992), the district court here found no government misconduct to deter, R.747:34-41.  Particularly given that Defendants had millions of dollars to hire counsel and failed to raise their choice-of-counsel claims until after trial, placing the burden on them was not error, much less clear or obvious error.

> **3.    The district court did not clearly err in estimating the amount of liquid funds Defendants would have had in June 2020 but for the overbroad restraint.**

Shah also contends that the district court clearly erred in finding that he could not have hired Burck absent the over-restraint.  Br.36-38.  Ultimately, there were two ways Defendants could have obtained funds: (1) through

distributions from the improperly restrained assets or (2) from selling those assets. R.747:22. The district court correctly determined that neither avenue would have provided Shah and Agarwal sufficient funds to retain their counsel of choice.

The parties calculated that, absent the over-restraint, the liquid distributions available in June 2020 would have been either $570,000 (the government's estimate) or $1.739 million (the defense expert's estimate). R.747:23-24; Hearing.Tr.340; Hearing.Exh.2060; Hearing.Exh.2142:12. As the district court explained, the defense expert's calculation was overstated by at least $601,973 because it included various funds whose unavailability did not result from the protective order. R.747:24 ($563,030 resulted from failure to fund a capital call and amounts of $32,487 and $6,456 were distributed before the protective order). Thus, the liquid distributions that would have been available but for the over-restraint were between $570,000 and $1.137 million. *See* R.747:24. And even $1.739 million was "well short of the $7.8 million that Burck said would be sufficient" to represent both Defendants.[5]

---

[5] Shah appears to suggest (Br.22-23) that he would have had $9.6 million in "*liquid* assets" but for the over-restraint. That is incorrect. Although the government agreed to unfreeze $9.6 million in liquid assets, the government subsequently realized that about $8.4 million of that amount was also traceable to the fraud. R.747:7; Hearing.Tr.58-59. The $9.6 million number is simply irrelevant to Defendants' claim.

R.747:25.  Defendants do not appear to challenge the district court's findings that the improperly restrained distributions would not have sufficed.

Instead, Shah focuses on the potential sales of the assets, contending that the "liquidation value" of the investments was "well above what he needed to hire Burck."  Br.36.  But Shah fails to establish any clear error in the district court's findings that Defendants could not have liquidated those assets quickly enough or for sufficient amounts to obtain their preferred counsel.

Shah first contends (Br.36-37) that the district court "was obviously wrong" to assume that Defendants would have been limited to the 11-week period between the April 8, 2020 order denying the request to unfreeze the settlement proceeds and the June 30, 2020 deadline for securing counsel.  Shah argues that the correct period is the 31 weeks between the November 2019 protective order and June 2020.  Br.37.

As an initial matter, it is far from clear that Shah and Agarwal would have immediately started liquidating the investments in November 2019 absent the over-restraint.  Shah had other unrestrained assets that he might have tapped first, Hearing.Tr.942-43; Hearing.Exh.2050, or he might have preferred to press ahead with his motion to unfreeze the $10.3 million that he claimed was cleansed by the civil settlement.

Moreover, even the 31-week period from November 2019 to June 2020 likely would have been too short given the many obstacles to liquidating these assets, which consisted of "investments in private equity funds and private companies held by Gravitas and Jumpstart II." R.747:23. First, as Defendants' expert acknowledged, none of the assets at issue could be "sold or transferred without the consent of the general partner," which was not guaranteed and could decrease marketability. R.747:26; *see* Hearing.Tr.696, 699-703, 711. Second, all but four of the investments contained at least some funds traceable to the fraud, *see* Hearing.Exh.2060, meaning that any sale of those assets would likely require the government's consent and court approval, *see* 21 U.S.C. § 853(e). Third, there may have been trouble finding "willing buyers." R.747:27. As Burck testified, market conditions arising from the COVID-19 pandemic—including "the markets . . . collapsing," "massive unemployment," and "a tremendous amount of uncertainty"—were part of the reason his firm was unwilling to accept illiquid assets. Hearing.Tr.839-40. And the defense expert was unsure how a "hypothetical buyer" might react to buying an asset partially restrained in a criminal case. Hearing.Tr.714. Fourth, as Shah's affidavit explained, even with "ideal" conditions and plenty of market interest, it took him more than six months to arrange his pre-indictment sale of Gravitas's interest in one asset, and that was the "only time"

53

he had "ever been able to sell a fund interest or private security." R.103-2 at 3-4. Finally, the non-traceable funds were spread across 18 different assets, so Defendants would have had to liquidate multiple funds to pay for chosen counsel. Hearing.Exh.2060. Given all these facts, the district court committed no clear error in finding that, without the excessive restraint, Shah could not have liquidated sufficient assets to hire counsel of choice by June 2020.

Shah next contends that the district court "erred on the back end" by using the June 30, 2020 deadline because Shah "unquestionably" would have sought to extend that deadline "had the only obstacle to hiring Burck been the need for more time to liquidate assets." Br.37. But Shah owned other unrestrained assets that he liquidated before trial for more than the $7.8 million he needed, Hearing.Exh.2061, and he could have asked for additional time to liquidate *those* assets regardless of the restraining order. But he never did.

Nor did Shah attempt to retain Burck once he obtained sufficient funds. Shah and Agarwal received a combined total of $2.7 million from the sale of Scriptdash (formerly Alto Pharmacy) in December 2020, $1.2 million from the sale of HealthFinch in June 2021, and $11.9 million from the sale of MPulse Intermediate Inc. in August 2022.[6] Hearing.Exh.2061. Accordingly, about

_____

[6] Shah was also the grantor of the Baroda Trust, created to benefit his family members, which had liquid assets of $6.8 million in late 2019 and which received an additional $6.7 million in cash in October 2021. Hearing.Tr.261,

five months before trial, Shah and Agarwal had $11.8 million in their Jumpstart II bank account.  R.482-2 at 12.  Yet Shah never sought to rehire Burck for trial, Hearing.Tr.979-80, even though he did before sentencing, *see* R.564; Sentencing.Tr.3.

Shah finally contends that the district court erred by failing to "spot [a] basic inconsistency" when it suggested that a 35% discount for liquidating the Gravitas and Jumpstart II assets might be appropriate, even though "a *40% discount* would have given Shah enough money to hire Burck."  Br.38.  Shah cannot show any inconsistency that "requires reversal."  Br.38.  The district court did *not* hold that the liquidated funds would have been insufficient even applying a 35% discount.  Instead, it simply discussed various discount rates in determining that the defense expert's calculations were, as the expert acknowledged, "necessarily speculative."  R.747:28-30.  Indeed, the expert himself testified that sale of the assets "could have generated cash proceeds" but that he did not "have enough information" to "assess" how much each fund would have sold for in 2020.  Hearing.Tr.746-47.  And Shah argued in a pretrial pleading that liquidating similar assets (the unrestrained assets held by Gravitas and Jumpstart II) "would result in a significantly discounted sale

---

267-68, 286, 1203-05.  The district court declined to consider these funds because, although Shah could substitute assets into the trust, the trustee was unlikely to permit "further substitutions."  R.747:22 n.14.

price, most likely less than half of their value."[7]  R.103:3.  Although the district court recognized that "[s]ome speculation is unavoidable," it ultimately found insufficient evidence that Defendants' "illiquid assets were sufficiently great or that they could have been liquidated fast enough to close the gap."  R.747:29-30.  Defendants cannot show any clear error in that finding.

### 4. The district court correctly held that the settlement agreement did not purge traceable funds of their taint.

Shah separately challenges the district court's denial of Defendants' motion to unfreeze $10.3 million in funds obtained from the civil settlement with Outcome's lenders and investors.  Br.44-46; *see* R.108.  Defendants preserved this claim by raising it before trial, R.75-2, but it fails on de novo review.

Federal law allows forfeiture of property that "constitutes or is derived from proceeds traceable to a violation" of certain offenses, including the fraud offenses at issue here.  18 U.S.C. § 981(a)(1)(C); *see* 18 U.S.C. §§ 981(a)(2)(A), 1956(c)(7)(A), 1961(1).  Based on the allegations that Outcome's $225 million dividend to Shah and Agarwal was the proceeds of fraud against Outcome's investors, the protective order restrained that payout, which was held by

---

[7] The expert's report cited studies showing median discount rates ranging from 13% to 45% for restricted stocks and from 21% to 66% for pre-initial-public-offering securities.  R.103-1 at 7.

Gravitas Holdings, LLC, "an entity controlled by Shah and Agarwal."[8]
R.108:2. After the allegations of fraud at Outcome became public, investors
sued Shah and Agarwal, seeking to recover their investment, including the
$225 million payout to Gravitas. *See* R.80-4 at 33; R.80-6 at 36. In January
2018, Defendants settled with the investors, agreeing (among other things) to
pay $190 million from Gravitas to Outcome and the investors. R.108:2; R.75-
3 at 75-76. The agreement allowed Shah and Agarwal to keep about $31
million in equity in Gravitas. R.108:3. In anticipation of the indictment,
Defendants transferred about $10.3 million of liquid Gravitas funds into their
attorneys' accounts. R.108:3.

Shah contends that this $10.3 million was untainted because it "derived
from the 2018 settlement [Defendants] had reached with Outcome's investors"
and is traceable to the "valuable consideration" he gave in the settlement
agreement—such as resigning from Outcome and relinquishing part of his
equity interest in the company. Br.44-45. Shah cites no legal authority for this
claim, which fails as a matter of logic. The $10.3 million transferred from
Gravitas did not cease to be "derived from" or "traceable to" the investor fraud

---

[8] Shah wrongly claims that he "never collected the dividend," which was "never distributed." Br.45. Shah conceded below that Gravitas was "ultimately under Mr. Shah's and Ms. Agarwal's control," R.75-2 at 7, and his attorney in the civil lawsuit represented that Shah and Agarwal owned the Gravitas assets "free and clear," R.80-1 at 18.

simply because Shah provided consideration to those investors to settle a civil lawsuit. 18 U.S.C. § 981(a)(1)(C). Those assets still had the same source—the $225 million dividend that came from the fraudulently obtained investment. And they were not somehow freed from that taint by Shah's independent decision to relinquish certain interests in Outcome to settle the civil suit. The district court properly rejected this novel and unsupported claim. *See* Hearing.Tr.881 (Burck's acknowledgment that this argument was "a long shot").

### 5. Agarwal's additional claims also fail.

Agarwal makes some additional, unavailing arguments. First, she claims that the district court engaged in "speculation" by accepting McGuireWoods's "request for $5.8 million" to represent her. Br.53. She suggests McGuireWoods might have offered a "discounted rate[]" or "accepted some combination of liquid and illiquid assets." Br.53.

As an initial matter, the district court relied on Agarwal's *own affidavit* in support of her post-trial motion, which represented that she "needed at least $5.8 million to keep McGuire Woods as [her] counsel." R.528-1 at 3-4. And her counsel maintained at the hearing that anything less than $5.8 million would have been inadequate. Hearing.Tr.1313-17. She cannot show that the district court plainly erred by accepting her own representations.

Furthermore, the possibility that McGuireWoods would have accepted lower or illiquid compensation may hurt Agarwal rather than help her. The hearing evidence showed that McGuireWoods offered to represent Agarwal for $3 million, plus expenses for experts and documents. Hearing.Exh.2079:2-3. And Agarwal averred that she had "approximately $3.1 million in liquid or readily liquid assets" in early 2020, R.528-1 at 4, which did not include the $2.25 million she received from the Quinn Emanuel and Vedder Price retainers, R.528-1 at 4; Hearing.Tr.189-90, 1318, 1351-52; Hearing.Exh.2001; Hearing Exh.2013. In addition, she owned three real properties worth about $3.4 million (one of which was pledged as security for her pretrial bond), R.93-2 at 4, though she also had a $1.6 million income tax liability, R.528-1 at 6. Thus, even without the over-restraint on the Gravitas and Jumpstart II assets, Agarwal might have been able to retain McGuireWoods. At the very least, she fails to establish that her share of the improperly restrained funds would have made the difference in hiring the firm.

Agarwal also contends that the district court clearly erred in finding that she would have received only 15% to 20% of the illegally retrained assets (based on her 20% ownership interest in Gravitas and 15% ownership interest in Jumpstart II, *see* R.93-2 at 2-3) because Shah had a past practice of "splitting funds 50-50 with Ms. Agarwal to pay legal fees." Br.54. It is true that Shah

gave Agarwal the equivalent of half of the $4.5 million remaining from the Quinn Emanuel retainer. Hearing.Tr.816-17; R.528-1 at 4. But, as the district court observed, that decision was apparently "entirely discretionary on Shah's part." R.747:25; *see* Hearing.Tr.776-77. The evidence suggests that Shah was originally hoping to keep "the lion['s] share" of that money. Hearing.Exh.2079:1. And Agarwal points to no support for this 50-50 guarantee beyond her counsel's arguments. Br.54 (citing SA191-92). She fails to demonstrate any clear error in the district court's findings.

## E.   No Fifth Amendment violation occurred, much less a clear or obvious one.

Shah and Agarwal also contend that "the Government's knowingly false statements to the grand jury and years-long failure to correct those statements violated due process." Shah.Br.32; Agarwal.Br.52. Their argument fails for several reasons.

"The government's knowing use of false testimony, or failure to correct false testimony, violates due process." *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959). In the context of allegedly false trial testimony, this Court "will not set aside a verdict and order a new trial unless the defendant establishes that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a reasonable likelihood that the false testimony

could have affected the judgment of the jury." *Burke*, 425 F.3d at 412. In the context of allegedly false grand jury testimony, however, dismissal is appropriate "only if it is established that the violation substantially influenced the grand jury's decision to indict." *United States v. Brooks*, 125 F.3d 484, 497 (7th Cir. 1997) (quotation omitted).

The government did not knowingly elicit false testimony in the grand jury. The district court found that Poelking "did not lie" when she testified that, "'to the best of [her] knowledge,'" the indictment's forfeiture allegations "'truly and accurately . . . list[ed] items for which there is probable cause that they came from proceeds of the fraud.'" R.747:31-32 (quoting Grand.Jury.Tr.18). The court explained how an attorney from the Department of Justice's Money Laundering and Asset Recovery Section had helped draft the forfeiture allegations, that the attorney and Poelking wrongly believed those allegations "restrained only the traceable portions," and that the prosecutors did not know that any part of the assets "had been acquired using nontraceable funds." R.747:4-5, 34-37. True, the indictment contained a drafting error when it sought "[a]ll right, title, and interest in" certain assets, "including, but not limited to," the specific traceable proceeds, R.14:49-57, rather than assets "acquired by or exchanged for" the traceable proceeds, *see*

R.747:6 n.4.  But Poelking's and the prosecutors' mistaken understanding did not constitute the failure to correct knowingly false testimony.

Rather than attempting to show clear error in any of the district court's findings, Defendants contend that the district court should have "consider[ed] the Government's knowledge *collectively* rather than each official's understanding in isolation."  Shah.Br.39.  They analogize (*id.*) to the context of *Brady v. Maryland*, 373 U.S. 83 (1963), where the government "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case," *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1994).  Defendants cite no authority for applying this "collective knowledge" concept to false-testimony cases.  And applying that concept would not help them in any event.

First, this is unlike the *Brady* context, where some member of the government is aware of exculpatory evidence.  Instead, this case involves a failure of anyone in the government to "put two and two together" and realize some overbreadth in the indictment's forfeiture allegations.  R.747:40.  Even considering everyone's collective knowledge, this error stemmed from a mistaken understanding of legal terminology.  As the district court observed, "a mistake is different than misconduct" and "[t]here is no evidence even tending to suggest that the government realized the problem with the protective order and ignored it or concealed it."  R.747:40-41.

Second, even in the *Brady* context, evidence is not "suppressed" if the information "was available to a defendant through the exercise of reasonable diligence." *United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996); *see United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) (no suppression where defendant accessed publicly available records). The district court found that Defendants "had all of the information they needed to discover the excessive restraint." R.747:13. And it found that, compared to the government, Shah and Agarwal "were equally if not better positioned to realize th[e] error." R.747:41. Thus, Defendants could not prevail even under a collective-knowledge analysis. So no clear or obvious error occurred.

In any event, Defendants cannot show that "the grand jury would have refused to indict" had it been informed of the proper tracing analysis. *United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005). At most, the grand jury might not have found probable cause for the forfeiture allegations. But even that is doubtful given that probable cause "is not a high bar." *Kaley*, 571 U.S. at 338. And Defendants do not appear to raise a standalone Fifth Amendment challenge to the forfeiture but instead focus on the pretrial restraint's effect on their ability to hire counsel. Shah.Br.31-32; Agarwal.Br.52. So their due process claim adds little, if anything, to their Sixth Amendment claim. And their Fifth Amendment claim requires some effect on the ultimate outcome—if

not on the grand jury's decision to indict, then on the jury's decision to convict. *See Burke*, 425 F.3d at 412; *Brooks*, 125 F.3d at 497. But they cannot show that denial of their preferred counsel affected the trial's outcome, given that they were represented by teams of highly qualified attorneys whose performance was "extraordinary" and "unparalleled." Tr.10454-55. So no Fifth Amendment prejudice occurred.

### F. Defendants' unpreserved Fifth and Sixth Amendment claims do not satisfy the fourth plain-error prong either.

Even if Defendants could show prejudicial error under the Fifth or Sixth Amendments, they would not be entitled to plain-error relief. Given the extraordinary performance of Defendants' high-caliber legal teams, they could not show that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Puckett*, 556 U.S. at 135 (brackets and quotations omitted).

## II. The district court did not abuse its discretion in admitting grand jury statements as prior consistent statements.

Shah and Agarwal next contend that the district court abused its discretion by admitting the grand-jury statements of three government witnesses. Shah.Br.49-61; Agarwal.Br.44-52. The court properly admitted those statements as prior consistent statements under Federal Rule of Evidence 801(d)(1)(B). And any possible error was harmless.

## A. Background

Jason Ketchum, David Ma, and Ashik Desai each testified during the government's case-in-chief, explaining the fraud at Outcome and Defendants' involvement in it. Tr.567-1085, 2140-2460, 3363-4146. On cross-examination, Shah, Agarwal, and co-defendant Purdy sought to impeach those witnesses on various grounds, including that their testimony was motivated by favorable treatment that they had received (or hoped to receive) from the government. *See, e.g.*, Tr.1178-82, 2865-66, 4311-20.

At the completion of each witness's cross-examination, the government moved to admit each witness's grand-jury statement as a prior consistent statement under Federal Rule of Evidence 801(d)(1)(B). *See* R.366, R.381, R.397. Shah and Agarwal opposed each motion. R.368, R.398; Tr.2914-19, 2965-66.

The district court granted the motions in whole or in part. SA114-26. The court determined that each witness's statements satisfied Rule 801(d)(1)(B)(i) because each was offered to rebut the charge of recent fabrication or improper influence or motive. SA114-15, 118, 122. For example, Shah impeached Ketchum by pointing to his "statutory immunity" and "suggested that Ketchum changed his story . . . *following* his grand jury testimony." SA115. Agarwal "sought to impeach Ma based on his SEC

65

deposition testimony" and "referenced Ma's immunity agreement." SA118. And "Shah's counsel cross-examined Desai at length on his plea agreement." SA122.

The court also held that some of the witnesses' statements were admissible for rehabilitation "on other grounds" under Rule 801(d)(1)(B)(ii). SA115, 118, 124 n.1. As the court explained, Agarwal "highlighted Ketchum's faulty memory." SA115. Agarwal challenged Ma's recollection of a conversation, "noting [that] Ma lacked any contemporaneous notes." SA118. And Purdy "attacked Desai's recollection of a phone call." SA124 n.1. The court rejected the defense's argument that a statement rebutting an attack on "another ground" under subsection (B)(ii) is subject to the pre-motive requirement of *Tome v. United States*, 513 U.S. 150 (1995), explaining that *Tome* "predates the amendment to the rule" that allowed attacks on other grounds, Tr.1706. All three witnesses read their grand jury statements (or portions of them) on redirect examination. *See* Tr.1821-31 (Ketchum), 3055-59 (Ma), 5649-73 (Desai).

## B.    Standard of review

Where an objection is preserved, as it was here, *see* R.368, R.398; Tr.2914-19, 2965-66, this Court reviews for abuse of discretion the admission of prior consistent statements under Rule 801(d)(1)(B), *United States v. Bonin*,

932 F.3d 523, 542 (7th Cir. 2019). "To the extent [the Court] must address the court's interpretation of the rules of evidence," it "appl[ies] a *de novo* standard of review." *United States v. Hamzeh*, 986 F.3d 1048, 1052 (7th Cir. 2021).

## C. The district court correctly exercised its discretion by admitting the statements under Rule 801(d)(1)(B).

The district court acted within its ample discretion in admitting the witnesses' prior consistent statements.

### 1. The prior statements were admissible as pre-motive statements under Rule 801(d)(1)(B)(i).

Under Rule 801(d)(1)(B), a statement is "not hearsay" if the declarant "testifies and is subject to cross-examination about a prior statement"; the statement "is consistent with the declarant's testimony"; and the statement is offered either "(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying" or "(ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B).

Before the addition of subsection (ii) in 2014, the Supreme Court held in *Tome*, 513 U.S. at 160, that what is now subsection (i) "was intended to carry over the common-law premotive rule," which permits prior consistent statements "to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent

fabrication or improper influence or motive." *Id.* at 160, 167. Because "the precise contours" of an attack on a witness's testimony as a recent fabrication "may be unclear," "the allegation will necessarily involve an exercise of the trial judge's discretion." *Miller v. Greenleaf Orthopedic Associates, S.C.*, 827 F.3d 569, 574 (7th Cir. 2016).

Here, the district court acted within its ample discretion in admitting all three witnesses' grand jury statements as pre-motive statements under Rule 801(d)(1)(B)(i).[9] As Shah points out (Br.50), Ketchum and Ma both received immunity agreements immediately before their grand jury testimony in 2019. *See* GX1025, GX1026. Such agreements "potentially give witnesses motives to testify falsely," *United States v. Nelson*, 39 F.3d 705, 709 (7th Cir. 1994), and Defendants accordingly attacked these witnesses' credibility based on their immunity agreements, *see,* Tr.1178-82, 2865-66, 4311-20. But the defendants also attacked the witnesses' credibility based on influences or motives arising *after* their grand jury testimony.

---

[9] Shah confusingly asserts that "not even the Government claims that the grand-jury statements would have been admissible at common law." Shah.Br.54-55. In fact, the government has consistently maintained that the statements satisfied the "common-law premotive requirement." *Tome*, 513 U.S. at 160; *see* Tr.1702-03; R.402:2.

As to Ketchum, Shah's counsel impeached him based on his unwillingness to testify at trial without statutory immunity, which Ketchum received the day before his trial testimony in 2023 and which Shah's counsel characterized as "the ultimate get out of jail free card." Tr.1181 (prompting a sustained objection). Shah's counsel cross-examined Ketchum about his meetings with the government "after [his] grand jury testimony," emphasized that Ketchum met with the government "15 times," and suggested Ketchum was trying to be "a pleaser with the government through all those sessions." Tr.1212, 1218.

As to Ma, both Shah and Agarwal suggested that his trial testimony differed from a deposition he had given shortly before trial. Tr.2774-76, 2922-24; *see* Tr.2007. And Agarwal tried to establish an improper motive by questioning Ma about text messages shortly before trial in which Ma said he hoped Shah would "go to jail" and wrote that Agarwal "may get deported LOL." Tr.2864.

As to Desai, the defendants repeatedly suggested that he fabricated or tailored his testimony to reduce his sentence. In opening statements, Agarwal said the jury should consider Desai's testimony "with great care" because he "agreed to cooperate with the government," "sat for countless interviews with the government," and "agreed to testify in this trial, all with the hope of

69

shaving time off . . . a decades-long prison sentence." Tr.146-47. Shah cross-examined Desai vigorously about his December 2019 plea agreement, Tr.4311-20, which Desai signed three months *after* his grand jury testimony, *see* R.397-1 at 22; R.397-2 at 27.[10] Shah's counsel characterized the agreement as a "lifesaver," "gift," "reward," and "incentive." Tr.4311-13, 4317. Co-defendant Purdy's attorney also pressed Desai on whether he was hoping to get "a significantly reduced sentence" by testifying, Tr.4988-89, and suggested that Desai's testimony had been influenced by things he learned from the government in the month before trial, Tr.5219-20.

This impeachment all related to alleged "improper influence or motive" arising after each witness's grand jury testimony. *Tome*, 513 U.S. at 167. Rule 801(d)(1)(B)(i) allowed the government to rebut this impeachment by showing that the witnesses had given the same story before the alleged influence or motive arose.

Shah wrongly contends (Br.51, 53) that a prior consistent statement is admissible only if it was made before *any* improper influence or motive arose. In his view, motivation to lie arises immediately upon arrest or a witness's learning he is the target of an investigation—and any subsequent statement is

---

[10] Although Desai anticipated reaching a cooperation agreement at the time of his grand jury testimony, he did not yet know the potential terms of that agreement and testified without any immunity. Tr.4310-11.

never admissible under Rule 801(d)(1)(B).  Br.51, 53.  But he points to no authority for this view, which is inconsistent with the rule's focus on the "charge[d]" motivation or influence.  Fed. R. Evid. 801(d)(1)(B)(i).  *Tome*, too, said the prior statement "must have been made before *the alleged* influence, or motive to fabricate, arose," *Tome*, 513 U.S. at 158 (emphasis added), not before all possible motives arose.

This Court's decisions confirm this reading of the rule.  In *United States v. Fulford*, 980 F.2d 1110, 1114 (7th Cir. 1992), the defendant argued that a witness's post-arrest statements were inadmissible because he already "possessed a reason to fabricate" (*i.e.*, to receive a lighter sentence) when he was arrested.  This Court found the statements admissible to rebut the charge that the witness "first possessed a motive to fabricate when he entered into a cooperation agreement."  *Id.*  This Court re-affirmed *Fulford*'s reasoning after *Tome*, holding that a witness's prior consistent statements to FBI agents were admissible because they predated his plea agreement.  *United States v. Stoecker*, 215 F.3d 788, 791 (7th Cir. 2000).  Shah is wrong to compare this case to *United States v. Echols*, 104 F.4th 1023, 1026-27 (7th Cir. 2024), where the witness had the same alleged motive (to protect her boyfriend) when she first spoke to a DEA agent as when she testified at trial.  Here, the district court did

not abuse its broad discretion in determining that all three witnesses' statements were admissible under Rule 801(d)(1)(B)(i) and *Tome*.

> **2.** **Many of the prior statements were also admissible to rebut credibility attacks on "[]other ground[s]" under Rule 801(d)(1)(B)(ii).**

Even if these prior consistent statements failed *Tome*'s pre-motive requirement, substantial portions of the statements were admissible for rehabilitation on "another ground." Rule 801(d)(1)(B)(ii). As the district court explained, the defendants sought to impeach all three witnesses with claims of lack of memory or inconsistent stories. *See* SA115, SA118, SA124 n.1.

Shah wrongly contends (Br.54-56) that subsection (ii), which was added in 2014 (long after *Tome*), is nevertheless subject to *Tome*'s pre-motive requirement. *Tome* itself provides no support for Shah's argument, as it relied on the similarity between the rule's text—"recent fabrication or improper influence or motive"—and the traditional common-law principle. *Tome*, 513 U.S. at 157, 159-60. There is no such correlation with subsection (ii)'s text. Moreover, as the Eighth Circuit has explained, the pre-motive requirement would make little sense when applied to attacks based on faulty memory or inconsistency. *United States v. Begay*, 116 F.4th 795, 801 (8th Cir. 2024).

Shah misreads (Br.54) the 2014 advisory committee notes, which state that subsection (ii) "does not make any consistent statement admissible that

72

was not admissible previously" but makes statements previously "admissible only for the limited purpose of rehabilitating a witness's credibility" now "admissible substantively as well." Fed. R. Evid. 801, 2014 Advisory Committee Notes. This note does not suggest that *Tome*'s requirements apply to subsection (ii). In fact, the note states that the amendment "retains the requirement set forth in *Tome*" only as to "a consistent statement offered to rebut a charge of recent fabrication or improper influence or motive"—*i.e.*, a statement under subsection (i). *Id.*

Shah also misreads (Br.55) the Fifth Circuit's decision in *United States v. Portillo*, 969 F.3d 144 (5th Cir. 2020). That court held that statements by two cooperating brothers were not admissible under either subsection (i) or (ii) because the statements were used "only" to rebut the defendants' "claim that the brothers fabricated their stories," and they failed *Tome*'s pre-motive requirement. *Id.* at 174. But the Fifth Circuit held that another witness's statement *was* admissible under subsection (ii) because his testimony "was attacked on a ground other than his alleged motive to fabricate." *Id.* at 176. Thus, *Portillo* held only that a statement is inadmissible under subsection (ii) where "the declarant was primarily attacked on the basis of an improper motivation" and the statement fails subsection (i)'s pre-motive requirement. *Id.* at 175-76.

Shah wrongly posits that statements falling within subsection (ii) must satisfy *Tome* to avoid "swallow[ing] the limitation set out in subsection (i)." Br.56. A district court can, like the Fifth Circuit in *Portillo*, parse between credibility attacks that are truly based on "another ground" and those that are "impossible to separate" from an attack on a witness's "motivations." *Portillo*, 969 F.3d at 175. And where a defendant has separately attacked a witness on "another ground," such as lack of memory, admitting prior consistent statements to rebut that claim does not raise the same concern of an "end-run" around subsection (i) that was present in *Portillo*. *See id.* at 176. Accordingly, the district court did not abuse its discretion in alternatively admitting some of the witness's prior statements to rehabilitate on "another ground" under Rule 801(d)(1)(B)(ii).

## D. The district court properly exercised its authority in admitting the full statements with limited redactions.

Shah next contends that the district court admitted the grand jury statements "nearly wholesale" without "tailor[ing] the statements to issues that arose on cross-examination." Br.56-57. That is incorrect. Shah and Agarwal broadly suggested that each witness's entire testimony was motivated by a desire to avoid responsibility rather than tell the truth. Given those generalized attacks, it was proper to admit all portions of their grand jury statements that were consistent with their trial testimony. The district court recognized that a

"general challenge to credibility may not be enough to just put in an entire grand jury statement," so it required the government to "discuss with the defense if there are portions of [Ma's statement] that don't satisfy the requirements of the rule," Tr.2980, and ultimately required some redaction, Tr.2986. So the district court properly ensured that only those portions of the statements that satisfied the rule were admitted. *See* Tr.2985.

The cases Shah cites (Br.57-58) do not demonstrate any abuse of discretion. One involved a materially different rule, Rule 106. *See United States v. Ramos-Caraballo*, 375 F.3d 797, 803 (8th Cir. 2004). And the remaining cases either state the general principle that prior consistent statements may not be used merely for bolstering, *see Echols*, 104 F.4th at 1031; *Miller*, 827 F.3d at 574; *United States v. Simonelli*, 237 F.3d 19, 28 (1st Cir. 2001), or find the entirety of a prior statement inadmissible, obviating the need for any tailoring, *see United States v. Lozada-Rivera*, 177 F.3d 98, 105 (1st Cir. 1999); *United States v. Collicott*, 92 F.3d 973, 979 (9th Cir. 1996). Admitting the entire statements was not an abuse of discretion.

## E. Any error in admitting the prior consistent statements was harmless.

In any event, any error in admitting these prior consistent statements was harmless because it "is unlikely to have altered the outcome of the trial." *United States v. Medrano*, 83 F.4th 1073, 1077 (7th Cir. 2023). First, the prior

consistent statements were "not meaningfully different from [the witnesses'] direct testimony." SA119, SA124. Aside from their relevance to rebut claims of recent fabrication or improper motive, they added nothing to this case. And the defendants extensively impeached the grand jury statements themselves on re-cross examination. They pointed out that the government had drafted the statements, Tr.1208-09, 3075, 9876-78, and that Ketchum and Ma had received immunity before their grand jury testimony, Tr.1211, 2865-66; R.381-1:8. And they suggested that Ketchum had inadequate information when he testified to the grand jury, Tr.1859, 1886; that Ma's statement was "misleading," Tr.3091-92; and that Desai's statement omitted information, Tr.5705, 5757, and was influenced by his desire for a lower sentence, Tr.5987-88. There is simply no likelihood that the jury believed the witnesses' heavily impeached trial testimony only because their similarly impeached grand jury testimony was also admitted.

Defendants make much of the fact that these statements were "scripted by the prosecution." Shah.Br.59 (italics omitted); *see* Agarwal.Br.18-19, 44. But all three witnesses reviewed their statements for accuracy at the time they were made, Tr.1820, 3055, 5648, and they re-affirmed at trial that the statements were accurate, Tr.1843, 3059, 5673. This Court has upheld the admission of such a prosecutor-drafted statement as a prior inconsistent

statement under Rule 801(d)(1)(A), *United States v. Young*, 316 F.3d 649, 655, 659-60 (7th Cir. 2002), and Defendants fail to show that they are inherently prejudicial simply because the government drafted them.

Second, the prior consistent statements were a comparatively small part of the trial. The admitted portions for Ketchum took up only 11 transcript pages, Tr.1821-31, compared to his 500-plus pages of direct examination, Tr.567-1085, and 500-plus pages of cross-examination, Tr.1136-1683, 1733-1747. Ma's grand jury statement took up four transcript pages, Tr.3055-59, compared to his 300-plus pages of direct examination, Tr.2140-2460, and 500-plus pages of cross-examination, Tr.2460-2964, 3000-3016. And although Desai's statement ran about 25 pages, Tr.5649-73, it was introduced only after Desai testified for three days on direct examination and more than four days on cross-examination, racking up more than 2,000 transcript pages. Tr.3364-5440. The statement was also followed by another 300-plus pages of re-cross and re-direct examination. Tr.5673-6010. Far from "the whole emphasis of the trial . . . shift[ing] to the out-of-court statements," *Tome*, 513 U.S. at 165, the out-of-court statements were dwarfed by the witnesses' in-court testimony.

Finally, the three witnesses' in-court testimony was corroborated in many other ways, including by emails, text messages, and Voxers that showed not only the existence of fraud at Outcome (which is not in dispute) but also

Shah's and Agarwal's participation in the fraud.  *See, supra*, pp.5-19.  Given the compelling evidence of guilt, there is simply no likelihood that the jury convicted based on the grand jury statements rather than the in-court evidence.[11]

### III. The district court did not plainly err in instructing the jury on the elements of mail, wire, and bank fraud.

Shah and Agarwal finally contend that they are entitled to a new trial because the government relied on, and the jury instructions reflected, invalid theories of fraud.  Shah.Br.62-64; Agarwal.Br.27-43.  Specifically, they claim that the instructions allowed the jury to believe that (1) "'under-delivering' on a contract is fraud" and (2) their misrepresentations were fraudulent even if they "never intended to deprive Outcome's advertisers of the benefit of their contracts."  Agarwal.Br.29, 37 (capitalization, boldface, and italics omitted).  Defendants never raised these challenges below, and they cannot show reversible plain error.

---

[11] Agarwal makes a one-sentence assertion that the government was able to "indirect[ly] comment" on Defendants' failure to testify by "implicitly contrast[ing]" them with Desai, "a fraudster who 'owned up to what he did' by testifying 'before the grand jury, and . . . at trial.'"  Br.51 (quoting Tr.9080).  The government did not indirectly comment on Defendants' silence, and Agarwal cannot establish prejudice through this proper argument.

## A.    Background

The district court instructed the jury that, to convict Shah and Agarwal

on the wire- and mail-fraud counts, it had to find that (a) they "knowingly

devised or participated in a scheme to defraud"; (b) they "did so with the intent

to defraud"; (c) the scheme "involved a materially false or fraudulent pretense,

representation, or promise"; and (d) Defendants used the mails or wires to

carry out the scheme.  Tr.9156-57; *see* Tr.9157-58 (bank-fraud instruction).

Shah and Agarwal submitted their own good-faith instruction, *see*

R.313:33, but they asked the district court to "at least" give this Court's

"model instruction," Tr.8942.  The district court said they were "certainly

entitled to a good faith instruction" but that it was "inclined to use the Pattern

Instruction."  Tr.8944, 9107.  Defendants did not object.  *See* Tr.8945, 9107.

The third paragraph of this Court's pattern good-faith instruction says,

"A defendant's honest and genuine belief that he will be able to perform what

he promised is not a defense to fraud if the defendant also knowingly made

false and fraudulent representations."  William J. Bauer Pattern Criminal Jury

Instructions of the Seventh Circuit 6.10 (2023 ed.).  The defense objected to

this paragraph without stating any basis other than that it was "optional."

Tr.9107.  The court overruled that objection, explaining that much of the

defense case was "predicated on the idea that the defendants believed they

would be able to perform." Tr.9110. But, the court said, "that's not a defense if they made false and fraudulent misrepresentations." Tr.9110. Accordingly, the court gave the entire pattern instruction. Tr.9165-66.

Shah and Agarwal also proposed an instruction that said, "[I]f the alleged victim received the full economic benefit of its bargain, it is not enough that the alleged victim would not have entered a contract if it had been told the truth." R.313:27. The district court did not give the instruction, saying it did "not find a basis for deviating from the Pattern Instruction." Tr.9101. Consistent with this Court's pattern instructions, the court defined a "scheme to defraud" as "a scheme that is intended to deceive or cheat another person . . . and to obtain money or property or cause a potential loss of money or property to another by means of materially false or fraudulent pretenses, representations, or promises." Tr.9159. And it instructed the jury that "[a] person acts with intent to defraud if he or she acts knowingly with the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant or another, or the potential loss of money or property to another." Tr.9159-60.

## B.    Standard of review

This Court reviews preserved challenges to jury instructions de novo. *United States v. Coscia*, 866 F.3d 782, 799 (7th Cir. 2017). To preserve an

objection to jury instructions, a party "must inform the court of the specific objection and the grounds for the objection." Fed. R. Crim. P. 30(d). Failure to do so "precludes appellate review, except as permitted under Rule 52(b)." *Id.*; *see United States v. Gan*, 54 F.4th 467, 478 (7th Cir. 2022).

Here, Shah and Agarwal forfeited both of their instructional challenges. Agarwal's attorney objected to the final paragraph of the pattern good-faith instruction simply by saying, "[I]t's an optional paragraph . . . and we'd object to that." Tr.9107. That the paragraph was optional, however, was not a basis not to give it, especially when the court explained that it was "warranted by the evidence." Tr.9110. As this Court has long recognized, "An objection must state grounds; 'I object' is not enough." *United States v. Roth,* 860 F.2d 1382, 1390 (7th Cir. 1988). At the very least, the objection that the instruction was "optional" is insufficient to preserve Defendants' very different claim on appeal. *See United States v. Wheeler*, 540 F.3d 683, 689 (7th Cir. 2008) (objection to instruction does not preserve "substantively different" claim on appeal).

Defendants also forfeited their claim to a "full economic benefit of the bargain" instruction. Tr.9101. "[I]t is well settled that in the absence of a specific and timely objection, the submission of a jury instruction is insufficient to preserve the right to appeal." *United States v. Benitez*, 92 F.3d 528, 533 n.4

(7th Cir. 1996). To be sure, this Court has treated an objection as preserved where, at the charge conference, "defense counsel argued in a timely and specific fashion in favor of the instructions, citing both the law and the facts in support of the instruction." *United States v. James*, 464 F.3d 699, 707 n.1 (7th Cir. 2006). But "[m]erely submitting an instruction is not enough. A defendant must object to the judge's refusal on the record and clearly state the reasons for his objections." *United States v. Gee*, 226 F.3d 885, 896 n.10 (7th Cir. 2000) (quotations omitted). Shah and Agarwal failed to do so here.

Shah and Agarwal contend that review is *de novo*, relying on this Court's decision in *United States v. Borrero*, 771 F.3d 973 (7th Cir. 2014). Agarwal.Br.28-29; Shah.Br.28. In *Borrero*, the district court and the parties failed to "recognize[] that the principal theory on which the mail fraud count was indicted, and the jury was instructed, was legally defective" under *Cleveland v. United States*, 531 U.S. 12 (2000), because it treated state licenses as "property." *Borrero*, 771 F.3d at 976. Although three defendants had invited the erroneous instructions and two defendants had failed to object to the instructions, "all five defendants requested a judgment of acquittal." *Id.* This Court said that, if the defendants had "been convicted of acts that the law does not make criminal, they [we]re entitled to . . . relief notwithstanding the legal errors that contaminated the jury instructions." *Id.*

Shah and Agarwal's reading of *Borrero*—to create an exception to plain-error review whenever a defendant both moves for judgment of acquittal and challenges the theory of his prosecution on appeal—is incompatible with Supreme Court precedent. That Court has warned against "[a]ny unwarranted extension of [Rule 52(b)'s] exacting definition of plain error," *United States v. Young*, 470 U.S. 1, 15 (1985), and said that "[e]ven less appropriate . . . would be the creation out of whole cloth of an exception to" the rule, *Johnson v. United States*, 520 U.S. 461, 466 (1997). The Court recently rejected an exception to the plain-error rule where the jury instructions omitted a crucial *mens rea* instruction and any objection would have been foreclosed by precedent. *Greer v. United States*, 593 U.S. 503, 511 (2021). There is simply no basis for creating an exception to the plain-error rule for claims that the instructions reflected an erroneous legal theory.

Nor are Shah's and Agarwal's motions for judgment of acquittal sufficient to preserve their claims. Those motions did not challenge the validity of the theories under which they were prosecuted. *See* R.487, R.489. And, since *Borrero*, the Supreme Court has clarified that sufficiency review is limited to the "'legal' determination whether the evidence was strong enough to reach a jury." *Musacchio v. United States*, 577 U.S. 237, 244 (2016). Defendants' arguments that the evidence was insufficient to convict them

could not preserve their newly raised claims that the government's arguments

and jury instructions allowed them to be convicted on invalid theories. *See*

*United States v. Fuertes*, 805 F.3d 485, 497 (4th Cir. 2015) (the defendant's

"motion for judgment of acquittal, which dealt only with the sufficiency of the

evidence, did not preserve a purely legal challenge to the jury instruction"). So

this Court must review for plain error.

### C. The instructions did not allow the jury to convict based solely on under-delivery on a contract.

The fraud statutes require a "scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses,

representations, or promises." 18 U.S.C. §§ 1341, 1343; *see* 18 U.S.C. § 1344

(similar). This Court has clarified that a mere "[b]reach of contract is not

fraud," *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999), and that fraud

requires "more than simply not following through on contractual or other

promises," *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1007 (7th

Cir. 2004). Instead, fraud "entails making a false representation, such as a

statement that the speaker will do something it plans not to do." *U.S. ex rel.*

*Main v. Oakland City University*, 426 F.3d 914, 917 (7th Cir. 2005); *see United*

*States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d

Cir. 2016) (requiring "fraudulent intent not to perform the promise at the time

of contract execution"). Thus, although a breach of contract is "consistent

84

with deceptive intent," it "is not in and of itself evidence of such an intent."
*Corley*, 388 F.3d at 1007.

Both the jury instructions and the government's theory at trial aligned
with this understanding. Consistent with this Court's pattern instruction, the
district court instructed the jury that a defendant "act[s] in good faith" and
"lack[s] the intent to defraud" if, "at the time, he or she honestly believe[s] the
truthfulness of the representations or promises" alleged to be false or
fraudulent. Tr.9165-66. The instruction therefore required "contemporaneous
intent to defraud." Shah.Br.62; Agarwal.Br.31 (quoting *O'Donnell*, 822 F.3d at
658). But the instruction clarified that "[a] defendant's honest and genuine
belief that he or she will be able to perform what he or she promised is not a
defense to fraud if the defendant also knowingly made false and fraudulent
representations." Tr.9166.

As this Court recently explained in an unpublished order, the pattern
instruction "reminds the jury of an important principle: a sincere belief that
everything will work out does not authorize deceit." *United States v. Batio*, No.
21-3195, 2023 WL 8446388, at *2 (7th Cir. Dec. 6, 2023). Thus, an
entrepreneur who "obtains a loan" by falsely inflating his business's assets still
commits fraud even if he "is confident that the business will succeed and that
he can repay the bank." *Id.*; *see United States v. Radziszewski*, 474 F.3d 480, 485

(7th Cir. 2007).  As the Court has elsewhere explained, a defendant's "ultimate intention to make good on the contract is irrelevant to his intent to obtain [the victim's] money to which he was not entitled through deceptive means." *United States v. Masquelier,* 210 F.3d 756, 759 (7th Cir. 2000).  And the Supreme Court recently confirmed that a person commits fraud if he "(1) devises a scheme (2) to induce the victim into a contract to obtain her money or property (3) by means of false or fraudulent pretenses."  *Kousisis v. United States*, 145 S. Ct. 1382, 1391 (2025) (brackets and quotations omitted).

Agarwal's reliance (Br.30, 33) on *Durland v. United States*, 161 U.S. 306 (1896), and *Evans v. United States*, 153 U.S. 584 (1894), is unavailing.  Those cases simply establish that good faith may negate intent to defraud.  Thus, a person lacks intent to defraud if he "buy[s] goods on credit, in good faith, . . . believing that he will be able to pay for them at the maturity of the bill," *Evans*, 153 U.S. at 592, or if he solicits business investments "believing that out of the moneys received [he] could, by investment or otherwise, make enough to justify the promised returns," *Durland*, 161 U.S. at 314.  But those cases also make clear that false promises are inconsistent with good faith.  *Evans* said that a person who buys goods on credit, "knowing that he will not be able to pay for them, and with an intent to cheat the vendor," has "intent to defraud." *Evans*, 153 U.S. at 592.  And *Durland* explained that intent to defraud exists

where a defendant pursues a scheme without intending his business to "make good its promises." *Durland*, 161 U.S. at 314. That is exactly the theory of the government's case here.

Contrary to Defendants' claims, the government never argued that the jury could convict based solely on "under-delivery" or "intentional breach" of Outcome's contracts. Shah.Br.62; Agarwal.Br.32. Under-delivery was one important component of the charged scheme, but it was far from the whole scheme. The indictment alleged that Shah, Agarwal, and others "falsely represented" that Outcome's network contained "specific doctors and doctor's offices," "lied to clients about how many screens the clients' advertisements were running on," "falsely inflated" tablet metrics, "caused material under-delivery on Outcome's advertising campaigns," and "caused clients to pay for advertising that was not delivered." R.14:7. Thus, the indictment "plainly charged [Shah and Agarwal] with making representations that [they] knew to be false or fraudulent at the time [they] made them." *United States v. Fattah*, 858 F.3d 801, 815 (3d Cir. 2017).

The government relied on this theory in closing argument, explaining that "[t]he scheme had three main steps: first, inflate list matches to obtain contracts; two, invoice clients in full, despite under-delivery; and three, conceal delivery and performance shortfalls from clients, auditors, lenders, and

investors. In other words, inflate, under-deliver, conceal." Tr.9171. The

government repeated this three-step refrain—"inflate, under-deliver,

conceal"— throughout its closing. Tr.9206, 9235, 9238, 9255, 9275, 9284-85,

9293, 9297, 9307, 9310, 9342, 9412, 9418, 9421, 9426. Thus, the government's

theory was not just that Defendants under-delivered, but that they made

"materially false or fraudulent promises" by "inflat[ing] list matches to obtain

contracts" and then "conceal[ing] delivery and performance shortfalls."

Tr.9171. Although "a contract breach, by itself," does not "constitute fraud,"

fraud *does* occur where defendants make "affirmative fraudulent

misrepresentations to their contractual counterparties in the course of

performance or to feign performance under the contract." *O'Donnell*, 822 F.3d

at 658. That is exactly the theory of fraud alleged here. *See* Tr.9418 ("false

representations of full delivery"); Tr.9422 ("concealing ongoing deltas");

Tr.9423 (proof of performance "was false").

The government did not, as Defendants claim, "argue[] that proof of

Outcome's failure to deliver on a contract satisfied all three elements" of fraud.

Agarwal.Br.29; *see* Shah.Br.63. Defendants read volumes into a single

sentence from closing argument, where the government said, "Anytime a

projection is used and they say, we are going to deliver X and then the

campaign starts and they're not delivering X, they're making a false promise

about what they're going to deliver." Tr.9416.  In context, the government was simply explaining that this case involved both "false representations" and "false promise[s]" of delivery.  Tr.9416.  The government did *not* say that mere failure to deliver "satisfied all three elements" or was alone "evidence of [Defendant's] intent to defraud."  Agarwal.Br.29-30.

Nor did the government tell the jury that simply "'not delivering' on a contract was a 'false promise.'" Agarwal.Br.40 (quoting Tr.9416).  Read in context, the government was arguing that using "a projection" and promising "to deliver X" when the company could *not* deliver was "a false promise." Tr.9416.  This was consistent with the evidence that Outcome could not accurately "project[]" a list-match because employees did not know which doctors might sign up in the future.  Tr.3452, 3456.  This single sentence did not invite the jury to find that under-delivery was *by itself* a false promise— much less that it satisfied "all three elements" of fraud.  Agarwal.Br.29.

None of Agarwal's other record citations support her claim that the government advocated this theory.  For example, she cites statements in the charge conference and the government's Rule 29 response, Agarwal.Br.21, 28, 32, which the jury never heard or read, *see* Tr.9108; R.502:34.  The prosecutor's offhanded reference to a "scheme to oversell and under-deliver," Tr.9270, did not invite the jury to convict solely on under-delivery.  The

89

statement that "[s]elling something that you don't have" is "fraud," Tr.8492, was a direct quote from Shah's presentation to entrepreneurs in 2012, *see* GX70 at 2:05-2:15. And the government's argument that "we wouldn't be here today" if "the clients had ended up getting what Outcome sold," Tr.1927, was accurate given the way this scheme played out. Although the fraud statutes "prohibit[] the 'scheme to defraud,' rather than the completed fraud," *Neder v. United States*, 527 U.S. 1, 25 (1999), the government could not have proven intent to defraud or even material misrepresentations if Outcome had consistently delivered exactly what it promised. But, as the prosecutor reminded the jury, "Outcome didn't. And when it didn't, Shah and Agarwal continued to lie." Tr.1927.

In short, none of the government's arguments to the jury invited it to rely solely, or even primarily, on contractual under-delivery. There was no error, much less a clear or obvious error, in the jury instructions or the government's theory of fraud.

### D.  The jury instructions did not misstate the law regarding fraudulent inducement.

Shah and Agarwal also contend that the instructions allowed them to be convicted based simply on "[o]verselling" or "misrepresenting Outcome's inventory" without proof of their "intent to deprive the other party of the benefit of the contractual bargain." Agarwal.Br.33-34 (emphasis omitted); *see*

90

Shah.Br.62.  Defendants' arguments find no support in precedent or the record.

Much of Defendants' argument is foreclosed by the Supreme Court's recent decision in *Kousisis*.  For example, they argue that the fraud statutes do not extend to "[s]chemes that do no more than cause their victims to enter into transactions they would otherwise avoid."  Agarwal.Br.34; Shah.Br.62 (quotation omitted).  They claim that simply "inducing a contract by means of a material misrepresentation" is not wire fraud.  Agarwal.Br.36; *see* Agarwal.Br.27 ("Even outright lies made to induce a contract are not enough.").  And they claim that the jury was erroneously told "it could find a 'scheme to defraud' based on nothing more than an intent 'to obtain money' by deceit."  Agarwal.Br.40.   Those arguments are foreclosed by *Kousisis*, which affirmed the validity of the "fraudulent-inducement theory," under which "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property."  *Kousisis*, 145 S. Ct. at 1388; *see id.* at 1398.  And that argument was already foreclosed by *United States v. Leahy*, 464 F.3d 773, 787-88 (7th Cir. 2006), which upheld a fraud conviction where the defendant obtained minority set-aside contracts by false representations about their

companies, explaining that the "object" of the scheme "was money, plain and simple." So that part of Defendants' claim must fail.

Agarwal also raises the somewhat different argument that she lacked intent to defraud because "she intended to deliver on Outcome's promises and give advertisers what they bargained for." Agarwal.Br.34; *see* Agarwal.Br.37-39. The jury was correctly instructed that it must find "intent to defraud," which the instructions defined as "the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant or another, or the potential loss of money or property to another." Tr.9159-60. The jury could not have found that Agarwal had the required intent to cheat the victims out of money while simultaneously intending to give them "what they bargained for." Agarwal.Br.34. So this challenge to the instructions is unavailing.

Moreover, the evidence overwhelmingly showed that Agarwal had the requisite intent to defraud. When clients asked for matches of specific doctors in Outcome's system, Agarwal instructed an employee to include doctors Outcome had not even called, much less signed up. *See* GX67, GX122:1. She was aware of persistent and dramatic delivery shortfalls. *See* Tr.749-51, 946-47, 3657, 3763-64. She directed Outcome employees to skew the results of return-on-investment studies. Tr.759-60; GX92. And she minimized and ignored employees' ethical concerns about Outcome's practices. Tr.654-55,

2424-25, 4045-47.  The jury could easily find that she intended to defraud victims and that those victims "paid for a service" they "did not receive." *Leahy*, 464 F.3d at 788.

Contrary to Agarwal's claim, the government did not concede that "Ms. Agarwal fully intended to deliver what Outcome promised."  Br.38.  Agarwal plucks out of context the government's arguments that she and Shah "went out after the sale was inked to try to acquire the very screens that they had sold" and that they "hoped that . . . by the time the campaign started . . . they would have had the inventory that they had sold."  Tr.9175-76.  In context, the government was referring to "when the scheme began," Tr.9174, and not suggesting that Agarwal "fully intended to deliver" throughout the fraudulent scheme.  Agarwal.Br.38.  The government went on to argue that "once the defendants started lying about list matches, they would not come clean when they failed to acquire the inventory."  Tr.9181.  And, the government argued, Defendants would "[l]ie up front to capture as much of the client's budget" as possible and then "conceal any under-delivery while billing the client in full." Tr.9192.

Agarwal is simply wrong to contend that her "efforts to *obtain* the promised inventory are inconsistent with an intent to deprive anyone of the benefit of a contractual bargain."  Agarwal.Br.38.  That might have been true if

Outcome had only failed to deliver once or twice. But Outcome consistently failed to deliver on its promises year after year, yet Defendants continued to perpetuate the scheme by lying to clients about their inventory to induce contracts and then lying about the under-delivery afterward. Their conduct over the years-long scheme shows that they repeatedly made promises without intent to deliver what was promised.

Finally, Agarwal contends that "the allegedly fraudulent list matches cannot support the convictions" because lies about inventory "would at most have deprived Outcome's advertisers of information about the likelihood that Outcome would make good on its contracts." Agarwal.Br.39 (capitalization and italics omitted). She suggests that this is comparable to the right-to-control theory that the Supreme Court rejected in *Ciminelli v. United States*, 598 U.S. 306 (2023). On the contrary, those false list matches fall squarely within the fraudulent-inducement theory upheld in *Kousisis* because they involved "intentionally lying to induce a victim into a transaction that w[ould] cost her money." *Kousisis*, 145 S. Ct. at 1398. No instructional error, much less a clear or obvious one, occurred.

### E. Any instructional error did not prejudice Defendants or seriously undermine the integrity of judicial proceedings.

Even if Defendants could show clear or obvious error in the jury instructions or the government's "theories," they cannot show prejudice. *See*

*United States v. DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009) (observing that "it is unusual that any error in an instruction to which no party objected would be so great as to affect substantial rights").

Defendants contend that this Court "must remand for a new trial" whenever the instructions allow the jury to convict on a "legally insufficient" theory. Agarwal.Br.28 (emphasis omitted) (quoting *Borrero*, 771 F.3d at 976-77). But that is not the law. The Supreme Court has clarified that ordinary harmless-error review applies even "in the context of a jury instructed on multiple theories of guilt, one of which is improper." *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam); *see Skilling v. United States*, 561 U.S. 358, 414 n.46 (2010) (clarifying that *Hedgpeth*, although a collateral-review case, applies to cases on direct appeal).

Defendants cite (Agarwal.Br.28, 41) *Yates v. United States*, 354 U.S. 298 (1957), but *Hedgpeth* explained that *Yates* predated the development of the Supreme Court's modern harmless-error jurisprudence, *Hedgpeth*, 555 U.S. at 60. And *Hedgpeth* "confirmed" that "errors of the *Yates* variety are subject to harmless-error analysis." *Skilling*, 561 U.S. at 414. Defendants' reliance on *Borrero* and *United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015), is also misplaced. In *Blagojevich*, this Court recognized (citing *Hedgpeth*) that instructions containing erroneous theories are subject to harmless-error review

95

but declined to consider the government's undeveloped, "one-line statement" that the error was harmless. *See Blagojevich*, 794 F.3d at 735. To the extent *Borrero* suggested that such errors require automatic reversal, that suggestion must yield to *Hedgpeth*'s and *Skilling*'s contrary holdings. And because preserved errors of this kind are subject to harmless-error review, unpreserved errors are similarly subject to plain-error review. *See United States v. Cardena*, 842 F.3d 959, 998 (7th Cir. 2016).

Defendants cannot show any prejudice from the alleged errors. The evidence overwhelmingly demonstrated that Shah and Agarwal did *not* "fully intend[] to deliver what Outcome promised," Agarwal.Br.38, over the life of the scheme. They may have had this intent when they first started inflating list matches. But they simply could not have had this intent after years of often dramatic delivery shortfalls. Moreover, the fraud was not limited to false promises of delivery. Overwhelming evidence established that Shah and Agarwal made or directed others to make multiple false representations about current inventory, proofs of performance, returns on investment, and the absence of any allegations of fraud. *See, supra*, pp.5-25. Thus, there was overwhelming evidence on every count under proper theories, and defendants cannot show that the alleged errors likely affected the verdict.

Finally, Shah and Agarwal cannot show that any potential errors in the jury instructions seriously affected the fairness or integrity of judicial proceedings. *Puckett*, 556 U.S. at 135. They admit that extensive fraud occurred at Outcome. Shah.Br.7-9; Agarwal.Br.10-11. And overwhelming evidence established that they knew of and approved of the fraud. Reversing their convictions based on newly raised hyper-technical errors in the jury instructions would not serve the interests of justice.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

MATTHEW R. GALEOTTI
Acting Assistant Attorney General

JASON A. YONAN
Assistant United States Attorney
Northern District of Illinois

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the word-count limitation of this Court's July 28, 2025 order because this brief contains 20,984 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser
WILLIAM A. GLASER
